**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **Case No.: 21-01068-5-SWH** |
| **N. G. PURVIS FARMS, INC.** | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |

**DEBTOR'S MOTION FOR EMERGENCY AND FINAL ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

NOW COMES N. G. Purvis Farms, Inc., debtor and debtor-in-possession (the "Debtor"), by and through its undersigned counsel, and hereby moves the Court for entry of emergency and final Orders, pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 502, 503, 507 and 553 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor to use cash collateral and obtain post-petition financing and granting related relief, and in support hereof states as follows:

**Relief Requested**

1. In this motion ("Motion") the Debtor seeks entry of an interim order and final order (the "Interim Order" and the "Final Order", respectively, and collectively, the "DIP Orders"):

a. authorizing the Debtor to obtain secured post-petition financing from First National Bank of Omaha ("FNBO") pursuant to a Debtor-in-Possession Credit Agreement between the Debtor and FNBO (the "FNBO DIP Credit Agreement") consisting of (i) a secured revolving credit facility up to the aggregate principal amount of

$2,500,000 (the "Revolving Credit Facility (Operating)"), (ii) a $3,000,000 discretionary revolving credit facility (the "Revolving Credit Facility (Hedging)"), and (iii) a $26,115,744.66 "roll-up" term loan facility (the "Term Loan Facility") (collectively, the Revolving Credit Facility (Operating), Revolving Credit Facility (Hedging), and Term Loan Facility are referred to as the "FNBO DIP Facility"), the terms and conditions of which are summarized herein and more particularly described in the FNBO Credit Agreement[1] and related loan documents, and substantially in the form of **Exhibit A** (the "FNBO DIP Facility Documents");

b. authorizing the Debtor to obtain secured post-petition financing from LOL Finance Co. ("LOLFC") pursuant to a Debtor-in-Possession Credit Agreement between the Debtor and LOLFC (the "LOLFC DIP Credit Agreement") consisting of (i) a secured revolving credit facility up to the aggregate principal amount of $7,600,000.00 (the "LOLFC Revolving Credit Facility"), and (ii) a $14,241,515.27 "roll-up" term loan facility (the "LOLFC Term Loan Facility") (collectively, the LOLFC Revolving Credit Facility and the LOLFC Term Loan Facility are referred to as the "LOLFC DIP Facility"), the terms and conditions of which are summarized herein and more particularly described in the LOLFC DIP Credit Agreement and related loan documents, and substantially in the form of **Exhibit B** (the "LOLFC DIP Facility Documents");

c. authorizing the Debtor to enter into, execute, deliver and perform the terms and conditions of the FNBO DIP Facility Documents and LOLFC DIP Facility

1 Capitalized terms not otherwise defined in this Motion shall have the meanings ascribed to them in the DIP Financing Agreements.

Documents, together with any and all related agreements, instruments, pledge agreements, control agreements, and other loan documents related thereto, according to their terms and conditions (including any notes and security agreements) (collectively, the "DIP Financing Agreements") and to perform such other acts as may be necessary or desirable in connection with the DIP Financing Agreements;[2]

d. authorizing the Debtor, subject to the entry of the Final Order (as defined herein), to waive any rights, benefits or causes of action it has or may claim to have under Bankruptcy Code Section 506(c) related to the property securing the obligations owed to FNBO or LOLFC, and under Bankruptcy Code Section 553, authorizing the setoff rights allowed to FNBO and LOLFC under their respective DIP Financing Agreements;

e. granting the FNBO DIP Facility and LOLFC DIP Facility and obligations owed thereunder and under, or secured by, the DIP Financing Agreements to FNBO and LOLFC (collectively, the "Post-Petition Obligations") an allowed super-priority administrative expense claim status in this bankruptcy case, without the necessity of filing any claim, as more specifically described in the applicable DIP Financing Agreements;

f. granting FNBO and LOLFC automatically perfected security interests in and liens on their respective Collateral (as defined in the DIP Financing Agreements), including property constituting "cash collateral," to the same extent that FNBO and

2 If and to the extent the terms of the DIP Financing Agreements and the description of those terms or their effect set forth in this Motion differ, the terms of the DIP Financing Agreements shall control.

LOLFC had liens in such Collateral prior to the filing of the bankruptcy case, including property constituting "cash collateral" as defined in Section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens and security interests shall be subject to the priorities set forth in the DIP Financing Agreements, subject to the terms of the Interim Order;

g.  authorizing the Debtor to use the pre-petition collateral of FNBO and LOLFC, including the Cash Collateral of FNBO and LOLFC, as applicable, and providing adequate protection to FNBO and LOLFC, as provided in the DIP Orders;

h.  scheduling a final hearing ("Final Hearing") within 30 days of the Petition Date (defined herein), or as soon thereafter as the Court's calendar allows, to consider the relief requested in this Motion and approving the form of notice with respect to the Final Hearing; and

i.  granting certain related relief as requested herein.

**Jurisdiction and Venue**

2.      The Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on May 6, 2021 ("Petition Date").  The Debtor continues to operate its business as a debtor and debtor-in-possession ("DIP") pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. As of the date of this Motion, no trustee or examiner has been requested and no creditors' committee has been appointed or designated in the bankruptcy case.

3.      This matter is a core proceeding pursuant to 28 U.S.C. § 157, this Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334, and venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This Court has the authority to hear this matter pursuant to the

General Order of Reference entered August 3, 1984, by the United States District Court for the Eastern District of North Carolina.

4.     The statutory bases for the relief requested herein are 11 U.S.C. §§ 105, 361, 362, 363, 364, 502, 503, 507 and 553 and Bankruptcy Rules 2002, 4001 and 9014.

## Background

5.     The Debtor is a North Carolina corporation which has been engaged in business for over fifty-five years.  The Debtor operates throughout the Southeast as a farrow-to-finish pork producer which breeds, farrows, weans, and raises weaner pigs, feeder pigs and market hogs, which are then sold to pork processors.  The Debtor owns and operates twelve (12) farms in North Carolina and two (2) farms in Georgia, together with associated facilities, on which it maintains herds of sows, breeds piglets, and raises market hogs.  In addition, the Debtor contracts with numerous independent growers to feed and finish at their facilities weaned pigs and feeder pigs furnished and owned by the Debtor into market hogs.

6.     Through this proceeding, the Debtor intends to phase-out of its market hog production and transition from a farrow-to-finish operation to a farrow-to-wean operation by growing out and liquidating its market hogs in the ordinary course of its business, liquidating certain other assets associated with its finishing operations, and restructuring its operations as a debtor-in-possession for the benefit of its creditors.  The component of the Debtor's reorganization involving the growing out and liquidation of its market hogs in the ordinary course of its business is anticipated to take approximately six (6) months.

7.     The decision to restructure the Debtor's operations was driven in large part by significant feed cost increases, which raised the Debtor's growing costs to an unsustainable level in relationship to potential revenue. Further, pursuant to the Debtor's governing market hog

contracts and its attempt at renegotiating such contracts, the increased expenses cannot be passed on to its customers.

8. By separate application, the Debtor has sought to employ Mr. Steve Weiss with NutriQuest Business Solutions, LLC ("NutriQuest") to serve as Chief Restructuring Officer during this case. Mr. Weiss began working with the Debtor on or about June 30, 2020 to develop a reorganization strategy. The Debtor hereby incorporates by reference the *Affidavit of Steve Weiss in Support of the Debtor's Chapter 11 Filings and First Day Motions* filed contemporaneously herewith (the "Weiss Declaration").

**Secured Lending Background**

***a. FNBO Pre-Petition Financing, Lien and Security Interests***

9. FNBO has been the Debtor's primary lender since 2014. The Debtor is currently indebted to FNBO pursuant to the terms of the following pre-petition credit agreements and notes (the "FNBO Pre-Petition Credit Agreements and Notes"): The Second Amended and Restated Credit Agreement dated April 1, 2019, as amended by these amendments; (i) First Amendment to Second Amended and Restated Credit Agreement dated January 1, 2020; (ii) Second Amendment to Second Amended and Restated Credit Agreement dated January 22, 2020; (iii) Third Amendment to Second Amended and Restated Credit Agreement dated March 1, 2020; and (iv) Fourth Amendment to Second Amended and Restated Credit Agreement dated April 1, 2020. The foregoing are collectively referred to herein as the "FNBO Credit Agreement." In connection with the FNBO Credit Agreement, the Debtor executed a series of promissory notes which were similarly amended over the years: (i) Second Amended and Restated Revolving Credit Note (Operating) dated April 1, 2019, as amended by the First Amendment to Second Amended and Restated Revolving Credit Note (Operating) dated January 1, 2020; the Second Amendment to

Second Amended and Restated Revolving Credit Note (Operating) dated January 22, 2020; the Third Amendment to Second Amended and Restated Revolving Credit Note (Operating) dated March 1, 2020; and the Fourth Amendment to Second Amended and Restated Revolving Credit Note (Operating) dated April 1, 2020;  (ii) the Revolving Credit Note (Hedging) dated April 1, 2019, as amended by the First Amendment to Revolving Credit Note (Hedging) dated January 1, 2020; the Second Amendment to Revolving Credit Note (Hedging) dated March 1, 2020; the Third Amendment to Revolving Credit Note (Hedging) dated April 1, 2020; and the Fourth Amendment to Revolving Credit Note (Hedging) dated March 24, 2021.

10.    The Debtor defaulted to FNBO under the FNBO Pre-Petition Credit Agreement and Notes which resulted in the Debtor, with the Guarantors' consent, entering into a forbearance agreement with FNBO dated April 1, 2019, that was later amended and extended on several occasions, restated in May of 2020 and further amended thereafter (collectively, the "FNBO Pre-Petition Forbearance Agreement").  The FNBO Pre-Petition Credit Agreement and Notes and the FNBO Pre-Petition Forbearance Agreement are sometimes collectively referred to as the "FNBO Pre-Petition Loan Documents".  FNBO's forbearance terminated under the FNBO Pre-Petition Forbearance Agreement on March 15, 2021, and on March 17, 2021, FNBO declared the Debtor in default under the FNBO Pre-Petition Loan Documents and invoked the default interest rate.

11.    As of the Petition Date, the Debtor was indebted to FNBO under the FNBO Pre-Petition Loan Documents in the amount of $26,115,744.66 (inclusive of accrued interest but exclusive of fees, costs, expenses and other sums and charges payable by the Debtor under the FNBO Pre-Petition Loan Documents).

12.    The Debtor's obligations to FNBO under the FNBO Pre-Petition Loan Documents are secured by (i) a first priority security interest in substantially all of the Debtor's personal

property, subject only to limited purchase money security interests on certain equipment and motor vehicles, and (ii) a lien junior to LOLFC on certain real property and improvements owned by the Debtor. In addition, payment of the obligations owed to FNBO by the Debtor under the FNBO Pre-Petition Loan Documents is guaranteed by the Guarantors.

***b. LOLFC Pre-Petition Financing***

13. The Debtor, certain individual borrowers, and LOLFC are parties to certain pre-petition loan contracts, including eleven Change in Terms Agreements dated December 23, 2020 (together with each Pre-Petition Note (as defined in the LOLFC DIP Credit Agreement), each of the Change in Terms Agreements described above, the Borrower Guaranties (as defined in the LOLFC DIP Credit Agreement), and any other agreements, mortgages, security agreements, instruments, documents and certificates executed and/or delivered in connection with the foregoing, as each may from time to time have been amended, restated, modified or otherwise supplemented, (the "LOLFC Pre-Petition Loan Documents"), pursuant to which LOLFC, subject to the terms and conditions contained therein, agreed to make loans to the Guarantors and the Debtor. As of the Petition Date, the Debtor was indebted to LOLFC under the LOLFC Pre-Petition Loan Documents in the amount of $14,241,515.27 (inclusive of accrued interest, fees, costs, expenses and other sums and charges payable by the Debtor under the LOLFC Pre-Petition Loan Documents). The FNBO Pre-Petition Loan Documents and LOLFC Pre-Petition Loan Documents are collectively referred to herein as the "Pre-Petition Loan Documents."

14. All of the Debtor's obligations to LOLFC under the LOLFC Pre-Petition Loan Documents are secured by senior liens in all or substantially all of the real property and improvements owned by the Debtor.

15. In order to continue its operations and complete the anticipated transition, the Debtor will be required to incur certain expenses, for which the Debtor is requesting authority to use Cash Collateral and obtain certain post-petition financing on the terms described herein, in accordance with the proposed DIP Financing Agreements.

**Basis for Emergency Relief**

16. As set forth in the Weiss Declaration, this Motion is brought on an emergency basis due to the immediate and irreparable harm that would be suffered by the Debtor and its creditors if it were denied use of Cash Collateral and financing needed to continue ongoing business operations during the early months of this case. The following circumstances justify the relief requested in this Motion:

a. The Debtor and the Bankruptcy Estate Will Suffer Irreparable Harm if the Requested Relief is Not Granted: As set forth in the Weiss Declaration, the Debtor is entering Chapter 11 with limited cash reserves on hand, and the Debtor requires immediate access to the liquidity provided by the FNBO DIP Facility and the LOLFC DIP Facility (together, the "DIP Facilities") to operate its business going forward. The DIP Facilities represent the most favorable financing transaction available to the Debtor. Because the Debtor has no other viable source of available third-party DIP financing, on the terms negotiated, the Debtor would soon run out of cash and be forced to convert this case to Chapter 7. Under a forced liquidation in Chapter 7, the creditors and other stakeholders in this case would receive lesser recoveries than they would in the contemplated Chapter 11 reorganization, and all parties in interest would suffer as a result. The requested relief is therefore

necessary to avoid the immediate and irreparable harm that would result if the Debtor is denied the liquidity that would be provided through the DIP Facilities.

b. The DIP Facilities Constitute the Best and Only Available Option for the Debtor: Given the Debtor's financial position and prospects, industry market conditions, and regional market conditions which have resulted in a significant downsizing and abandonment of swine production facilities in the Southeast United States, all of which significantly impaired the value of the Debtor's operations and assets, the DIP Facilities remain the best and only options available to the Debtor. Negotiations with FNBO and LOLFC were conducted in good faith and at arms' length, and the DIP Facilities provide reasonable milestones and covenants. The DIP Facilities provide the only source of financing available to the Debtor that allow a reasonable prospect of a successful restructuring, thereby maximizing value for all stakeholders.

c. The Debtor's Proposed Conversion of Certain Pre-Petition Obligations into Post-Petition Obligations Will Benefit Stakeholders: The Debtor intends to convert certain of its pre-petition obligations to FNBO under the FNBO Pre-Petition Loan Documents, and certain of its pre-petition obligations to LOLFC under the LOLFC Pre-Petition Loan Documents, into post-petition obligations following entry of the Interim Order (as set forth more particularly in the DIP Financing Agreements), and to draw on the DIP Facilities to fund the Debtor's working capital needs during the pendency

of this bankruptcy case. The conversion of the applicable pre-petition obligations into post-petition obligations will benefit the Debtor and the bankruptcy estate and is a necessary condition to the extension of the DIP Facilities. The Debtor believes that the applicable pre-petition obligations are secured by perfected liens with respect to most of the Debtor's personal property (as to FNBO) and real property and improvements (as to LOLFC and FNBO). The proposed conversion merely accelerates the satisfaction of the respective pre-petition obligations and converts them into post-petition obligations without affecting any recovery to other creditors.

d. FNBO and LOLFC Have Proceeded in Good Faith: As set forth further herein and in the Weiss Declaration, the Debtor's negotiations with FNBO and LOLFC were vigorous and were conducted at arms' length with the assistance of the Debtor's financial and legal advisors. The Debtor reviewed and analyzed each alternative proposal with its advisors, and ultimately selected the financing provided by the DIP Facilities, which is fully-committed with favorable terms, including operational flexibility and appropriate case milestones. No potential other third-party financing provided a viable alternative for the Debtor, such that the DIP Facilities represent the best and only option to provide the Debtor with the liquidity necessary to bridge the Debtor from the Petition Date through its emergence from Chapter 11.

17. The DIP Facilities will provide the Debtor the funding needed to operate and maintain its business, to navigate the anticipated transition from a farrow-to-finish operation to a

farrow-to-wean operation, to pay necessary expenses during the pendency of this bankruptcy case, and to pursue what the Debtor believes is the best and only path to the continuation of its business as a going concern. The Debtor anticipates the proposed DIP Facilities will work in tandem with the Debtor's Chapter 11 plan to facilitate a process that will maximize the value of the bankruptcy estate, increase the likelihood of a going-concern transaction for the benefit of all stakeholders, and promote confirmation of the Debtor's Chapter 11 plan.

18. The Debtor is unable to secure post-petition financing as unsecured credit under 11 U.S.C. §§ 364(a) or (b), allowable as an administrative expense under 11 U.S.C. § 503(b)(1). Furthermore, the Debtor is unable to secure post-petition financing as secured credit pursuant to 11 U.S.C. § 364(c) on more favorable terms from other sources. Absent the DIP Facilities, the Debtor could be forced to liquidate its business, resulting in lesser recoveries for creditors than they would receive in a reorganization.

19. The use of cash collateral alone would potentially be insufficient to meet the Debtor's post-petition liquidity needs. As a result, the Debtor requests approval of the DIP Facilities, which are consented to by FNBO and LOLFC, subject to approval of the proposed terms and conditions of the DIP Facilities as described in this Motion and set forth in the DIP Financing Agreements.

20. The Debtor provides the following table to concisely summarize the terms of the DIP Facilities to the extent required by Bankruptcy Rules 4001(b) and (c).[3]

3 This summary is qualified by and subject to the terms of the FNBO DIP Facility Documents and the LOLFC DIP Facility Documents.

## Concise Summary of Proposed DIP Financing from FNBO

| Bankruptcy Code | DIP Facility |
|---|---|
| **Debtor**<br>Bankruptcy Rule 4001(c)(1)(B) | • N. G. Purvis Farms, Inc. |
| **Guarantor(s)**<br>Bankruptcy Rule 4001(c)(1)(B) | • David Purvis<br>• Jerry M. Purvis<br>• Larry M. Purvis<br>• Melvin Purvis |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | • FNBO and LOLFC |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | From entry of the Interim Order approving the DIP Facilities to the "FNBO Termination Date" as defined in this Motion, upon the terms in the DIP Financing Agreements. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Pursuant to Bankruptcy Code Section 507(b), FNBO is granted the liens and super priority administrative claim (without the need to file any proof of claim) with priority over any and all claims against the Debtor, including all administrative expenses of any kind specified in Section 503(b) and 507(b) and is subject to the other terms and conditions contained in Section 2.7(b) of the FNBO DIP Credit Agreement as the same may be adjusted by the DIP Orders. Provided that this super priority administrative expense claim shall not exceed the value of FNBO's secured claim in the Collateral.<br><br>*See*, FNBO DIP Credit Agreement § 2.7 |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay provisions of Bankruptcy Code Section 362, and any other restrictions are modified by the DIP Orders to allow the Debtor to enter into, execute, perform, and comply with all terms and conditions of the FNBO DIP Credit Agreement and other FNBO DIP Facility Documents. |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B); | See the Interim Order at ¶12 of decretal portion. |

| **Bankruptcy Code** | **DIP Facility** |
|---|---|
| **506(c) Waiver** Bankruptcy Rule 4001(c)(l)(B)(x) | Upon entry of the Final Order, the Debtor agrees to waive any and all 506(c) claims of the estate. |
| **Loan Facility**<br>Bankruptcy Rule **4**001(c)(1)(B) | *See*, Motion at ¶ 21. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | *See*, Section 3.1 and 3.2 of the FNBO DIP Credit Agreement |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | • Standard interest rate is 12% fixed calculated as provided for in Section 2.3 of the FNBO DIP Credit Agreement.<br>• Default Rate is the standard rate of interest plus 3% calculated as provided in Section 2.3 of the FNBO DIP Credit Agreement |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B | • Entry of the Interim Order within seven (7) business days of the Petition Date<br>• Within thirty (30) days after the Petition Date, entry of the Final Order<br>• By no later than October 31, 2021, the Debtor shall have sold and delivered the last Existing Pig.<br>• By no later than December 31, 2021, the Bankruptcy Court shall enter an order confirming a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code acceptable to FNBO.<br>*See*, FNBO DIP Credit Agreement § 5.16 |
| **Use of DIP Facility and Cash Collateral**<br>**Bankruptcy Rule** 4001(b)(l)(B)(ii) | The FNBO DIP Facility and Cash Collateral use is restricted to payment of those expenses described in Section 2.5 of the FNBO DIP Credit Agreement and as provided in the Approved Budget. |
| **Repayment Features** | Repayment is to be accomplished as provided in Section 2.4 of the FNBO DIP Credit Agreement as further summarized in Section III of this Motion. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i) | FNBO will be provided an allowed Super-priority Administrative Expense Claims without the necessity of filing a claim provided the value of the claims will not exceed the value of FNBO's collateral. FNBO will also be granted first priority automatically perfected Post-Petition Liens subject only to the Permitted Priority Liens. All as more particularly provided in Section 2.7 of the FNBO DIP Credit Agreement. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B | Standard events of default, including payment defaults, covenant defaults, bankruptcy case related defaults, such as conversion, dismissal, appointment of a trustee, confirmation of an unacceptable plan, and contesting the validity, perfection, priority and amount of FNBO's liens |

| Bankruptcy Code | DIP Facility |
|---|---|
| | and debt.<br><br>*See*, FNBO DIP Credit Agreement at § 7. |

## Concise Summary of Proposed DIP Financing from LOLFC

| Bankruptcy Code | DIP Facility |
|---|---|
| **Debtor**<br>Bankruptcy Rule 4001(c)(1)(B) | • N. G. Purvis Farms, Inc. |
| **Guarantor(s)/Co-Debtors**<br>Bankruptcy Rule 4001(c)(1)(B) | • David Purvis<br>• Jerry M. Purvis<br>• Larry M. Purvis<br>• Betty Garner Purvis<br>• Melvin Purvis<br>• Judith Essary Purvis<br>• Robert Worth McFayden<br>• Marie Purvis McFayden |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | • FNBO and LOLFC |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | From entry of the Interim Order approving the DIP Facilities to the "DIP Loan Maturity Date", upon the terms in the DIP Financing Agreements.<br><br>*See* LOLFC DIP Credit Agreement § 2.1(d); § 3.1(p) |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Pursuant to Bankruptcy Code Section 507(b), LOLFC is granted liens and a super priority administrative claim (without the need to file any proof of claim) with priority over any and all claims against the Debtor, including all administrative expenses of any kind specified in Section 503(b) and 507(b) and is subject to the other terms and conditions contained in Section 2.7(b) of the LOLFC DIP Credit Agreement as the same may be adjusted by the DIP Orders. Provided that this super priority administrative expense claim shall not exceed the value of LOLFC's secured claim in the Collateral.<br><br>*See*, LOLFC DIP Credit Agreement § 2.7(a); Interim Order at ¶20 of decretal portion. |

| Bankruptcy Code | DIP Facility |
|---|---|
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay provisions of Bankruptcy Code Section 362, and any other restrictions are modified by the DIP Orders to allow the Debtor to enter into, execute, perform, and comply with all terms and conditions of the LOLFC DIP Credit Agreement and other LOLFC DIP Facility Documents.<br>*See* the Interim Order at ¶16 of decretal portion. |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B); | See the Interim Order at ¶12 of decretal portion. |
| **506(c) Waiver** Bankruptcy Rule 4001(c)(l)(B)(x) | Upon entry of the Final Order, the Debtor agrees to waive any and all 506(c) claims of the estate.<br>See the Interim Order at ¶4. |
| **Loan Facility** Bankruptcy Rule 4001(c)(1)(B) | Subject to the terms and conditions contained in the LOLFC DIP Credit Agreement:<br>1. Advances needed to procure from FNBO an assignment of its security interest in the Farrow-to-Wean Collateral.<br>2. Advances used to finance one hundred percent (100%) of the Farrow-to-Wean Operations Expenses incurred from the Closing Date until the DIP Loan Maturity Date but only to the extent provided for under the Approved Budget.<br>3. Advances used to finance twenty percent (20%) of the G&A Expenses of Borrower incurred from the Closing Date until the date on which the last Existing Pig is sold to a third-party purchaser but only to the extent provided for under the Approved Budget and Advances used to finance one hundred percent (100%) of the G&A Expenses incurred from the date on which the last Existing Pig is sold to a third-party purchaser until the DIP Loan Maturity Date but only to the extent provided for under the Approved Budget.<br>4. Advances used to finance thirty-eight percent (38%) of the Bankruptcy Expenses of the Borrower incurred from the Closing Date until January 1, 2022 but only to the extent provided for under the Approved Budget and Advances used to finance one hundred percent (100%) of the Bankruptcy Expenses of the Borrower incurred from January 1, 2022 until March 31, 2022 (or such later date as the parties may mutually agree to extend in writing) but only to the extent provided for under the Approved Budget.<br>*See*, Section 2.1 of the LOLFC DIP Credit Agreement; Interim Order at ¶2. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | 1. Standard conditions, including execution and delivery of the applicable Loan Documents (as defined in the LOLFC DIP Credit Agreement) and related deliverables, including certificates of officers of the Debtor, corporate documents, insurance, and other instruments, certificates, documents, information, and reports reasonably requested by LOLFC.<br>2. Steve Weiss shall have been appointed as CRO of the Debtor on terms |

| Bankruptcy Code | DIP Facility |
|---|---|
| | and conditions satisfactory to LOLFC.<br>3. Entry of the DIP Orders.<br>*See*, Section 3.1 and 3.2 of the LOLFC DIP Credit Agreement |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | • Standard interest rate is 4.13% for the Term Note and a variable rate (currently 3.65%) for the DIP Loan Note, both calculated as provided for in Section 2.3 of the LOLFC DIP Credit Agreement.<br>• Default Rate is the standard rate of interest plus 2% calculated as provided in Section 2.3 of the LOLFC DIP Credit Agreement |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B) | • Entry of the Interim Order within seven (7) business days of the Petition Date<br>• Within thirty (30) days after the Petition Date or such later time as the Bankruptcy Court determines, entry of the Final Order<br>• By no later than December 31, 2021, the Bankruptcy Court shall enter an order confirming a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code acceptable to LOLFC.<br>*See*, LOLFC DIP Credit Agreement § 5.16 |
| **Use of DIP Facility and Cash Collateral**<br>**Bankruptcy Rule** 4001(b)(l)(B)(ii) | The LOLFC DIP Facility and Cash Collateral use is restricted to payment of those expenses described in Section 2.5 of the LOLFC DIP Credit Agreement and as provided in the Approved Budget. |
| **Repayment Features** | Repayment is to be accomplished as provided in Section 2.4 of the LOLFC DIP Credit Agreement as further summarized in Section III of this Motion. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i) | LOLFC will be provided an allowed Super-Priority Administrative Expense Claim (as defined in the LOLFC DIP Credit Agreement) without the necessity of filing a claim provided the value of the claims will not exceed the value of LOLFC's collateral. LOLFC will also be granted first priority automatically perfected Post-Petition Liens (as defined in the LOLFC DIP Credit Agreement) subject only to the Permitted Priority Liens (as defined in the LOLFC DIP Credit Agreement). All as more particularly provided in Section 2.7 of the LOLFC DIP Credit Agreement. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | Standard events of default, including payment defaults, covenant defaults, bankruptcy case related defaults, such as conversion, dismissal, appointment of a trustee, confirmation of an unacceptable plan, and contesting the validity perfection, priority and amount of LOLFC's liens and debt.<br>*See*, LOLFC DIP Credit Agreement at § 7. |

21. Subject to the terms of and as set forth more particularly in the FNBO DIP Facility Documents, FNBO shall provide the FNBO DIP Facility subject to the entry of the DIP Orders approving the relief requested herein. The FNBO DIP Facility with the use of FNBO's Cash Collateral as requested herein will be made available for the Availability Period as defined in the FNBO DIP Facility Documents, and be used by the Debtor solely to pay the expenses provided for in the Approved Budget as applicable to the following:

a. One hundred percent (100%) of the Debtor's "Wean-to-Finish Operations" (as defined in the DIP Financing Agreements), facilitated by a $2.5 million Revolving Credit Facility (Operating) and a $3 million Revolving Credit Facility (Hedging) to support the Debtor's hedging activities for Debtor's hog finishing operations related to the Existing Pigs.

b. Eighty percent (80%) of the general and administrative expenses incurred by the Debtor or the bankruptcy estate ("G&A Expenses") [4]; and

c. Sixty-two percent (62%) of bankruptcy expenses incurred by the Debtor or the bankruptcy estate (the "Bankruptcy Expenses")[5].

**Summary of Proposed DIP Financing from LOLFC**

22. Subject to the terms of and as set forth more particularly in the LOLFC DIP Facility Documents, LOLFC shall provide the LOLFC DIP Facility subject to entry of the DIP Orders

4 "G&A Expenses" means those expenses designated as "Labor, Contract Labor", "Utilities", "Property & Other Taxes", "Repairs and Maintenance", "Insurance", "Purchase Money Debt Payments" and "All Other" in the Approved Budget.

5 "Bankruptcy Expenses" means (a) all required bankruptcy filing and related fees due to the Bankruptcy Court from Borrower, (b) all quarterly fees due to the bankruptcy administrator or government from Debtor and (c) all fees and expenses of Bankruptcy Professionals, in each case, to the extent incurred post-petition and prior to the Revolving Credit Maturity Date (Operating) and approved by an interim or final order of the Bankruptcy Court and limited to the amounts set forth in the Approved Budget.

approving the relief requested herein.  The LOLFC DIP Facility with the use of LOLFC's Cash Collateral as requested herein will be made available in accordance with the LOLFC DIP Facility Documents, and be used by the Debtor solely to pay the expenses provided for in the Approved Budget as applicable to the following:

a.  Financing of an assignment from FNBO to LOLFC of its security interest in the Farrow-to-Wean Collateral;

b.  One hundred percent (100%) of the Debtor's "Farrow-to-Wean Operations" (as defined in the DIP Financing Agreements);

c.  Twenty percent (20%) of the G&A Expenses incurred by the Debtor or the bankruptcy estate from the Closing Date until the date on which the last Existing Pig is sold to a third-party purchaser;

d.  One hundred percent (100%) of the G&A Expenses incurred by the Debtor or the bankruptcy estate from the date on which the last Existing Pig is sold to a third-party purchaser;

e.  Thirty-eight percent (38%) of Bankruptcy Expenses incurred by the Debtor or the bankruptcy estate from the Closing Date to the FNBO Revolving Credit Maturity Date (Operating); and

f.  One hundred percent (100%) of the Bankruptcy Expenses incurred by the Debtor or the bankruptcy estate after the FNBO Revolving Credit Maturity Date (Operating) until March 31, 2022, unless otherwise extended pursuant to the terms of the LOLFC DIP Facility Documents.

23.  Subject to the terms of the LOLFC DIP Facility Documents, LOLFC has agreed to loan sufficient funds from the LOLFC DIP Facility to enable the Debtor to pay FNBO the amount

of $5,966,311.00 following entry of an order approving this Motion, in exchange for FNBO's assignment to LOLFC of its security interest in the Farrow-to-Wean Collateral, which consist of all collateral of Debtor needed for the Farrow-to-Wean Operations, including all sows owned for breeding and farrowing, gilts, boars, suckling pigs and piglet inventory. Furthermore, LOLFC has agreed to pay FNBO directly for certain feed inventory and supplies used by the Debtor on and after the Petition Date in connection with its Farrow-to-Wean Operations in the amount of $121,174.90. FNBO also intends to subordinate any security interest it may have in (i) all personal property financed with the proceeds of the LOLFC DIP Facility for the Farrow-to-Wean Operations, and (ii) all accounts receivable owed to the Debtor in connection with the sale, transfer or other disposition of weaned piglets, in each case, to any security interest LOLFC obtains in the same.

**The Debtor's Liquidity Needs**

I. The Debtor Cannot Prudently Operate With Cash Collateral Alone

24. In conjunction with its proposed restructuring advisor, NutriQuest, the Debtor reviewed and analyzed its projected cash needs and has prepared a projected budget (as updated from time to time in accordance with the DIP Financing Agreements, the "Approved Budget") outlining the Debtor's post-petition cash needs following the Petition Date. A copy of the Approved Budget is attached to the Interim Order as **Schedule 1**. The Debtor believes the Approved Budget and its projections provide a realistic and best possible estimate of the necessary costs and revenues for its operations during the periods identified and are reasonable and appropriate for its ongoing needs.

25. The Debtor has relied on the forecasts and projections to determine the amount of post-petition financing required to administer this bankruptcy case. The DIP Facilities are critical

to the Debtor's ability to operate smoothly post-petition.  The Debtor believe the DIP Facilities will provide the Debtor with sufficient liquidity to stabilize its operations and fund the administration of this bankruptcy case as the Debtor seeks to implement the contemplated restructuring, and are therefore essential to the preservation of the bankruptcy estate.

26.    The Debtor enters Chapter 11 with insufficient liquidity to operate its business and continue paying its debts as they come due.  The costs of administering this case will also impose demands on the Debtor's liquidity, such that immediate access to the DIP Facilities and Cash Collateral is necessary to provide liquidity and ensure the Debtor's business is stabilized and its value maximized for the benefit of all parties in interest.

27.    The Debtor requires interim approval of the DIP Facilities to preserve and maximize the value of the estate and to position the estate to reorganize as a going concern. Without the prompt infusion of funds from the DIP Facilities, access to Cash Collateral, and the cooperation of key business partners during this critical early stage, the Debtor could face a destructive interruption to its business and lose essential support from important stakeholders upon whom the Debtor's business depends. Such an interruption would hinder the Debtor's ability to maximize the value of the estate and force the Debtor to curtail its operations significantly to the detriment of the Debtor, the estate and their stakeholders. In other words, absent the immediate relief requested herein, the Debtor faces a material risk of irreparable harm.

II.    The Debtor Negotiated the Proposed Financing in Good Faith

28.    The Debtor retained NutriQuest to assist in exploring restructuring alternatives. With NutriQuest's assistance, the Debtor approached FNBO and LOLFC to seek additional sources of liquidity and explore restructuring options.  The Debtor and its advisors thereafter

engaged in multiple meetings with FNBO and LOLFC regarding restructuring alternatives that would strengthen the Debtor's balance sheet and provide for an expedited exit from Chapter 11.

29. Following significant arms'-length, good-faith negotiations, FNBO and LOLFC agreed to provide the DIP Facilities required to support the Debtor's estate during this Chapter 11 case. Upon entry of the Final Order, certain pre-petition obligations under the FNBO Pre-Petition Loan Documents and the LOLFC Pre-Petition Loan Documents will be "rolled up" and converted into post-petition obligations as provided in the DIP Financing Agreements. The roll-up of certain of the pre-petition obligations as provided herein was a prerequisite to FNBO and LOLFC agreeing to provide the financing necessary to support the Debtor's reorganization.

III. The Proposed DIP Facilities Represent the Best Available Financing Option

30. As noted previously, given the Debtor's financial position and prospects, industry market conditions, and regional market conditions which have resulted in a significant downsizing and abandonment of swine production facilities in the Southeast United States, all of which significantly impaired the value of the Debtor's operations and assets, the DIP Facilities remain the best and only options available to the Debtor. Substantially all of the Debtor's material and tangible assets are encumbered under the existing capital structure with FNBO and LOLFC. This fact, combined with the Debtor's uncertain financial condition, restricts the availability of, and options for, post-petition financing. The DIP Facilities are the best post-petition financing options available to the Debtor at this time.

**Basis for Relief**

I. The Debtor Should Be Authorized to Obtain Post-Petition Financing Through the DIP Financing Agreements

A. Entering the DIP Financing Agreements is an Exercise of the Debtor's Sound Business Judgment

31. The Court should authorize the Debtor, in the exercise of its sound business judgment, to enter into the DIP Financing Agreements, obtain access to the DIP Facilities, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under conditions that are present in this case, as discussed herein. A DIP is given considerable deference when acting in accordance with its business judgment in obtaining post-petition secured credit, so long as the agreement to obtain such credit does not violate the provisions of, and policies underlying, the Bankruptcy Code. *See*, *e.g.*, *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr.W.D.Mo. 2003) ("Business judgments should be left to the board room and not to this Court"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr.D.Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr.D.Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr.S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

32. The business judgment is not an onerous standard and may be satisfied "'as long as the proposed action appears to enhance the debtor's estate.'" *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003) (citation omitted) (emphasis in original, text modifications removed); *see also In re AbitibiBowater*, 418 B.R. 815, 831 (Bankr.D.Del. 2009) (the business judgment standard is "not a difficult standard to satisfy"). Specifically, to determine whether the business judgment standard is met, a court need only

"examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr.D.Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr.D.Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

33. In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr.W.D.Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D.Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). Courts may also appropriately consider non-economic benefits offered by a proposed post-petition facility. For example, in *In re ION Media Networks Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr.S.D.N.Y. July 6, 2009) (emphasis added).

34.    The Debtor's decision to move forward with the DIP Facilities following an arm's-length negotiation process is well within the Debtor's sound business judgment. Specifically, and in the face of insufficient cash on hand, the Debtor and its advisors determined that the Debtor would require significant post-petition financing to support its operational and Chapter 11 activities. The Debtor negotiated the DIP Financing Agreements with FNBO and LOLFC in good faith, at arm's length, and with the assistance of their respective advisors. The Debtor believes it has obtained the best financing available under the circumstances. Accordingly, the Court should authorize the Debtor's entry into the DIP Financing Agreements, as it is a reasonable exercise of the Debtor's business judgment.

B.    The Debtor Should Be Authorized to Grant Liens and Super-priority Claims

35.    The Debtor proposes to obtain financing under the DIP Facilities by providing security interests, liens, and super-priority claims to the extent and as set forth in the DIP Financing Agreements pursuant to Sections 364(c) of the Bankruptcy Code. Specifically, the Debtor proposes to provide to FNBO and LOLFC continuing, valid, binding, enforceable, non-avoidable, and automatically and properly-perfected post-petition security interests in and liens on its property, which together includes substantially all of the Debtor's assets.

36.    Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, FNBO and LOLFC will receive certain security interests securing the DIP Facilities, as set forth more particularly in the DIP Financing Agreements.

37.    To obtain post-petition financing under 11 U.S.C. § 364(c), the court must find, after notice and a hearing, that the debtor "is unable to obtain unsecured credit allowable under

section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71

B.R. 544, 549 (Bankr.E.D.Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code

is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

Courts have articulated a three-part test to determine whether a debtor is entitled to financing under

section 364(c) of the Bankruptcy Code, specifically looking at whether (i) the debtor is unable to

obtain unsecured credit under 11 U.S.C. § 364(b) (i.e. by allowing a lender only an administrative

claim); (ii) the transaction is necessary to preserve the assets of the estate; and (iii) the terms are

fair, reasonable and adequate given the circumstances of the debtor-borrower and proposed

lender(s). *See, e.g.*, *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr.E.D.Pa. 1991); *In re Ames

Dep't Stores*, 115 B.R. at 37-40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr.E.D.Pa.

1988); *Crouse Grp.*, 71 B.R. at 549.

    38.    As described above and as set forth in the Weiss Declaration, the Debtor is in need

of an immediate capital infusion, yet substantially all of the Debtor's existing assets are

encumbered under its existing capital structure. Considering these circumstances and following

discussions with potential lenders regarding post-petition financing, the Debtor, in consultation

with its advisors, concluded that the best financing option would be one that was provided by the

Debtor's existing lenders. Without post-petition financing, the Debtor lacks sufficient funds to

operate its enterprise, continue paying its debts as they come due, and cover the projected costs of

this Chapter 11 case. Absent the DIP Facilities, the value of the bankruptcy estate would be

significantly impaired to the detriment of all stakeholders. The Debtor therefore believes that the

terms of the DIP Facilities, as set forth in the DIP Financing Agreements, are fair, reasonable, and

adequate, all as more fully set forth herein. For all these reasons, the Debtor submits that it has met

the standard for obtaining post-petition financing.

39.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, Section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt-- (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  As described above, the Debtor is unable to obtain unsecured credit. Therefore, approving superpriority claims to the extent and as set forth in the DIP Financing Agreements is also reasonable and appropriate.

C.      No Comparable Alternative to the DIP Facilities Is Reasonably Available

40.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Sections 364(c) and (d) of the Bankruptcy Code. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr.N.D.Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr.N.D.Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D.Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D.Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

41. As noted above and as borne out by the Debtor's efforts, the Debtor does not believe that any alternative sources of financing exist or are reasonably available given the realities imposed by the Debtor's existing capital structure and its unsuccessful solicitation of alternative financing proposals. FNBO and LOLFC assert that substantially all of the Debtor's existing assets are encumbered under their existing capital structure. Thus, the Debtor has determined that the DIP Facilities provide the most favorable terms available to the Debtor under the circumstances to fund this bankruptcy case. Therefore, the Debtor submits that the requirement that alternative credit on more favorable terms be unavailable is satisfied.

II. <u>The Debtor Should Be Authorized to Use Cash Collateral</u>

42. Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor-in-possession to use cash collateral with the consent of the secured party. Here, FNBO and LOLFC consent to the Debtor's use of the Cash Collateral (as well as the other pre-petition collateral), subject to the terms and limitations set forth in the Interim Order.

43. Section 363(e) provides for adequate protection against diminution in value of interests in property when a debtor uses cash collateral. Further, Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (*en banc*). While Section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Rocco*, 319 B.R. 411 (Bankr.W.D.Pa. 2005); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr.D.Del. Dec. 7, 2012); *see also In re Dynaco Corp.*,

162 B.R. 389, 394 (Bankr.D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")). It was the intent of Congress in Section 361 to give courts flexibility to fashion relief in light of each case in general equitable principals. *In re Wilson*, 30 B.R. 371 (Bankr.E.D.Pa. 1983).

44. The Debtor proposes to provide FNBO and LOLFC with a variety of forms of adequate protection to protect against the post-petition diminution in value of the Cash Collateral (as well as their other pre-petition collateral) resulting from the use of the Cash Collateral (and other pre-petition collateral) by the Debtor (collectively, the "Adequate Protection Obligations"), including (i) continuing, valid, binding, enforceable, non-avoidable and perfected post-petition security interests in and liens on the property of the Debtor ; and (ii) super-priority administrative claims under Section 507(b) of the Bankruptcy Code.

45. The Debtor submits that the proposed Adequate Protection Obligations are sufficient to protect the pre-petition secured parties from any diminution in value of the Cash Collateral and the other pre-petition collateral. The Debtor further submits that the proposed Adequate Protection Obligations to be provided for the benefit of the pre-petition secured parties are adequate and appropriate. The Debtor's provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of this bankruptcy case to ensure the Debtor is able to continue using the Cash Collateral, subject only to the terms and any limitations reasonably acceptable to FNBO and LOLFC as set forth in the Interim Order, for the benefit of all parties in interest and their estates.

III. <u>The Repayment Feature Is Appropriate</u>

46. Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. Such transactions should be approved when they are supported by a sound business purpose. *See, e.g., In re Abbots Dairies, Inc*., 788 F.2d 143 (3d Cir. 1986) (holding that a debtor's use of assets outside the ordinary course of business under Section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction). Furthermore, conversions of prepetition claims into post-petition claims, or "roll-ups," as well as similar refinancings of pre-petition claims with post-petition credit, may be authorized under Section 363(b) of the Bankruptcy Code. *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 510-11 (Bankr.D.Del. 2010) ("Post-petition refinancing of uneconomical *secured* debt through a DIP loan may be authorized by section 363(b) of the Bankruptcy Code as a use of estate property outside the ordinary course of business . . . similarly, prepetition secured claims can be paid off through a roll-up."); *In re Energy Future Holding Corp.*, 527 B.R. 157, 167 (D.Del. 2015). As the United States District Court for the District of Delaware has observed:

> [P]repetition secured claims can be paid off through a "roll-up." Most simply, a [roll-up] is the payment of a pre-petition debt with the proceeds of a post-petition loan. Roll-ups most commonly arise where a pre-petition secured creditor is also providing a post-petition DIP loan under section 364(c) and/or (d) of the Bankruptcy Code. The proceeds of the DIP loan are used to pay off or replace the pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus any new money being lent to the debtor. As a result, the entirety of the prepetition and post-petition debt enjoys the post-petition protection of section 364(c) and/or (d) as well as the terms of the DIP order. In both a refinancing and a rollup, the pre-petition secured claim is paid through the issuance of new debt rather than from unencumbered cash.

*Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 2015 U.S. Dist. LEXIS 19684, 20-21 (D.Del. Feb. 9, 2015) (*quoting In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 511 (Bankr.D.Del. 2010)).

47. Courts consider a number of factors when determining whether to authorize roll-ups of pre-petition debt into post-petition financing facilities, including whether: (a) the proposed financing is an exercise of sound and reasonable business judgment; (b) no alternative financing is available on any other basis; (c) the financing is in the best interests of the estate and its creditors; (d) no better offers, bids, or timely proposals are before the court; (e) the credit transaction is necessary to preserve the assets of the estate; (f) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender(s); (g) the financing is necessary, essential, and appropriate for the continued operating of the debtor's business and the preservation of the estate; and (h) the financing agreement was negotiated in good faith and at arms'-length between the debtor and the proposed lender. *See In re Farmland Indus., Inc.*, 294 B.R. at 879–80 (surveying opinions authorizing roll-ups and listing relevant factors considered by courts in those cases).

48. Courts have approved repayments funded by DIP financing proceeds in other Chapter 11 cases, including on the first day of the case. *See, e.g.*, *In re Payless Holdings LLC*, Case No. 17-42267 (Bankr. E.D. Mo. May 17, 2017) (authorizing $385 million DIP facility and a roll-up of approximately $187 million, pursuant to a final order); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing $1.23 billion DIP facility and a roll-up of approximately $639 million, pursuant to interim and final orders); *In re BCBG Max Azria Global Holdings LLC*, No. 17-10466 (Bankr. S.D.N.Y. Mar. 2, 2017) (authorizing a $157 million DIP facility and a roll-up of $117 million, including a full ABL roll-up of $82 million pursuant to final

order following a creeping roll-up pursuant to the interim order); *In re Gymboree Corporation*, No. 17-32986 (Bankr. E.D. Va. June 12, 2017) (authorizing a $378 million DIP facility and $247 million roll-up, including a full ABL roll-up of $177 million); *In re Toys "R" US, Inc.*, No. 17-34665 (Bankr. E.D. Va. Sept. 20, 2017) (authorizing a $2.3 billion DIP facility and a full roll-up of approximately $948 million in the pre-petition ABL and FILO facilities).

49. As set forth above and in the DIP Financing Agreements, the DIP Facilities include a roll-up of certain pre-petition obligations. The conversion of the pre-petition obligations into post-petition obligations will create availability under the DIP Facilities, allowing the Debtor to continue operating in the ordinary course during this case.

50. The repayment of the pre-petition obligations is a sound exercise of the Debtor's business judgment, is a material component of the structure of the DIP Facilities and was required by FNBO and LOLFC as a condition to their commitment to provide post-petition financing. The Debtor was unable to obtain DIP financing on similar terms.

51. The economic reality is that a peaceful, going-concern transition into Chapter 11 comes at a price, which in this case the Debtor believes to be reasonable. FNBO and LOLFC are unlikely to continue to lend post-petition without some assurance regarding their prepetition claims. Absent their support, the first month of the Debtor's Chapter 11 case would likely devolve into a costly fight over cash collateral and lien priority between FNBO and LOLFC, severely jeopardizing the Debtor's ability to reorganize its operations and emerge as a going concern. Thus, after careful consideration of all available alternatives, the Debtor has determined that conversion of the applicable pre-petition obligations into post-petition obligations is necessary to obtain access to the liquidity necessary to preserve the value of its business for the benefit of all stakeholders.

## IV. Failure to Obtain Immediate Interim Access to the DIP Facilities and Cash Collateral Would Cause Immediate and Irreparable Harm

52. Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit under 11 U.S.C. § 364 or a motion to use cash collateral pursuant to 11 U.S.C. § 363 may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

53. For the reasons noted above, the Debtor has an immediate post-petition need to use Cash Collateral, and access the liquidity provided by the DIP Facilities. The Debtor cannot maintain the value of the bankruptcy estate during the pendency of this Chapter 11 case without access to cash. The Debtor will use cash, among other things, to fund the operation of its business, including to ensure that vendors continue to provide feed and other goods and services, and to fund the administration of this case. Substantially all of the Debtor's available cash constitutes the pre-petition secured parties' Cash Collateral. The Debtor will therefore be unable to operate its business or otherwise fund this Chapter 11 case without access to Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. In short, the Debtor's ability to administer this case through the use of Cash Collateral is vital to preserve and maximize the value of the Debtor's estate.

54. The Debtor requests that the Court conduct a hearing to consider entry of the Interim Order authorizing the Debtor, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facilities on the terms and conditions set forth in the Interim Order attached hereto as **Exhibit C**. This relief will enable the Debtor to preserve and

maximize value and, therefore, avoid immediate and irreparable harm and prejudice to its estate and all parties in interest.

**Request for Final Hearing**

55. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing as soon as is practicable, and in no event more than thirty (30) days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

56. To successfully implement the foregoing, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

**Reservation of Rights**

57. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to Section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, extent. enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

**Notice**

58. The Debtor has provided notice of this Motion to the following parties or their respective counsel: (a) the office of the Bankruptcy Administrator for the Eastern District of North Carolina; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) counsel for FNBO; (d) counsel for LOLFC; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Debtor respectfully prays for the following relief:

1. For an emergency preliminary hearing on this Motion and entry of the Interim Order to avoid immediate and irreparable harm to the Debtor's bankruptcy estate;

2. That the Court enter the DIP Orders, granting the relief requested herein; and

3. For such other and further relief that this Court deems just and appropriate.

DATED: May 7, 2021

**HENDREN, REDWINE MALONE, PLLC**

s/Jason L. Hendren
Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC State Bar No. 37012)
Benjamin E.F.B. Waller (NC State Bar No. 27680)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: (919) 573-1422
Facsimile: (919) 420-0475
Email: jhendren@hendrenmalone.com
Email: rredwine@hendrenmalone.com
Email: bwaller@hendrenmalone.com
CO-COUNSEL FOR THE DEBTOR

and

**BUTLER & BUTLER, LLP**

s/Algernon L. Butler, III______
Algernon L. Butler, III (N.C. State Bar No. 20881)
P.O. Box 38
Wilmington, NC 28402
Telephone: (910) 762-1908
Facsimile: (910) 762-9441
Email: albutleriii@butlerbutler.com
CO-COUNSEL FOR THE DEBTOR

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **Case No.: 21-01068-5-SWH** |
| **N. G. PURVIS FARMS, INC.** | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |

**NOTICE OF MOTION**

NOTICE IS HEREBY GIVEN of the MOTION FOR EMERGENCY AND FINAL ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF ("Motion") filed simultaneously herewith in the above captioned case; and,

FURTHER NOTICE IS HEREBY GIVEN that this Motion may be allowed provided no response and request for a hearing is made by a party in interest in writing to the Clerk of this Court by **5:00 p.m. on May 11, 2021**; and

FURTHER NOTICE IS HEREBY GIVEN, that a hearing will be conducted on the Motion and any response thereto at **2:30 p.m. on May 12, 2021** at the United States Bankruptcy Court, located at 300 Fayetteville Street, 2nd Floor Courtroom, Raleigh, North Carolina.

DATED: May 7, 2021

**HENDREN, REDWINE MALONE, PLLC**

s/Jason L. Hendren

Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC State Bar No. 37012)
Benjamin E.F.B. Waller (NC State Bar No. 27680)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: (919) 573-1422
Facsimile: (919) 420-0475
Email: jhendren@hendrenmalone.com
Email: rredwine@hendrenmalone.com
Email: bwaller@hendrenmalone.com
CO-COUNSEL FOR THE DEBTOR

Exhibit A

# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT (as the same may from time to time be amended, restated, modified or otherwise supplemented, this "Agreement") is dated this __ day of May, 2021 by and among N.G. PURVIS FARMS, INC., a North Carolina corporation and debtor and debtor-in-possession (together with its successors and assigns, the "Borrower"), and FIRST NATIONAL BANK OF OMAHA, a national banking association (together with its successors and assigns, the "Lender").

## RECITALS

WHEREAS, Borrower and Lender are parties to (a) that certain Second Amended and Restated Credit Agreement dated April 1, 2019, First Amendment to Second Amended and Restated Credit Agreement dated January 1, 2020, Second Amendment to Second Amended and Restated Credit Agreement dated January 22, 2020, Third Amendment to Second Amended and Restated Credit Agreement dated March 1, 2020 and Fourth Amendment to Second Amended and Restated Credit Agreement dated April 1, 2020 (collectively, the "Pre-Petition Credit Agreement") and (b) that certain Second Amended and Restated Forbearance Agreement dated May 15, 2020, First Amendment to Second Amended and Restated Forbearance Agreement dated June 17, 2020, Second Amendment to Second Amended and Restated Forbearance Agreement dated August 18, 2020, Third Amendment to Second Amended and Restated Forbearance Agreement dated October 31, 2020 and Fourth Amendment to Second Amended and Restated Forbearance Agreement dated March 24, 2021 (collectively, the "Pre-Petition Forbearance Agreement"), pursuant to which Lender agreed to make loans to Borrower;

WHEREAS, the loans to Borrower are (a) secured by substantially all the personal property of Borrower, now existing or hereafter acquired, and the Real Property (as hereinafter defined) and (b) guaranteed by certain equity owners of Borrower;

WHEREAS, on May __, 2021 (the "Petition Date"), Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as hereinafter defined) in the United States Bankruptcy Court for the Eastern District of North Carolina (the "Bankruptcy Court"), and continues to manage its business and possess its assets as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrower has requested that Lender provide debtor-in-possession financing to Borrower via (a) a Two Million Five Hundred Thousand Dollar ($2,500,000) revolving credit facility, (b) a Three Million Dollar ($3,000,000) discretionary revolving credit facility and (c) a Twenty-Six Million One Hundred Fifteen Thousand Seven Hundred Forty-Four and 66/100 Dollar ($26,115,744.66) "roll-up" term loan facility;

WHEREAS, the debtor-in-possession financing will be secured by the Super-Priority Administrative Expense Claim (as hereinafter defined) and the Post-Petition Liens (as hereinafter defined); and

WHEREAS, Lender is willing to provide the debtor-in-possession financing on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, for and in consideration of Lender making the loans hereunder, the recitals set forth above, which are incorporated into the Agreement by this reference, and other

good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

AGREEMENT

SECTION 1. DEFINITIONS AND INTERPRETATION

1.1. Terms Defined. As used in this Agreement, the following terms have the following respective meanings:

"Account" means a right to payment of a monetary obligation, whether or not earned by performance, arising out of the sale of goods or production of services, in which Borrower now has or hereafter acquires any right.

"Advance" means any monies advanced or credit extended as a Loan to or for the benefit of Borrower by Lender.

"Affiliate" means, with respect to any specified Person, (a) any Person which, directly or indirectly, controls, is controlled by or is under common control with, the specified Person, and (b) any director or officer (or, in the case of a Person which is not a corporation, any individual having analogous powers) of the specified Person or of a Person who is an Affiliate of the specified Person within the meaning of the preceding clause (a). For purposes of the preceding sentence, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, or direct or indirect ownership (beneficially or of record) of, or direct or indirect power to vote, five percent (5%) or more of the equity interests of such Person.

"Agreement" has the meaning set forth in the introductory paragraph of this Agreement.

"Approved Budget" means the projection for receipts and revenues and budget for cash expenditures of Borrower over a twenty-four (24) week period, substantially in the form of Exhibit A attached hereto (as amended from time to time by each of Borrower and Lender) that is approved by any Interim or Final Order.

"Authorized Representative" means any director or officer of Borrower, or Steve Weiss, as Chief Restructuring Officer, to the extent such employment is approved by the Bankruptcy Court, authorized by specific resolutions of the Governing Body of Borrower to execute and deliver the Loan Documents and request the Loans, as set forth in the incumbency certificate required by Section 3.1(i) hereof.

"Authorizing Order" means the Interim Order until such time as the Final Order is filed, final and non-appealable, from which time it means the Final Order.

"Availability Period" means, (a) with respect to the Operating Advances and the G&A Expense Advances, the period commencing on the Closing Date and continuing until the earlier of (i) thirty (30) days after the sale and delivery of the last Existing Pig to a third party purchaser and (ii) the Revolving Credit Maturity Date (Operating) and (b) with respect to the Bankruptcy Expense Advances, the period commencing on the Closing Date and continuing until the close of the Bankruptcy Case.

"Avoidance Actions" means an action originating under the authority of and pursuant to Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

"Bankruptcy Case" means Case No. ____________________ filed by Borrower in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" has the meaning set forth in the recitals of this Agreement, as amended from time to time.

"Bankruptcy Expense Advances" has the meaning set forth in Section 2.1(b) hereof.

"Bankruptcy Expenses" means (a) all required bankruptcy filing and related fees due to the Bankruptcy Court from Borrower, (b) all quarterly fees due to the bankruptcy administrator or government from Borrower and (c) all fees and expenses of Bankruptcy Professionals, in each case, to the extent incurred post-petition and prior to the Revolving Credit Maturity Date (Operating) and approved by an interim or final order of the Bankruptcy Court and limited to the amounts set forth in the Approved Budget.

"Bankruptcy Professionals" means any attorneys, accountants and other professionals retained in the Bankruptcy Case by Borrower or any official committee of unsecured creditors pursuant to Sections 327, 328, 330, 331 or 363 of the Bankruptcy Code.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning set forth in the introductory paragraph of this Agreement.

"Borrowing Notice" means a written, electronic, telex, telecopy or telephonic notice by Borrower to Lender specifying (a) the Facility from which any Advance is requested to be made, (b) the Effective Date of making such Advance and (c) the amount of such Advance.

"Business Day" means any day other than a Saturday, Sunday or any day on which banking institutions in Omaha, Nebraska are permitted or required by law, executive order or governmental decree to remain closed or a day on which Lender is closed for business.

"Capitalized Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" has the meaning ascribed to such term in the Authorizing Order.

"Cash Collateral" means Borrower's "cash collateral", as such term is defined in Section 363(a) of the Bankruptcy Code.

"Change in Law" means (a) the adoption of any law, rule or regulation by any governmental authority after the Closing Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any governmental authority after the Closing Date or (c) any binding request, guideline or directive (whether or not having the force of law) of any governmental authority made or issued after the Closing Date with which Lender is legally obligated to comply.

"Change of Control" has the meaning set forth in Section 6.6 hereof.

"Closing" has the meaning set forth in Section 3.4 hereof.

"Closing Date" has the meaning set forth in Section 3.4 hereof.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations and rulings issued thereunder.

"Collateral" means the Personal Property, Real Property and all other Property that now or hereafter secures the payment and performance of any of the Obligations pursuant to any of the Loan Documents, the Authorizing Order, the Pre-Petition Loan Documents or otherwise.

"Commodity Exchange Act" means the Commodity Exchange Act, as amended from time to time, and any successor statute.

"Control Agreements" has the meaning set forth in Section 3.1(e) hereof.

"Debt" means, whether or not included as indebtedness or liabilities in accordance with GAAP, the following: (a) the obligations of Borrower for borrowed money; (b) the obligations of Borrower evidenced by bonds, debentures, notes or other similar instruments; (c) the obligations of Borrower under conditional sale or other title retention agreements relating to property purchased to the extent of the value of such property; (d) the obligations of Borrower to pay the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business and due within three (3) months of the incurrence thereof); (e) the obligations of Borrower under Capitalized Leases; (f) the obligations of Borrower, contingent or otherwise, to purchase, redeem, retire or otherwise acquire securities or other property which arise out of or in connection with the sale of the same or substantially similar securities or property; (g) the obligations of Borrower to reimburse any other Person in respect of amounts paid under a letter of credit, bankers' acceptance or similar instrument and the amount available to be drawn under a letter of credit, banker's acceptance or similar instrument; (h) Swap Obligations of Borrower; (i) the obligations of any other Person, to the extent such obligations are guaranteed by Borrower; (j) the obligations of any other Person, to the extent such obligations are secured by a Lien on Borrower's Property (whether or not such obligations have been assumed by Borrower); and (k) the obligations of any other Person, to the extent Borrower is reasonably likely to be liable for such obligations.

"Default Rate" means the rate of interest otherwise applicable on any Loan plus three percent (3.00%).

"Disbursement Account" has the meaning set forth in Section 2.2(d) hereof.

"Disclosures" has the meaning set forth in Section 8.20(b) hereof.

"Distribution" means (a) dividends, distributions or other payments on, or on account of, the equity interests of Borrower, (b) the purchase, redemption, retirement or other acquisition of such equity interests or of warrants, rights or other options to purchase such equity interests, (c) loans made, directly or indirectly, to any shareholder of Borrower and (d) any other form of compensation paid, directly or indirectly, to any shareholder of Borrower which is not made in the ordinary course of business consistent with past practice.

"Effective Date" means, (a) with respect to any Advance under the Revolving Credit Facility (Operating), the first (1st) Business Day of any week and (b) with respect to any Advance under the Revolving Credit Facility (Hedging), any Business Day designated by Borrower in a Borrowing Notice as the date any Advance shall become effective.

"Environmental Laws" has the meaning set forth in Section 4.21 hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations and rulings issued thereunder.

"ERISA Affiliate" means any Person that, together with Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, Section 414(m) of the Code.

"ERISA Event" means: (a) the occurrence of a "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan unless the thirty (30) day notice period requirement with respect to such event has been waived or the requirements of subsection (1) of Section 4043(b) of ERISA (without regard to subsection (2) of such Section) are met with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following thirty (30) days; (b) the failure with respect to any Plan to satisfy the minimum funding standard described in Section 412 of the Code or Section 302 of ERISA, whether or not waived; (c) the filing of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by Borrower or its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by Borrower or its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by Borrower or its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by Borrower or its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from Borrower or its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning set forth in Section 7.1 hereof.

"Exchange Act" has the meaning set forth in Section 6.6 hereof.

"Excluded Swap Obligation" means, with respect to any Obligor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty Agreement or other obligation of such Obligor with respect to, or the grant by such Obligor of a security interest to secure, such Swap Obligation (or any Guaranty Agreement or other obligation with respect thereto) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Obligor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty Agreement or other obligation of such Obligor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty Agreement or other obligation or security interest is or becomes illegal.

"Existing Pigs" means those pigs (exclusive of sows owned for breeding and farrowing, gilts, boars, suckling pigs and piglet inventory) owned by Borrower as of the Petition Date.

"Expenses" has the meaning set forth in Section 8.5 hereof.

"Facilities" means the Revolving Credit Facility (Operating), the Revolving Credit Facility (Hedging) and the Term Loan Facility. Each of the foregoing is referred to herein as a "Facility".

"Farm Products" has the meaning given to it in the Food Security Act.

"Farrow-to-Wean Operations" means those operations of Borrower involved in (a) the acquisition of sows and (b) the breeding and farrowing processes of producing piglets. For the avoidance of doubt, the period of time for Farrow-to-Wean Operations terminates at that point in time in which piglets are weaned from their mothers and delivered to third party purchasers.

"Final Order" means the Final Order of the Bankruptcy Court in a form and substance approved by Lender in Lender's sole discretion, authorizing Borrower to obtain final credit as provided for herein under each of the Facilities, and granting Lender the Super-Priority Administrative Expense Claim and Post-Petition Liens.

"Food Security Act" means the Food Security Act of 1985, as amended from time to time, and the regulations and rulings issued thereunder.

"G&A Expense Advances" has the meaning set forth in Section 2.1(b) hereof.

"G&A Expenses" means those expenses designated as "Labor, Contract Labor", "Utilities", "Property & Other Taxes", "Repairs & Maintenance", "Insurance", "Purchase Money Debt Payments" and "All Other" in the Approved Budget, in each case, (a) limited to the amounts set forth in the Approved Budget and (b) excluding any Bankruptcy Expenses covered therein.

"GAAP" means generally accepted accounting principles, consistently applied.

"Governing Body" means, with respect to any specified Person, (a) the board of directors when such Person is a corporation, (b) the managers, members or other governing body appointed by agreement or applicable law when such Person is a limited liability company; (c) the general partner or other governing body appointed by agreement or applicable law when such Person is a limited partnership; or (d) or Steve Weiss, as Chief Restructuring Officer, to the extent such employment is approved by the Bankruptcy Court.

"Guarantors" means David Purvis, Jerry M. Purvis, Larry M. Purvis and Melvin G. Purvis. The foregoing Persons are hereinafter referred to individually and collectively as the "Guarantor."

"Guaranty Agreements" has the meaning set forth in Section 3.1(d) hereof.

"Hazardous Substance" means any asbestos, urea-formaldehyde, polychlorinated biphenyls, nuclear fuel or material, chemical waste, radioactive material, explosives, known carcinogens, petroleum products and by-products and other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials or substances listed or identified in, or regulated by, any Environmental Laws.

"Hedging Accounts" means commodity trading accounts maintained by Borrower for hedging purposes with any reputable broker reasonably acceptable to Lender, and in which Lender has a first priority perfected security interest.

"Hedging Policy" means a policy setting forth standards, practices and procedures with respect to Borrower's hedging activities, if any, including a prohibition on speculative trading and

a requirement that all hedging positions must be in the same or substantially similar products as the Collateral being hedged, which has been approved by the Governing Body of Borrower and reasonably acceptable to Lender.

"Indemnified Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any governmental authority against Borrower (other than income and franchise taxes imposed on the net income of Lender).

"Indemnitee" has the meaning set forth in Section 8.3(b) hereof.

"Intercreditor Agreement" has the meaning set forth in Section 3.1(f) hereof.

"Interim Order" means the Interim Order of the Bankruptcy Court in a form and substance approved by Lender in Lender's sole discretion, authorizing Borrower to obtain interim credit as provided for herein, and granting Lender the Super-Priority Administrative Expense Claim and Post-Petition Liens.

"Investments" means any equity interest, evidence of indebtedness or other security (including any option, warrant or other right to acquire any of the foregoing) of, any loan or advance to or any other investment or interest in, any other Person.

"IP Rights" has the meaning set forth in Section 4.20 hereof.

"Lender" has the meaning set forth in the introductory paragraph of this Agreement.

"Lien" means any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement or other arrangement having the practical effect of the foregoing or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any Capitalized Lease having the same economic effect as any of the foregoing).

"Loan Documents" means this Agreement, the Notes, the Security Agreement, the UCC-1 Financing Statement, the Mortgages, the UCC-1 Fixture Filings, the Guaranty Agreements, the Control Agreements, the Intercreditor Agreement and any other agreements, instruments, documents and certificates executed and/or delivered in connection with this Agreement, as each may from time to time be amended, restated, modified or otherwise supplemented.  For the avoidance of doubt, (a) any Security Agreement, UCC-1 Financing Statement, Mortgage, UCC-1 Fixture Filing or Control Agreement entered into in connection with the Pre-Petition Loan Documents shall be deemed to be a "Loan Document" (other than under Section 7.1 hereof with respect to actions or omissions occurring prior to the Petition Date) and (b) all other Pre-Petition Loan Documents shall not be deemed to be a "Loan Document".

"Loans" means the Revolving Credit Loans (Operating), the Revolving Credit Loans (Hedging) and the Term Loan.  Each of the foregoing is referred to herein as a "Loan".

"LOLFC" means Land O'Lakes Finance Company.

"LOLFC DIP Financing" means that debtor-in-possession financing obtained by Borrower from LOLFC in the Bankruptcy Case.

"Material Adverse Effect" means (a) a material adverse change in the business, assets, operations or condition, financial or otherwise, of Borrower or (b) a material impairment in the perfection or priority of Lender's Lien in the Collateral or in the value of the Collateral.

"Milestones" has the meaning set forth in Section 5.16 hereof.

"Minimum Notice Period" means a period commencing no later than 12:00 p.m., Omaha time, on the Effective Date of any Advance under any Facility.

"Mortgages" has the meaning set forth in Section 3.1(c) hereof.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Notes" means the Revolving Credit Note (Operating), the Revolving Credit Note (Hedging) and the Term Note. Each of the foregoing is referred to herein as a "Note".

"Obligations" means all now existing or hereafter arising loans, advances, liabilities, debts, obligations, covenants and duties of payment or performance of every kind, matured or unmatured, direct or contingent, owing, arising, due or to become due, or payable to Lender, by or from Borrower, in each case, to the extent arising out of this Agreement, any other Loan Document, any other agreement or otherwise including, without limitation, all obligations to repay principal of and interest on Loans and Pre-Petition Loans, all obligations to pay principal, interest, fees, costs, charges, expenses and any other sums chargeable to Borrower under the Loan Documents, any other agreement or otherwise, whether or not evidenced by any note or other instrument, and Swap Obligations of Borrower owed to Lender, but excluding, as to any Obligor, its Excluded Swap Obligations.

"Obligor" means each Borrower and Guarantor.

"Operating Advances" has the meaning set forth in Section 2.1(b) hereof.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Packers and Stockyards Act" means the Packers and Stockyards Act of 1921, as amended from time to time, and the regulations and rulings issued thereunder.

"Participation" means one or more grants by Lender to a third party of a participating interest in notes evidencing obligations to repay secured or unsecured loans owned by Lender.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Affiliate Transactions" means: (a) that certain Farm Lease Agreement dated October 1, 2013 by and between North Moore Management, LLC and Borrower; (b) that certain Farm Lease Agreement dated October 10, 2006 by and between Copperhead Farms, L.L.C. and Borrower; and (c) any other transaction which has been approved in writing by Lender in Lender's sole discretion.

"Permitted Debt" means: (a) Obligations owed to Lender; (b) Debt outstanding on the date of this Agreement and set forth on Schedule 1.1(a) hereto; (c) purchase money obligations and obligations under Capitalized Leases not in excess of Five Hundred Thousand Dollars ($500,000) in the aggregate at any one time outstanding; (d) Debt owed to LOLFC under the LOLFC DIP Financing; and (e) any other Debt which has been approved in writing by Lender in Lender's sole discretion.

"Permitted Investments" means: (a) Investments outstanding on the date of this Agreement and set forth on Schedule 1.1(b) hereto; (b) loans or advances to employees or Affiliates of Borrower in the ordinary course of business not in excess of One Hundred Thousand Dollars ($100,000) in the aggregate at any one time outstanding; (c) extensions of trade credit or similar advances in the ordinary course of business to any Person who is not an employee or Affiliate of Borrower; (d) hedging transactions in compliance with Section 6.9 hereof; and (e) any other Investments which have been approved in writing by Lender in Lender's sole discretion.

"Permitted Liens" means: (a) Liens in favor of Lender; (b) Liens outstanding on the date of this Agreement and set forth on Schedule 1.1(c) hereto; (c) covenants, restrictions, rights, easements, minor irregularities in title and other similar Liens that do not materially interfere with the business or operations of Borrower as presently conducted or materially impair the value of Borrower's Property to which they attach; (d) Liens for taxes, fees, assessments and governmental charges not delinquent or to the extent that payments therefor shall not at the time be required to be made in accordance with the provisions of Section 5.8 hereof; (e) Liens on Borrower's Property that secure the purchase money obligations and obligations under Capitalized Leases permitted by Section 6.1 hereof; provided, that any such Lien only covers the Property then being acquired and the Debt secured by such Lien does not exceed the value of the Property so acquired; (f) Liens of carriers, warehousemen, suppliers or other Persons that are possessory in nature arising in the ordinary course of business; (g) Liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business; (h) Liens arising from attachments or judgments, orders or decrees in circumstances not constituting an Event of Default under Section 7.1(i) hereof; (i) Liens in favor of other financial institutions arising in connection with Borrower's deposit or securities accounts held thereat; provided, that Lender has a prior perfected security interest in the amounts held in such deposit or securities accounts; (j) Liens in favor of LOLFC that secure the LOLFC DIP Financing; (k) the Permitted Priority Liens; and (l) any other Liens which have been approved in writing by Lender in Lender's sole discretion.

"Permitted Priority Liens" means: (a) Liens in favor of LOLFC on the "Senior LOLFC Collateral" (as defined in the Intercreditor Agreement) and (b) Liens on Borrower's Property that secure the purchase money obligations and obligations under Capitalized Leases permitted by Section 6.1 hereof; provided, that any such Lien only covers the Property then being acquired and the Debt secured by such Lien does not exceed the value of the Property so acquired.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, association, trust, unincorporated organization, joint venture, court or government or political subdivision or agency thereof, or other entity.

"Personal Property" means the personal property owned by Borrower and described in the Security Agreement and / or Authorizing Order, now existing or hereafter acquired.

"Petition Date" has the meaning set forth in the recitals of this Agreement.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which Borrower or its ERISA Affiliates is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pre-Petition Credit Agreement" has the meaning set forth in the recitals of this Agreement.

"Pre-Petition Forbearance Agreement" has the meaning set forth in the recitals of this Agreement.

"Pre-Petition Liens" means Lender's security interests and Liens in the Property that existed as of the Petition Date.

"Pre-Petition Loan Documents" means the Pre-Petition Credit Agreement, the Pre-Petition Forbearance Agreement and any other agreements, instruments, documents and certificates executed and/or delivered in connection with the foregoing, as each may from time to time be amended, restated, modified or otherwise supplemented.

"Pre-Petition Loans" means the loans made by Lender to Borrower prior to the Petition Date pursuant to the Pre-Petition Loan Documents.

"Post-Petition Obligations" has the meaning set forth in Section 4.1 hereof.

"Post-Petition Liens" has the meaning set forth in Section 2.7(a) hereof.

"Property" means any interest of Borrower in any kind of property or asset, whether real or personal, tangible or intangible, and includes the Collateral.

"Qualified ECP" means each Obligor that has total assets exceeding Ten Million Dollars ($10,000,000) or that constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Real Property" means the real property owned by Borrower and subject to and described in (a) that certain Deed to Secure Debt, Assignment of Leases and Rents and Security Agreement and Fixture Filing dated June 17, 2020 and recorded June 25, 2020 with the Clerk of Superior Court, Oglethorpe County, Georgia, by Borrower in favor of Lender, (b) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated June 26, 2020 and recorded July 6, 2020 with the Register of Deeds of Richmond County, North Carolina, by Borrower in favor of Lender, (c) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated June 26, 2020 and recorded July 6, 2020 with the Register of Deeds of Moore County, North Carolina, by Borrower in favor of Lender, (d) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated June 26, 2020 and recorded July 7, 2020 with the Register of Deeds of Warren County, North Carolina, by Borrower in favor of Lender, (e) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated June 26, 2020 and recorded June 26, 2020 with the Register of Deeds of Chatham County, North Carolina, by Borrower in favor of Lender and (f) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated June 26, 2020 and recorded June 26, 2020 with the

Register of Deeds of Montgomery County, North Carolina, by Borrower in favor of Lender, and, in each case, all improvements now or hereafter existing thereon.

"Revolving Credit Commitment (Hedging)" means an amount equal to Three Million Dollars ($3,000,000).

"Revolving Credit Commitment (Operating)" means an amount equal to Two Million Five Hundred Thousand Dollars ($2,500,000).

"Revolving Credit Facility (Hedging)" has the meaning set forth in Section 2.1(a) hereof.

"Revolving Credit Facility (Operating)" has the meaning set forth in Section 2.1(a) hereof.

"Revolving Credit Loans (Hedging)" has the meaning set forth in Section 2.1(b) hereof.

"Revolving Credit Loans (Operating)" has the meaning set forth in Section 2.1(b) hereof.

"Revolving Credit Maturity Date (Hedging)" has the meaning set forth in Section 2.1(d) hereof.

"Revolving Credit Maturity Date (Operating)" has the meaning set forth in Section 2.1(d) hereof.

"Revolving Credit Note (Hedging)" has the meaning set forth in Section 2.1(c) hereof.

"Revolving Credit Note (Operating)" has the meaning set forth in Section 2.1(c) hereof.

"Security Agreement" has the meaning set forth in Section 3.1(b) hereof.

"Subsidiary" shall mean any corporation, limited liability company, limited partnership, partnership, joint venture, trust or other legal entity of which Borrower owns, directly or indirectly, fifty percent (50%) or more of the outstanding voting stock or equity interests, or of which Borrower has effective control, by contract or otherwise.

"Super-Priority Administrative Expense Claim" has the meaning set forth in Section 2.7(a) hereof.

"Swap Obligation" means, with respect to any Obligor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Sweep Account" means any deposit account maintained with Lender and designated as such by Lender.

"Sweep Account Agreement" has the meaning set forth in Section 2.4(h) hereof.

"Term Loan" has the meaning set forth in Section 2.1(b) hereof.

"Term Loan Commitment" means an amount equal to Twenty-Six Million One Hundred Fifteen Thousand Seven Hundred Forty-Four and 66/100 Dollars ($26,115,744.66).

"Term Loan Facility" has the meaning set forth in Section 2.1(a) hereof.

"Term Loan Maturity Date" has the meaning set forth in Section 2.1(d) hereof.

"Term Loan Note" has the meaning set forth in Section 2.1(c) hereof.

"Transfer" means one or more sales, transfers or assignments by Lender to a third party of notes evidencing obligations to repay secured or unsecured loans owned by Lender.

"Unmatured Event of Default" means an event which with the passage of time, giving of notice or both, would become an Event of Default.

"Wean-to-Finish Operations" means the operations of Borrower involved in the taking of farrowed, weaned pigs through the nursery, growing and finishing processes of producing the Existing Pigs. For the avoidance of doubt, (a) the period of time for Wean-to-Finish Operations commences at that point in time in which Existing Pigs are weaned from their mothers and terminates at that point in time in which such Existing Pigs are delivered to third party purchasers upon reaching market weight and (b) the Wean-to-Finish Operations shall not apply to any pigs other than the Existing Pigs.

"Wean-to-Finish Operations Expenses" means those expenses incurred in the Wean-to-Finish Operations but limited to the amounts set forth in the Approved Budget (including interest payable under the Facilities).

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

1.2. Matters of Construction. The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders. Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any instruments or agreements to which Lender is a party including, without limitation, references to any of the Loan Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof.

1.3. Accounting Principles. Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, this shall be done in accordance with GAAP, to the extent applicable, except as otherwise expressly provided in this Agreement.

SECTION 2. THE CREDIT FACILITIES

2.1. Description.

(a) Subject to the other terms and conditions of this Agreement, Lender hereby agrees to make available to Borrower total credit in the amount of up to Thirty-One Million Six Hundred Fifteen Thousand Seven Hundred Forty-Four and 66/100 Dollars ($31,615,744.66) consisting of (i) a Two Million Five Hundred Thousand Dollar ($2,500,000) revolving credit facility (the "Revolving Credit Facility (Operating)"), (ii) a Three Million Dollar ($3,000,000) discretionary revolving credit facility (the "Revolving Credit Facility (Hedging)") and (iii) a

Twenty-Six Million One Hundred Fifteen Thousand Seven Hundred Forty-Four and 66/100 Dollar ($26,115,744.66) "roll-up" term loan facility (the "Term Loan Facility").

(b) The Revolving Credit Facility (Operating) permits Advances to be extended by Lender to or for the benefit of Borrower during the Availability Period in the form of revolving credit loans (the "Revolving Credit Loans (Operating)") consisting of (i) Advances used to finance one hundred percent (100%) of the Wean-to-Finish Operations Expenses incurred during the Availability Period but only to the extent provided for under the Approved Budget (and including interest payable under the Facilities) (the "Operating Advances"), (ii) Advances used to finance eighty percent (80%) of the G&A Expenses of Borrower incurred during the Availability Period but only to the extent provided for under the Approved Budget (the "G&A Expense Advances") and (iii) Advances used to finance sixty-two percent (62%) of the Bankruptcy Expenses of Borrower incurred prior to the Revolving Credit Maturity Date (Operating) but only to the extent provided for under the Approved Budget (the "Bankruptcy Expense Advances"). The aggregate outstanding principal amount of all Revolving Credit Loans (Operating), at any time, shall not exceed the Revolving Credit Commitment (Operating). Subject to such limitation, the aggregate outstanding principal amount of all Revolving Credit Loans (Operating) may fluctuate from time to time, through repayments and reborrowings. The Revolving Credit Facility (Hedging) permits Advances to be extended by Lender, in Lender's sole discretion, to or for the benefit of Borrower from time to time hereunder on or after the Closing Date in the form of revolving credit loans (the "Revolving Credit Loans (Hedging)"). Notwithstanding any provision in this Agreement to the contrary, Lender is under no obligation to make any Revolving Credit Loans (Hedging) to Borrower hereunder. Any Revolving Credit Loans (Hedging) made hereunder shall be made by Lender at its option and in its sole discretion. The aggregate outstanding principal amount of all Revolving Credit Loans (Hedging), at any time, shall not exceed the Revolving Credit Commitment (Hedging). Subject to such limitation, the aggregate outstanding principal amount of all Revolving Credit Loans (Hedging) may fluctuate from time to time, through repayments and reborrowings. The Term Loan Facility permits a single Advance to be deemed made by Lender to or for the benefit of Borrower on or after entry of the Final Order in the form of a term loan used to "roll-up", refinance and replace the Pre-Petition Obligations (the "Term Loan"). The aggregate outstanding principal amount of the Term Loan, at any time, shall not exceed the Term Loan Commitment. Any Advance under the Term Loan Facility which is repaid is not available for reborrowing. The Obligations of Borrower under the Facilities, this Agreement and the other Loan Documents shall at all times be absolute and unconditional.

(c) At the Closing, (i) Borrower shall duly execute and deliver to Lender a promissory note made payable to the order of Lender in the principal amount of the Revolving Credit Commitment (Operating) (as the same may be amended, restated, modified, supplemented, replaced or refinanced from time to time, the "Revolving Credit Note (Operating)"), (ii) Borrower shall duly execute and deliver to Lender a promissory note made payable to the order of Lender in the principal amount of the Revolving Credit Commitment (Hedging) (as the same may be amended, restated, modified, supplemented, replaced or refinanced from time to time, the "Revolving Credit Note (Hedging)") and (iii) Borrower shall duly execute and deliver to Lender a promissory note made payable to the order of Lender in the principal amount of the Term Loan Commitment (as the same may be amended, restated, modified, supplemented, replaced or refinanced from time to time, the "Term Loan Note"). The Notes shall evidence Borrower's absolute and unconditional obligation to repay Lender for all Loans made by Lender under the Facility applicable thereto, with interest as herein and therein provided. Each and every Advance under any Facility shall be evidenced by the Note applicable thereto. The Notes are incorporated herein by reference and made a part hereof. The Notes shall be substantially in the form of Exhibit B, Exhibit C and Exhibit D attached hereto.

(d) The term of the Revolving Credit Facility (Operating) shall expire on January 1, 2022. All Revolving Credit Loans (Operating) under the Revolving Credit Facility (Operating) shall be repaid on or before the earliest of (i) January 1, 2022, (ii) the effective date with respect to any plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code, (iii) termination of the Revolving Credit Facility (Operating) and (iv) termination of this Agreement (the earliest of such dates, the "Revolving Credit Maturity Date (Operating)"). After the Availability Period, no further Advances under the Revolving Credit Facility (Operating) shall be available from Lender. The term of the Revolving Credit Facility (Hedging) shall expire on January 1, 2022. All Revolving Credit Loans (Hedging) under the Revolving Credit Facility (Hedging) shall be repaid on or before the earliest of (i) January 1, 2022, (ii) the effective date with respect to any plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code, (iii) termination of the Revolving Credit Facility (Hedging) and (iv) termination of this Agreement (the earliest of such dates, the "Revolving Credit Maturity Date (Hedging)"). After the Revolving Credit Maturity Date (Hedging), no further Advances under the Revolving Credit Facility (Hedging) shall be available from Lender. The term of the Term Loan Facility shall expire on January 1, 2022. The Term Loan under the Term Loan Facility shall be repaid on or before the earliest of (i) January 1, 2022, (ii) the effective date with respect to any plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code, (iii) termination of the Term Loan Facility and (iv) termination of this Agreement (the earliest of such dates, the "Term Loan Maturity Date"). After the Term Loan Maturity Date, no further Advances under the Term Loan Maturity Date shall be available from Lender.

2.2. Funding Procedures.

(a) Borrower shall deliver to Lender a Borrowing Notice for an Advance under the Revolving Credit Facility (Operating) and Revolving Credit Facility (Hedging). No more than one (1) Borrowing Notice for an Advance under the Revolving Credit Facility (Operating) shall be delivered to Lender in any week.

(b) Any Advance to Borrower under the Revolving Credit Facility (Operating) shall be limited to the amount of Wean-to-Finish Operation Expenses, G&A Expenses and Bankruptcy Expenses to be paid by Borrower during the week commencing on the Effective Date. Any Borrowing Notice delivered to Lender for any Advance under the Revolving Credit Facility (Operating) shall be accompanied by an itemized list of all Wean-to-Finish Operation Expenses, G&A Expenses and Bankruptcy Expenses to be paid from such Advance. If Lender determines in its good faith reasonable discretion that the nature or amount of Wean-to-Finish Operation Expenses, G&A Expenses and Bankruptcy Expenses to be paid from such Advance are not provided for under the Approved Budget, Lender may withhold such Advance.

(c) Subject to the terms and conditions of this Agreement and so long as no Event of Default or Unmatured Event of Default has occurred hereunder, Lender shall make Advances to Borrower under the Revolving Credit Facility (Operating) and the Revolving Credit Facility (Hedging) on the Effective Dates specified in Borrowing Notices received by Lender if the Borrowing Notice is delivered to Lender not less than the Minimum Notice Period prior to any Effective Date, and any other conditions set forth in this Agreement are satisfied (or the next applicable Business Day if the Borrowing Notice is delivered to Lender less than the Minimum Notice Period prior to the Effective Date).

(d) Any such Advance under the Revolving Credit Facility (Operating) and Revolving Credit Facility (Hedging) shall be deposited by Lender into the Sweep Account or as otherwise directed in writing by Borrower. Borrower may transfer any such Advance to another debtor-in-

possession account (the "Disbursement Account") for further distribution pursuant to the Approved Budget.

(e) Subject to the terms and conditions of this Agreement and so long as no Event of Default or Unmatured Event of Default has occurred hereunder, effective upon entry of the Final Order and without the need for a Borrowing Notice or any further action by Borrower or Lender, the Pre-Petition Obligations shall be automatically "rolled-up" and deemed refinanced and replaced by the Term Loan on a dollar-for-dollar basis, which roll-up, refinancing and replacement shall not constitute a novation. For the avoidance of doubt, the Advance under the Term Loan Facility shall be deemed made on the books and records of Lender and shall not be made directly to Borrower.

2.3. Interest.

(a) Each Loan shall bear interest on the outstanding principal amount thereof from the date made until such Loan is paid in full. Borrower agrees to pay interest on the unpaid principal amount of each Loan from time to time outstanding hereunder at the rate of interest per annum set forth in the Note applicable thereto.

(b) If any Event of Default shall occur, the rate of interest applicable to Loans then outstanding shall be the Default Rate. The Default Rate shall apply from the date of the Event of Default until the date such Event of Default is waived or cured, as determined by Lender in its sole discretion, and interest accruing at the Default Rate shall be payable on demand.

(c) Interest shall be computed for the actual number of days elapsed on the basis of a year consisting of three hundred sixty (360) days, including the date a Loan is made and excluding the date such Loan or any portion thereof is paid or prepaid. This calculation method results in a higher effective rate than the numeric interest rates stated in the Note applicable thereto.

(d) All contractual rates of interest chargeable on any outstanding Loan shall continue to accrue and be paid even after default, maturity, acceleration, judgment, bankruptcy, insolvency proceedings of any kind or the happening of any similar event or occurrence.

(e) In no contingency or event whatsoever shall the aggregate of all amounts deemed interest hereunder and charged or collected pursuant to the terms of this Agreement exceed the highest rate of interest permissible under applicable law. In the event that any court of competent jurisdiction determines Lender has charged or received interest hereunder in excess of the highest applicable rate of interest, Lender may, in its sole discretion, apply and set off such excess interest received by Lender against other Obligations due or to become due and such rate of interest shall automatically be reduced to the maximum rate of interest permitted by such law.

2.4. Payments.

(a) All accrued interest on the Revolving Credit Loans (Operating) shall be due and payable in arrears (i) on the first (1st) day of each month, commencing on June 1, 2021, until the Revolving Credit Maturity Date (Operating), (ii) on the Revolving Credit Maturity Date (Operating) and (iii) upon payment in full. All accrued interest on the Revolving Credit Loans (Hedging) shall be due and payable in arrears (i) on the first (1st) day of each month, commencing on June 1, 2021, until the Revolving Credit Maturity Date (Hedging), (ii) on the Revolving Credit Maturity Date (Hedging) and (iii) upon payment in full. All accrued interest on

the Term Loan shall be due and payable in arrears (i) on the first (1st) day of each month, commencing on the first (1st) day of the month occurring after entry of the Final Order, until the Term Loan Maturity Date, (ii) on the Term Loan Maturity Date and (iii) upon payment in full. After the Revolving Credit Maturity Date (Operating), Revolving Credit Maturity Date (Hedging) or Term Loan Maturity Date, as applicable, interest shall be due and payable on demand.

(b)    If, at any time, the aggregate principal amount of all Revolving Credit Loans (Operating) outstanding exceeds the Revolving Credit Commitment (Operating) then in effect, Borrower shall immediately make such principal prepayments of the Revolving Credit Loans (Operating) as is necessary to eliminate such excess.  If, at any time, the aggregate principal amount of all Revolving Credit Loans (Hedging) outstanding exceeds the Revolving Credit Commitment (Hedging) then in effect, Borrower shall immediately make such principal prepayments of the Revolving Credit Loans (Hedging) as is necessary to eliminate such excess.

(c)    The entire outstanding principal balance of the Revolving Credit Loans (Operating), together with all unpaid accrued interest thereon, shall be due and payable on the Revolving Credit Maturity Date (Operating).  The entire outstanding principal balance of the Revolving Credit Loans (Hedging), together with all unpaid accrued interest thereon, shall be due and payable on the Revolving Credit Maturity Date (Hedging).  The entire outstanding principal balance of the Term Loan, together with all unpaid accrued interest thereon, shall be due and payable on the Term Loan Maturity Date.

(d)    In addition to the payments of principal required by Section 2.4(c) hereof, Borrower shall repay the Revolving Credit Facility (Hedging) by making payments of principal to Lender in amounts equal to the proceeds received by Borrower from the hedging trades and transactions that are conducted by Borrower within one (1) day after Borrower's receipt of such proceeds.  Such payments shall be applied as payments on the Facilities (first, to the principal of the Revolving Credit Facility (Hedging) and thereafter to the Facilities as determined by Lender in its sole discretion).

(e)    Borrower may prepay, without premium or penalty, all or any part of the principal of the Loans at any time.

(f)    Subject to Sections 2.4(d) and (h) hereof, all payments and prepayments shall be applied first to unpaid interest, second to the principal of the Loans (in such order as determined by Lender in its sole discretion), third as adequate protection (to the extent approved by the Bankruptcy Court) for Lender's Liens securing the Pre-Petition Loans (including Liens in the Cash Collateral), fourth to any unpaid fees and expenses (to the extent such fees and expenses have been approved by the Bankruptcy Court) and thereafter to other amounts due Lender. Except as otherwise provided herein, all payments of principal, interest, fees or other amounts payable by Borrower hereunder shall be remitted to Lender in immediately available funds and in lawful money of the United States of America not later than 2:30 p.m., Omaha time, on the day due, at Lender's principal office in Omaha, Nebraska or at such other address as may be designated by Lender in writing. Whenever any payment is stated as due on a day which is not a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day and interest shall continue to accrue during such extension.

(g)    Borrower hereby authorizes Lender to automatically deduct the amount of any payment owed under this Agreement, the Notes or any other Loan Document from the Sweep Account.  If the funds in the account are insufficient to cover any payment, Lender shall not be obligated to advance funds to cover the payment.

(h) At the election of Lender, the Revolving Credit Facility (Operating) may be linked to the Sweep Account pursuant to any agreement between Borrower and Lender establishing a sweep account arrangement (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Sweep Account Agreement"). All references in the Sweep Account Agreement to a line of credit are amended to refer to the Revolving Credit Facility (Operating). For as long as the Revolving Credit Facility (Operating) is linked to the Sweep Account, Lender is authorized and directed to (i) disburse Advances under the Revolving Credit Facility (Operating) for deposit into the Sweep Account on each applicable Effective Day and (ii) disburse all collected funds in the Sweep Account on each Business Day to Lender to be applied as payments on the Facilities (first, to the principal of the Revolving Credit Facility (Operating) and thereafter to the Facilities as determined by Lender in its sole discretion).

2.5. Use of Proceeds.

(a) The proceeds of the Operating Advances shall be used exclusively to finance one hundred percent (100%) of the Wean-to-Finish Operations Expenses incurred during the Availability Period but only to the extent provided for under the Approved Budget. The proceeds of the G&A Expense Advances shall be used exclusively to finance eighty percent (80%) of the G&A Expenses of Borrower incurred during the Availability Period but only to the extent provided for under the Approved Budget. The Bankruptcy Expense Advances shall be used exclusively to finance sixty-two percent (62%) of the Bankruptcy Expenses of Borrower incurred prior to the Revolving Credit Maturity Date (Operating) but only to the extent provided for under the Approved Budget. The proceeds of the Revolving Credit Loans (Hedging) shall be used to finance margin calls on the Hedging Accounts. The proceeds of the Term Loan shall, on a dollar-for-dollar basis, be used to roll-up, refinance and replace the Pre-Petition Obligations.

(b) No part of the proceeds of the Loans under this Agreement, the loans under the Pre-Petition Loan Documents or the Cash Collateral shall be used (i) to investigate or prosecute, or for proceedings to contest, (A) the claims and Obligations of Lender under this Agreement or the Pre-Petition Loan Documents, (B) the security interests and Liens in favor of Lender that secure the Obligations under this Agreement or the Pre-Petition Loan Documents or (C) the Super-Priority Administrative Expense Claim or Post-Petition Liens or (ii) to prevent, hinder or delay any of Lender's rights or remedies arising under this Agreement or the Pre-Petition Loan Documents.

2.6. Late Fees. If any payment (other than any payment due on the Revolving Credit Maturity Date (Operating), Revolving Credit Maturity Date (Hedging) or Term Loan Maturity Date) hereunder is ten (10) days or more late, Borrower shall owe Lender a fee equal to the greater of (i) five percent (5%) of such payment or (ii) Twenty-Five Dollars ($25.00).

2.7. Super-Priority Administrative Expense Claim and Post-Petition Liens.

(a) Subject to entry and terms of the Authorizing Order, all of the Obligations shall, subject to the Carve-Out, at all times:

(i) pursuant to Section 364(c)(1) of the Bankruptcy Code and the Authorizing Order, constitute an allowed super-priority administrative expense claim against Borrower (without the need to file any proof of claim) with priority over any and all claims against Borrower, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses

or other claims arising under Sections 105, 326, 328, 330, 331, 363, 364(c)(1), 365, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 507(d), 726, 1113 or 1114 of the Bankruptcy Code (including any adequate protection obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "Super-Priority Administrative Expense Claim"), which allowed Super-Priority Administrative Expense Claim shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered an administrative expense allowed under Section 503(b) of the Bankruptcy Code, and shall be payable from and have recourse to all pre- and post-petition assets and Property of Borrower, whether existing on the Petition Date or thereafter acquired, and all proceeds thereof (excluding Avoidance Actions), subject only to the Carve-Out and the Permitted Priority Liens.    The Super-Priority Administrative Expense Claim shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event the Authorizing Order or any provision thereof is vacated, reversed, amended or otherwise modified, on appeal or otherwise.    Notwithstanding any provision in this Agreement to the contrary, the amount of the Super-Priority Administrative Expense Claim shall not exceed the value of Lender's secured claim in the Collateral;

(ii)    pursuant to Section 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, the Loan Documents and the Authorizing Order, be secured by a valid, binding, perfected, continuing, enforceable, non-avoidable first priority security interest in and Lien on all Collateral and all other Property of Borrower, subject only to the Carve-Out and the Permitted Priority Liens, to the extent such Collateral and Property is not subject to a valid, enforceable, perfected and non-avoidable Lien as of the Petition Date; and

(iii)    pursuant to Sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the Loan Documents and the Authorizing Order, be secured by a valid, binding, perfected, continuing, enforceable, non-avoidable first priority security interest in and Lien on all Collateral and all other Property of Borrower (excluding Avoidance Actions), subject only to the Carve-Out and the Permitted Priority Liens which security interests and Liens shall, in each case, be senior to and prime all other security interests and Liens, subject only to the Carve-Out and the Permitted Priority Liens (the security interests and Liens described in subsections (ii) and (iii) of this Section 2.7(a) shall be referred to collectively as the "Post-Petition Liens").

(b)    Pursuant to and in accordance with the Authorizing Order, the Post-Petition Liens shall not at any time be (i) made subject or subordinate to, or made pari passu with, any other Lien or claim existing as of the Petition Date, or created under Sections 363 or 364 of the Bankruptcy Code or otherwise, other than the Permitted Priority Liens, or (ii) avoidable or subject to preservation for the benefit of Borrower's estate under Section 551 of the Bankruptcy Code.

(c)    Upon (and at all times after) the entry, and subject to the terms, of the Authorizing Order, the Authorizing Order and the Loan Documents are sufficient to provide the Super-Priority Administrative Expense Claim and Post-Petition Liens.

(d) Pursuant to and in accordance with the Authorizing Order and the Loan Documents, the Post-Petition Liens shall be deemed fully perfected Liens, effective and perfected upon the date of the Authorizing Order without the necessity of execution by Borrower of mortgages, security agreements, pledge agreements, financing agreements, financing statements or other agreements or instruments, such that no additional steps need be taken by Lender to perfect such interests. Subject to notice of hearing and entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other instrument or agreement that requires the consent or approval of one or more landlords, licensors or other parties in order for Borrower to pledge, grant, mortgage, sell, assign or otherwise transfer any fee or leasehold interest or the proceeds thereof or other Collateral or Property, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the transactions granting Lender the Post-Petition Liens on such fee, leasehold or other interest or other Collateral or Property or the proceeds of any assignment, sale or other transfer thereof.

(e) Pursuant to and in accordance with the Authorizing Order and the Loan Documents, the Super-Priority Administrative Expense Claim, Post-Petition Liens and other rights and remedies granted to Lender shall continue in the Bankruptcy Case, and such Super-Priority Administrative Expense Claim and Post-Petition Liens shall maintain their enforceability and priority until all the Obligations have been indefeasibly paid in full in cash and completely satisfied and the Facilities been terminated in accordance with this Agreement.

2.8. Increased Costs.

(a) If any Change in Law shall: (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, Lender; or (ii) impose on Lender or the London interbank market any other condition affecting this Agreement; and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by Lender (whether of principal, interest or otherwise), then Borrower shall pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

(b) If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on Lender's capital or on the capital of Lender's holding company, if any, as a consequence of this Agreement to a level below that which Lender or Lender's holding company, if any, would have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company, if any, with respect to capital adequacy), then from time to time Borrower shall pay to Lender such additional amount or amounts as will compensate Lender or Lender's holding company, if any, for any such reduction suffered.

(c) A certificate of Lender setting forth the amount or amounts necessary to compensate Lender or its holding company, if any, as specified in paragraphs (a) or (b) above shall be delivered to Borrower demonstrating in reasonable detail the calculation of the amounts, and shall be conclusive absent manifest error. Borrower shall pay Lender the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

(d) Failure or delay on the part of Lender to demand compensation pursuant to this Section 2.8 shall not constitute a waiver of Lender's right to demand such compensation; provided that Borrower shall not be required to compensate Lender pursuant to this Section 2.8 for any increased costs or reductions incurred more than one hundred eighty (180) days prior to

the date that Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive and if Lender notifies Borrower of such Change in Law within one hundred eighty (180) days after the adoption, enactment or similar act with respect to such Change in Law, then the one hundred eighty (180) day period referred to above shall be extended to include the period from the effective date of such Change in Law to the date of such notice.

2.9. Taxes.

(a) Any and all payments by or on account of any obligation of Borrower under this Agreement or any other Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions applicable to additional sums payable under this Section 2.9) Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions or withholdings and (iii) Borrower shall pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law.

(b) In addition, Borrower shall pay any Other Taxes to the relevant governmental authority in accordance with applicable law.

(c) Borrower shall indemnify Lender, within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by Lender on or with respect to any payment by or on account of any obligation of Borrower under this Agreement or any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.9) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to Borrower by Lender demonstrating in reasonable detail the calculation of the amounts, shall be conclusive absent manifest error. However, Lender shall not be entitled to receive any payment with respect to Indemnified Taxes or Other Taxes that are incurred or accrued more than one hundred eighty (180) days prior to the date Lender gives notice and demand thereof to Borrower.

(d) As soon as reasonably practicable after any payment of Indemnified Taxes or Other Taxes by Borrower to a governmental authority, Borrower shall deliver to Lender the original or a certified copy of a receipt issued by such governmental authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(e) Lender, if requested by Borrower, shall deliver such properly completed and executed documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not Lender is subject to backup withholding or information reporting requirements.

(f) If Lender determines, in its reasonable discretion, that it has received a refund of any taxes or Other Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section 2.9, it shall pay over such refund to Borrower (but only to the extent of indemnity payments made, or additional amounts

paid, by Borrower under this Section 2.9 with respect to the taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of Lender and without interest (other than any interest paid by the relevant governmental authority with respect to such refund); provided, that Borrower, upon the request of Lender, agree to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant governmental authority) to Lender in the event Lender is required to repay such refund to such governmental authority. This Section 2.9 shall not be construed to require Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to Borrower or any other Person.

## SECTION 3. CLOSING AND CONDITIONS PRECEDENT TO ADVANCES

Closing under this Agreement and the making of each Advance are subject to the satisfaction or waiver of the following conditions precedent (all documents to be in form and substance satisfactory to Lender):

3.1. Conditions Precedent to Closing. Prior to the Closing, Borrower shall have delivered to Lender the following:

(a) A duly and fully executed Agreement, Revolving Credit Note (Operating), Revolving Credit Note (Hedging) and Term Loan Note.

(b) A duly and fully executed security agreement by Borrower (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Security Agreement") and UCC-1 Financing Statement. The Security Agreement, UCC-1 Financing Statement and Authorizing Order shall secure the Obligations and create a first priority perfected security interest in the Personal Property, subject only to the Permitted Priority Liens.

(c) Duly and fully executed deeds of trust with respect to the Real Property (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Mortgages") and UCC-1 Fixture Filings. The Mortgages, UCC-1 Fixture Filings and Authorizing Order shall secure the Obligations and create a first priority lien on the Real Property, subject only to the Permitted Priority Liens.

(d) Duly and fully executed guaranty agreements by Guarantors (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Guaranty Agreements").

(e) Duly and fully executed control agreements with respect to the hedging and commodity trading accounts set forth on Schedule 4.18 hereto (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Control Agreements"). The Control Agreements and Authorizing Order shall secure the Obligations and create a first priority perfected security interest on the hedging and commodity trading accounts set forth on Schedule 4.18 hereto, subject only to the Permitted Priority Liens.

(f) A duly and fully executed intercreditor agreement with LOLFC (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Intercreditor Agreement").

(g) Each instrument, document and agreement required to be executed under any provision of this Agreement or any other Loan Document.

(h) A certified copy of (i) resolutions of the Governing Body of Borrower authorizing the execution, delivery and performance of this Agreement and the other Loan Documents and the transactions contemplated thereby and (ii) Borrower's organizational and governing documents and agreements.

(i) An incumbency certificate identifying all Authorized Representatives and any Person executing this Agreement and the other Loan Documents, with specimen signatures.

(j) A certificate of existence for Borrower issued by the appropriate governmental authority.

(k) Satisfactory evidence of "all risk" property insurance coverage on Borrower's Property and general liability, business interruption, auto liability, worker's compensation and other insurance of Borrower, as may be required by any of the Loan Documents or Lender.

(l) An inventory of the Existing Pigs as of the Petition Date.

(m) The Approved Budget, in form and substance satisfactory to Lender.

(n) The Interim Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been stayed, vacated, reversed or rescinded and any appeal of such order shall not have been timely filed. Borrower shall be in compliance in all respects with the Interim Order.

(o) All other "first day orders" or other orders to be entered on prior to the Closing Date (including, without limitation, an order of the Bankruptcy Court approving the LOLFC DIP Financing) shall be reasonably satisfactory to Lender in all respects, shall have been entered by the Bankruptcy Court and shall not have been stayed, vacated, reversed or rescinded and any appeal of such orders shall not have been timely filed.

(p) All other instruments, certificates, documents, information and reports reasonably required or requested to be executed and/or delivered by Borrower or Guarantor in the sole discretion of Lender.

3.2. Conditions Precedent to Advances. Lender's obligation to make Advances shall be subject to the satisfaction of each of the following conditions:

(a) All representations and warranties of Borrower and Guarantor in this Agreement and the other Loan Documents shall be deemed reaffirmed as of the making of such Advance and shall be true, correct and complete in all material respects both before and after giving effect to such Advance (except for those representations and warranties which specifically relate to an earlier date, in which case such representations and warranties shall be true, correct and complete as of such earlier date); provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided,

further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date.

(b) No Event of Default or Unmatured Event of Default shall have occurred and be continuing, Borrower and Guarantor shall be in compliance with this Agreement and the other Loan Documents and Borrower and Guarantor shall be deemed to have certified such matters to Lender.

(c) The Interim Order and, following entry of the Final Order, the Final Order, shall be in full force and effect, and shall not have been stayed, vacated, reversed or rescinded and any appeal of such order shall not have been timely filed.

(d) Since the Closing Date, there shall have been no change that has had or could reasonably be expected to have a Material Adverse Effect.

(e) No injunction, writ, restraining order or other order of any nature prohibiting, directly or indirectly, the extending of credit hereunder shall have been issued by any court of competent jurisdiction against Borrower, Lender or any of their Affiliates and remain in force.

(f) The Approved Budget shall be in full force and effect and acceptable to Lender in Lender's sole discretion. Since the Closing Date, Borrower shall have (i) conducted its operations and made disbursements strictly within the Approved Budget, except to the extent consented to by Lender in writing, and (ii) obtained receipts and revenues in the amounts set forth in the Approved Budget.

(g) Borrower and Guarantor shall have taken such other actions, including the delivery of instruments, documents and agreements, as Lender may reasonably request.

3.3. Compliance with this Agreement. Borrower shall have performed and complied with all agreements, covenants and conditions contained herein including, without limitation, the provisions of Sections 5 and 6 hereof, which are required to be performed or complied with by Borrower before or at the Closing Date and as of the date of each Advance.

3.4. Closing. Subject to the conditions of this Section 3 and the other terms and conditions of this Agreement, the Facilities shall be made available to Borrower on the date (the "Closing Date") this Agreement is duly executed and delivered to Lender and all of the conditions contained in Section 3.1 hereof are satisfied or waived (the "Closing").

3.5. Non-Waiver of Rights. By completing the Closing hereunder, or by making Advances hereunder, Lender does not thereby waive a breach of any representation, warranty or covenant made by Borrower or Guarantor hereunder or under any agreement, document or instrument delivered to Lender or otherwise referred to herein, and any claims and rights of Lender resulting from any breach or misrepresentation by Borrower or Guarantor are specifically reserved by Lender.

## SECTION 4. REPRESENTATIONS AND WARRANTIES

To induce Lender to complete the Closing and make Advances under the Facilities, Borrower represents and warrants to Lender that:

4.1. Pre-Petition Obligations. As of the Petition Date, Borrower is indebted to Lender in the aggregate amount of Twenty-Six Million One Hundred Fifteen Thousand Seven Hundred Forty-Four and 66/100 Dollars ($26,115,744.66) under the Pre-Petition Loan Documents (the "Pre-Petition Obligations"), exclusive of fees, costs and expenses, consisting of (i) Twenty-Six Million Sixty-Six Thousand Three Hundred Eighty-Five and 34/100 Dollars ($26,066,385.34) in principal and (ii) Forty-Nine Thousand Three Hundred Fifty-Nine and 32/100 Dollars ($49,359.32) in accrued interest. The Pre-Petition Obligations, the Pre-Petition Loans and the Pre-Petition Liens are valid, binding and enforceable, and Borrower has no defense thereto.

4.2. Organization, Powers, Authorization, Enforceability and Pre-Petition Loans.

(a) Borrower is duly organized and validly existing under the laws of the state of its organization, has lawful power and authority to engage in the business it conducts and is qualified to do business and validly existing or in good standing, as applicable, in each state and other jurisdiction where the nature and extent of its business requires qualification, except where the failure to so qualify could not have a Material Adverse Effect.

(b) Borrower has all requisite power and authority to enter into and perform this Agreement and the other Loan Documents and to incur the Obligations herein provided for, and has taken all proper and necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents.

(c) This Agreement and the other Loan Documents, when executed and delivered, will be legal, valid and binding upon Borrower and Guarantor, as applicable, and enforceable against Borrower and Guarantor, as applicable, in accordance with their respective terms, except to the extent enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and by general principles of equity.

4.3. No Conflicts. The execution, delivery and performance of this Agreement, the other Loan Documents and all related agreements and each document required by any provision hereof by Borrower will not violate any law, government rule or regulation, violate the organizational or governing documents and agreements of Borrower or violate or result in a default of (immediately or with the passage of time) any contract, agreement or instrument to which Borrower is a party, or by which Borrower or its Property is bound. Borrower is not in violation of nor has it knowingly caused any Person to violate any term of any agreement or instrument to which it is a party or by which it or its Property may be bound, which violation could reasonably be expected to have a Material Adverse Effect. Borrower is not in violation of its organizational or governing documents and agreements.

4.4. Financial Condition / Full Disclosure. Borrower has delivered to Lender the audited balance sheets, statements of income, statements of equity (deficit) and statements of cash flows of Borrower as of and for its fiscal year ended on March 31, 2020. Such financial statements present fairly the financial condition and results of operations and cash flows of Borrower as of such date and for such period in accordance with GAAP. The other financial statements and information relating to Borrower or Guarantor and delivered to Lender in connection with the negotiation of this Agreement present fairly the financial condition of Borrower or Guarantor, as applicable, as of the date thereof and the results of operations and cash flows as of the period thereof. Since the Petition Date, there has been no Material Adverse Effect. Neither the written statements furnished by Borrower to Lender in connection with the negotiation of this Agreement nor those contained in any financial statements or documents relating to Borrower or Guarantor contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. Any

projected financial statements and information relating to Borrower and delivered to Lender in connection with the negotiation of this Agreement have been prepared in good faith on the basis of assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation, it being understood that actual results may vary from such projections.

4.5. Governmental Approval. Neither the nature of Borrower or of Borrower's business or Property, nor any relationship between Borrower and any other Person, nor any circumstance affecting Borrower in connection with the issuance or delivery of any Loan Document, is such as to require a consent, approval or authorization of, or filing, registration or qualification with, any governmental authority on the part of Borrower in connection with the execution and delivery of this Agreement or the other Loan Documents, except for filings and recordings for collateral security purposes.

4.6. Pending Litigation. Except as set forth on Schedule 4.6 hereto, there are no judgments, judicial or administrative orders, suits, actions, proceedings or investigations (civil or criminal) pending, or to the knowledge of Borrower, threatened, against Borrower or affecting any of its Property in any court or before any governmental authority, regulatory agency or arbitration board or tribunal which, if adversely determined, could reasonably be expected to have a Material Adverse Effect. Borrower is not in default with respect to any order of any court, governmental authority, regulatory agency or arbitration board or tribunal. To the knowledge of Borrower, no shareholder, director, officer, employee or Affiliate of Borrower has been indicted or convicted in connection with or is engaging in any criminal conduct, or is currently subject to any lawsuit or proceeding or under investigation in connection with any anti-racketeering or other related conduct or activity.

4.7. Taxes. All tax returns required to be filed by Borrower in any jurisdiction have in fact been filed, and all taxes, assessments, fees and other governmental charges upon Borrower, or any of its Property, income or franchises, which are shown to be due and payable on such returns have been paid, except for those taxes being contested in good faith with due diligence by appropriate proceedings and for which adequate reserves are maintained. Borrower is not aware of any proposed additional material tax assessment or material tax to be assessed against or applicable to Borrower.

4.8. Insurance. All premiums due in respect of all insurance maintained by Borrower or with respect to its Property have been paid.

4.9. Contracts, Etc.

(a) Borrower is not a party to any contract or agreement, or subject to any other restriction, which unduly and unreasonably materially and adversely affects its business, financial condition, Property or prospects.

(b) Except as otherwise specifically provided in this Agreement, Borrower has not agreed or consented to cause or permit any of its Property to be subject in the future (upon the happening of a contingency or otherwise) to any Lien, except the Permitted Liens.

4.10. Compliance with Laws. Borrower is not in violation of, has not received written notice that it is in violation of, nor has it knowingly caused any Person to violate, any applicable statute, regulation or ordinance of the United States of America, or of any state, city, town, municipality, county or of any other jurisdiction, or of any agency, or department thereof (including without limitation, environmental laws and regulations), which violation could reasonably be expected to have a Material Adverse Effect.

4.11. Equity Interests. The authorized and outstanding equity interests of Borrower are owned as set forth on Schedule 4.11 hereto. All of the equity interests of Borrower have been duly and validly authorized and issued and are fully paid and non-assessable and have been sold and delivered to the holder thereof in compliance with, or under valid exemption from, all federal and state laws and the rules and regulations of all regulatory bodies thereof governing the sale and delivery of securities. There are no subscriptions, warrants, options, calls, commitments, rights or agreements by which Borrower is bound relating to the issuance, transfer, voting or redemption of Borrower's equity interests or any pre-emptive rights held by any Person with respect to the equity interests of Borrower. Borrower has not issued any securities convertible into or exchangeable for its equity interests or any options, warrants or other rights to acquire such equity interests or securities convertible into or exchangeable for such equity interests.

4.12. Investments and Subsidiaries. Borrower does not have any Investments, except Permitted Investments. Borrower does not have any Subsidiaries.

4.13. Labor Matters. There are no strikes, lockouts or slowdowns against Borrower pending or, to the knowledge of Borrower, threatened. The hours worked by and payments made to employees of Borrower have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters. All payments due from Borrower, or for which any claim may be made against Borrower, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Borrower.

4.14. ERISA. Neither Borrower nor any of its ERISA Affiliates has received any notice or has any knowledge to the effect that it is not in compliance in all material respect with any of the requirements of ERISA, the Code or applicable state law with respect to any Plan. No ERISA Event has occurred or is reasonably expected to occur. The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan.

4.15. Debt. Borrower does not have existing Debt, except Permitted Debt.

4.16. Title to Property. Borrower has good and marketable title to its Property, free from all Liens, except Permitted Liens. Borrower's Property is not subject to any right of first refusal, right of first offer, option to purchase or lease.

4.17. Collateral Locations. Attached hereto as Schedule 4.17 is a complete and accurate list showing all places at which the Collateral is located on the date hereof. Such list indicates whether the premises are owned or leased by Borrower or whether the premises are the premises of a lessor, warehouseman, bailee or other third party, and if owned by a third party, the name, address and telephone number of such third party.

4.18. Location of Bank and Brokerage Accounts. Attached hereto as Schedule 4.18 is a complete and accurate list of all deposit, checking, savings, securities, investment, hedging, commodity trading and other accounts maintained with any bank, broker or dealer and all other similar accounts maintained by Borrower on the date hereof, together with a description thereof. Each of the accounts set forth on Schedule 4.18 hereto is maintained with the corresponding financial institution indicated thereon.

4.19. Investment Company Act, Etc. Borrower is not (a) an "investment company," as defined in, or subject to regulations under, the Investment Company Act of 1940, as amended, (b) a "holding company," as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935, as amended, or (c) otherwise subject to any other regulatory scheme limiting its ability to incur Debt.

4.20. Intellectual Property. Borrower owns, licenses or possesses the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, licenses, technology, software, know-how, database rights, rights of privacy and publicity and other intellectual property rights (collectively, "IP Rights") that are necessary for the operation of its business as currently conducted, and, without infringement of the rights of any Person. The operation of the business of Borrower as currently conducted does not infringe upon, misuse, misappropriate or violate any IP Rights held by any Person. No claim or litigation regarding any IP Rights is pending or, to the knowledge of Borrower, threatened against Borrower which, if adversely determined, could reasonably be expected to have a Material Adverse Effect.

4.21. Environmental Compliance. Borrower has obtained all permits, licenses and other authorizations which are required under federal, state and local laws and regulations relating to emissions, discharges, releases of pollutants, contaminants, hazardous or toxic materials, or wastes into ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants or hazardous or toxic materials or wastes ("Environmental Laws") at its facilities or in connection with the operation of its facilities. Borrower and all activities of Borrower, at its facilities, comply in all material respects with all Environmental Laws and with all material terms and conditions of any required permits, licenses and authorizations applicable to such Person with respect thereto. Borrower is in compliance in all material respects with all limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in Environmental Laws or contained in any plan, order, decree, judgment or notice of which Borrower is aware. Borrower is not aware of, nor has Borrower received notice of, any events, conditions, circumstances, activities, practices, incidents, actions or plans which may interfere with or prevent continued compliance in all material respects with, or which may give rise to any liability under, any Environmental Laws.

## SECTION 5. BORROWER'S AFFIRMATIVE COVENANTS

Borrower covenants that until all of the Obligations are paid and satisfied in full and the Facilities have been terminated:

5.1. Financial and Business Information. Borrower shall deliver to Lender the following (all to be in form and substance satisfactory to Lender):

(a) as soon as available, but in any event within ninety (90) days after the end of each fiscal year of Borrower, financial statements of Borrower for such fiscal year which present fairly Borrower's financial condition, including balance sheets as of the end of such fiscal year and statements of income, statements of equity (deficit) and statements of cash flows for such fiscal year, all on a consolidated basis and accompanied by consolidating schedules, prepared in accordance with GAAP, and compiled by an independent certified public accounting firm of recognized standing selected by Borrower and reasonably satisfactory to Lender;

(b) as soon as available, but in any event within thirty (30) days after the end of each month, internally-prepared financial statements of Borrower for such month,

along with year to date information and comparative information from the same periods of the preceding fiscal year, which present fairly Borrower's financial condition, including balance sheets as of the end of such month and statements of income for such month, prepared in accordance with GAAP (subject to the absence of footnotes);

(c) promptly upon receipt, daily and monthly electronic copies of all broker statements for Hedging Accounts showing all activity in each such account (including all open positions of Borrower in lean hog futures contracts traded on the CME and lean hog option contracts traded on the CME, which positions are maintained in Hedging Accounts for purposes of hedging finisher pigs against price decreases);

(d) as soon as available, but in any event within ten (10) days after execution, copies of any agreements entered into by Borrower providing for the sale of hogs and any amendments, restatements, modifications or supplements to any such agreements;

(e) at all times, view-only access to the online account information for the Disbursement Account;

(f) as soon as available and for the duration of the Approved Budget, but in any event within six (6) days after the end of each week, the weekly actual cash flow reports of Borrower, compared to each line item in the Approved Budget for each such week;

(g) as soon as available, but in any event within six (6) days after the end of each week, an inventory of the Existing Pigs as of the last day of such week;

(h) as soon as available, but in any event at least five (5) days prior to approval, a draft of the Hedging Policy, and a final copy of the Hedging Policy within five (5) days after approval; and

(i) such other data, reports, statements and information (financial or otherwise) as Lender may reasonably request.

5.2. Tax Returns and Reports. Upon the request of Lender, Borrower shall promptly furnish Lender with copies of the annual federal and state income tax returns of Borrower and Guarantor requested by Lender.

5.3. Certain Notices. Borrower shall deliver written notice to Lender of the occurrence of any of the following conditions or events promptly upon Borrower or any shareholder, director, officer, employee or Affiliate of Borrower becoming aware of any such condition or event:

(a) any condition or event which constitutes an Event of Default or Unmatured Event of Default, such notice to specify the nature and period of existence thereof and what action Borrower is taking (and proposes to take) with respect thereto;

(b) any condition or event which could reasonably be expected to have a Material Adverse Effect, such notice to specify the nature and period of existence thereof and such anticipated Material Adverse Effect;

(c) any litigation claiming in excess of One Hundred Thousand Dollars ($100,000) from Borrower, or which could otherwise have a Material Adverse Effect; or

(d) any damage, loss, theft or destruction in excess of One Hundred Thousand Dollars ($100,000) with respect to any portion of Borrower's Property, or which could otherwise have a Material Adverse Effect; or

(e) satisfaction of any Milestone or failure to satisfy any Milestone in accordance with Section 5.16 hereof.

5.4. Places of Business; Jurisdiction of Organization; Name. Borrower shall give thirty (30) days prior written notice to Lender of any changes in the location of its chief executive office or any other places of business, any changes in its jurisdiction of organization, change of name or the establishment of any new, or the discontinuance of any existing, place of business.

5.5. Business Conducted, Financial Records and Existence and Rights.

(a) Borrower shall continue in the primary business presently engaged in by it, it being agreed that Borrower may engage in businesses reasonably related to its primary business.

(b) Borrower shall keep current and accurate books of records and accounts in which full and correct entries will be made of all of its business transactions, and will reflect in its financial statements adequate accruals and appropriations to reserves, all in accordance with GAAP. All books of records and accounts shall separate all entries between the Farrow-to-Wean Operations and the Wean-to-Finish Operations including, but not limited to, all expenses and revenues. Borrower shall provide written notice to Lender promptly upon any change to its fiscal year end date.

(c) Borrower shall do (or cause to be done) all things reasonably necessary to preserve and keep in full force and effect its legal existence, rights and franchises.

5.6. Maintenance of Insurance.

(a) Borrower shall keep its business and the Collateral insured for such risks, in such amounts, with such deductibles and with such insurers as are customarily used by companies operating in the same industry as Borrower or which Borrower has historically used (and which is reasonably acceptable to Lender).

(b) Borrower shall maintain, or cause to be maintained, general liability, business interruption, auto liability, worker's compensation and other insurance in such amounts, with such deductibles and with such insurers as are customarily used by companies operating in the same industry as Borrower or which Borrower has historically used (and which is reasonably acceptable to Lender).

(c) The policies of all such insurance shall contain standard lender loss payable and additional insured clauses issued in favor of Lender pursuant to which all losses thereunder shall be paid to Lender as Lender's interests may appear. Such policies shall expressly provide that the requisite insurance cannot be materially altered or canceled without thirty (30) days prior written notice to Lender and shall insure Lender notwithstanding the act or neglect of the insured. Upon the request of Lender, Borrower shall furnish Lender with insurance certificates certified as true and correct and being in full force and effect or such other evidence of insurance

as Lender may require. Such insurance certificates shall name Lender as loss payee and as additional insured. In the event Borrower fails to procure or cause to be procured any such insurance or to timely pay or cause to be paid the premium(s) on any such insurance, Lender may do so for Borrower, but Borrower shall continue to be liable for the same. Borrower hereby appoints Lender as its attorney-in-fact, exercisable at Lender's option, to endorse any check which may be payable to Borrower in order to collect the proceeds of such insurance.

5.7. Compliance with Laws. Borrower shall be in compliance with any and all laws, ordinances, governmental rules and regulations, and court or administrative orders or decrees to which it or its Property is subject, whether federal, state or local (including, without limitation, environmental or environmental-related laws, statutes, ordinances, rules, regulations and notices) and shall obtain and maintain any and all licenses, permits, franchises, certificates or other governmental authorizations necessary to the ownership of its Property and to the conduct of its businesses.

5.8. Payment of Obligations, Taxes and Claims. On a post-Petition Date basis, Borrower shall pay, before they become delinquent, all debts, obligations, taxes, assessments, governmental charges, levies and claims imposed upon it or upon its Property, except for those being contested in good faith with due diligence by appropriate proceedings and for which adequate reserves are maintained in accordance with GAAP.

5.9. Maintenance of Property / Inspection. Borrower shall keep and maintain its Property in good working order and condition, ordinary wear and tear excepted. Borrower shall, during regular business hours upon reasonable advance notice, permit any of Lender's officers or other representatives to visit and inspect Borrower's Property, to examine and audit all of Borrower's books of account, records, reports and other papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with the shareholders, directors, officers, employees, Affiliates and independent certified public accountants of Borrower.

5.10. Collateral Locations. Borrower shall keep the Collateral at the locations set forth on Schedule 4.17 hereto and not move any Collateral to any location not shown on Schedule 4.17 hereto, except in connection with sales of Collateral made in the ordinary course of Borrower's business.

5.11. Purchase of Farm Products. Borrower shall utilize reasonable good faith efforts in connection with its purchase or other acquisition of any Farm Products to insure that all Liens in such Farm Products have been terminated or released.

5.12. Packers and Stockyards Act. Borrower shall comply with the Packers and Stockyards Act so that the trust for the benefit of all unpaid cash sellers or growers of livestock covered thereby shall not arise in connection with its purchase of any such livestock. Borrower shall not take any action which would impair its ability to benefit from the trust established under such Act in connection with any sales by Borrower of livestock covered by such Act.

5.13. Food Security Act Compliance.

(a) As Seller. Borrower agrees to deliver to Lender upon request a list of all Persons to or through whom Borrower may sell any of its Farm Products, such list to identify the name and address of such Person or Persons. Borrower agrees that it will, at any time, execute and assist in the preparation of any "effective financing statements" (as such term in utilized in the Food Security Act) with respect to each jurisdiction that has established a "central filing system" pursuant to the Food Security Act as Lender may reasonably request to protect its Liens under

the Food Security Act as against the purchasers of its Farm Products. If Borrower shall fail to comply with the provisions of this Section 5.13 with respect to a sale of Farm Products, Borrower agrees to deliver the proceeds of such sale to Lender not later than ten (10) days after such sale. Borrower agrees to notify Lender of any type of Farm Product that Borrower undertakes to produce after the date hereof that is different from the Farm Products it produces on the date hereof.

(b) As Buyer. If Borrower acquires any Collateral which may have constituted Farm Products in the possession of the seller or supplier thereof, Borrower shall, at its own expense, use its best efforts to take such steps to insure that all Liens in such acquired Collateral are terminated or released, including, without limitation, in the case of such Farm Products produced in a state which has established a "central filing system" pursuant to the Food Security Act, registering with the secretary of state of such state (or such other party or office designated by such state) and otherwise take such reasonable actions necessary, as prescribed by the Food Security Act, to purchase Farm Products free of Liens, provided, however, that Borrower may contest and need not obtain the release or termination of any Lien asserted by any creditor of any seller of such Farm Products, so long as it shall be contesting the same in good faith with due diligence by appropriate proceedings and maintain adequate reserves therefor in accordance with GAAP. Upon Lender's request, Borrower agrees to forward to Lender promptly after receipt copies of all notices of Liens and master lists of "effective financing statements" (as such term is utilized in the Food Security Act) delivered to Borrower pursuant to the Food Security Act, which notices and / or lists pertain to any of the Collateral. Upon Lender's request, Borrower agrees to provide Lender with the names of Persons who supply Borrower with such Farm Products and such other information as Lender may reasonably request with respect to such Persons.

5.14. Approved Budget. Borrower shall conduct its operations and make disbursements strictly within the Approved Budget. Borrower shall obtain receipts and revenues in the amounts set forth in the Approved Budget.

5.15. Wean-to-Finish Operations.

(a) Borrower shall specifically identify all Existing Pigs.

(b) Borrower shall cause all third party purchasers of Existing Pigs and weaned piglets to bifurcate payments between Existing Pigs and weaned piglets such that any payment does not include payment for both Existing Pigs and weaned piglets in the payment amount. All such payments received by the Company should be (i) separately accounted for and identified by the Company, (ii) be deposited into the Sweep Account to the extent a payment received in connection with the sale of an Existing Pig and (iii) be deposited into a separate debtor-in-possession account designated by LOLFC, but maintained with Lender, to the extent a payment received in connection with the sale of a weaned piglet.

5.16. Milestones. Borrower shall satisfy the following events (the "Milestones") on or before the date indicated:

(a) Within seven (7) Business Days after the Petition Date, the Interim Order shall have been entered by the Bankruptcy Court.

(b) Within thirty (30) days after the Petition Date, the Final Order shall have been entered by the Bankruptcy Court.

(c) By no later than October 31, 2021, Borrower shall have sold and delivered the last Existing Pig.

(d) By no later than December 31, 2021, the Bankruptcy Court shall have entered an order confirming a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code, acceptable to Lender in Lender's sole discretion.

## SECTION 6. BORROWER'S NEGATIVE COVENANTS

Borrower covenants that until all of the Obligations are paid and satisfied in full and the Facilities have been terminated:

6.1. Debt. Borrower shall not create, incur, assume or permit to exist, voluntarily or involuntarily, any Debt, except Permitted Debt.

6.2. Liens. Borrower shall not (a) execute a negative pledge agreement with any Person covering any Property, except as set forth in this Agreement, or (b) cause or permit, voluntarily or involuntarily, or consent to cause or permit (upon the happening of a contingency or otherwise) its Property to be subject to any Lien, except Permitted Liens and the Carve-Out.

6.3. Investments. Borrower shall not purchase, hold, acquire, make or permit to exist, voluntarily or involuntarily, any Investment, except Permitted Investments.

6.4. Distributions. Borrower shall not declare, pay or make any form of Distribution.

6.5. Fundamental Changes.

(a) Borrower shall not sell, lease, license, transfer or otherwise dispose of its Property, agree to the same or convey any rights regarding the same, except (i) inventory sold in the ordinary course or ordinary operation of Borrower's business, (ii) subject to Section 6.5(b) hereof, Property sold for fair market value in accordance with a sale approved by the Bankruptcy Court under Section 363 of the Bankruptcy Code, (iii) pursuant to the agreements set forth on Schedule 4.16 hereto, (iv) worn-out or obsolete equipment and (v) as expressly set forth in the definitions of "Permitted Liens" and "Permitted Investments." Borrower shall not materially amend, restate, modify, supplement, extend, renew or take any similar material actions with respect to the agreements set forth on Schedule 4.16 hereto.

(b) Borrower shall not sell all or substantially all of its assets.

(c) Borrower shall not merge or consolidate with, or otherwise engage in any form of business combination with, any other Person, commence a dissolution or create or form any Subsidiary.

(d) Borrower shall not acquire all or substantially all of the assets of (or any assets constituting a business unit of) any other Person.

6.6. Change of Control of Borrower. No Change of Control shall occur with respect to Borrower. For the purposes of this Section 6.6, a "Change of Control" shall occur if the Guarantors (other than Borrower) cease to be the "beneficial owners" (as described in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) of at least eighty percent (80%) of the outstanding equity interests of Borrower entitled to vote for members of the Board of Directors or equivalent Governing Body of Borrower or to possess

the power to direct or cause the direction of the management or policies of Borrower; provided, however, that this Section 6.6 shall not be violated by the Bankruptcy Court's approval of the employment of Steve Weiss as the Chief Restructuring Officer of Borrower or the elimination or sale of the equity interests of Borrower to a third party pursuant to a confirmed plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code in the Bankruptcy Case.

6.7. Transactions With Affiliates. Borrower shall not enter into any transaction, except Permitted Affiliate Transactions, with any Affiliate of Borrower including, without limitation, the purchase, sale, lease or exchange of Borrower's Property, or the loaning, capitalization or giving of funds to any such Affiliate, unless (a) such Affiliate is engaged in a business substantially related to the business of Borrower, (b) the transaction is in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon terms substantially the same and no less favorable to Borrower as it would obtain in a comparable arm's-length transaction with any Person not an Affiliate of Borrower and (c) such transaction is not otherwise prohibited hereunder.

6.8. Bank and Brokerage Accounts; Deposits. Borrower shall not establish any new deposit, checking, savings, securities, investment, hedging, commodity trading or other similar accounts, maintain any account other than those accounts specified on Schedule 4.18 hereto, deposit proceeds from the sale of Collateral in any account other than a deposit account specified on Schedule 4.18 hereto or permit the cash balance of the accounts set forth on Schedule 4.18 hereto to exceed the corresponding balance limit indicated on Schedule 4.18 hereto, in each case, except to the extent approved and authorized by the Bankruptcy Court. The accounts set forth on Schedule 4.18 hereto that are maintained with financial institutions other than Lender and in which Lender does not have a first priority perfected security interest shall not have an aggregate balance limit in excess of One Hundred Thousand Dollars ($100,000), except for accounts used by Borrower for funds held or used for payroll or employee benefits.

6.9. Hedging. Borrower shall not (a) violate the Hedging Policy, (b) terminate, amend or otherwise modify, or grant any waiver or consent with respect to, the Hedging Policy or (c) fail to make any margin call on a Hedging Account when due. Borrower shall not conduct any hedging activity without prior notice and prior written consent of Lender, which consent may be withheld in Lender's sole discretion.

6.10. Capital Leases / Operating Leases. Borrower shall not have payment obligations under Capitalized Leases or operating leases that exceed Six Hundred Thousand Dollars ($600,000) in the aggregate in any fiscal year of Borrower. This Section 6.10 shall not include payment obligations of Borrower to growers.

6.11. Sale-Leaseback Transactions. Borrower shall not enter into any arrangement, directly or indirectly, with any other Person whereby Borrower shall sell or transfer any Property, whether now owned or hereafter acquired, and then or thereafter rent or lease as lessee such Property or any part thereof or any other property which Borrower intends to use for substantially the same purpose or purposes as the Property being sold or transferred.

6.12. Margin Regulations. None of the proceeds of the Loans shall be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of such terms under Regulation U of the Board and Borrower shall not take, or authorize any agent acting on its behalf to take, any action which could result in a violation of any regulation of the Board.

6.13. Hazardous Substances. Borrower shall not cause or permit any Hazardous Substance to be disposed of in any manner which could reasonably be expected to result in any liability to Borrower on, under or at any real property which is operated by Borrower or in which Borrower has any interest.

## SECTION 7. DEFAULT

7.1. Events of Default. Each of the following events shall constitute an event of default ("Event of Default") and Lender shall thereupon have the option to declare the Obligations immediately due and payable, all without demand, notice, presentment or protest or further action of any kind (it also being understood that the occurrence of any of the events or conditions set forth in subparagraphs (l), (m) or (n) shall automatically cause an acceleration of the Obligations):

(a) Payments - if Borrower fails to make any payment of principal or interest on the date when such payment is due and payable; or

(b) Other Charges - if Borrower fails to pay any other charges, fees, Expenses or other monetary obligations owing to Lender, whether arising out of or incurred in connection with this Agreement, any other Loan Document or otherwise, on the date when such payment is due and payable, whether upon maturity, acceleration, demand or otherwise, and such failure continues for a period of five (5) days after the earlier of Borrower becoming aware of such failure or Borrower receiving written notice from Lender of such failure; provided however, that the five (5) day grace period shall not be applicable if such payments are due and payable due to maturity, acceleration or demand, whether following an Event of Default, or otherwise; or

(c) Particular Covenant Defaults – if Borrower fails to perform, comply with or observe any covenant or undertaking contained in Sections 5.1, 5.6, 5.8, 5.9, 5.9, 5.10, 5.14, 5.15, 5.16, 6.1, 6.2, 6.3, 6.4, 6.5, 6.6, 6.7, 6.8, 6.9, 6.10, 6.11, 6.12 or 6.13 hereof; or

(d) General Covenant Defaults - if Borrower or Guarantor fails to perform, comply with or observe any covenant or undertaking contained in this Agreement or any other Loan Document, Authorizing Order, Interim Order or Final Order not otherwise described in this Section 7.1, and such failure continues for a period of thirty (30) days after the earlier of Borrower or Guarantor becoming aware of such failure or Borrower or Guarantor receiving written notice from Lender of such failure; provided, however, that if the default cannot by its nature be cured within the thirty (30) day period or cannot after diligent attempts by Borrower be cured within such thirty (30) day period, and such default is likely to be cured within a reasonable time, Borrower shall have an additional period (which shall not in any case exceed thirty (30) days) to attempt to cure such default, and within such reasonable time period the failure to cure the default shall not be deemed an Event of Default; or

(e) Financial Information - if any statement, report, financial statement or certificate made or delivered by Borrower or any of its shareholders, directors, officers, employees, Affiliates or agents to Lender is not true and correct in all material respects when made; or

(f) Representations or Warranties - if any representation, warranty or other statement by or on behalf of Borrower or Guarantor contained in or pursuant to this Agreement, any of the other Loan Documents or in any document, agreement or instrument furnished in compliance with, relating to or in reference to this Agreement, is false, erroneous or misleading in any material respect when made; or

(g) Other Agreements with Lender – if, after the passage of all applicable notice and cure or grace periods, Borrower or Guarantor breaches or violates the terms of, or if a default or an event of default occurs under, any other post-petition agreement or obligation between or among Borrower or Guarantor and Lender that is in any way related to this Agreement including, without limitation, the Loan Documents and Swap Obligations owed to Lender; or

(h) Uninsured Loss - if there shall occur any uninsured damage, loss, theft or destruction in excess of One Hundred Thousand Dollars ($100,000) with respect to any portion of Borrower's Property, the result of which could reasonably be expected to have a Material Adverse Effect; or

(i) Judgments - if any final, nonappealable judgment for the payment of money in excess of One Hundred Thousand Dollars ($100,000) which is not covered by insurance or an appeal bond, or for which Borrower has not established a cash or cash equivalent reserve in the amount of such judgment, shall be rendered and shall remain unsatisfied and unstayed for a period of at least thirty (30) days; or

(j) LOLFC DIP Financing - if (i) Borrower shall default under the LOLFC DIP Financing and (A) such default consists of the failure to perform any covenant or agreement with respect to such Debt, if the effect of such default would, with the passage of time, giving of notice, or both, permit such creditor to cause the obligations of Borrower which are the subject thereof to become due prior to their maturity date or prior to their regularly scheduled date of payment, unless Borrower is in good faith with due diligence by appropriate proceedings contesting such default or obligation or (B) the result of such default could reasonably be expected to have a Material Adverse Effect; or (ii) the LOLFC DIP Financing, or any order of the Bankruptcy Court authorizing the LOLFC DIP Financing, ceases to be in full force and effect for any reason; or

(k) Bankruptcy – if any of the following shall have occurred in the Bankruptcy Case:

(i) the bringing of a motion or application by Borrower, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case: (A) to obtain additional post-petition financing under Section 364(c) or (d) of the Bankruptcy Code other the LOLFC DIP Financing; (B) to grant any super-priority Lien upon or affecting any of the Collateral which is senior or pari passu with the Post-Petition Liens other than the Permitted Priority Liens; or (C) to grant any super-priority administrative expense claim which is senior or pari passu with Lender's claims under the Loan Documents other than those granted to LOLFC under the LOLFC DIP Financing; or

(ii) the bringing of a motion or application by Borrower, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case, to appoint an

interim or permanent trustee, receiver of examiner in the Bankruptcy Case;

(iii) the bringing of a motion or application by Borrower, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case, to dismiss or convert the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

(iv) the bringing of a motion or application by Borrower, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case, to approve the sale of all or substantially all of the assets of Borrower;

(v) the confirmation of any plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code in the Bankruptcy Case, if it is not acceptable to Lender, in Lender's sole discretion;

(vi) the bringing of a motion or application, or the commencement of any proceeding, by Borrower or Guarantor, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case in any proceeding commenced by any other Person, challenging or contesting the validity, extent, perfection or priority of any Liens granted under or obligations arising under the Loan Documents or the Pre-Petition Loan Documents;

(vii) any attempt by Borrower to reduce, avoid, set off or subordinate the Obligations or the Liens securing the Obligations to any other debt;

(viii) the failure of Borrower to perform any of its obligations under the Authorizing Order or any violation of any of the terms of the Authorizing Order, subject to any applicable grace or cure periods set forth therein;

(ix) the Authorizing Order ceases to be in full force and effect for any reason;

(x) the Post-Petition Liens or Super-Priority Administrative Expense Claim granted with respect to this Agreement cease to be valid, perfected and enforceable in all respects;

(xi) the determination by the Bankruptcy Court that it will not approve the "roll-up", refinance and replacement of the Pre-Petition Obligations into the Term Loan under this Agreement, in a manner and on terms satisfactory to Lender;

(xii) the determination by the Bankruptcy Court that Lender's interests are not adequately protected; or

(xiii) the bringing of a motion or application by Borrower or any Person, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case, seeking to exercise rights under Section 506(c) of the Bankruptcy Code.

(l) Assignment for Benefit of Creditors, Etc. - if Guarantor makes or proposes an assignment for the benefit of creditors generally, offers a composition or extension to creditors or makes or sends notice of an intended bulk sale of any business or assets now or hereafter owned or conducted by Guarantor; or

(m) Bankruptcy, Dissolution, Etc. - upon the commencement of any action for the bankruptcy, dissolution or liquidation of Guarantor, or the commencement of any proceeding to avoid any transaction entered into by Guarantor, or the commencement of any case or proceeding for reorganization or liquidation of Guarantor, or any of their debts under the Bankruptcy Code or any other state or federal law, now or hereafter enacted for the relief of debtors, whether instituted by or against Guarantor (in each case, other than the commencement of any action, proceeding or case commenced by Lender); provided, however, that Guarantor shall have forty-five (45) days to obtain the dismissal or discharge of involuntary proceedings filed against Guarantor, it being understood that during such forty-five (45) day period, Lender shall not be obligated to make Advances hereunder and Lender may seek adequate protection in any bankruptcy proceeding; or

(n) Receiver - upon the appointment of a receiver, liquidator, custodian, trustee or similar official or fiduciary for Guarantor or for any portion of Guarantor's property (other than one appointed in a proceeding commenced by Lender), the value of which exceeds One Hundred Thousand Dollars ($100,000) in the aggregate; provided, however, that Guarantor shall have forty-five (45) days to obtain the dismissal or discharge of the receiver; or

(o) Pension Benefits, Etc. - if Borrower fails to comply with ERISA, so that grounds exist to permit the appointment of a trustee under ERISA to administer Borrower's employee plans or to allow the Pension Benefit Guaranty Corporation to institute proceedings to appoint a trustee to administer such plans, or to permit the entry of a Lien to secure any deficiency or claim.

7.2. Cure. Nothing contained in this Agreement or the Loan Documents shall be deemed to compel Lender to accept a cure of any Event of Default hereunder, except as outlined in Section 7.1 hereof or in the Authorizing Order.

7.3. Rights and Remedies on Default.

(a) In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents, or otherwise available at law or in equity, upon or at any time after the occurrence and during the continuance of an Event of Default or Unmatured Event of Default, Lender may, in its discretion, subject to the Authorizing Order, withhold or cease making Advances.

(b) In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents, or otherwise available at law or in equity, upon or at any time after the occurrence and during the continuance of an Event of Default, Lender may, in its discretion, subject to the Authorizing Order, terminate any Facility or this Agreement.

(c) In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents, or otherwise available at law or in equity, upon or at any time after the occurrence and during the continuance of an Event of Default, Lender may, in its discretion, subject to the Authorizing Order, exercise all rights under the Uniform Commercial Code and any other applicable law or in equity, and under all Loan Documents permitted to be exercised after the occurrence of an Event of Default, including the following rights and remedies (which list is given by way of example and is not intended to be an exhaustive list of all such rights and remedies):

(i) The right to "take possession" of the Collateral, and notify all Account debtors of Lender's security interest in the Accounts and require payment under the Accounts to be made directly to Lender and Lender may, in its own name or in the name of Borrower, exercise all rights of a secured party with respect to the Collateral and collect, sue for and receive payment on all Accounts, and settle, compromise and adjust the same on any terms as may be satisfactory to Lender, in its discretion for any reason or without reason and Lender may do all of the foregoing with or without judicial process (including, without limitation, notifying the United States postal authorities to redirect mail addressed to Borrower, to an address designated by Lender); or

(ii) Require Borrower, at Borrower's expense, to assemble all or any part of the Collateral and make it available to Lender; or

(iii) The right to reduce or modify the Revolving Credit Commitment (Operating), Revolving Credit Commitment (Hedging) or Term Loan Commitment, or to modify the terms and conditions upon which Lender may be willing to consider making Advances.

(d) Borrower hereby agrees that a notice received by it at least ten (10) days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable law, any Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Lender without prior notice to Borrower. Borrower covenants and agrees not to interfere with or impose any obstacle to Lender's exercise of its rights and remedies with respect to the Collateral.

7.4. Nature of Remedies. All rights and remedies granted Lender hereunder and under the Loan Documents, or otherwise available at law or in equity, shall be deemed concurrent and cumulative, and not alternative remedies, and Lender may proceed with any number of remedies at the same time until all Obligations are satisfied in full. The exercise of any one right or remedy shall not be deemed a waiver or release of any other right or remedy, and Lender, upon or at any time after the occurrence and during the continuance of an Event of Default, may proceed against Borrower at any time, under any agreement, with any available remedy and in any order.

7.5. Set-Off. If an Event of Default shall have occurred and be continuing, Lender and its Affiliates are hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Lender, or any such Affiliate, to or for the credit or the account of Borrower against any and all of the Obligations hereunder, irrespective of whether or not Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of Lender and its Affiliates under this Section 7.5 are in addition to other rights and remedies (including other rights of setoff) that Lender or its Affiliates may have. Lender agrees to notify Borrower promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 8. MISCELLANEOUS

8.1. GOVERNING LAW. THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL RELATED AGREEMENTS AND DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF NEBRASKA. THE PROVISIONS OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL OTHER AGREEMENTS AND DOCUMENTS REFERRED TO HEREIN ARE TO BE DEEMED SEVERABLE, AND THE INVALIDITY OR UNENFORCEABILITY OF ANY PROVISION SHALL NOT AFFECT OR IMPAIR THE REMAINING PROVISIONS WHICH SHALL CONTINUE IN FULL FORCE AND EFFECT.

8.2. Integrated Agreement. The Notes, the Security Agreement, the UCC-1 Financing Statement, the Mortgages, the UCC-1 Fixture Filings, the Guaranty Agreements, the Control Agreements, the Intercreditor Agreement and the other Loan Documents, all related agreements and this Agreement shall be construed as integrated and complementary of each other and as augmenting and not restricting Lender's rights and remedies. If, after applying the foregoing, an inconsistency still exists, the provisions of this Agreement shall constitute an amendment thereto and shall control.

8.3. Waiver and Indemnity.

(a) No omission or delay by Lender in exercising any right or power under this Agreement or any related agreements and documents will impair such right or power or be construed to be a waiver of any default, or Event of Default or an acquiescence therein, and any single or partial exercise of any such right or power will not preclude other or further exercise thereof or the exercise of any other right, and as to Borrower no waiver will be valid unless in writing and signed by Lender and then only to the extent specified.

(b) Borrower shall indemnify Lender and its directors, officers, employees, agents and Affiliates (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any third party arising out of, in connection with or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) the Loans or the use or proposed use of the proceeds therefrom or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, and regardless of whether any Indemnitee is a party thereto; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c) To the fullest extent permitted by applicable law, Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Loans or the use of the proceeds thereof. No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other

materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(d) The agreements in this Section 8.3 shall survive the payment, satisfaction or discharge in full of all the Obligations.

8.4. Time. Except as otherwise set forth in this Agreement, whenever Borrower shall be required to make any payment, or perform any act, on a day which is not a Business Day, such payment may be made, or such act may be performed, on the next succeeding Business Day. Time is of the essence in Borrower's performance under all provisions of this Agreement and all related agreements and documents.

8.5. Expenses of Lender. Borrower shall pay all expenses reasonably incurred by Lender on demand (including, without limitation, search costs, audit fees, inspection fees, appraisal fees and the reasonable fees and expenses of legal counsel for Lender) relating to this Agreement, all related agreements and documents (including, without limitation, expenses incurred in the analysis, negotiation, preparation, closing, administration and enforcement of this Agreement and the other Loan Documents), the Loans and the Collateral, to the extent such expenses are approved by the Bankruptcy Court. In the event of any Event of Default which requires action by Lender in accordance with the terms of the Loan Documents, Borrower shall pay all expenses reasonably incurred by Lender relating to the enforcement, protection and defense of the rights of Lender in and to the Collateral or otherwise hereunder. Additionally, Borrower shall pay all expenses relating to extensions, amendments, modifications, waivers or consents pursuant to the provisions hereof, or any related agreements and documents or relating to agreements with other creditors (including in connection with a Transfer or Participation), or termination of this Agreement. The fees, expenses and other costs set forth in this Section 8.5 are collectively referred to as the "Expenses." Any Expenses not paid within thirty (30) days following demand by Lender shall bear interest at the Default Rate.

8.6. [Intentionally Omitted].

8.7. Notices.

(a) Any notices, consents or other communications required or permitted by this Agreement shall be in writing and shall be deemed given if delivered in person or if sent by e-mail (with confirmation of receipt), facsimile (with confirmation of receipt) or by nationally recognized overnight courier, or via first class, certified or registered mail, postage prepaid, to the address of such party set forth below, unless such address is changed by written notice hereunder.

Address for notices to Borrower:

N.G. Purvis Farms, Inc.
2504 Spies Road
Robbins, North Carolina 27325
Attn: Steve Weiss
E-mail: steve@nutriquest.com
Fax: (910) 948-3213

With a copy (which shall not constitute notice) to:

Algernon L. Butler, III
BUTLER & BUTLER, L.L.P.
111 North Fifth Avenue
Wilmington, NC 28401
E-mail: albutleriii@butlerbutler.com
Fax: (910) 762-9441

Rebecca F. Redwine and
Jason L. Hendren
Hendren, Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
E-mail:rredwine@hendrenmalone.com;
jhendren@hendrenmalone.com
Fax: 919-420-0475

Robins May & Rich LLP
120 Applecross Road
Pinehurst, North Carolina 28374
Attn: Stephen Later
E-mail: sflater@rmrattorneys.com
Fax: (910) 692-4900

Address for notices to Lender:

First National Bank of Omaha
1620 Dodge Street, Stop 1040
Omaha, Nebraska 68197
Attn: Douglas J. Groebner
E-mail: dgroebner@fnni.com

With a copy (which shall not constitute notice) to:

McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Attn: James J. Niemeier
Robert P. Diederich
E-mail: jniemeier@mcgrathnorth.com
rdiederich@mcgrathnorth.com
Fax: (402) 952-1806

(b) Any notice sent by Lender or Borrower by any of the above methods shall be deemed to be given when so received.

(c) Lender shall be fully entitled to rely upon any e-mail or facsimile transmission or other writing purported to be sent by any Authorized Representative (whether requesting an Advance or otherwise) as being genuine and authorized.

8.8. Headings. The headings of any paragraph or section of this Agreement are for convenience only and shall not be used to interpret any provision of this Agreement.

8.9. Survival. All representations, warranties and covenants made by Borrower herein, in any Loan Document or in any agreement referred to herein or on any certificate, document or other instrument delivered by it or on its behalf under this Agreement, shall be considered to have been relied upon by Lender, and shall survive the delivery to Lender of any Loan Document, regardless of any investigation made by Lender or on its behalf. All statements in any such certificate or other instrument prepared and/or delivered for the benefit of Lender shall constitute representations and warranties by Borrower hereunder. Except as otherwise expressly provided herein, all covenants made by Borrower hereunder, in any Loan Document or under any other agreement or instrument shall be deemed continuing until all Obligations are satisfied in full.

8.10. Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the successors and assigns of each of the parties. Except in accordance with Section 8.20 hereof, neither party may transfer, assign or delegate any of their duties, rights or obligations hereunder without the prior written consent of the other party.

8.11. Duplicate Originals and Counterparts. Two or more duplicate originals of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument. This Agreement may be executed in counterparts, all of which counterparts taken together shall constitute one completed fully executed document.

8.12. Amendment or Modification. No amendment or modification hereof or of any agreement referred to herein shall be binding or enforceable unless in writing and signed by Borrower and Lender.

8.13. Signatories. Each individual signatory hereto represents and warrants that such signatory is duly authorized to execute this Agreement on behalf of such signatory's principal and that such signatory executes the Agreement in such capacity and not as a party.

8.14. Third Parties. No rights are intended to be created hereunder, or under any related agreements or documents for the benefit of any third party donee, creditor or incidental beneficiary of Borrower. Nothing contained in this Agreement shall be construed as a delegation to Lender of Borrower's duty of performance, including, without limitation, Borrower's duties under any account or contract with any other Person.

8.15. Waivers.

(a) Borrower hereby irrevocably, unconditionally and fully subordinates in favor of Lender and waives any and all rights it may have at any time (whether arising, directly or indirectly, by operation of law or contract) to assert or receive payment on any claim against it, on account of payments made under this Agreement, including without limitation, any and all rights of subrogation, reimbursement, exoneration, contribution or indemnity. Borrower waives any event or circumstances which might constitute a legal or equitable defense of, or discharge of, Borrower. Furthermore, Borrower agrees that if any payment on the Obligations is recovered from or repaid by Lender in whole or in part in any bankruptcy, insolvency or similar proceeding instituted by or against Borrower, Borrower shall be obligated to the same extent as if the recovered or repaid payment had never been originally made on such Obligation.

(b) Borrower hereby consents and agrees that Lender, at any time or from time to time in its discretion, may: (i) settle, compromise or grant releases for liabilities of any Person or Persons liable for any Obligations, (ii) exchange, release, surrender, sell, subordinate or

compromise any Collateral to the extent allowed under federal, state or local law, including without limitation administrative pronouncements, of any party now or hereafter securing any of the Obligations and (iii) following an Event of Default, apply any and all payments received at any time against the Obligations in any order as Lender may determine; all of the foregoing in such manner and upon such terms as Lender may see fit, without notice to or further consent from Borrower who hereby agrees and shall remain bound upon this Agreement notwithstanding any such action on Lender's part.

(c) The liability of Borrower hereunder is absolute and unconditional and shall not be reduced, impaired or affected in any way by reason of (i) any failure to obtain, retain or preserve, or the lack of prior enforcement of, any rights against any Person or Persons or in any Property, (ii) the invalidity or unenforceability of any Obligations or rights in any Collateral, (iii) any delay in making demand upon any other Person or Persons or any delay in enforcing, or any failure to enforce, any rights against any other Person or Persons or in any Collateral even if such rights are thereby lost, (iv) any failure, neglect or omission to obtain, perfect or retain any Lien upon, protect, exercise rights against, or realize on, any Property of Borrower, or any other party securing the Obligations, (v) the existence or non-existence of any defenses which may be available to any other Person or Persons with respect to the Obligations or (vi) the commencement of any bankruptcy, reorganization, liquidation, dissolution or receivership proceeding or case filed by or against Borrower.

8.16. <u>CONSENT TO JURISDICTION</u>. BORROWER AND LENDER HEREBY IRREVOCABLY CONSENT TO THE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, ANY STATE OR FEDERAL COURT LOCATED IN DOUGLAS COUNTY, NEBRASKA IN ANY AND ALL ACTIONS AND PROCEEDINGS WHETHER ARISING HEREUNDER OR UNDER ANY OTHER AGREEMENT OR UNDERTAKING. BORROWER WAIVES ANY OBJECTION TO IMPROPER VENUE AND FORUM NON-CONVENIENS TO PROCEEDINGS IN ANY SUCH COURT AND ALL RIGHTS TO TRANSFER FOR ANY REASON. BORROWER IRREVOCABLY AGREES TO SERVICE OF PROCESS BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED TO THE ADDRESS OF THE APPROPRIATE PARTY SET FORTH HEREIN.

8.17. <u>WAIVER OF JURY TRIAL</u>. BORROWER AND LENDER HEREBY WAIVE ANY AND ALL RIGHTS THEY MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION COMMENCED BY OR AGAINST LENDER WITH RESPECT TO RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO OR UNDER THE LOAN DOCUMENTS, WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

8.18. <u>Discharge of Taxes, Borrower's Obligations, Etc</u>. Lender, in its discretion, shall have the right at any time, and from time to time, with prior notice to Borrower, if Borrower fails to do so fifteen (15) Business Days after being requested in writing to do so by Lender, to: (a) pay for the performance of any of Borrower's obligations hereunder and (b) discharge taxes or Liens, at any time levied or placed on any of Borrower's Property in violation of this Agreement unless Borrower is in good faith with due diligence by appropriate proceedings contesting such taxes or Liens. Expenses and advances shall be deemed Advances hereunder and shall bear interest at the Default Rate from Borrower's notice thereof until reimbursed to Lender. Such payments and advances made by Lender shall not be construed as a waiver by Lender of an Event of Default under this Agreement.

8.19. <u>Injunctive Relief</u>. The parties acknowledge and agree that, in the event of a breach or threatened breach of any party's obligations hereunder, they may have no adequate remedy in money damages and, accordingly, shall be entitled to an injunction (including without

limitation, a temporary restraining order, preliminary injunction, writ of attachment, or order compelling an audit) against such breach or threatened breach. However, no specification in this Agreement of a specific legal or equitable remedy shall be construed as a waiver or prohibition against any other legal or equitable remedies in the event of a breach or threatened breach of any provision of this Agreement.

8.20. Transfers and Participations.

(a) A material inducement to Lender's willingness to complete the transactions contemplated by this Agreement and the other Loan Documents is Borrower's agreement that Lender may, at any time, complete a Transfer or Participation with respect to any Note or any of the other Loan Documents.

(b) Borrower agrees to cooperate in good faith with Lender in connection with any such Transfer or Participation of any Note or any of the other Loan Documents, including, without limitation, providing such documents, financial and other data, and other information and materials which would typically be required with respect to Borrower by a transferee or participant involved with respect to such Transfer or Participation (collectively, the "Disclosures").

(c) Borrower consents to Lender providing the Disclosures, as well as any other information which Lender may now have or hereafter acquire with respect to Borrower, to each transferee or participant involved with respect to each Transfer or Participation, as applicable.

8.21. USA Patriot Act. IMPORTANT NOTICE: to help the government fight the funding of terrorism and money laundering activities, the USA Patriot Act requires all banks to obtain and verify the identity of each person or business that opens an account. When Borrower opens an account, Lender will ask Borrower for information that will allow Lender to properly identify Borrower and Lender will verify that information. If Lender cannot properly verify the identity of Borrower within thirty (30) calendar days, Lender reserves the right to declare the Obligations immediately due and payable.

8.22. Keepwell. Each Obligor that is a Qualified ECP when its Guaranty Agreement or other obligation with respect to, or grant of a security interest to secure, any Swap Obligation becomes effective hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide funds or other support to each Obligor with respect to such Swap Obligation as may be needed by such Obligor from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP's obligations and undertakings under this Section 8.22 voidable under any applicable fraudulent transfer or conveyance act). The obligations and undertakings of each Qualified ECP under this Section 8.22 shall remain in full force and effect until payment of all Obligations. Each Obligor intends this Section 8.22 to constitute, and this Section 8.22 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support or other agreement" for the benefit of, each Obligor for all purposes of the Commodity Exchange Act.

## SECTION 9. NOTICE - WRITTEN AGREEMENTS.

This notice is provided pursuant to Nebraska Revised Statutes Section 45-1,112 et. seq. This Agreement is a credit agreement. A credit agreement must be in writing to be enforceable under Nebraska law. To protect you and us from any misunderstandings or disappointments, any contract, promise, undertaking or offer to forebear repayment of money or to make any

other financial accommodation in connection with this loan of money or grant or extension of credit, or any amendment of, cancellation of, waiver of or substitution for any or all of the terms or provisions of any instrument or document executed in connection with this loan of money or grant or extension of credit, must be in writing to be effective.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.

BORROWER:

N.G. PURVIS FARMS, INC.

By: ________________________________

Name: Jerry M. Purvis
Title: President

LENDER:

FIRST NATIONAL BANK OF OMAHA

By: ________________________________

Name: Douglas J. Groebner
Title: Vice President

## GUARANTORS' CONSENT

The undersigned Guarantors hereby (a) consent to this Agreement and the transactions contemplated hereby and to any orders entered by the Bankruptcy Court related thereto, (b) reaffirm their respective obligations under the Guaranty Agreements including, without limitation, the joint and several unconditional guarantee to Lender of the full and prompt payment and performance of the Guaranteed Obligations (as defined in the Guaranty Agreements), whether now existing or hereafter arising, and (c) represent and warrant that (i) the Guaranty Agreements of the respective Guarantors continue to constitute the legal, valid and binding obligation of the respective Guarantors enforceable against such Guarantors in accordance with their terms, (ii) other than the Designated Events of Default (as defined in the Forbearance Agreement), there exists no Event of Default or Unmatured Event of Default and (iii) there are no, and shall not be any, defenses to or counterclaims or rights of set-off against Lender's rights under the Guaranty Agreements.

______________________________
DAVID PURVIS

______________________________
JERRY M. PURVIS

______________________________
LARRY M. PURVIS

______________________________
MELVIN G. PURVIS

# EXHIBIT A

Approved Budget

| # | B | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT | BU | BV | BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | **N. G. Purvis Farms** | | | | | | | | | | | | | | | | | | | | | | | | | |
| 4 | *Cash Flow Forecast* | | | | | | | | | | | | | | | | | | | | | | | | | |
| 5 | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 6 | Fiscal Period | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 7 | Fiscal Week | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | |
| 8 | Bankruptcy week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 9 | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| 10 | Week Beginning Date | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 11 | Week Ending Date | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 12 | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 13 | Smithfield | 5,893 | 6,104 | 6,430 | 6,652 | 6,190 | 6,634 | 7,101 | 6,340 | 5,803 | 6,473 | 6,742 | 4,654 | 7,249 | 2,385 | 2,636 | 7,757 | 7,616 | 7,364 | 7,355 | 7,628 | 6,636 | 6,799 | 6,918 | 903 | 146,264 |
| 14 | JBS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 15 | Others | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 16 | Market Hogs | 5,893 | 6,104 | 6,430 | 6,652 | 6,190 | 6,634 | 7,101 | 6,340 | 5,803 | 6,473 | 6,742 | 4,654 | 7,249 | 2,385 | 2,636 | 7,757 | 7,616 | 7,364 | 7,355 | 7,628 | 6,636 | 6,799 | 6,918 | 903 | 146,264 |
| 17 | Weaned Pigs | 7,586 | 7,411 | 7,750 | 8,355 | 8,089 | 8,000 | 8,224 | 7,402 | 8,037 | 8,243 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 191,449 |
| 18 | Cull Hogs | 151 | 153 | 155 | 157 | 158 | 159 | 160 | 158 | 150 | 141 | 131 | 121 | 112 | 103 | 95 | 91 | 83 | 71 | 60 | 49 | 37 | 27 | 17 | 6 | 2,544 |
| 19 | **Head** | **13,630** | **13,667** | **14,335** | **15,164** | **14,437** | **14,793** | **15,485** | **13,900** | **13,991** | **14,856** | **14,898** | **12,800** | **15,386** | **10,512** | **10,756** | **15,873** | **15,724** | **15,460** | **15,440** | **15,702** | **14,699** | **14,851** | **14,960** | **8,935** | **340,256** |
| 20 | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 21 | Smithfield | 1,679,620 | 1,739,504 | 1,832,457 | 1,895,881 | 1,764,168 | 1,890,729 | 2,023,804 | 1,807,024 | 1,653,925 | 1,844,762 | 1,921,330 | 1,326,444 | 2,065,892 | 679,624 | 751,351 | 2,210,799 | 2,170,576 | 2,098,739 | 2,096,279 | 2,174,105 | 1,891,312 | 1,937,680 | 1,971,684 | 257,468 | 41,685,158 |
| 22 | JBS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 23 | Others | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 24 | Market Hogs | 1,679,620 | 1,739,504 | 1,832,457 | 1,895,881 | 1,764,168 | 1,890,729 | 2,023,804 | 1,807,024 | 1,653,925 | 1,844,762 | 1,921,330 | 1,326,444 | 2,065,892 | 679,624 | 751,351 | 2,210,799 | 2,170,576 | 2,098,739 | 2,096,279 | 2,174,105 | 1,891,312 | 1,937,680 | 1,971,684 | 257,468 | 41,685,158 |
| 25 | Cull Hogs | 28,672 | 29,095 | 29,514 | 29,897 | 30,093 | 30,196 | 30,343 | 29,951 | 28,557 | 26,731 | 24,894 | 22,934 | 21,236 | 19,476 | 18,040 | 17,256 | 15,726 | 13,506 | 11,348 | 9,237 | 7,099 | 5,070 | 3,166 | 1,231 | 483,268 |
| 26 | **Pounds** | **1,708,292** | **1,768,599** | **1,861,972** | **1,925,778** | **1,794,261** | **1,920,925** | **2,054,146** | **1,836,976** | **1,682,482** | **1,871,493** | **1,946,224** | **1,349,378** | **2,087,128** | **699,100** | **769,392** | **2,228,055** | **2,186,302** | **2,112,245** | **2,107,627** | **2,183,342** | **1,898,410** | **1,942,750** | **1,974,850** | **258,699** | **42,168,426** |
| 27 | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 28 | Smithfield | 1,390,042 | 1,471,122 | 1,549,733 | 1,619,761 | 1,507,231 | 1,613,147 | 1,681,533 | 1,501,416 | 1,374,209 | 1,558,259 | 1,637,804 | 1,130,705 | 1,761,034 | 488,769 | 529,916 | 1,559,239 | 1,481,462 | 1,432,432 | 1,453,068 | 1,507,015 | 1,321,844 | 1,354,252 | 1,141,996 | 149,125 | 32,215,113 |
| 29 | JBS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 30 | Others | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 31 | Market Hogs | 1,390,042 | 1,471,122 | 1,549,733 | 1,619,761 | 1,507,231 | 1,613,147 | 1,681,533 | 1,501,416 | 1,374,209 | 1,558,259 | 1,637,804 | 1,130,705 | 1,761,034 | 488,769 | 529,916 | 1,559,239 | 1,481,462 | 1,432,432 | 1,453,068 | 1,507,015 | 1,321,844 | 1,354,252 | 1,141,996 | 149,125 | 32,215,113 |
| 32 | Cull Hogs | 49,228 | 50,549 | 50,788 | 51,466 | 51,577 | 52,514 | 51,972 | 51,750 | 50,959 | 50,025 | 48,533 | 47,470 | 46,549 | 38,454 | 36,589 | 36,232 | 33,744 | 32,735 | 31,989 | 31,030 | 30,772 | 29,850 | 24,146 | 23,458 | 1,002,376 |
| 33 | Sows | 34,067 | 34,803 | 34,803 | 34,803 | 34,803 | 34,803 | 34,765 | 34,765 | 34,765 | 34,765 | 33,247 | 33,247 | 33,247 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 21,784 | 21,784 | 740,990 |
| 34 | **Hog Sales** | **1,473,337** | **1,556,474** | **1,635,324** | **1,706,030** | **1,593,611** | **1,700,463** | **1,768,269** | **1,587,930** | **1,459,932** | **1,643,048** | **1,719,584** | **1,211,422** | **1,840,830** | **555,060** | **594,342** | **1,623,309** | **1,543,043** | **1,493,005** | **1,512,895** | **1,565,883** | **1,380,454** | **1,411,940** | **1,187,926** | **194,367** | **33,958,479** |
| 35 | Weaned Pigs | 333,785 | 326,065 | 341,012 | 304,945 | 295,240 | 292,003 | 300,182 | 270,183 | 293,349 | 300,854 | 292,920 | 292,920 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 7,591,855 |
| 36 | Feed | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 37 | Other | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 38 | **Total Sales** | **1,807,122** | **1,882,539** | **1,976,337** | **2,010,975** | **1,888,850** | **1,992,467** | **2,068,451** | **1,858,113** | **1,753,282** | **1,943,903** | **2,012,504** | **1,504,341** | **2,169,863** | **884,093** | **923,375** | **1,952,342** | **1,872,076** | **1,822,038** | **1,841,928** | **1,894,916** | **1,709,487** | **1,740,973** | **1,516,959** | **523,401** | **41,550,335** |
| 39 | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 40 | *Smithfield* | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 41 | *Lbs./Head* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* |
| 42 | *$/Head* | *235.86* | *241.03* | *241.03* | *243.49* | *243.49* | *243.16* | *236.80* | *236.80* | *236.80* | *240.74* | *242.94* | *242.94* | *242.94* | *204.96* | *201.01* | *201.01* | *194.52* | *194.52* | *197.55* | *197.55* | *199.19* | *199.19* | *165.07* | *165.07* | *220.25* |
| 43 | *$/cwt* | *82.76* | *84.57* | *84.57* | *85.44* | *85.44* | *85.32* | *83.09* | *83.09* | *83.09* | *84.47* | *85.24* | *85.24* | *85.24* | *71.92* | *70.53* | *70.53* | *68.25* | *68.25* | *69.32* | *69.32* | *69.89* | *69.89* | *57.92* | *57.92* | *77.28* |
| 44 | *$/ccwt* | *109.62* | *112.02* | *112.02* | *113.16* | *113.16* | *113.01* | *110.05* | *110.05* | *110.05* | *111.88* | *112.91* | *112.91* | *112.91* | *95.26* | *93.42* | *93.42* | *90.40* | *90.40* | *91.81* | *91.81* | *92.57* | *92.57* | *76.72* | *76.72* | *102.36* |
| 45 | *JBS* | | | | | | | | | | | | | | | | | | | | | | | | | |
| 46 | *Lbs./Head* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* |
| 47 | *$/Head* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* |
| 48 | *$/cwt* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* |
| 49 | *$/ccwt* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* |
| 50 | *Others* | | | | | | | | | | | | | | | | | | | | | | | | | |
| 51 | *Lbs./Head* | | | | | | | | | | | | | | | | | | | | | | | | | |
| 52 | *$/Head* | | | | | | | | | | | | | | | | | | | | | | | | | |
| 53 | *$/cwt* | | | | | | | | | | | | | | | | | | | | | | | | | |
| 54 | *$/ccwt* | | | | | | | | | | | | | | | | | | | | | | | | | |
| 55 | *Weaners/Head* | *44.00* | *44.00* | *44.00* | *36.50* | *36.50* | *36.50* | *36.50* | *36.50* | *36.50* | *36.50* | *36.50* | *36.50* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *952.50* |
| 56 | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 57 | Smithfield | 1,563,541 | 1,389,833 | 1,473,636 | 1,550,786 | 1,615,804 | 1,509,921 | 1,617,376 | 1,675,379 | 1,497,922 | 1,380,783 | 1,563,492 | 1,621,715 | 1,136,515 | 1,745,200 | 492,016 | 559,536 | 1,560,662 | 1,481,033 | 1,433,237 | 1,455,578 | 1,501,673 | 1,323,689 | 1,365,452 | 1,109,386 | 33,624,164 |
| 58 | JBS | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 59 | Market Hogs | 1,563,541 | 1,389,833 | 1,473,636 | 1,550,786 | 1,615,804 | 1,509,921 | 1,617,376 | 1,675,379 | 1,497,922 | 1,380,783 | 1,563,492 | 1,621,715 | 1,136,515 | 1,745,200 | 492,016 | 559,536 | 1,560,662 | 1,481,033 | 1,433,237 | 1,455,578 | 1,501,673 | 1,323,689 | 1,365,452 | 1,109,386 | 33,624,164 |
| 60 | Weaned Pigs | - | 333,785 | 326,065 | 341,012 | 304,945 | 295,240 | 292,003 | 300,182 | 270,183 | 293,349 | 300,854 | 292,920 | 292,920 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 7,262,822 |
| 61 | Cull Hogs | 15,934 | 16,519 | 16,757 | 16,974 | 17,085 | 17,144 | 17,208 | 16,986 | 16,195 | 15,160 | 13,502 | 12,439 | 11,518 | 8,845 | 8,193 | 7,836 | 7,142 | 6,133 | 5,154 | 4,195 | 3,224 | 2,302 | 1,125 | 438 | 258,006 |
| 62 | GDU Non-Select Sales | 33,294 | 34,031 | 34,031 | 34,492 | 34,492 | 35,370 | 34,763 | 34,763 | 34,763 | 34,865 | 35,031 | 35,031 | 35,031 | 29,609 | 28,396 | 28,396 | 26,602 | 26,602 | 26,836 | 26,836 | 27,548 | 27,548 | 23,021 | 23,021 | 744,370 |
| 63 | Sows | 34,067 | 34,803 | 34,803 | 34,803 | 34,803 | 34,803 | 34,765 | 34,765 | 34,765 | 34,765 | 33,247 | 33,247 | 33,247 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 21,784 | 21,784 | 740,990 |
| 64 | **Hog Collections** | **1,646,836** | **1,808,970** | **1,885,291** | **1,978,068** | **2,007,129** | **1,892,477** | **1,996,115** | **2,062,075** | **1,853,829** | **1,758,922** | **1,946,126** | **1,995,352** | **1,509,231** | **2,140,524** | **885,475** | **952,639** | **1,951,276** | **1,870,639** | **1,822,097** | **1,843,479** | **1,889,315** | **1,710,411** | **1,740,415** | **1,483,662** | **42,630,353** |
| 65 | Feed | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 6,000,000 |
| 66 | Cost of Feed Sold | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (5,760,000) |
| 67 | Market Price Adjustment | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 68 | **Total Collections** | **1,656,836** | **1,818,970** | **1,895,291** | **1,988,068** | **2,017,129** | **1,902,477** | **2,006,115** | **2,072,075** | **1,863,829** | **1,768,922** | **1,956,126** | **2,005,352** | **1,519,231** | **2,150,524** | **895,475** | **962,639** | **1,961,276** | **1,880,639** | **1,832,097** | **1,853,479** | **1,899,315** | **1,720,411** | **1,750,415** | **1,493,662** | **42,870,353** |
| 69 | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 70 | Mixed (Sunrise & Mercer) 1 | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 71 | Ingredients | (297,090) | (292,076) | (286,863) | (280,624) | (275,361) | (269,566) | (260,765) | (249,875) | (240,235) | (230,094) | (219,590) | (212,697) | (201,258) | (198,473) | (195,593) | (181,158) | (166,936) | (126,897) | (113,088) | (98,760) | (86,222) | (73,379) | (58,667) | (56,964) | (4,672,231) |
| 72 | Corn & Wheat | (740,387) | (759,418) | (760,952) | (759,279) | (762,318) | (721,462) | (703,041) | (675,032) | (648,049) | (562,856) | (560,812) | (483,525) | (468,939) | (479,253) | (465,391) | (555,431) | (396,753) | (330,235) | (285,681) | (243,326) | (206,036) | (167,332) | (110,095) | (105,482) | (11,951,086) |
| 73 | Change in AP | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 74 | Less: Nursery Feed Cost Reductions | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 75 | Less: Finisher Feed Cost Reductions | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 76 | Feed Costs | (1,037,477) | (1,051,494) | (1,047,816) | (1,039,903) | (1,037,679) | (991,028) | (963,806) | (924,907) | (888,284) | (792,950) | (780,402) | (696,222) | (670,197) | (677,726) | (660,984) | (736,589) | (563,688) | (457,132) | (398,769) | (342,086) | (292,258) | (240,711) | (168,762) | (162,446) | (16,623,317) |
| 77 | Hauling | (50,339) | (52,187) | (54,939) | (56,670) | (52,825) | (53,958) | (60,100) | (53,724) | (49,439) | (52,724) | (57,303) | (40,151) | (45,041) | (13,901) | (17,084) | (46,348) | (45,282) | (43,845) | (41,750) | (45,455) | (39,854) | (40,778) | (40,219) | (6,922) | (1,060,838) |
| 78 | Contract Grower Closeout Fees 2 | (122,597) | (121,767) | (362,236) | (121,149) | (111,143) | (116,754) | (123,359) | (109,847) | (106,484) | (117,942) | (119,136) | (93,045) | (125,476) | (64,675) | (67,821) | (131,832) | (130,068) | (126,917) | (126,809) | (130,223) | (117,819) | (119,853) | (121,345) | (46,160) | (2,934,458) |
| 79 | Contract Grower Rent 3 | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 80 | Medication & Veterinary Services | (49,894) | (48,052) | (47,970) | (47,890) | (46,185) | (45,855) | (46,967) | (43,231) | (45,866) | (46,743) | (45,443) | (45,339) | (45,181) | (45,125) | (45,065) | (44,898) | (44,734) | (44,577) | (44,421) | (44,259) | (44,119) | (43,976) | (43,831) | (43,812) | (1,093,432) |
| 81 | Cost of Sales Disbursements | (1,260,307) | (1,273,500) | (1,512,961) | (1,265,612) | (1,247,831) | (1,207,595) | (1,194,232) | (1,131,709) | (1,090,073) | (1,010,360) | (1,002,284) | (874,756) | (885,895) | (801,428) | (790,954) | (959,667) | (783,773) | (672,471) | (611,749) | (562,022) | (494,051) | (445,318) | (374,158) | (259,340) | (21,712,045) |
| 82 | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 83 | Payroll | (56,902) | (177,210) | (56,902) | (170,797) | (56,902) | (170,582) | (56,902) | (170,459) | (56,902) | (170,207) | (56,902) | (169,956) | (56,902) | (169,736) | (56,902) | (169,576) | (56,902) | (159,423) | (56,902) | (159,131) | (56,902) | (158,860) | (56,902) | (128,651) | (2,657,411) |
| 84 | Other Payroll | (28,387) | (26,982) | (25,385) | (29,328) | (26,590) | (26,306) | (27,657) | (24,105) | (26,660) | (27,509) | (25,725) | (25,459) | (25,056) | (24,914) | (24,758) | (24,332) | (23,915) | (23,513) | (23,113) | (22,700) | (22,342) | (21,977) | (21,607) | (21,558) | (599,877) |
| 85 | Payroll Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 86 | Insurance & Benefits | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (170,279) |
| 87 | Payroll Disbursements | (92,383) | (211,287) | (89,382) | (207,220) | (90,587) | (203,983) | (91,654) | (201,659) | (90,657) | (204,812) | (89,722) | (202,510) | (89,053) | (201,744) | (88,755) | (201,004) | (87,912) | (190,031) | (87,110) | (188,926) | (86,339) | (187,932) | (85,604) | (157,304) | (3,427,567) |
| 88 | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 89 | Utilities | (118,697) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (7,547) | (7,547) | (607,283) |
| 90 | Property & Other Taxes | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (136,451) |
| 91 | Supplies | (3,956) | (3,905) | (3,834) | (3,677) | (3,660) | (3,661) | (3,652) | (3,633) | (3,614) | (3,595) | (3,574) | (3,560) | (3,538) | (3,530) | (3,521) | (3,498) | (3,476) | (3,454) | (3,432) | (3,410) | (3,390) | (3,370) | (3,350) | (3,348) | (85,638) |
| 92 | Legal, Accounting & Other | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (504,000) |
| 93 | Repairs & Maintenance | (13,016) | (12,631) | (12,113) | (9,320) | (9,188) | (9,192) | (9,163) | (9,103) | (9,048) | (8,987) | (8,924) | (8,879) | (8,812) | (8,788) | (8,763) | (8,692) | (8,622) | (8,555) | (8,488) | (8,420) | (8,360) | (8,299) | (8,237) | (8,229) | (221,830) |

| | A | B | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT | BU | BV | BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | N. G. Purvis Farms | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 4 | *Cash Flow Forecast* | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 5 | | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 6 | | Fiscal Period | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 7 | | Fiscal Week | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | |
| 8 | | Bankruptcy week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 9 | | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| 10 | | Week Beginning Date | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 11 | | Week Ending Date | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | TOTALS |
| 94 | | Credit Cards | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 95 | | Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 96 | | All Other | (58,862) | (58,693) | (58,462) | (57,946) | (57,812) | (57,816) | (57,785) | (57,720) | (57,660) | (57,593) | (57,525) | (57,477) | (57,404) | (57,378) | (57,350) | (57,273) | (57,197) | (57,124) | (57,052) | (56,977) | (56,912) | (56,846) | (56,779) | (56,770) | (1,380,411) |
| 97 | | SG&A Disbursements | (221,216) | (124,462) | (123,642) | (120,176) | (119,894) | (119,901) | (119,834) | (119,688) | (119,555) | (119,408) | (119,255) | (119,148) | (118,986) | (118,929) | (118,867) | (118,695) | (118,527) | (118,366) | (118,205) | (118,039) | (117,895) | (117,748) | (102,599) | (102,579) | (2,935,614) |
| 98 | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 99 | | **Operating Disbursements** | **(1,573,907)** | **(1,609,249)** | **(1,725,984)** | **(1,593,009)** | **(1,458,312)** | **(1,531,480)** | **(1,405,720)** | **(1,453,056)** | **(1,300,285)** | **(1,334,579)** | **(1,211,261)** | **(1,196,414)** | **(1,093,935)** | **(1,122,101)** | **(998,576)** | **(1,279,366)** | **(990,212)** | **(980,867)** | **(817,063)** | **(868,987)** | **(698,284)** | **(750,997)** | **(562,361)** | **(519,223)** | **(28,075,227)** |
| 100 | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 101 | | **Net Operating Cash Flow** | **82,929** | **209,721** | **169,307** | **395,059** | **558,817** | **370,997** | **600,396** | **619,019** | **563,544** | **434,343** | **744,865** | **808,938** | **425,297** | **1,028,423** | **(103,101)** | **(316,727)** | **971,065** | **899,772** | **1,015,033** | **984,493** | **1,201,031** | **969,413** | **1,188,054** | **974,438** | **14,795,126** |
| 102 | | **Cumulative Cash Flow** | **82,929** | **292,651** | **461,957** | **857,016** | **1,415,833** | **1,786,830** | **2,387,226** | **3,006,245** | **3,569,789** | **4,004,132** | **4,748,996** | **5,557,934** | **5,983,231** | **7,011,654** | **6,908,554** | **6,591,827** | **7,562,892** | **8,462,663** | **9,477,697** | **10,462,189** | **11,663,220** | **12,632,634** | **13,820,688** | **14,795,126** | **14,795,126** |
| 103 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 104 | | *Additional Lender Advance* | - | - | (5,966,311) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (5,966,311) |
| 105 | | Principal Payments | (24,567) | - | 5,966,311 | - | (24,636) | - | - | - | - | (24,705) | - | - | - | (24,774) | - | - | - | (24,844) | - | - | - | - | (24,913) | - | 5,817,872 |
| 106 | | Interest Expense | (96,873) | (56,639) | (56,286) | (42,257) | (102,827) | (40,447) | (39,690) | (38,396) | (37,056) | (97,156) | (35,126) | (33,488) | (31,698) | (92,036) | (28,690) | (28,994) | (29,792) | (28,180) | (86,283) | (23,528) | (21,310) | (15,505) | (74,410) | (10,791) | (1,147,458) |
| 107 | | **Lender Receipts / (Disbursements)** | **(121,440)** | **(56,639)** | **(56,286)** | **(42,257)** | **(127,463)** | **(40,447)** | **(39,690)** | **(38,396)** | **(37,056)** | **(121,861)** | **(35,126)** | **(33,488)** | **(31,698)** | **(116,810)** | **(28,690)** | **(28,994)** | **(29,792)** | **(53,023)** | **(86,283)** | **(23,528)** | **(21,310)** | **(15,505)** | **(99,324)** | **(10,791)** | **(1,295,897)** |
| 108 | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 109 | | Commodity Account | - | - | - | - | - | 0 | - | - | - | 0 | - | - | - | 0 | - | - | - | - | - | - | 1,335,844 | - | - | - | 1,335,844 |
| 110 | | Required AP Catch-Up Payments | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 111 | | Professional Fees | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 112 | | All Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 113 | | CapEx | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 114 | | **Other Receipts / (Disbursements)** | **-** | **-** | **-** | **-** | **-** | **0** | **-** | **-** | **-** | **0** | **-** | **-** | **-** | **0** | **-** | **-** | **-** | **-** | **-** | **-** | **1,335,844** | **-** | **-** | **-** | **1,335,844** |
| 115 | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 116 | | **Non-Operating Receipts / (Disbursements)** | **(121,440)** | **(56,639)** | **(56,286)** | **(42,257)** | **(127,463)** | **(40,447)** | **(39,690)** | **(38,396)** | **(37,056)** | **(121,861)** | **(35,126)** | **(33,488)** | **(31,698)** | **(116,810)** | **(28,690)** | **(28,994)** | **(29,792)** | **(53,023)** | **(86,283)** | **(23,528)** | **1,314,534** | **(15,505)** | **(99,324)** | **(10,791)** | **39,947** |
| 117 | | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 118 | | *Net Cash Flow* | *(38,510)* | *153,082* | *113,021* | *352,802* | *431,355* | *330,550* | *560,706* | *580,623* | *526,488* | *312,482* | *709,739* | *775,450* | *393,598* | *911,614* | *(131,791)* | *(345,721)* | *941,272* | *846,748* | *928,750* | *960,965* | *2,515,565* | *953,908* | *1,088,730* | *963,647* | *14,835,073* |
| 119 | | Check | (0) | 0 | (5,966,311) | - | 0 | 2,493 | - | - | - | 2,355 | - | - | (0) | 1,801 | 0 | - | - | - | 2,153 | - | - | - | - | - | (5,957,508) |
| 120 | | **Cumulative cash flow after P&I payments** | **(38,510)** | **114,572** | **227,593** | **580,395** | **1,011,750** | **1,342,299** | **1,903,005** | **2,483,628** | **3,010,115** | **3,322,597** | **4,032,336** | **4,807,787** | **5,201,385** | **6,112,999** | **5,981,208** | **5,635,487** | **6,576,759** | **7,423,507** | **8,352,258** | **9,313,223** | **11,828,788** | **12,782,696** | **13,871,426** | **14,835,073** | |
| 121 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 122 | | Total G&A Costs | 87,892 | 43,533 | 62,488 | 43,533 | 87,815 | 43,456 | 62,412 | 43,456 | 62,412 | 68,859 | 62,412 | 43,456 | 62,412 | 68,859 | 62,412 | 43,456 | 62,412 | 59,007 | 62,412 | 33,604 | 62,412 | 33,604 | 87,815 | 33,604 | 1,383,727 |
| 123 | | Allocation - FNBO | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | |
| 124 | | 80% | | | | | | | | | | | | | | | | | | | | | | | | | |
| 125 | | Hog Revenues to FNBO | 1,579,475 | 1,406,352 | 1,490,393 | 1,567,761 | 1,632,890 | 1,527,064 | 1,634,584 | 1,692,365 | 1,514,117 | 1,395,943 | 1,576,994 | 1,634,154 | 1,148,033 | 1,754,044 | 500,208 | 567,372 | 1,567,803 | 1,487,166 | 1,438,390 | 1,459,773 | 1,504,896 | 1,325,992 | 1,366,577 | 1,109,824 | 33,882,170 |
| 126 | | Outside Feed Net Revenues to FNBO | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 240,000 |
| 127 | | Margin Account | - | - | - | - | - | 0 | - | - | - | 0 | - | - | - | 0 | - | - | - | - | - | - | 1,335,844 | - | - | - | 1,335,844 |
| 128 | | Interest paid to FNBO | (56,550) | (56,639) | (56,286) | (42,257) | (41,443) | (40,447) | (39,690) | (38,396) | (37,056) | (35,841) | (35,126) | (33,488) | (31,698) | (30,790) | (28,690) | (28,994) | (29,792) | (27,620) | (25,666) | (23,528) | (21,310) | (15,505) | (13,304) | (10,791) | (800,907) |
| 129 | | Nursery expenses to FNBO | (117,166) | (105,778) | (74,407) | (45,791) | (27,698) | (10,812) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (412,952) |
| 130 | | Finisher expenses to FNBO | (845,865) | (906,289) | (1,134,871) | (936,738) | (913,346) | (928,388) | (884,012) | (867,248) | (791,573) | (746,246) | (704,639) | (625,260) | (598,825) | (576,638) | (531,142) | (701,407) | (495,237) | (415,916) | (327,881) | (304,686) | (211,650) | (192,026) | (94,280) | (12,700) | (14,746,861) |
| 131 | | Utility deposits | (68,267) | | | | | | | | | | | | | | | | | | | | | | | | (68,267) |
| 132 | | Pork checkoff & freight to market | (50,339) | (52,187) | (54,939) | (56,670) | (52,825) | (53,958) | (60,100) | (53,724) | (49,439) | (52,724) | (57,303) | (40,151) | (45,041) | (13,901) | (17,084) | (46,348) | (45,282) | (43,845) | (41,750) | (45,455) | (39,854) | (40,778) | (40,219) | (6,922) | (1,060,838) |
| 133 | | Sale: Sow and GDU Animals to LOLF | | | 5,966,311 | | | | | | | | | | | | | | | | | | | | | | 5,966,311 |
| 134 | 62% | Bankruptcy costs | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (932,480) |
| 135 | | G&A expenses to FNBO | (70,313) | (34,826) | (49,991) | (34,826) | (70,252) | (34,765) | (49,929) | (34,765) | (49,929) | (55,087) | (49,929) | (34,765) | (49,929) | (55,087) | (49,929) | (34,765) | (49,929) | (47,206) | (49,929) | (26,883) | (49,929) | (26,883) | (70,252) | (26,883) | (1,106,981) |
| 136 | | Net cash flow - FNBO | 342,122 | 221,779 | 6,057,356 | 422,625 | 498,473 | 429,841 | 570,261 | 667,640 | 555,528 | 475,453 | 699,405 | 869,899 | 391,948 | 1,047,036 | (157,229) | (274,734) | 916,971 | 921,987 | 962,572 | 1,028,630 | 2,487,404 | 1,020,208 | 1,117,929 | 1,021,935 | 22,295,039 |
| 137 | | Cumulative net cash flow - FNBO | 342,122 | 563,901 | 6,621,257 | 7,043,882 | 7,542,355 | 7,972,196 | 8,542,457 | 9,210,097 | 9,765,625 | 10,241,077 | 10,940,482 | 11,810,381 | 12,202,329 | 13,249,366 | **13,092,137** | **12,817,403** | **13,734,374** | **14,656,361** | **15,618,933** | **16,647,562** | **19,134,966** | **20,155,175** | **21,273,104** | **22,295,039** | 22,295,039 |
| 138 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 139 | | | | | | | | | | | | | | | | | | | | | | | | | | **Total projected proceeds to FNBO** | **$22,295,039** |
| 140 | | | | | | | | | | | | | | | | | | | | | | | | | | **FNBO debt** | 25,793,000 |
| 141 | | | | | | | | | | | | | | | | | | | | | | | | | | **Deficiency** | **(3,497,961)** |
| 142 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 143 | | Revenues to LOL | 67,361 | 402,619 | 394,898 | 410,307 | 374,239 | 365,413 | 361,531 | 369,710 | 339,711 | 362,979 | 369,132 | 361,198 | 361,198 | 386,480 | 385,267 | 385,267 | 383,473 | 383,473 | 383,706 | 383,706 | 384,419 | 384,419 | 373,838 | 373,838 | 8,748,183 |
| 144 | | Interest paid to LOL | (39,486) | - | - | - | (60,617) | - | - | - | - | (60,617) | - | - | - | (60,617) | - | - | - | - | (60,617) | - | - | - | (60,617) | - | (342,570) |
| 145 | | Sow unit expenses to LOL | (278,152) | (372,620) | (274,663) | (381,347) | (277,328) | (368,061) | (274,880) | (360,099) | (272,531) | (366,482) | (265,372) | (361,689) | (265,742) | (361,934) | (265,808) | (361,813) | (265,166) | (361,175) | (263,382) | (359,391) | (262,743) | (358,752) | (250,468) | (346,796) | (7,576,394) |
| 146 | | GDU expenses to LOL | (61,080) | (66,176) | (61,949) | (66,264) | (62,037) | (64,138) | (59,911) | (64,124) | (59,924) | (61,266) | (57,131) | (61,453) | (57,510) | (61,766) | (57,725) | (61,936) | (57,709) | (61,922) | (57,233) | (61,446) | (57,219) | (61,432) | (50,576) | (54,796) | (1,446,725) |
| 147 | | Utility deposits | (27,884) | | | | | | | | | | | | | | | | | | | | | | | | (27,884) |
| 148 | | Purchase: Sow and GDU Animals from FNBO | | | (5,966,311) | | | | | | | | | | | | | | | | | | | | | | (5,966,311) |
| 149 | | Bankruptcy costs | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (571,520) |
| 150 | | G&A expenses to LOL | (17,578) | (8,707) | (12,498) | (8,707) | (17,563) | (8,691) | (12,482) | (8,691) | (12,482) | (13,772) | (12,482) | (8,691) | (12,482) | (13,772) | (12,482) | (8,691) | (12,482) | (11,801) | (12,482) | (6,721) | (12,482) | (6,721) | (17,563) | (6,721) | (276,745) |
| 151 | | Net cash flow - LOL | (380,632) | (68,696) | (5,944,335) | (69,823) | (67,118) | (99,292) | (9,555) | (87,017) | (29,040) | (162,971) | 10,334 | (94,449) | 1,650 | (135,422) | 25,438 | (70,987) | 24,302 | (75,239) | (33,821) | (67,665) | 28,161 | (66,300) | (29,199) | (58,288) | **(7,459,965)** |
| 152 | | Cumulative net cash flow - LOL | (380,632) | (449,329) | (6,393,664) | (6,463,487) | (6,530,605) | (6,629,897) | (6,639,452) | (6,726,469) | (6,755,509) | (6,918,480) | (6,908,146) | (7,002,595) | (7,000,944) | (7,136,367) | (7,110,929) | (7,181,916) | (7,157,614) | (7,232,854) | (7,266,675) | (7,334,339) | (7,306,179) | (7,372,479) | (7,401,677) | (7,459,965) | **(1,493,655)** |
| 153 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 154 | | *Check* | - | *0* | - | - | *0* | *0* | *0* | *(0)* | *0* | - | *(0)* | - | *0* | - | *(0)* | *0* | *0* | - | - | - | *(0)* | - | *(0)* | - | 0 |
| 155 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 156 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 157 | | | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 158 | | | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 159 | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 160 | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 161 | | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| 162 | | | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 163 | | | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | TOTALS |
| 164 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 165 | | **G&A Expenses** | | | | | | | | | | | | | | | | | | | | | | | | | |
| 166 | | Labor, contract labor | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 28,159 | 56,967 | 28,159 | 56,967 | 28,159 | 56,967 | 28,159 | 1,100,327 |
| 167 | | Utilities | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 28,011 |
| 168 | | Property & Other Taxes | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 32,010 |
| 169 | | Repairs & Maintenance | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 12,462 |
| 170 | | Insurance | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 12,499 |
| 171 | | Purchase money debt payments | 25,403 | - | - | - | 25,403 | - | - | - | - | 25,403 | - | - | - | 25,403 | - | - | - | 25,403 | - | - | - | - | 25,403 | - | 152,420 |
| 172 | | All Other | 1,981 | 1,981 | 1,981 | 1,981 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 45,998 |
| 173 | | | 87,892 | 43,533 | 62,488 | 43,533 | 87,815 | 43,456 | 62,412 | 43,456 | 62,412 | 68,859 | 62,412 | 43,456 | 62,412 | 68,859 | 62,412 | 43,456 | 62,412 | 59,007 | 62,412 | 33,604 | 62,412 | 33,604 | 87,815 | 33,604 | 1,383,727 |
| 174 | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 175 | | **Bankruptcy Costs** | | | | | | | | | | | | | | | | | | | | | | | | | |

**N. G. Purvis Farms**

*Cash Flow Forecast*

| Row | Item | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT | BU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 |
| 6 | Fiscal Period | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 |
| 7 | Fiscal Week | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 8 | Bankruptcy week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 9 | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| 10 | Week Beginning Date | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 |
| 11 | Week Ending Date | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 |
| 176 | Professional fees | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 |
| 177 | Additional bankruptcy costs | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 |
| 178 | | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 |
| 179 | | - | - | - | - | - | - | - | - | - | - | - | - |
| 180 | **FNBO BUDGET** | | | | | | | | | | | | |
| 181 | **Animal Inventories** | | | | | | | | | | | | |
| 182 | Nursery | 44,290 | 35,853 | 27,206 | 19,716 | 12,131 | 4,493 | - | - | - | - | - | - |
| 183 | Finishing | 104,936 | 106,325 | 107,676 | 107,726 | 108,411 | 108,779 | 105,609 | 98,796 | 92,541 | 85,647 | 78,512 | 73,496 |
| 184 | Total | 149,226 | 142,178 | 134,882 | 127,442 | 120,542 | 113,272 | 105,609 | 98,796 | 92,541 | 85,647 | 78,512 | 73,496 |
| 185 | **Hogs sold** | | | | | | | | | | | | |
| 186 | Market Hogs | 5,751 | 5,961 | 6,287 | 6,509 | 6,047 | 6,491 | 6,958 | 6,198 | 5,660 | 6,330 | 6,599 | 4,511 |
| 187 | Cull Hogs | 151 | 153 | 155 | 157 | 158 | 159 | 160 | 158 | 150 | 141 | 131 | 121 |
| 188 | **Head** | 5,902 | 6,114 | 6,442 | 6,667 | 6,206 | 6,650 | 7,118 | 6,355 | 5,811 | 6,471 | 6,730 | 4,632 |
| 189 | Market Hogs | 1,679,620 | 1,739,504 | 1,832,457 | 1,895,881 | 1,764,168 | 1,890,729 | 2,023,804 | 1,807,024 | 1,653,925 | 1,844,762 | 1,921,330 | 1,326,444 |
| 190 | Cull Hogs | 28,672 | 29,095 | 29,514 | 29,897 | 30,093 | 30,196 | 30,343 | 29,951 | 28,557 | 26,731 | 24,894 | 22,934 |
| 191 | **Pounds** | 1,708,292 | 1,768,599 | 1,861,972 | 1,925,778 | 1,794,261 | 1,920,925 | 2,054,146 | 1,836,976 | 1,682,482 | 1,871,493 | 1,946,224 | 1,349,378 |
| 192 | Market Hogs | $1,390,042 | $1,471,122 | $1,549,733 | $1,619,761 | $1,507,231 | $1,613,147 | $1,681,533 | $1,501,416 | $1,374,209 | $1,558,259 | $1,637,804 | $1,130,705 |
| 193 | Cull Hogs | $49,228 | $50,549 | $50,788 | $51,466 | $51,577 | $52,514 | $51,972 | $51,750 | $50,959 | $50,025 | $48,533 | $47,470 |
| 194 | **Hog Sales** | $1,439,270 | $1,521,671 | $1,600,521 | $1,671,227 | $1,558,808 | $1,665,660 | $1,733,504 | $1,553,165 | $1,425,168 | $1,608,284 | $1,686,337 | $1,178,174 |
| 195 | Butchers lbs/head | 292.1 | 291.8 | 291.5 | 291.3 | 291.7 | 291.3 | 290.8 | 291.6 | 292.2 | 291.4 | 291.2 | 294.0 |
| 196 | Butchers $/head | $241.72 | $246.80 | $246.50 | $248.83 | $249.24 | $248.51 | $241.66 | $242.25 | $242.77 | $246.17 | $248.20 | $250.63 |
| 197 | Butchers $/cwt | $82.76 | $84.57 | $84.57 | $85.44 | $85.44 | $85.32 | $83.09 | $83.09 | $83.09 | $84.47 | $85.24 | $85.24 |
| 198 | | | | | | | | | | | | | |
| 199 | **Revenues - cash basis** | | | | | | | | | | | | |
| 200 | Market Hogs | 1,563,541 | 1,389,833 | 1,473,636 | 1,550,786 | 1,615,804 | 1,509,921 | 1,617,376 | 1,675,379 | 1,497,922 | 1,380,783 | 1,563,492 | 1,621,715 |
| 201 | Cull Hogs | 15,934 | 16,519 | 16,757 | 16,974 | 17,085 | 17,144 | 17,208 | 16,986 | 16,195 | 15,160 | 13,502 | 12,439 |
| 202 | **Hog Collections** | 1,579,475 | 1,406,352 | 1,490,393 | 1,567,761 | 1,632,890 | 1,527,064 | 1,634,584 | 1,692,365 | 1,514,117 | 1,395,943 | 1,576,994 | 1,634,154 |
| 203 | Feed | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| 204 | **Total Collections** | 1,829,475 | 1,656,352 | 1,740,393 | 1,817,761 | 1,882,890 | 1,777,064 | 1,884,584 | 1,942,365 | 1,764,117 | 1,645,943 | 1,826,994 | 1,884,154 |
| 205 | | - | - | - | - | - | - | - | - | - | - | - | - |
| 206 | **Selling costs** | | | | | | | | | | | | |
| 207 | Pork checkoff | 9,086 | 9,463 | 9,932 | 10,105 | 9,494 | 7,519 | 10,392 | 9,341 | 8,816 | 7,414 | 10,113 | 7,572 |
| 208 | Freight | 41,254 | 42,725 | 45,008 | 46,566 | 43,330 | 46,439 | 49,707 | 44,383 | 40,623 | 45,310 | 47,191 | 32,579 |
| 209 | | 50,339 | 52,187 | 54,939 | 56,670 | 52,825 | 53,958 | 60,100 | 53,724 | 49,439 | 52,724 | 57,303 | 40,151 |
| 210 | **Nursery expenses** | - | - | - | - | - | - | - | - | - | - | - | - |
| 211 | Nursery Feed | 90,529 | 76,971 | 58,323 | 42,249 | 25,959 | 9,074 | - | - | - | - | - | - |
| 212 | Labor, contract labor | 613 | 7,187 | 353 | 271 | - | - | - | - | - | - | - | - |
| 213 | Drugs | 5,470 | 4,478 | 3,151 | 345 | - | - | - | - | - | - | - | - |
| 214 | Utilities | 1,318 | 1,168 | 966 | 539 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 |
| 215 | Utilities deposit | 5,769 | | | | | | | | | | | |
| 216 | Repairs/maintenance | 2,188 | 1,791 | 1,261 | 138 | - | - | - | - | - | - | - | - |
| 217 | Lease/grower | 15,315 | 12,538 | 8,824 | 967 | - | - | - | - | - | - | - | - |
| 218 | Insurance | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 |
| 219 | Taxes | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 |
| 220 | Other | 481 | 394 | 277 | 30 | - | - | - | - | - | - | - | - |
| 221 | | 122,935 | 105,778 | 74,407 | 45,791 | 27,698 | 10,812 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 |
| 222 | **Finishing expenses** | 5,769 | - | - | - | - | - | - | - | - | - | - | - |
| 223 | Finishing Feed | 725,535 | 751,974 | 768,432 | 777,224 | 789,088 | 768,189 | 752,208 | 709,655 | 670,636 | 588,883 | 545,165 | 515,507 |
| 224 | Cost of Feed Sold | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| 225 | Change in feed inventories | (32,207) | (33,013) | (34,175) | (34,845) | (32,317) | (34,052) | (35,893) | (31,912) | (29,293) | (32,294) | (1,149) | (55,763) |
| 226 | Payment on Smithfield feed/genetics AP | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 |
| 227 | Labor, contract labor | 5,570 | 37,675 | 5,715 | 37,789 | 5,754 | 37,862 | 5,605 | 37,209 | 4,912 | 36,259 | 4,167 | 35,363 |
| 228 | Drugs | 2,179 | 2,208 | 2,236 | 2,237 | 2,252 | 2,259 | 2,193 | 2,052 | 1,922 | 1,779 | 1,631 | 1,526 |
| 229 | Utilities | 15,378 | 15,378 | 15,378 | 15,378 | 15,378 | 15,378 | 15,378 | 15,377 | 15,377 | 15,377 | 15,377 | 15,377 |
| 230 | Utilities deposit | 62,498 | | | | | | | | | | | |
| 231 | Repairs/maintenance | 928 | 941 | 953 | 953 | 959 | 962 | 934 | 874 | 819 | 758 | 695 | 650 |
| 232 | Lease/grower | 73,668 | 76,294 | 321,484 | 83,153 | 77,376 | 82,927 | 88,763 | 79,255 | 72,541 | 80,911 | 84,269 | 58,177 |
| 233 | Insurance | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 |
| 234 | Taxes | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 |
| 235 | Other | 1,312 | 1,329 | 1,346 | 1,347 | 1,355 | 1,360 | 1,320 | 1,235 | 1,157 | 1,071 | 981 | 919 |
| 236 | | 1,148,364 | 1,146,290 | 1,374,872 | 1,176,739 | 1,153,348 | 1,168,389 | 1,124,013 | 1,107,249 | 1,031,574 | 986,246 | 944,640 | 865,260 |
| 237 | **Other expenses (income)** | 62,499 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 238 | Margin Account | - | - | - | - | - | (0) | - | - | - | (0) | - | - |
| 239 | Interest paid to FNBO | 56,550 | 56,639 | 56,286 | 42,257 | 41,443 | 40,447 | 39,690 | 38,396 | 37,056 | 35,841 | 35,126 | 33,488 |
| 240 | Sale: Sow and GDU Animals to LOLF | - | - | (5,966,311) | - | - | - | - | - | - | - | - | - |
| 241 | 80% G&A Allocation | 70,313 | 34,826 | 49,991 | 34,826 | 70,252 | 34,765 | 49,929 | 34,765 | 49,929 | 55,087 | 49,929 | 34,765 |
| 242 | 62% Bankruptcy Cost Allocation | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 |
| 243 | **Total Expenses** | 1,487,355 | 1,434,576 | (4,316,961) | 1,395,138 | 1,384,420 | 1,347,226 | 1,314,326 | 1,274,726 | 1,208,591 | 1,170,492 | 1,127,590 | 1,014,257 |
| 244 | | - | (0) | (5,966,311) | (0) | 0 | 0 | 0 | (0) | 0 | 0 | 0 | (0) |
| 245 | **Net Cash Flow - FNBO** | 342,120 | 221,775 | 6,057,353 | 422,623 | 498,470 | 429,839 | 570,258 | 667,639 | 555,526 | 475,451 | 699,403 | 869,898 |
| 246 | **Cumulative Net Cash Flow - FNBO** | 342,120 | 563,895 | 6,621,249 | 7,043,871 | 7,542,342 | 7,972,180 | 8,542,438 | 9,210,077 | 9,765,603 | 10,241,054 | 10,940,458 | 11,810,355 |
| 247 | | (2) | (3) | (3) | (3) | (3) | (3) | (3) | (2) | (2) | (2) | (2) | (2) |
| 248 | | (2) | (5) | (8) | (10) | (13) | (16) | (18) | (20) | (21) | (23) | (25) | (26) |
| 249 | | | | | | | | | | | | | |
| 250 | | - | - | - | - | - | 0 | - | - | - | - | - | - |
| 251 | **LOLF BUDGET** | - | - | - | - | - | - | - | - | - | - | - | - |
| 252 | **Animal Inventories** | | | | | | | | | | | | |
| 253 | Sows | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 |
| 254 | Boars | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 |
| 255 | GDU | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 |
| 256 | Pigs in farrowing (21 days' Inventory) | 25,008 | 24,376 | 23,848 | 24,617 | 25,295 | 25,545 | 25,415 | 24,728 | 24,765 | 24,783 | 25,406 | 25,395 |
| 257 | **Total** | 52,806 | 52,175 | 51,647 | 52,416 | 53,094 | 53,344 | 53,213 | 52,527 | 52,564 | 52,582 | 53,205 | 53,193 |

| Row | Item | BV | BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 6 | Fiscal Period | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 7 | Fiscal Week | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | |
| 8 | Bankruptcy week | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 9 | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| 10 | Week Beginning Date | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 11 | Week Ending Date | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 176 | Professional fees | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 504,000 |
| 177 | Additional bankruptcy costs | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 1,000,000 |
| 178 | | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 1,504,000 |
| 179 | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 180 | **FNBO BUDGET** | | | | | | | | | | | | | |
| 181 | **Animal Inventories** | | | | | | | | | | | | | |
| 182 | Nursery | - | - | - | - | - | - | - | - | - | - | - | - | |
| 183 | Finishing | 65,912 | 63,219 | 60,298 | 52,269 | 44,404 | 36,827 | 29,292 | 21,518 | 14,770 | 7,891 | 923 | 0 | |
| 184 | Total | 65,912 | 63,219 | 60,298 | 52,269 | 44,404 | 36,827 | 29,292 | 21,518 | 14,770 | 7,891 | 923 | 0 | |
| 185 | **Hogs sold** | | | | | | | | | | | | | |
| 186 | Market Hogs | 7,106 | 2,242 | 2,494 | 7,614 | 7,473 | 7,221 | 7,213 | 7,486 | 6,493 | 6,799 | 6,918 | 903 | 143,266 |
| 187 | Cull Hogs | 112 | 103 | 95 | 91 | 83 | 71 | 60 | 49 | 37 | 27 | 17 | 6 | 2,544 |
| 188 | **Head** | 7,218 | 2,344 | 2,589 | 7,705 | 7,556 | 7,292 | 7,272 | 7,534 | 6,531 | 6,826 | 6,935 | 910 | 145,809 |
| 189 | Market Hogs | 2,065,892 | 679,624 | 751,351 | 2,210,799 | 2,170,576 | 2,098,739 | 2,096,279 | 2,174,105 | 1,891,312 | 1,937,680 | 1,971,684 | 257,468 | 41,685,158 |
| 190 | Cull Hogs | 21,236 | 19,476 | 18,040 | 17,256 | 15,726 | 13,506 | 11,348 | 9,237 | 7,099 | 5,070 | 3,166 | 1,231 | 483,268 |
| 191 | **Pounds** | 2,087,128 | 699,100 | 769,392 | 2,228,055 | 2,186,302 | 2,112,245 | 2,107,627 | 2,183,342 | 1,898,410 | 1,942,750 | 1,974,850 | 258,699 | 42,168,426 |
| 192 | Market Hogs | $1,761,034 | $488,769 | $529,916 | $1,559,239 | $1,481,462 | $1,432,432 | $1,453,068 | $1,507,015 | $1,321,844 | $1,354,252 | $1,141,996 | $149,125 | $32,215,113 |
| 193 | Cull Hogs | $46,549 | $38,454 | $36,589 | $36,232 | $33,744 | $32,735 | $31,989 | $31,030 | $30,772 | $29,850 | $24,146 | $23,458 | $1,002,376 |
| 194 | **Hog Sales** | $1,807,583 | $527,223 | $566,504 | $1,595,472 | $1,515,205 | $1,465,167 | $1,485,057 | $1,538,045 | $1,352,616 | $1,384,102 | $1,166,142 | $172,583 | $33,217,489 |
| 195 | Butchers lbs/head | 290.7 | 303.1 | 301.3 | 290.3 | 290.4 | 290.6 | 290.6 | 290.4 | 291.3 | 285.0 | 285.0 | 285.0 | 291.0 |
| 196 | Butchers $/head | $247.82 | $218.02 | $212.51 | $204.77 | $198.23 | $198.36 | $201.46 | $201.32 | $203.57 | $199.19 | $165.07 | $165.07 | $224.86 |
| 197 | Butchers $/cwt | $85.24 | $71.92 | $70.53 | $70.53 | $68.25 | $68.25 | $69.32 | $69.32 | $69.89 | $69.89 | $57.92 | $57.92 | $77.28 |
| 198 | | | | | | | | | | | | | | |
| 199 | **Revenues - cash basis** | | | | | | | | | | | | | |
| 200 | Market Hogs | 1,136,515 | 1,745,200 | 492,016 | 559,536 | 1,560,662 | 1,481,033 | 1,433,237 | 1,455,578 | 1,501,673 | 1,323,689 | 1,365,452 | 1,109,386 | 33,624,164 |
| 201 | Cull Hogs | 11,518 | 8,845 | 8,193 | 7,836 | 7,142 | 6,133 | 5,154 | 4,195 | 3,224 | 2,302 | 1,125 | 438 | 258,006 |
| 202 | **Hog Collections** | 1,148,033 | 1,754,044 | 500,208 | 567,372 | 1,567,803 | 1,487,166 | 1,438,390 | 1,459,773 | 1,504,896 | 1,325,992 | 1,366,577 | 1,109,824 | 33,882,170 |
| 203 | Feed | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 6,000,000 |
| 204 | **Total Collections** | 1,398,033 | 2,004,044 | 750,208 | 817,372 | 1,817,803 | 1,737,166 | 1,688,390 | 1,709,773 | 1,754,896 | 1,575,992 | 1,616,577 | 1,359,824 | 39,882,170 |
| 205 | | - | - | - | - | - | - | - | - | - | - | - | - | 0 |
| 206 | **Selling costs** | | | | | | | | | | | | | |
| 207 | Pork checkoff | 10,899 | 2,669 | 4,667 | 9,812 | 9,410 | 9,160 | 7,106 | 9,525 | 8,597 | 8,755 | 7,635 | 2,667 | 200,149 |
| 208 | Freight | 34,142 | 11,232 | 12,417 | 36,536 | 35,872 | 34,684 | 34,644 | 35,930 | 31,256 | 32,023 | 32,585 | 4,255 | 860,689 |
| 209 | | 45,041 | 13,901 | 17,084 | 46,348 | 45,282 | 43,845 | 41,750 | 45,455 | 39,854 | 40,778 | 40,219 | 6,922 | 1,060,838 |
| 210 | **Nursery expenses** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 211 | Nursery Feed | - | - | - | - | - | - | - | - | - | - | - | - | 303,105 |
| 212 | Labor, contract labor | - | - | - | - | - | - | - | - | - | - | - | - | 8,424 |
| 213 | Drugs | - | - | - | - | - | - | - | - | - | - | - | - | 13,444 |
| 214 | Utilities | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 13,728 |
| 215 | Utilities deposit | | | | | | | | | | | | | 5,769 |
| 216 | Repairs/maintenance | - | - | - | - | - | - | - | - | - | - | - | - | 5,378 |
| 217 | Lease/grower | - | - | - | - | - | - | - | - | - | - | - | - | 37,644 |
| 218 | Insurance | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 19,767 |
| 219 | Taxes | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 10,280 |
| 220 | Other | - | - | - | - | - | - | - | - | - | - | - | - | 1,182 |
| 221 | | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 418,721 |
| 222 | **Finishing expenses** | - | - | - | - | - | - | - | - | - | - | - | - | 5,769 |
| 223 | Finishing Feed | 468,583 | 453,299 | 437,250 | 381,927 | 326,929 | 273,180 | 216,752 | 160,394 | 110,893 | 59,672 | 6,316 | 0 | 11,257,692 |
| 224 | Cost of Feed Sold | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 5,760,000 |
| 225 | Change in feed inventories | (35,522) | (12,609) | (13,682) | 117,576 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (331,151) |
| 226 | Payment on Smithfield feed/genetics AP | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 892,181 |
| 227 | Labor, contract labor | 3,498 | 34,597 | 3,200 | 33,857 | 2,357 | 32,736 | 1,555 | 31,631 | 784 | 30,637 | 49 | 9 | 428,789 |
| 228 | Drugs | 1,369 | 1,313 | 1,252 | 1,086 | 922 | 765 | 608 | 447 | 307 | 164 | 19 | 0 | 32,728 |
| 229 | Utilities | 15,377 | 15,377 | 15,377 | 15,376 | 15,376 | 15,376 | 15,376 | 15,376 | 15,376 | 15,376 | 376 | 376 | 339,049 |
| 230 | Utilities deposit | | | | | | | | | | | | | 62,498 |
| 231 | Repairs/maintenance | 583 | 559 | 533 | 462 | 393 | 326 | 259 | 190 | 131 | 70 | 8 | 0 | 13,940 |
| 232 | Lease/grower | 90,609 | 29,808 | 32,954 | 96,965 | 95,201 | 92,050 | 91,942 | 95,355 | 82,952 | 84,986 | 86,477 | 11,292 | 2,069,409 |
| 233 | Insurance | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 6,917 |
| 234 | Taxes | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 17,625 |
| 235 | Other | 824 | 790 | 754 | 653 | 555 | 460 | 366 | 269 | 185 | 99 | 12 | 0 | 19,697 |
| 236 | | 838,825 | 816,638 | 771,142 | 941,407 | 735,237 | 655,916 | 567,881 | 544,686 | 451,650 | 432,026 | 334,280 | 252,700 | 20,569,374 |
| 237 | **Other expenses (income)** | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | 62,513 |
| 238 | Margin Account | - | (0) | - | - | - | - | - | - | (1,335,844) | - | - | - | (1,335,844) |
| 239 | Interest paid to FNBO | 31,698 | 30,790 | 28,690 | 28,994 | 29,792 | 27,620 | 25,666 | 23,528 | 21,310 | 15,505 | 13,304 | 10,791 | 800,907 |
| 240 | Sale: Sow and GDU Animals to LOLF | - | - | - | - | - | - | - | - | - | - | - | - | (5,966,311) |
| 241 | 80% G&A Allocation | 49,929 | 55,087 | 49,929 | 34,765 | 49,929 | 47,206 | 49,929 | 26,883 | 49,929 | 26,883 | 70,252 | 26,883 | 1,106,981 |
| 242 | 62% Bankruptcy Cost Allocation | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 932,480 |
| 243 | **Total Expenses** | 1,006,087 | 957,009 | 907,438 | 1,092,106 | 900,833 | 815,179 | 725,819 | 681,143 | (732,508) | 555,783 | 498,648 | 337,889 | 17,649,661 |
| 244 | | 0 | 0 | 0 | 0 | 0 | - | (0) | 0 | - | - | - | - | (5,966,311) |
| 245 | **Net Cash Flow - FNBO** | 391,947 | 1,047,035 | (157,230) | (274,734) | 916,971 | 921,987 | 962,572 | 1,028,630 | 2,487,404 | 1,020,208 | 1,117,929 | 1,021,935 | 22,232,510 |
| 246 | **Cumulative Net Cash Flow - FNBO** | 12,202,302 | 13,249,337 | 13,092,107 | 12,817,373 | 13,734,344 | 14,656,331 | 15,618,903 | 16,647,532 | 19,134,937 | 20,155,145 | 21,273,074 | 22,295,009 | 22,295,009 |
| 247 | | (2) | (1) | (1) | - | - | - | - | - | - | - | - | - | (62,529) |
| 248 | | (28) | (29) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) |
| 249 | | | | | | | | | | | | | | |
| 250 | | - | 0 | - | - | - | - | - | - | - | - | - | - | - |
| 251 | **LOLF BUDGET** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 252 | **Animal Inventories** | | | | | | | | | | | | | |
| 253 | Sows | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | |
| 254 | Boars | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | |
| 255 | GDU | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | |
| 256 | Pigs in farrowing (21 days' Inventory) | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | |
| 257 | **Total** | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | |

| Row | A | B | C | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT | BU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | |
| 3 | **N. G. Purvis Farms** | | | | | | | | | | | | | | |
| 4 | *Cash Flow Forecast* | | | | | | | | | | | | | | |
| 5 | | Fiscal Year | | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 |
| 6 | | Fiscal Period | | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 |
| 7 | | Fiscal Week | | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 8 | | Bankruptcy week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 9 | | Actual / Forecast | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| 10 | | Week Beginning Date | | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 |
| 11 | | Week Ending Date | | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 |
| 258 | | | | | | | | | | | | | | | |
| 259 | | **Hogs sold** | | | | | | | | | | | | | |
| 260 | | Weaned Pigs | | 7,586 | 7,411 | 7,750 | 8,355 | 8,089 | 8,000 | 8,224 | 7,402 | 8,037 | 8,243 | 8,025 | 8,025 |
| 261 | | Sows | | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 |
| 262 | | Gilt - Non Select Sales | | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 |
| 263 | | **Head** | | 7,872 | 7,697 | 8,036 | 8,641 | 8,375 | 8,286 | 8,510 | 7,688 | 8,323 | 8,529 | 8,311 | 8,311 |
| 264 | | Weaner price/Head | | $44.00 | $44.00 | $44.00 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 |
| 265 | | | | | | | | | | | | | | | |
| 266 | | Sow Price/Head | | $237.58 | $242.71 | $242.71 | $242.71 | $242.71 | $242.71 | $242.45 | $242.45 | $242.45 | $242.45 | $231.87 | $231.87 |
| 267 | | Gilt - Non Select Price/Head | | $233.23 | $238.39 | $238.39 | $241.62 | $241.62 | $247.77 | $243.52 | $243.52 | $243.52 | $244.23 | $245.40 | $245.40 |
| 268 | | | | | | | | | | | | | | | |
| 269 | | **Revenues - cash basis** | | | | | | | | | | | | | |
| 270 | | Weaned Pigs | | - | 333,785 | 326,065 | 341,012 | 304,945 | 295,240 | 292,003 | 300,182 | 270,183 | 293,349 | 300,854 | 292,920 |
| 271 | | Gilt - Non Select Sales | | 33,294 | 34,031 | 34,031 | 34,492 | 34,492 | 35,370 | 34,763 | 34,763 | 34,763 | 34,865 | 35,031 | 35,031 |
| 272 | | Sows | | 34,067 | 34,803 | 34,803 | 34,803 | 34,803 | 34,803 | 34,765 | 34,765 | 34,765 | 34,765 | 33,247 | 33,247 |
| 273 | | | | 67,361 | 402,619 | 394,898 | 410,307 | 374,239 | 365,413 | 361,531 | 369,710 | 339,711 | 362,979 | 369,132 | 361,198 |
| 274 | | **Sow unit expenses to LOL** | | - | - | - | - | - | - | - | - | - | - | - | - |
| 275 | | Feed | | 146,739 | 147,805 | 147,486 | 147,430 | 147,111 | 142,097 | 141,778 | 141,459 | 141,216 | 133,514 | 133,454 | 133,443 |
| 276 | | Labor, contract labor | | 21,885 | 116,845 | 18,997 | 119,580 | 20,517 | 116,541 | 21,733 | 114,870 | 21,429 | 118,972 | 21,239 | 117,567 |
| 277 | | Drugs | | 18,090 | 17,517 | 18,104 | 19,799 | 18,975 | 18,693 | 19,472 | 17,296 | 18,988 | 19,642 | 18,913 | 18,913 |
| 278 | | AI Expense | | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 |
| 279 | | Royalties | | 13,861 | 13,555 | 14,185 | 15,215 | 14,665 | 14,610 | 15,008 | 13,590 | 14,663 | 15,029 | 14,606 | 14,606 |
| 280 | | Utilities | | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 |
| 281 | | Utilities deposit | | 24,999 | | | | | | | | | | | |
| 282 | | Repairs/maintenance | | 9,436 | 9,436 | 9,436 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 |
| 283 | | Lease/grower | | 33,316 | 32,636 | 31,630 | 36,731 | 33,469 | 33,529 | 34,298 | 30,293 | 33,644 | 36,733 | 34,569 | 34,569 |
| 284 | | Insurance | | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 |
| 285 | | Taxes | | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 |
| 286 | | Other | | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 |
| 287 | | | | 303,120 | 372,588 | 274,632 | 381,315 | 277,296 | 368,030 | 274,848 | 360,067 | 272,500 | 366,451 | 265,340 | 361,657 |
| 288 | | **GDU expenses to LOL** | | 24,967 | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) |
| 289 | | Feed | | 54,400 | 55,276 | 55,269 | 55,364 | 55,357 | 53,239 | 53,232 | 53,225 | 53,245 | 50,366 | 50,451 | 50,554 |
| 290 | | Labor, contract labor | | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 |
| 291 | | Drugs | | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 |
| 292 | | Utilities | | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 |
| 293 | | Utilities deposit | | 2,885 | | | | | | | | | | | |
| 294 | | Repairs/maintenance | | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 |
| 295 | | Lease/grower | | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 |
| 296 | | Insurance | | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 |
| 297 | | Taxes | | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 |
| 298 | | Other | | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 |
| 299 | | | | 63,964 | 66,176 | 61,949 | 66,264 | 62,037 | 64,138 | 59,911 | 64,124 | 59,924 | 61,266 | 57,131 | 61,453 |
| 300 | | | | 2,884 | - | - | - | - | - | - | - | - | - | - | - |
| 301 | | Interest paid to LOL | | 39,486 | - | - | - | 60,617 | - | - | - | - | 60,617 | - | - |
| 302 | | Purchase: Sow and GDU Animals from FNBO | | - | - | 5,966,311 | - | - | - | - | - | - | - | - | - |
| 303 | 20% | G&A Allocation | | 17,578 | 8,707 | 12,498 | 8,707 | 17,563 | 8,691 | 12,482 | 8,691 | 12,482 | 13,772 | 12,482 | 8,691 |
| 304 | 38% | Bankruptcy Cost Allocation | | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 |
| 305 | | | | - | - | - | - | - | - | - | - | - | (0) | - | - |
| 306 | | **Total Expenses** | | 447,962 | 471,283 | 6,339,202 | 480,099 | 441,326 | 464,673 | 371,055 | 456,696 | 368,720 | 525,918 | 358,766 | 455,615 |
| 307 | | | | | | | | | | | | | | | |
| 308 | | **Net Cash Flow - LOL** | | **(380,601)** | **(68,665)** | **(5,944,304)** | **(69,792)** | **(67,087)** | **(99,260)** | **(9,524)** | **(86,986)** | **(29,008)** | **(162,939)** | **10,366** | **(94,417)** |
| 309 | | **Cumulative Net Cash Flow - LOL** | | **(380,601)** | **(449,266)** | **(6,393,569)** | **(6,463,361)** | **(6,530,447)** | **(6,629,707)** | **(6,639,231)** | **(6,726,217)** | **(6,755,225)** | **(6,918,165)** | **(6,907,799)** | **(7,002,216)** |
| 310 | | | | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |
| 311 | | **Total Net Cash Flow** | | **(38,481)** | **153,110** | **113,050** | **352,831** | **431,384** | **330,579** | **560,734** | **580,653** | **526,518** | **312,512** | **709,769** | **775,480** |
| 312 | | **Total Cumulative Net Cash Flow** | | **(38,481)** | **114,630** | **227,680** | **580,511** | **1,011,894** | **1,342,473** | **1,903,207** | **2,483,860** | **3,010,378** | **3,322,890** | **4,032,659** | **4,808,139** |
| 313 | | | | 30 | 28 | 29 | 29 | 29 | 29 | 29 | 30 | 30 | 30 | 30 | 30 |
| 314 | | ***Difference > FNBO and LOL pieces*** | | 0 | (0) | 0 | 0 | (0) | (0) | (0) | 0 | (0) | 0 | 0 | (0) |

| Row | B | BV | BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 6 | Fiscal Period | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 7 | Fiscal Week | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | |
| 8 | Bankruptcy week | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 9 | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | *Forecast* | Forecast | Forecast | Forecast | Forecast | |
| 10 | Week Beginning Date | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 11 | Week Ending Date | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 258 | | | | | | | | | | | | | | |
| 259 | **Hogs sold** | | | | | | | | | | | | | |
| 260 | Weaned Pigs | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 191,449 |
| 261 | Sows | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 3,441 |
| 262 | Gilt - Non Select Sales | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 3,426 |
| 263 | **Head** | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 198,317 |
| 264 | Weaner price/Head | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $37.94 |
| 265 | | | | | | | | | | | | | | |
| 266 | Sow Price/Head | $231.87 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $151.92 | $151.92 | $215.32 |
| 267 | Gilt - Non Select Price/Head | $245.40 | $207.42 | $198.92 | $198.92 | $186.35 | $186.35 | $187.99 | $187.99 | $192.98 | $192.98 | $161.26 | $161.26 | $217.27 |
| 268 | | | | | | | | | | | | | | |
| 269 | **Revenues - cash basis** | | | | | | | | | | | | | |
| 270 | Weaned Pigs | 292,920 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 7,262,822 |
| 271 | Gilt - Non Select Sales | 35,031 | 29,609 | 28,396 | 28,396 | 26,602 | 26,602 | 26,836 | 26,836 | 27,548 | 27,548 | 23,021 | 23,021 | 744,370 |
| 272 | Sows | 33,247 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 21,784 | 21,784 | 740,990 |
| 273 | | 361,198 | 386,480 | 385,267 | 385,267 | 383,473 | 383,473 | 383,706 | 383,706 | 384,419 | 384,419 | 373,838 | 373,838 | 8,748,183 |
| 274 | **Sow unit expenses to LOL** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 275 | Feed | 133,824 | 133,689 | 133,890 | 133,567 | 133,248 | 132,929 | 131,464 | 131,145 | 130,826 | 130,506 | 118,550 | 118,550 | 3,265,718 |
| 276 | Labor, contract labor | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 1,663,009 |
| 277 | Drugs | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 451,358 |
| 278 | AI Expense | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 142,877 |
| 279 | Royalties | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 348,865 |
| 280 | Utilities | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 151,047 |
| 281 | Utilities deposit | | | | | | | | | | | | | 24,999 |
| 282 | Repairs/maintenance | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 191,386 |
| 283 | Lease/grower | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 820,239 |
| 284 | Insurance | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 137,118 |
| 285 | Taxes | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 105,223 |
| 286 | Other | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 298,797 |
| 287 | | 265,710 | 361,903 | 265,777 | 361,782 | 265,135 | 361,144 | 263,350 | 359,359 | 262,712 | 358,721 | 250,436 | 346,764 | 7,600,636 |
| 288 | **GDU expenses to LOL** | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | 24,242 |
| 289 | Feed | 50,830 | 50,867 | 51,045 | 51,037 | 51,030 | 51,023 | 50,554 | 50,547 | 50,540 | 50,533 | 43,896 | 43,896 | 1,235,772 |
| 290 | Labor, contract labor | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 58,300 |
| 291 | Drugs | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 104,160 |
| 292 | Utilities | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 13,130 |
| 293 | Utilities deposit | | | | | | | | | | | | | 2,885 |
| 294 | Repairs/maintenance | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 11,126 |
| 295 | Lease/grower | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 7,166 |
| 296 | Insurance | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 5,719 |
| 297 | Taxes | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 3,324 |
| 298 | Other | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 8,028 |
| 299 | | 57,510 | 61,766 | 57,725 | 61,936 | 57,709 | 61,922 | 57,233 | 61,446 | 57,219 | 61,432 | 50,576 | 54,796 | 1,449,609 |
| 300 | | - | - | - | - | - | - | - | - | - | - | - | - | 2,884 |
| 301 | Interest paid to LOL | - | 60,617 | - | - | - | - | 60,617 | - | - | - | 60,617 | - | 342,570 |
| 302 | Purchase: Sow and GDU Animals from FNBO | - | - | - | - | - | - | - | - | - | - | - | - | 5,966,311 |
| 303 | G&A Allocation | 12,482 | 13,772 | 12,482 | 8,691 | 12,482 | 11,801 | 12,482 | 6,721 | 12,482 | 6,721 | 17,563 | 6,721 | 276,745 |
| 304 | Bankruptcy Cost Allocation | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 571,520 |
| 305 | | - | (0) | - | - | - | - | - | (0) | - | (0) | - | (0) | - |
| 306 | **Total Expenses** | 359,516 | 521,871 | 359,797 | 456,223 | 359,140 | 458,681 | 417,496 | 451,339 | 356,227 | 450,687 | 403,005 | 432,094 | 16,207,391 |
| 307 | | | | | | | | | | | | | | |
| 308 | **Net Cash Flow - LOL** | **1,682** | **(135,391)** | **25,470** | **(70,956)** | **24,333** | **(75,208)** | **(33,790)** | **(67,633)** | **28,192** | **(66,268)** | **(29,167)** | **(58,256)** | **(7,459,208)** |
| 309 | **Cumulative Net Cash Flow - LOL** | **(7,000,534)** | **(7,135,925)** | **(7,110,456)** | **(7,181,412)** | **(7,157,078)** | **(7,232,286)** | **(7,266,076)** | **(7,333,709)** | **(7,305,517)** | **(7,371,785)** | **(7,400,952)** | **(7,459,208)** | **(7,459,208)** |
| 310 | | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 757 |
| 311 | **Total Net Cash Flow** | **393,628** | **911,644** | **(131,760)** | **(345,689)** | **941,304** | **846,780** | **928,782** | **960,996** | **2,515,596** | **953,940** | **1,088,762** | **963,679** | **14,773,301** |
| 312 | **Total Cumulative Net Cash Flow** | **5,201,768** | **6,113,411** | **5,981,651** | **5,635,962** | **6,577,265** | **7,424,045** | **8,352,827** | **9,313,824** | **11,829,420** | **12,783,360** | **13,872,122** | **14,835,801** | **14,835,801** |
| 313 | | 30 | 30 | 30 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | (61,772) |
| 314 | ***Difference > FNBO and LOL pieces*** | (0) | (0) | 0 | 0 | (0) | (0) | 0 | (0) | 0 | 0 | (0) | (0) | (0) |

# EXHIBIT B

Revolving Credit Note (Operating)

# REVOLVING CREDIT NOTE (OPERATING)

May __, 2021 $2,500,000

FOR VALUE RECEIVED, the undersigned N.G. PURVIS FARMS, INC., a North Carolina corporation and debtor and debtor-in-possession (together with its successors and assigns, the "Borrower"), promises to pay to the order of FIRST NATIONAL BANK OF OMAHA, a national banking association (together with its successors and assigns, the "Lender"), the principal sum of Two Million Five Hundred Thousand Dollars ($2,500,000) or the unpaid balance of all principal advanced against this Revolving Credit Note (Operating) (as the same may be amended, restated, modified, supplemented, replaced or refinanced from time to time, the "Revolving Credit Note (Operating)"), if that amount is less, together with interest thereon, as specified below.

This Revolving Credit Note (Operating) is issued under and in accordance with the terms of that certain Debtor-in-Possession Credit Agreement dated of even date herewith among Borrower and Lender (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Credit Agreement"), and is subject to the provisions and entitled to the benefits of such agreement, including all provisions related to renewal, default, acceleration and remedies. Capitalized terms not defined in this Revolving Credit Note (Operating) shall have the respective meanings set forth in the Credit Agreement. All obligations of Borrower hereunder shall be payable in immediately available funds in lawful money of the United States of America in the manner specified in Section 2.4 of the Credit Agreement.

Borrower agrees to pay to Lender the Revolving Credit Loans (Operating) which are evidenced by this Revolving Credit Note (Operating) on or before the earliest of (i) January 1, 2022, (ii) the effective date with respect to any plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code, (iii) termination of the Revolving Credit Facility (Operating) and (iv) termination of the Credit Agreement. Borrower may prepay all or any part of the unpaid principal hereunder, without premium or penalty, at any time and reborrow, on a revolving basis, the principal amount available on this Revolving Credit Note (Operating), subject to the terms and conditions of the Credit Agreement. Notwithstanding the immediately preceding sentence and subject to the terms and conditions of the Credit Agreement, the Revolving Credit Loans (Operating) outstanding under this Revolving Credit Note (Operating) at any one time shall not exceed the Revolving Credit Commitment (Operating).

Each Advance made against this Revolving Credit Note (Operating), any repayment of principal hereon and the status of each such Advance from time to time shall be endorsed by Lender on Schedule A attached to this Revolving Credit Note (Operating) or recorded on the books and records of Lender (provided that such entries shall be endorsed on Schedule A attached to this Revolving Credit Note (Operating) prior to any negotiation hereof). Borrower agrees that in any action or proceeding instituted to collect or enforce collection of this Revolving Credit Note (Operating), the entries endorsed on Schedule A attached to this Revolving Credit Note (Operating) or recorded on the books and records of Lender shall be conclusive evidence of the unpaid principal balance of this Revolving Credit Note (Operating) and the status of each such Advance from time to time absent manifest error.

Interest shall accrue on the unpaid principal amount of the Revolving Credit Loans (Operating) at an interest rate equal to twelve percent (12.00%) per annum until this Revolving Credit Note (Operating) is paid in full. Interest shall accrue on the unpaid principal amount of the Revolving Credit Loans (Operating) on and after the occurrence and during the continuance of an Event of Default at the Default Rate. Interest shall be calculated on the basis of actual days outstanding and a 360-day year. This calculation method results in a higher effective rate than the numeric interest rate stated in this Revolving Credit Note (Operating). Borrower shall pay interest in arrears (i) on the first (1st) day of each month, commencing on June 1, 2021, until the Revolving Credit Maturity Date (Operating), (ii) on the Revolving Credit Maturity Date (Operating) and (iii) upon payment in full. Interest shall continue to accrue on the unpaid principal amount of the Revolving Credit Loans (Operating) notwithstanding any permitted or unpermitted failure of Borrower to make any payment.

The entire outstanding principal balance of the Revolving Credit Loans (Operating), together with all unpaid accrued interest thereon, shall be due and payable in full on the Revolving Credit Maturity Date (Operating).

If Borrower fails to make any payment of principal or interest on the date due and payable hereunder, or if any other Event of Default occurs under the Credit Agreement, then the entire balance due on this Revolving Credit Note (Operating) shall at the option of Lender become at once due and payable.

This Revolving Credit Note (Operating) is secured by the Collateral encumbered by the Credit Agreement and other Loan Documents. The obligations, covenants and agreements of the Credit Agreement and each and every of the Loan Documents are hereby made a part of this Revolving Credit Note (Operating) to the same extent and with the same effect as if they were fully set forth herein, and Borrower does hereby agree to perform and keep each and every obligation, covenant and agreement set forth in this Revolving Credit Note (Operating), the Credit Agreement and the other Loan Documents. This Revolving Credit Note (Operating) shall evidence, and the Credit Agreement and other Loan Documents shall secure, the Obligations.

Borrower hereby waives presentment, protest and notice of dishonour and protest and/or non-payment.

Lender shall not be deemed to have waived any of its rights upon or under this Revolving Credit Note (Operating), the Credit Agreement or the other Loan Documents, unless such waiver be in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion. All rights and remedies of Lender on liabilities or collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly or concurrently, subject to any express limitations thereof contained in this Revolving Credit Note (Operating), the Credit Agreement or the other Loan Documents.

This Revolving Credit Note (Operating) shall be construed according to the substantive laws of the State of Nebraska.

Any provision of this Revolving Credit Note (Operating) which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. This Revolving Credit Note (Operating) may be executed in one or more counterparts, each of which shall be deemed an original.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Borrower has executed this Revolving Credit Note (Operating) as of the day and year first set forth above.

BORROWER:

N.G. PURVIS FARMS, INC.

By: ______________________________
Name: Jerry M. Purvis
Title: President

*[Signature Page to Revolving Credit Note (Operating)]*

## SCHEDULE A

Advances and Repayments

| Date | Repayment (amount of decrease in principal amount of this Revolving Credit Note (Operating)) | Advance (amount of increase in principal amount of this Revolving Credit Note (Operating)) | Balance (principal amount of this Revolving Credit Note (Operating) following such decrease or increase) | Signature of authorized signatory of Lender |
|---|---|---|---|---|

# EXHIBIT C

Revolving Credit Note (Hedging)

# REVOLVING CREDIT NOTE (HEDGING)

May __, 2021 $3,000,000

FOR VALUE RECEIVED, the undersigned N.G. PURVIS FARMS, INC., a North Carolina corporation and debtor and debtor-in-possession (together with its successors and assigns, the "Borrower"), promises to pay to the order of FIRST NATIONAL BANK OF OMAHA, a national banking association (together with its successors and assigns, the "Lender"), the principal sum of Three Million Dollars ($3,000,000) or the unpaid balance of all principal advanced against this Revolving Credit Note (Hedging) (as the same may be amended, restated, modified, supplemented, replaced or refinanced from time to time, the "Revolving Credit Note (Hedging)"), if that amount is less, together with interest thereon, as specified below.

This Revolving Credit Note (Hedging) is issued under and in accordance with the terms of that certain Debtor-in-Possession Credit Agreement dated of even date herewith among Borrower and Lender (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Credit Agreement"), and is subject to the provisions and entitled to the benefits of such agreement, including all provisions related to renewal, default, acceleration and remedies. Capitalized terms not defined in this Revolving Credit Note (Hedging) shall have the respective meanings set forth in the Credit Agreement. All obligations of Borrower hereunder shall be payable in immediately available funds in lawful money of the United States of America in the manner specified in Section 2.4 of the Credit Agreement.

Borrower agrees to pay to Lender the Revolving Credit Loans (Hedging) which are evidenced by this Revolving Credit Note (Hedging) on or before the earliest of (i) January 1, 2022, (ii) the effective date with respect to any plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code, (iii) termination of the Revolving Credit Facility (Hedging) and (iv) termination of the Credit Agreement. Borrower may prepay all or any part of the unpaid principal hereunder, without premium or penalty, at any time and reborrow, on a revolving basis, the principal amount available on this Revolving Credit Note (Hedging), subject to the terms and conditions of the Credit Agreement. Notwithstanding the immediately preceding sentence and subject to the terms and conditions of the Credit Agreement, the Revolving Credit Loans (Hedging) outstanding under this Revolving Credit Note (Hedging) at any one time shall not exceed the Revolving Credit Commitment (Hedging).

Each Advance made against this Revolving Credit Note (Hedging), any repayment of principal hereon and the status of each such Advance from time to time shall be endorsed by Lender on Schedule A attached to this Revolving Credit Note (Hedging) or recorded on the books and records of Lender (provided that such entries shall be endorsed on Schedule A attached to this Revolving Credit Note (Hedging) prior to any negotiation hereof). Borrower agrees that in any action or proceeding instituted to collect or enforce collection of this Revolving Credit Note (Hedging), the entries endorsed on Schedule A attached to this Revolving Credit Note (Hedging) or recorded on the books and records of Lender shall be conclusive evidence of the unpaid principal balance of this Revolving Credit Note (Hedging) and the status of each such Advance from time to time absent manifest error.

Interest shall accrue on the unpaid principal amount of the Revolving Credit Loans (Hedging) at an interest rate equal to twelve percent (12.00%) per annum until this Revolving Credit Note (Hedging) is paid in full. Interest shall accrue on the unpaid principal amount of the Revolving Credit Loans (Hedging) on and after the occurrence and during the continuance of an Event of Default at the Default Rate. Interest shall be calculated on the basis of actual days outstanding and a 360-day year. This calculation method results in a higher effective rate than the numeric interest rate stated in this Revolving Credit Note (Hedging). Borrower shall pay interest in arrears (i) on the first (1st) day of each month, commencing on June 1, 2021, until the Revolving Credit Maturity Date (Hedging), (ii) on the Revolving Credit Maturity Date (Hedging) and (iii) upon payment in full. Interest shall continue to accrue on the unpaid principal amount of the Revolving Credit Loans (Hedging) notwithstanding any permitted or unpermitted failure of Borrower to make any payment.

The entire outstanding principal balance of the Revolving Credit Loans (Hedging), together with all unpaid accrued interest thereon, shall be due and payable in full on the Revolving Credit Maturity Date (Hedging).

In addition to the payments of principal required by the foregoing paragraph, Borrower shall repay the Revolving Credit Facility (Hedging) by making payments of principal to Lender in amounts equal to the proceeds received by Borrower from the hedging trades and transactions that are conducted by Borrower within one (1) day after Borrower's receipt of such proceeds.

If Borrower fails to make any payment of principal or interest on the date due and payable hereunder, or if any other Event of Default occurs under the Credit Agreement, then the entire balance due on this Revolving Credit Note (Hedging) shall at the option of Lender become at once due and payable.

This Revolving Credit Note (Hedging) is secured by the Collateral encumbered by the Credit Agreement and other Loan Documents. The obligations, covenants and agreements of the Credit Agreement and each and every of the Loan Documents are hereby made a part of this Revolving Credit Note (Hedging) to the same extent and with the same effect as if they were fully set forth herein, and Borrower does hereby agree to perform and keep each and every obligation, covenant and agreement set forth in this Revolving Credit Note (Hedging), the Credit Agreement and the other Loan Documents. This Revolving Credit Note (Hedging) shall evidence, and the Credit Agreement and other Loan Documents shall secure, the Obligations.

Borrower hereby waives presentment, protest and notice of dishonour and protest and/or non-payment.

Lender shall not be deemed to have waived any of its rights upon or under this Revolving Credit Note (Hedging), the Credit Agreement or the other Loan Documents, unless such waiver be in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion. All rights and remedies of Lender on liabilities or collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly or concurrently, subject to any express limitations thereof contained in this Revolving Credit Note (Hedging), the Credit Agreement or the other Loan Documents.

This Revolving Credit Note (Hedging) shall be construed according to the substantive laws of the State of Nebraska.

Any provision of this Revolving Credit Note (Hedging) which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. This Revolving Credit Note (Hedging) may be executed in one or more counterparts, each of which shall be deemed an original.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Borrower has executed this Revolving Credit Note (Hedging) as of the day and year first set forth above.

BORROWER:

N.G. PURVIS FARMS, INC.

By: ______________________________
Name: Jerry M. Purvis
Title: President

*[Signature Page to Revolving Credit Note (Hedging)]*

SCHEDULE A

Advances and Repayments

| Date | Repayment (amount of decrease in principal amount of this Revolving Credit Note (Hedging)) | Advance (amount of increase in principal amount of this Revolving Credit Note (Hedging)) | Balance (principal amount of this Revolving Credit Note (Hedging) following such decrease or increase) | Signature of authorized signatory of Lender |
|---|---|---|---|---|

# EXHIBIT D

Term Loan Note

# TERM LOAN NOTE

____________________, 2021 $26,115,744.66

FOR VALUE RECEIVED, the undersigned N.G. PURVIS FARMS, INC., a North Carolina corporation and debtor and debtor-in-possession (together with its successors and assigns, the "Borrower"), promises to pay to the order of FIRST NATIONAL BANK OF OMAHA, a national banking association (together with its successors and assigns, the "Lender"), the principal sum of Twenty-Six Million One Hundred Fifteen Thousand Seven Hundred Forty-Four and 66/100 Dollars ($26,115,744.66) or the unpaid balance of all principal advanced against this Term Loan Note (as the same may be amended, restated, modified, supplemented, replaced or refinanced from time to time, the "Term Loan Note"), if that amount is less, together with interest thereon, as specified below.

This Term Loan Note is issued under and in accordance with the terms of that certain Debtor-in-Possession Credit Agreement dated of even date herewith among Borrower and Lender (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Credit Agreement"), and is subject to the provisions and entitled to the benefits of such agreement, including all provisions related to renewal, default, acceleration and remedies. Capitalized terms not defined in this Term Loan Note shall have the respective meanings set forth in the Credit Agreement. All obligations of Borrower hereunder shall be payable in immediately available funds in lawful money of the United States of America in the manner specified in Section 2.4 of the Credit Agreement.

Borrower agrees to pay to Lender the Term Loan which is evidenced by this Term Loan Note on or before the earliest of (i) January 1, 2022, (ii) the effective date with respect to any plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code, (iii) termination of the Term Loan Facility and (iv) termination of the Credit Agreement. Borrower may prepay all or any part of the unpaid principal hereunder, without premium or penalty, at any time; provided, that the principal repaid under this Term Loan Note is not available for reborrowing. Notwithstanding the immediately preceding sentence and subject to the terms and conditions of the Credit Agreement, the Term Loan outstanding under this Term Loan Note at any one time shall not exceed the Term Loan Commitment.

Any Advance made against this Term Loan Note, any repayment of principal hereon and the status of any such Advance from time to time shall be endorsed by Lender on Schedule A attached to this Term Loan Note or recorded on the books and records of Lender (provided that such entries shall be endorsed on Schedule A attached to this Term Loan Note prior to any negotiation hereof). Borrower agrees that in any action or proceeding instituted to collect or enforce collection of this Term Loan Note, the entries endorsed on Schedule A attached to this Term Loan Note or recorded on the books and records of Lender shall be conclusive evidence of the unpaid principal balance of this Term Loan Note and the status of any such Advance from time to time absent manifest error.

Interest shall accrue on the unpaid principal amount of the Term Loan at an interest rate equal to twelve percent (12.00%) per annum until this Term Loan Note is paid in full. Interest shall accrue on the unpaid principal amount of the Term Loan on and after the occurrence and during the continuance of an Event of Default at the Default Rate. Interest shall be calculated on the basis of actual days outstanding and a 360-day year. This calculation method results in a higher effective rate than the numeric interest rate stated in this Term Loan Note. Borrower shall pay interest in arrears (i) on the first (1st) day of each month, commencing on the first (1st) day of the month occurring after entry of the Final Order, until the Term Loan Maturity Date, (ii) on the Term Loan Maturity Date and (iii) upon payment in full. Interest shall continue to accrue on the unpaid principal amount of the Term Loan notwithstanding any permitted or unpermitted failure of Borrower to make any payment.

The entire outstanding principal balance of the Term Loan, together with all unpaid accrued interest thereon, shall be due and payable in full on the Term Loan Maturity Date.

If Borrower fails to make any payment of principal or interest on the date due and payable hereunder, or if any other Event of Default occurs under the Credit Agreement, then the entire balance due on this Term Loan Note shall at the option of Lender become at once due and payable.

This Term Loan Note is secured by the Collateral encumbered by the Credit Agreement and other Loan Documents. The obligations, covenants and agreements of the Credit Agreement and each and every of the Loan Documents are hereby made a part of this Term Loan Note to the same extent and with the same effect as if they were fully set forth herein, and Borrower does hereby agree to perform and keep each and every obligation, covenant and agreement set forth in this Term Loan Note, the Credit Agreement and the other Loan Documents. This Term Loan Note shall evidence, and the Credit Agreement and other Loan Documents shall secure, the Obligations.

Borrower hereby waives presentment, protest and notice of dishonour and protest and/or non-payment.

Lender shall not be deemed to have waived any of its rights upon or under this Term Loan Note, the Credit Agreement or the other Loan Documents, unless such waiver be in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion. All rights and remedies of Lender on liabilities or collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly or concurrently, subject to any express limitations thereof contained in this Term Loan Note, the Credit Agreement or the other Loan Documents.

This Term Loan Note shall be construed according to the substantive laws of the State of Nebraska.

Any provision of this Term Loan Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. This Term Loan Note may be executed in one or more counterparts, each of which shall be deemed an original.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Borrower has executed this Term Loan Note as of the day and year first set forth above.

BORROWER:

N.G. PURVIS FARMS, INC.

By: ______________________________
Name: Jerry M. Purvis
Title: President

## SCHEDULE A

Advances and Repayments

| Date | Repayment (amount of decrease in principal amount of this Term Loan Note) | Advance (amount of increase in principal amount of this Term Loan Note) | Balance (principal amount of this Term Loan Note following such decrease or increase) | Signature of authorized signatory of Lender |
|---|---|---|---|---|

SCHEDULE 1.1(a)

Outstanding Debt

| Creditor | Date | Outstanding Balance as of 4/23/2021 |
|---|---|---|
| Land O' Lakes - LOC | | $678,559.38 |
| Pollitt Ventures, Inc. d/b/a Gilchrest Farms | | $150,000 |
| Ford Motor Credit | Various dates for 9 vehicle loans | ~$128,000 |
| North Moore Management, LLC | October 1, 2013 (three-year evergreen) | Lease/$74,800/year plus triple net lease terms |
| Copperhead Farms, LLC | October 10, 2006-October 31, 2021 | Lease/all operating and other costs which shall not exceed $338,856.57/year |

## SCHEDULE 1.1(b)

Outstanding Investments

None.

## SCHEDULE 1.1(c)

### Outstanding Liens

Liens in certain real property in favor of LOLFC securing that certain debt owing to LOLFC described on Schedule 1.1(a).

# SCHEDULE 4.6

## Litigation

*Sunrise Cooperative, Inc. v. N. G. Purvis Farms, Inc.*
Court of Common Pleas, Shelby County, Ohio, Case No.: 21 CV 000068

*Clinton R. Wood, Jr. d/b/a JR. Wood v. N. G. Purvis Farms, Inc. and Bonlee Mills LLC*
Davidson County District Court, Case No.: 21 CVD 386

*Travis Buchanan d/b/a Buchanan Farms v. N. G. Purvis Farms, Inc.*
Lee County Superior Court, Case No.: 21 CVS 225

# SCHEDULE 4.11

## Equity Interests of Purvis

| | |
|---|---|
| Marie P. McFayden | 20% |
| David Purvis | 20% |
| Jerry M. Purvis | 20% |
| Larry M. Purvis | 20% |
| Melvin G. Purvis | 20% |

## SCHEDULE 4.16

Agreements Regarding Rights, Options and Leases

None.

# SCHEDULE 4.17

## Collateral Locations

| Farm Name | Address | City | State | Zip Code | Type | Ownership | Hogs | Equipment | Feed | Med/Supplies |
|---|---|---|---|---|---|---|---|---|---|---|
| Pollitt Ventures (Gilchrest Farm) | PO Box 936 | Clarkesville | GA | 30523 | Sow | Leased | This farm is empty | | | |
| P & F Farms, Inc. (P&F/Small Farm) | 1210 Lake Fork Road | Salisbury | NC | 28146 | Sow | Leased | x | | x | x |
| LMS, LLC (Cognac Farm) | 1227 Rockingham Road | Rockingham | NC | 28379 | Sow | Leased | x | | x | x |
| JD Farms (#327) | 170 Cognac Road | Marston | NC | 28363 | Nursery | Leased | x | | x | x |
| Spring Valley | 254 Spring Valley Road | Norlina | NC | 27563 | Nursery | Leased | x | | x | x |
| NC Farm of Wise (Engel Nursery) | 973 Kerr Lake Cole Bridge Rd. | Norlina | NC | 27563 | Nursery | Leased | x | | x | x |
| North Moore Management (Clearview) | 2504 Spies Road | Robbins | NC | 27325 | Finisher | Leased | x | | x | |
| Copperhead Farms | 2504 Spies Road | Robbins | NC | 27325 | Finisher | Leased | x | | x | |
| Key Farms, Inc. (Gilbert Key) | 596 Maness Road | Robbins | NC | 27325 | Finisher | Leased | x | | x | |
| JF Carroll Farms LLC | 526 County Line Rd | Ellerbe | NC | 28338 | Finisher | Leased | x | | x | |
| David Sullivan (#116) | 342 Linwood Lane | Rockingham | NC | 28379 | Finisher | Leased | x | | x | |
| Oakland Farms (Joe Cox #120) | 5567 Joe Dean Trail | Ramseur | NC | 27316 | Finisher | Leased | x | | x | |
| Jonathan Brent Jester (#126) | 1248 Wright Country Road | Ramseur | NC | 27316 | Finisher | Leased | x | | x | |
| Don A Gibbons Jr. (Loblolly #131) | 3796 Bethlehem Church Rd. | Carthage | NC | 28327 | Finisher | Leased | x | | x | |
| Nick Craven (#133) | 4718 Lambeth Mill Rd | Bennett | NC | 27208 | Finisher | Leased | x | | x | |
| Applefield Farms | 5403 Hwy 150-E | Brown Summitt | NC | 27214 | Finisher | Leased | x | | x | |
| Hill Top Finisher | 215 Cotton road | Riedsville | NC | 27320 | Finisher | Leased | x | | x | |
| Neal H. Grant (Mountain View #142) | 1794 N. U.S. Hwy. 220 | Ellerbe | NC | 28336 | Finisher | Leased | This farm is empty | | | |
| Melvin K. Huneycutt (#144) | 28376 Milling Port Road | Albemarle | NC | 28001 | Finisher | Leased | x | | x | |
| Dennis Loflin | 1007 Skeen Road | Denton | NC | 27239 | Finisher | Leased | x | | x | |
| Thurman Jessup (#161) | 6913 Brush Creek Road | Bennett | NC | 27208 | Finisher | Leased | x | | x | |
| Chris Redding Farm | 4100 Baker Farm Road | Sophia | NC | 27350 | Finisher | Leased | x | | x | |
| Spring Valley Finisher | 254 Spring Valley Road | Norlina | NC | 27563 | Finisher | Leased | x | | x | |
| NC-Engel Finisher | 847 Kerr Lake Cole Bridge Rd. | Norlina | NC | 27563 | Finisher | Leased | x | | x | |
| Mike and Robin Lackey (Beaver Creek #170) | 2425 Breeze Road | Hurdle Mills | NC | 27541 | Finisher | Leased | This farm is empty | | | |
| Rusty Cox | 5312 Dudley Road | Monroe | NC | 28112 | Finisher | Leased | x | | x | |
| Meadow Creek | 507 Alston Bridge Road | Siler City | NC | 27344 | Finisher | Leased | x | | x | |
| Davistown Farming | 1002 Ferndale Court | Wilson | NC | 27893 | Finisher | Leased | This farm is empty | | | |
| Bruce & Darlene Humble (#195) | 6632 Smithwood Rd | Liberty | NC | 27298 | Finisher | Leased | x | | x | |
| JD Farms (#196) | 170 Cognac Road | Marston | NC | 28363 | Finisher | Leased | x | | x | |
| James C Bell (#250) | 3100 B&S Road | Loris | SC | 29569 | Finisher | Leased | This farm is empty | | | |
| Jimmy Huggins / Huggins Farm (#251) | 5424 Bluff Road | Mullins | SC | 29574 | Finisher | Leased | x | | x | |
| Jimmy Bailey (#252) | 6400 Jordan Creek Rd. | Nichols | SC | 29581 | Finisher | Leased | x | | x | |
| Debra H. Barnhill (#253) | 460 River Front S | Conway | SC | 29527 | Finisher | Leased | x | | x | |
| Butler Farms | 1314 Pisgah Church Rd. | Aynor | SC | 29511 | Finisher | Leased | x | | x | |
| Floyd Smith | 6508 Cypress Swamp Road | Conway | SC | 29527 | Finisher | Leased | x | | x | |
| Drew Hog Farms | 4053 Bluff Rd | Mullins | SC | 29574 | Finisher | Leased | This farm is empty | | | |
| Edward Baxley | Boyd Atkinson Road | Marion | SC | 29571 | Finisher | Leased | This farm is empty | | | |
| C & M Hog Farms | 2678 Centerville Rd | Latta | SC | 29565 | Finisher | Leased | x | | x | |
| | | | | | | | | | | |
| **Farms Run by Mercer Landmark Inc** | 426 W Market St | Celina | OH | 45822 | | | | | | |
| Mike Holdhiede | 4150 Carthagena Road | St. Henry | OH | 45883 | Finisher | Leased | x | | x | |
| Westgerdes Farm | 8870 E 500 N | Portland | IN | 47371 | Finisher | Leased | x | | x | |
| David Knapke | 2310 Siegrist Jute Road | Fort Recovery | OH | 45846 | Finisher | Leased | x | | x | |
| Rick Alig | 8670 E 400 N | Portland | IN | 47371 | Finisher | Leased | x | | x | |
| Rick Alig Ohio | 5246 State Route 49 | Ft. Recovery | OH | 45846 | Finisher | Leased | x | | x | |
| Greg Alig 1 | 777 Schroeder Road | Celina | OH | 45822 | Finisher | Leased | x | | x | |
| Chris Ontrop | 5017 E 500 N | Portland | IN | 47371 | Finisher | Leased | x | | x | |
| Randy Siefring | 5684 Karch Road | Coldwater | OH | 45828 | Finisher | Leased | x | | x | |
| Jeff & Michelle Knapke | 5359 Township Line Road | Coldwater | OH | 45828 | Finisher | Leased | x | | x | |
| Timmerman (Jeff) | 400 N 850 E | Portland | IN | 47371 | Finisher | Leased | x | | x | |
| Doug Franke | 2675 State Route 127 | St. Henry | OH | 45883 | Finisher | Leased | x | | x | |
| Mike Chrisman | 7888 Guadalupe Road | Celina | OH | 45822 | Finisher | Leased | x | | x | |
| Ben & Neil Siefring | 2956 Menchhofer Road | Coldwater | OH | 45828 | Finisher | Leased | x | | x | |
| | | | | | | | | | | |
| **Owned Farms:** | | | | | | | | | | |
| Dixie | 365 Spivey Rd | Carthage | NC | 28327 | Nursery | Owned | x | x | x | x |
| Blue Ribbon | 2464 Kelly Plantation Rd | Carthage | NC | 28327 | Nursery | Owned | x | x | x | x |
| Little River | 2578 Thickety Creek Rd | Mount Gilead | NC | 27306 | Nursery | Owned | x | x | x | x |
| Naked Creek | 475 Haines Rd | Jackson Springs | NC | 27821 | Nursery | Owned | x | x | x | x |
| Circle P | 5223 Bonlee Bennet Rd | Bear Creek | NC | 27207 | Finisher | Owned | x | x | x | |
| Tarheel | 144 Windy Hill Farm Rd | Ellerbe | NC | 28338 | Sow | Owned | x | x | x | x |
| Wet Creek | 10470-A NC 705 | Eagle Springs | NC | 27242 | Sow | Owned | x | x | x | x |
| Green Acres | 400 Falkner Quarter Rd | Warrenton | NC | 27589 | Sow | Owned | x | x | x | x |
| Mossland | 484 Sims Cross Rd | Stephens | GA | 30667 | Sow | Owned | x | x | x | x |
| Holly Ridge | 10470-B NC 705 | Eagle Springs | NC | 27242 | Sow | Owned | x | x | x | x |
| Deerfield | 866-A Skill Rd | Eagle Springs | NC | 27242 | Sow | Owned | x | x | x | x |
| Indian Hills | 866-B Skill Rd | Eagle Springs | NC | 27242 | Sow | Owned | x | x | x | x |
| Stephens | 487 Sims Cross Rd | Stephens | GA | 30667 | Sow | Owned | x | x | x | x |

<u>Vehicles/Other</u>

N.G. Purvis Farms, Inc.
2504 Spies Road
Robbins, NC 27325

<u>Feed Mill</u>

N.G. Purvis Farms, Inc.
3732 Old Hwy 421 S
Siler City, NC 27344

SCHEDULE 4.18

Location of Bank and Brokerage Accounts

| Bank | Account | Title | Location | Balance Limit |
|---|---|---|---|---|
| FNBO | 110392093 | Sweep (Deposit) | Omaha, NE | N/A |
| Fidelity Bank | 25141947 | Payroll Account | Fuquay-Varina, NC | N/A |
| ADM Investor Services, Inc. | 42046247 | Hedge Account | | N/A |
| AXOS Bank | 890000050223 | DIP Operating | San Diego, CA | N/A |
| AXOS Bank | 890000050231 | DIP Payroll Account | San Diego, CA | N/A |
| AXOS Bank | 890000050249 | DIP Tax Account | San Diego, CA | N/A |

Exhibit B

# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT (as the same may from time to time be amended, restated, modified or otherwise supplemented, this "Agreement") is dated this __ day of May, 2021 by and between N.G. PURVIS FARMS, INC., a North Carolina corporation and debtor and debtor-in-possession (together with its successors and assigns, the "Borrower"), and LOL FINANCE CO., a Minnesota corporation (together with its successors and assigns, the "Lender").

## RECITALS

WHEREAS, Borrower and Lender and the Guarantors are parties to certain promissory notes, and loan contracts, including eleven Change in Terms Agreements dated December 23, 2020, pursuant to which Lender made loans to the Guarantors and the Borrower pursuant to the Pre-Petition Notes (as hereinafter defined), and the other related documents delivered in connection therewith (together with the Pre-Petition Note, each of the Change in Terms Agreements described above, the Borrower Guaranties (as hereinafter defined), and any other agreements, mortgages, security agreements, instruments, documents and certificates executed and/or delivered in connection with the foregoing, as each may from time to time be amended, restated, modified or otherwise supplemented, the "Pre-Petition Loan Documents");

WHEREAS, as of the Petition Date, the aggregate outstanding principal amount of the Pre-Petition Loans is $14,133,750.49 and the Borrower is a direct guarantor of the 2018 Notes (as herein defined) pursuant to the Borrower Guaranties and is a direct obligor of 2020 Note, and all such Pre-Petition Loans are currently in default and the Borrower is directly obligated under each of the Borrower Guaranties of the Pre-Petition Loans with respect to the 2018 Notes;

WHEREAS, the Pre-Petition Loans (as hereinafter defined) and each of Pre-Petition Notes are secured by mortgages over the Real Property (as hereinafter defined) granted by the Borrower;

WHEREAS, on May 6, 2021 (the "Petition Date"), Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as hereinafter defined) in the United States Bankruptcy Court for the Eastern District of North Carolina (the "Bankruptcy Court"), and continues to manage its business and possess its assets as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrower has requested that Lender provide certain debtor-in-possession financing to Borrower via (a) a Seven Million Six Hundred Thousand ($7,600,000.00) revolving credit facility and (b) a Fourteen Million Two Hundred Forty One Thousand Five Hundred Fifteen and 27/100 United States Dollars ($14,241,515.27) "roll-up" term loan facility, in each case, pursuant to this Agreement and the promissory notes issued in connection herewith;

WHEREAS, the debtor-in-possession financing will be secured by the Super-Priority Administrative Expense Claim (as hereinafter defined) and the Post-Petition Liens (as hereinafter defined); and

WHEREAS, Lender is willing to provide the debtor-in-possession financing on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, for and in consideration of Lender providing the debtor-in-possession financing, the Recitals set forth above, which are incorporated into the Agreement

by this reference, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

## AGREEMENT

## SECTION 1. DEFINITIONS AND INTERPRETATION

1.1. Terms Defined. As used in this Agreement, the following terms have the following respective meanings:

"2018 Notes" has the meaning set forth in the definition of Pre-Petition Notes.

"2020 Note" has the meaning set forth in the definition of Pre-Petition Notes.

"Account" means a right to payment of a monetary obligation, whether or not earned by performance, arising out of the sale of goods or production of services, in which Borrower now has or hereafter acquires any right.

"Advance" means any monies advanced or credit extended as a DIP Loan to or for the benefit of Borrower by Lender.

"Affiliate" means, with respect to any specified Person, (a) any Person which, directly or indirectly, controls, is controlled by or is under common control with, the specified Person, and (b) any director or officer (or, in the case of a Person which is not a corporation, any individual having analogous powers) of the specified Person or of a Person who is an Affiliate of the specified Person within the meaning of the preceding clause (a). For purposes of the preceding sentence, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, or direct or indirect ownership (beneficially or of record) of, or direct or indirect power to vote, five percent (5%) or more of the equity interests of such Person.

"Agreement" has the meaning set forth in the introductory paragraph of this Agreement.

"Approved Budget" means the projection for receipts and revenues and budget for cash expenditures of Borrower over a twenty-four (24) week period, substantially in the form of Exhibit A attached hereto (as amended from time to time by each of Borrower and Lender) that is approved by any Interim or Final Order, and as the same may be extended from time to time by order of the Bankruptcy Court. The quantities, prices and timeline set forth in the Approved Budget are the Borrower's best projections of the manner, timing and cash flow that will be realized through the liquidation process. The parties acknowledge that there may be deviations from the Approved Budget based on (i) market prices; (ii) Smithfield or JBS plant closures; (iii) reduced production or buying by Smithfield or JBS; (iv) the dates on which operating expenses are invoiced and paid that are beyond the parties' reasonable control; and (v) any reasonable and necessary expense directly related to the liquidation but which is not included in the Approved Budget because it was unexpected at the time of this Agreement; provided that Lender approves such expenses, with such approval not to be unreasonably withheld; and provided further that the aggregate amount of all such deviations from the Approved Budget identified in clauses (i) through (v) above do not result in a variances from the Approved Budget of greater than ten percent (10%) (the "Applicable Variance") unless the Lender approves such greater amount in its discretion.

"Authorized Representative" means any director or officer of Borrower, or Steve Weiss, as Chief Restructuring Officer, to the extent such employment is approved by the Bankruptcy Court, authorized by specific resolutions of the Governing Body of Borrower to execute and deliver the Loan Documents and request the DIP Loans, as set forth in the incumbency certificate required by Section 3.1(i) hereof.

"Authorizing Order" means the Interim Order until such time as the Final Order is filed, final and non-appealable, from which time it means the Final Order.

"Avoidance Actions" means an action originating under the authority of and pursuant to Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

"Bankruptcy Case" means Case No. 21-01068-5-SWH filed by Borrower in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" has the meaning set forth in the recitals of this Agreement, as amended from time to time.

"Bankruptcy Expense Advances" has the meaning set forth in Section 2.1(b) hereof.

"Bankruptcy Expenses" means (a) all required bankruptcy filing and related fees due to the Bankruptcy Court from Borrower, (b) all quarterly fees due to the bankruptcy administrator or government from Borrower and (c) all fees and expenses of Bankruptcy Professionals, in each case, to the extent incurred post-petition and prior to the Bankruptcy Court entering a final decree in the Bankruptcy Case, and in each case, approved by an interim or final order of the Bankruptcy Court and limited to the amounts set forth in the Approved Budget.

"Bankruptcy Professionals" means any attorneys, accountants and other professionals retained in the Bankruptcy Case by Borrower or any official committee of unsecured creditors pursuant to Sections 327, 328, 330, 331 or 363 of the Bankruptcy Code.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning set forth in the introductory paragraph of this Agreement.

"Borrower Guaranties" has the meaning set forth in the definition of Pre-Petition Notes.

"Borrowing Notice" means a written, electronic, telex, telecopy or telephonic notice by Borrower to Lender specifying (a) the Effective Date of making such Advance, (b) the applicable Maximum Percentages with respect to such Advance, and (c) the amount of such Advance.

"Business Day" means any day other than a Saturday, Sunday or any day on which banking institutions in Minneapolis, Minnesota, are permitted or required by law, executive order or governmental decree to remain closed or a day on which Lender is closed for business.

"Capitalized Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" has the meaning ascribed to such term in the Authorizing Order.

"Cash Collateral" means Borrower's "cash collateral", as such term is defined in Section 363(a) of the Bankruptcy Code.

"Change in Law" means (a) the adoption of any law, rule or regulation by any governmental authority after the Closing Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any governmental authority after the Closing Date or (c) any binding request, guideline or directive (whether or not having the force of law) of any governmental authority made or issued after the Closing Date with which Lender is legally obligated to comply.

"Change of Control" has the meaning set forth in Section 6.6 hereof.

"Closing" has the meaning set forth in Section 3.4 hereof.

"Closing Date" has the meaning set forth in Section 3.4 hereof.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations and rulings issued thereunder.

"Collateral" means the Personal Property, Real Property and all other Property that now or hereafter secures the payment and performance of any of the Obligations pursuant to any of the Loan Documents, the Authorizing Order, the Pre-Petition Loan Documents or otherwise.

"Commodity Exchange Act" means the Commodity Exchange Act, as amended from time to time, and any successor statute.

"Control Agreements" has the meaning set forth in Section 3.1(e) hereof.

"Debt" means, whether or not included as indebtedness or liabilities in accordance with GAAP, the following: (a) the obligations of Borrower for borrowed money; (b) the obligations of Borrower evidenced by bonds, debentures, notes or other similar instruments; (c) the obligations of Borrower under conditional sale or other title retention agreements relating to property purchased to the extent of the value of such property; (d) the obligations of Borrower to pay the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business and due within three (3) months of the incurrence thereof); (e) the obligations of Borrower under Capitalized Leases; (f) the obligations of Borrower, contingent or otherwise, to purchase, redeem, retire or otherwise acquire securities or other property which arise out of or in connection with the sale of the same or substantially similar securities or property; (g) the obligations of Borrower to reimburse any other Person in respect of amounts paid under a letter of credit, bankers' acceptance or similar instrument and the amount available to be drawn under a letter of credit, banker's acceptance or similar instrument; (h) Swap Obligations of Borrower; (i) the obligations of any other Person, to the extent such obligations are guaranteed by Borrower; (j) the obligations of any other Person, to the extent such obligations are secured by a Lien on Borrower's Property (whether or not such obligations have been assumed by Borrower); and (k) the obligations of any other Person, to the extent Borrower is reasonably likely to be liable for such obligations.

"Default Rate" means the rate of interest otherwise applicable on the Loans plus two percent (2.00%).

"Designated Account" means a debtor-in-possession account designated by Lender, and either maintained with FNBO, so long as such account is not a "Sweep Account" (as defined in

the Debtor-in-Possession Credit Agreement dated as of the date hereof by and among the Borrower and FNBO), or at such other financial institution as the Borrower and Lender may otherwise agree.

"DIP Loan" and "Dip Loans" have the meanings set forth in Section 2.1(b) hereof.

"DIP Loan Facility Commitment" means an aggregate principal amount not to exceed $7,600,000.00.

"DIP Loan Facility" has the meaning set forth in Section 2.1(a) hereof.

"DIP Loan Maturity Date" has the meaning set forth in Section 2.1(d) hereof.

"DIP Loan Note" has the meanings set forth in Section 2.1(b) hereof.

"Disclosures" has the meaning set forth in Section 8.20(b) hereof.

"Distribution" means (a) dividends, distributions or other payments on, or on account of, the equity interests of Borrower, (b) the purchase, redemption, retirement or other acquisition of such equity interests or of warrants, rights or other options to purchase such equity interests, (c) loans made, directly or indirectly, to any shareholder of Borrower and (d) any other form of compensation paid, directly or indirectly, to any shareholder of Borrower which is not made in the ordinary course of business consistent with past practice.

"Disbursement Account" has the meaning set forth in Section 2.2(d) hereof.

"Effective Date" means, with respect to any Advance hereunder, the first (1st) Business Day of any week.

"Environmental Laws" has the meaning set forth in Section 4.21 hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations and rulings issued thereunder.

"ERISA Affiliate" means any Person that, together with Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, Section 414(m) of the Code.

"ERISA Event" means: (a) the occurrence of a "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan unless the thirty (30) day notice period requirement with respect to such event has been waived or the requirements of subsection (1) of Section 4043(b) of ERISA (without regard to subsection (2) of such Section) are met with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following thirty (30) days; (b) the failure with respect to any Plan to satisfy the minimum funding standard described in Section 412 of the Code or Section 302 of ERISA, whether or not waived; (c) the filing of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by Borrower or its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by Borrower or its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by Borrower or its ERISA Affiliates of

any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by Borrower or its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from Borrower or its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning set forth in Section 7.1 hereof.

"Exchange Act" has the meaning set forth in Section 6.6 hereof.

"Excluded Swap Obligation" means, with respect to any Obligor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty Agreement or other obligation of such Obligor with respect to, or the grant by such Obligor of a security interest to secure, such Swap Obligation (or any Guaranty Agreement or other obligation with respect thereto) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Obligor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty Agreement or other obligation of such Obligor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty Agreement or other obligation or security interest is or becomes illegal.

"Existing Pigs" means those pigs (exclusive of sows owned for breeding and farrowing, gilts, boars, suckling pigs and piglet inventory) owned by Borrower as of the Petition Date.

"Expenses" has the meaning set forth in Section 8.5 hereof.

"Farm Products" has the meaning given to it in the Food Security Act.

"Farrow-to-Wean Collateral" means all collateral of Borrower needed for the Farrow-to-Wean Operations, including all sows owned for breeding and farrowing, gilts, boars, suckling pigs and piglet inventory.

"Farrow-to-Wean Collateral Advance" has the meaning set forth in Section 2.1(b) hereof.

"Farrow-to-Wean Operations" means the operations of Borrower involved in the acquisition of sows and the breeding and farrowing processes of producing piglets.  For the avoidance of doubt, the period of time for the Farrow-to-Wean Operations terminates at that point in time in which piglets are weaned from their mothers and delivered to third-party purchasers.

"Farrow-to-Wean Operations Expenses" means those expenses incurred in the Farrow-to-Wean Operations but limited to the amounts set forth in the Approved Budget (including interest payable under the Facilities).

"Final Order" means the Final Order of the Bankruptcy Court in a form and substance approved by Lender in Lender's reasonable discretion and/or approved by the Bankruptcy Court, authorizing Borrower to obtain final credit as provided for herein under each of the Facilities, and granting Lender the Super-Priority Administrative Expense Claim and Post-Petition Liens.

"FNBO" means First National Bank of Omaha.

"FNBO DIP Financing" means that debtor-in-possession financing obtained by Borrower from FNBO in the Bankruptcy Case.

"Food Security Act" means the Food Security Act of 1985, as amended from time to time, and the regulations and rulings issued thereunder.

"G&A Expense Advances" has the meaning set forth in Section 2.1(b) hereof.

"G&A Expenses" means those expenses designated as "Labor, Contract Labor ", "Utilities", "Property & Other Taxes", "Repairs & Maintenance", "Insurance", "Purchase Money Debt Payments" and "All Other" in the Approved Budget, in each case, (a) limited to the amounts set forth in the Approved Budget and (b) excluding any Bankruptcy Expenses covered therein.

"GAAP" means generally accepted accounting principles, consistently applied.

"Governing Body" means, with respect to any specified Person, (a) the board of directors when such Person is a corporation, (b) the managers, members or other governing body appointed by agreement or applicable law when such Person is a limited liability company; (c) the general partner or other governing body appointed by agreement or applicable law when such Person is a limited partnership; or (d) or Steve Weiss, as Chief Restructuring Officer, to the extent such employment is approved by the Bankruptcy Court.

"Guarantors" means David Phillip Purvis, Melvin Green Purvis, Judith Essary Purvis, Larry McArthur Purvis, Betty Garner Purvis, Robert Worth McFayden, Marie Purvis McFayden and Jerry Monroe Purvis.  The foregoing Persons are hereinafter referred to individually and collectively as the "Guarantor."

"Guaranty Agreements" has the meaning set forth in Section 3.1(d) hereof.

"Hazardous Substance" means any asbestos, urea-formaldehyde, polychlorinated biphenyls, nuclear fuel or material, chemical waste, radioactive material, explosives, known carcinogens, petroleum products and by-products and other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials or substances listed or identified in, or regulated by, any Environmental Laws.

"Hedging Accounts" means commodity trading accounts maintained by Borrower for hedging purposes with any reputable broker reasonably acceptable to Lender, and in which Lender has a first priority perfected security interest.

"Hedging Policy" means a policy setting forth standards, practices and procedures with respect to Borrower's hedging activities, if any, including a prohibition on speculative trading and a requirement that all hedging positions must be in the same or substantially similar products as the Collateral being hedged, which has been approved by the Governing Body of Borrower and reasonably acceptable to Lender.

"Indemnified Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any governmental authority against Borrower (other than income and franchise taxes imposed on the net income of Lender).

"Indemnitee" has the meaning set forth in Section 8.3(b) hereof.

"Intercreditor Agreement" has the meaning set forth in Section 3.1(f) hereof.

"Interim Order" means the Interim Order of the Bankruptcy Court in a form and substance approved by Lender in Lender's reasonable discretion and/or approved by the Bankruptcy Court, authorizing Borrower to obtain interim credit as provided for herein, and granting Lender the Super-Priority Administrative Expense Claim and Post-Petition Liens.

"Investments" means any equity interest, evidence of indebtedness or other security (including any option, warrant or other right to acquire any of the foregoing) of, any loan or advance to or any other investment or interest in, any other Person.

"IP Rights" has the meaning set forth in Section 4.20 hereof.

"Lender" has the meaning set forth in the introductory paragraph of this Agreement.

"Lien" means any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement or other arrangement having the practical effect of the foregoing or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any Capitalized Lease having the same economic effect as any of the foregoing).

"Loan Documents" means this Agreement, the DIP Loan Note, the Term Note, any Change in Terms Agreements, Commercial Security Agreements, the UCC-1 Financing Statement, the Mortgages, the UCC-1 Fixture Filings, the Guaranty Agreements, the Control Agreements, the Intercreditor Agreement and any other agreements, instruments, documents and certificates executed and/or delivered in connection with this Agreement, as each may from time to time be amended, restated, modified or otherwise supplemented. For the avoidance of doubt, (a) any Security Agreement, UCC-1 Financing Statement, Mortgage, UCC-1 Fixture Filing or Control Agreement entered into in connection with the Pre-Petition Loan Documents shall be deemed to be a "Loan Document" (other than under Section 7.1 hereof with respect to actions or omissions occurring prior to the Petition Date) and (b) all other Pre-Petition Loan Documents shall not be deemed to be a "Loan Document" under this Agreement.

"Material Adverse Effect" means (a) a material adverse change in the business, assets, operations or condition, financial or otherwise, of Borrower or (b) a material impairment in the perfection or priority of Lender's Lien in the Collateral or in the value of the Collateral.

"Maximum First Phase BK Expense Percentage" has the meaning set forth in Section 2.1(b) hereof.

"Maximum First Phase G&A Percentage" has the meaning set forth in Section 2.1(b) hereof.

"Maximum Farrow to Wean Percentage" has the meaning set forth in Section 2.1(b) hereof.

"Maximum Initial G&A Percentage" has the meaning set forth in Section 2.1(b) hereof.

"Maximum Percentages" has the meaning set forth in Section 2.1(b) hereof.

"Maximum Second Phase BK Expense Percentage" has the meaning set forth in Section 2.1(b) hereof.

"Maximum Second Phase G&A Percentage" has the meaning set forth in Section 2.1(b) hereof.

"Milestones" has the meaning set forth in Section 5.16 hereof.

"Minimum Notice Period" means a period commencing no later than 12:00 p.m., Minneapolis time, on the Effective Date of any Advance under any Facility.

"Mortgages" has the meaning set forth in Section 3.1(c) hereof.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Obligations" means all now existing or hereafter arising loans, advances, liabilities, debts, obligations, covenants and duties of payment or performance of every kind, matured or unmatured, direct or contingent, owing, arising, due or to become due, or payable to Lender, by or from Borrower, in each case, to the extent arising out of this Agreement, any other Loan Document, any other agreement or otherwise including, without limitation, all obligations to repay principal of and interest on DIP Loans and Pre-Petition Loans, all obligations to pay principal, interest, fees, costs, charges, expenses and any other sums chargeable to Borrower under the Loan Documents, any other agreement or otherwise, whether or not evidenced by any note or other instrument, and Swap Obligations of Borrower owed to Lender, but excluding, as to any Obligor, its Excluded Swap Obligations.

"Obligor" means each Borrower and Guarantor.

"Operating Advances" has the meaning set forth in Section 2.1(b) hereof.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Packers and Stockyards Act" means the Packers and Stockyards Act of 1921, as amended from time to time, and the regulations and rulings issued thereunder.

"Participation" means one or more grants by Lender to a third party of a participating interest in notes evidencing obligations to repay secured or unsecured loans owned by Lender.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Affiliate Transactions" means: (a) that certain Farm Lease Agreement dated October 1, 2013 by and between North Moore Management, LLC and Borrower; (b) that certain Farm Lease Agreement dated October 10, 2006 by and between Copperhead Farms, L.L.C. and Borrower; and (c) any other transaction which has been approved in writing by Lender in Lender's sole discretion.

"Permitted Debt" means: (a) Obligations owed to Lender; (b) Debt outstanding on the date of this Agreement and set forth on Schedule 1.1(a) hereto; (c) purchase money obligations and obligations under Capitalized Leases not in excess of Five Hundred Thousand Dollars ($500,000) in the aggregate at any one time outstanding; (d) Debt owed to FNBO under the FNBO DIP Financing; and (e) any other Debt which has been approved in writing by Lender in Lender's sole discretion.

"Permitted Investments" means: (a) Investments outstanding on the date of this Agreement and set forth on Schedule 1.1(b) hereto; (b) loans or advances to employees or Affiliates of Borrower in the ordinary course of business not in excess of One Hundred Thousand Dollars ($100,000) in the aggregate at any one time outstanding; (c) extensions of trade credit or similar advances in the ordinary course of business to any Person who is not an employee or Affiliate of Borrower; (d) hedging transactions in compliance with Section 6.9 hereof; and (e) any other Investments which have been approved in writing by Lender in Lender's sole discretion.

"Permitted Liens" means: (a) Liens in favor of Lender; (b) Liens outstanding on the date of this Agreement and set forth on Schedule 1.1(c) hereto; (c) covenants, restrictions, rights, easements, minor irregularities in title and other similar Liens that do not materially interfere with the business or operations of Borrower as presently conducted or materially impair the value of Borrower's Property to which they attach; (d) Liens for taxes, fees, assessments and governmental charges not delinquent or to the extent that payments therefor shall not at the time be required to be made in accordance with the provisions of Section 5.8 hereof; (e) Liens on Borrower's Property that secure the purchase money obligations and obligations under Capitalized Leases permitted by Section 6.1 hereof; provided, that any such Lien only covers the Property then being acquired and the Debt secured by such Lien does not exceed the value of the Property so acquired; (f) Liens of carriers, warehousemen, suppliers or other Persons that are possessory in nature arising in the ordinary course of business; (g) Liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business; (h) Liens arising from attachments or judgments, orders or decrees in circumstances not constituting an Event of Default under Section 7.1(i) hereof; (i) Liens in favor of other financial institutions arising in connection with Borrower's deposit or securities accounts held thereat; provided, that Lender has a prior perfected security interest in the amounts held in such deposit or securities accounts; (j) the Permitted Priority Liens; (k) other Liens in favor of FNBO that secure the FNBO DIP Financing, and (l) any other Liens which have been approved in writing by Lender in Lender's sole discretion.

"Permitted Priority Liens" means (a) Liens in favor of FNBO on the "Senior FNBO Collateral" (as defined in the Intercreditor Agreement) and (b) Liens on Borrower's Property that secure the purchase money obligations and obligations under Capitalized Leases permitted by Section 6.1 hereof; provided, that any such Lien only covers the Property then being acquired and the Debt secured by such Lien does not exceed the value of the Property so acquired.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, association, trust, unincorporated organization, joint venture, court or government or political subdivision or agency thereof, or other entity.

"Personal Property" means the personal property owned by Borrower and described in the Security Agreement and / or Authorizing Order, now existing or hereafter acquired.

"Petition Date" has the meaning set forth in the recitals of this Agreement.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which Borrower or its ERISA Affiliates is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pre-Petition Liens" means Lender's security interests and Liens in the Property that existed as of the Petition Date.

"Pre-Petition Loan Documents" has the meaning set forth in the Recitals.

"Pre-Petition Loans" means the loans made by Lender to Borrower and the Guarantors prior to the Petition Date pursuant to the Pre-Petition Loan Documents.

"Pre-Petition Notes" means each of the following:

(a)     David Philip Purvis and Tracey Bunting Purvis are jointly and severally indebted to the Lender pursuant to that certain (i) Promissory Note dated as of October 1, 2018 in the original principal amount of $2,351,688.04 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "David/Tracey October Note"), and (ii) Promissory Note dated as of December 4, 2018 in the original principal amount of $500,000 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "David/Tracey December Note" and with the David/Tracey October Note, collectively, the "David/Tracey Notes") and guaranteed by the Borrower pursuant to that certain Commercial Guaranty from the Borrower to the Lender and dated October 1, 2018 and that certain Commercial Guaranty from the Borrower to the Lender and dated December 4, 2018 (collectively, the "David/Tracey Guaranties");

(b)     Jerry Monroe Purvis is indebted to the Lender pursuant to that certain (i) Promissory Note dated as of October 1, 2018 in the original principal amount of $2,351,688.04 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Jerry October Note"), and (ii) Promissory Note dated as of December 4, 2018 in the original principal amount of $500,000 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Jerry December Note" and with the Jerry October Note, collectively, the "Jerry Notes") and guaranteed by the Borrower pursuant to that certain Commercial Guaranty from the Borrower to the Lender and dated October 1, 2018 and that certain Commercial Guaranty from the Borrower to the Lender and dated December 4, 2018 (collectively, the "Jerry Guaranties");

(c)     Larry McArthur Purvis and Betty Garner Purvis are jointly and severally indebted to the Lender pursuant to that certain (i) Promissory Note dated as of October 1, 2018 in the original principal amount of $2,351,688.04 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Larry/Betty October Note"), and (ii) Promissory Note dated as of December 4, 2018 in the original principal amount of $500,000 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Larry/Betty December Note" and with Larry/Betty October Note, collectively, the "Larry/Betty Notes") and guaranteed by the Borrower pursuant to that certain Commercial Guaranty from the Borrower to the Lender and dated October 1, 2018 and that certain Commercial Guaranty from the Borrower to the Lender and dated December 4, 2018 (collectively, the "Larry/Betty Guaranties");

(d)     Melvin Green Purvis and Judith Essary Purvis are jointly and severally indebted to the Lender pursuant to that certain (i) Promissory Note dated as of October 1, 2018 in the

original principal amount of $2,351,688.04 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Melvin/Judith October Note"), and (ii) Promissory Note dated as of December 4, 2018 in the original principal amount of $500,000 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Melvin/Judith December Note" and with the Melvin/Judith October Note, collectively, the "Melvin/Judith Notes") and guaranteed by the Borrower pursuant to that certain Commercial Guaranty from the Borrower to the Lender and dated October 1, 2018 and that certain Commercial Guaranty from the Borrower to the Lender and dated December 4, 2018 (collectively, the "Melvin/Judith Guaranties");

(e)     Robert Worth McFayden and Marie Purvis McFayden are jointly and severally indebted to the Lender pursuant to that certain (i) Promissory Note dated as of October 1, 2018 in the original principal amount of $2,351,688.04 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Robert/Marie October Note"), and (ii) Promissory Note dated as of December 4, 2018 in the original principal amount of $500,000 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Robert/Marie December Note" and with the Robert/Marie October Note, collectively, the "Robert/Marie Notes"; and the Robert/Marie Notes with the David/Tracey Notes, the Jerry Notes, the Larry/Betty Notes, and the Melvin/Judith Notes, collectively, the "2018 Notes") and guaranteed by the Borrower pursuant to that certain Commercial Guaranty from the Borrower to the Lender and dated October 1, 2018 and that certain Commercial Guaranty from the Borrower to the Lender and dated December 4, 2018 (collectively, the "Robert/Marie Guaranties" and together with the David/Tracey Guaranties, the Jerry Guaranties, the Larry/Betty Guaranties, and the Melvin/Judith Guaranties, collectively, the "Borrower Guaranties"); and

(f)     Borrower jointly and severally issued in favor of the Lender that certain Promissory Note dated as of January 28, 2020 in the original principal amount of $1,000,000 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "2020 Note"; and the 2020 Note with the 2018 Notes, each a "Pre-Petition Note" and, collectively, the "Pre-Petition Notes").

"Pre-Petition Obligations" has the meaning set forth in Section 4.1 hereof.

"Post-Petition Liens" has the meaning set forth in Section 2.7(a) hereof.

"Promissory Note" means either the DIP Loan Note or the Term Note, as applicable.

"Property" means any interest of Borrower in any kind of property or asset, whether real or personal, tangible or intangible, and includes the Collateral.

"Qualified ECP" means each Obligor that has total assets exceeding Ten Million Dollars ($10,000,000) or that constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Real Property" means the real property owned by Borrower and subject to and described in (a) that certain Deed of Trust dated January 16, 2014, and recorded in Book No., 4317, Page No. 337, on January 28, 2014; with the Register of Deeds of Moore County, North Carolina; (b) that certain Deed of Trust dated January 16, 2014, recorded in Book No. 1650, Page No. 233, on January 28, 2014, with the Register of Deeds of Richmond County, North Carolina; (c) that certain Deed of Trust dated January 16, 2014, and recorded in Book No. 1728,

Page No. 0555, on January 28, 2014, with the Register of Deeds of Chatham County, North Carolina; (d) that certain Deed of Trust dated January 16, 2014, and recorded in Book No. 730, Page No. 299, on January 28, 2014, with the Register of Deeds of Montgomery County, North Carolina; (e) that certain Deed of Trust dated December 12, 2014, and recorded in Book No. 745, Page No. 862, on December 15, 2014, with the Register of Deeds of Montgomery County, North Carolina; (f) that certain Deed of Trust dated May 27, 2016, and recorded in Book No. 00995, Page No. 0105, on May 27, 2016, with the Register of Deeds of Warren County, North Carolina; (g) that certain Security Deed dated June 5, 2017, and recorded as Document No. 001736 on July 13, 2017, with the Register of Deeds of Oglethorpe County, Georgia; (h) that certain Construction Security Deed dated October 19, 2017, and recorded as Document No. 002675 on December 8, 2017, with the Register of Deeds of Oglethorpe County, Georgia; (i) that certain Deed of Trust Securing Future Advances dated June 1, 2020, and recorded in Book No. 848, Page No. 206 on June 4, 2020, with the Register of Deeds of Montgomery County, North Carolina; and (j) that certain Deed of Trust Securing Future Advances dated June 1, 2020, and recorded in Book No. 5341, Page No. 182 on June 4, 2020, with the Register of Deeds of Moore County, North Carolina.

"Security Agreement" has the meaning set forth in Section 3.1(b) hereof.

"Subsidiary" shall mean any corporation, limited liability company, limited partnership, partnership, joint venture, trust or other legal entity of which Borrower owns, directly or indirectly, fifty percent (50%) or more of the outstanding voting stock or equity interests, or of which Borrower has effective control, by contract or otherwise.

"Super-Priority Administrative Expense Claim" has the meaning set forth in Section 2.7(a) hereof.

"Swap Obligation" means, with respect to any Obligor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swine and Inventory Report" has the meaning set forth in Section 5.1(h) hereof.

"Term Loan" has the meaning set forth in Section 2.2(e) hereof.

"Term Loan Conversion Date" has the meaning set forth in Section 2.2(e) hereof

"Term Loan Maturity Date" has the meaning set forth in Section 2.2(e) hereof.

"Term Note" has the meaning set forth in Section 2.2(e) hereof.

"Transfer" means one or more sales, transfers or assignments by Lender to a third party of notes evidencing obligations to repay secured or unsecured loans owned by Lender.

"Unmatured Event of Default" means an event which with the passage of time, giving of notice or both, would become an Event of Default.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

    1.2. Matters of Construction. The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders. Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any instruments or agreements to which Lender is a party including, without limitation, references to any of the Loan Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof.

1.3. Accounting Principles. Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, this shall be done in accordance with GAAP, to the extent applicable, except as otherwise expressly provided in this Agreement.

SECTION 2. THE CREDIT FACILITIES

2.1. Description.

(a) Subject to the other terms and conditions of this Agreement, Lender hereby agrees to make available to Borrower a revolving credit facility in an aggregate principal amount not to exceed the DIP Loan Facility Commitment (the "DIP Loan Facility").

(b) The DIP Loan Facility permits Advances to be extended by Lender to or for the benefit of Borrower consisting of (i) Advances needed to procure from FNBO an assignment of its security interest in the Farrow-to-Wean Collateral (the "Farrow-to-Wean Collateral Advance"), (ii) Advances used to finance one hundred percent (100%) of the Farrow-to-Wean Operations Expenses (the "Maximum Farrow to Wean Percentage") incurred from the Closing Date until the DIP Loan Maturity Date but only to the extent provided for under the Approved Budget (the "Operating Advances"), (iii) Advances used to finance twenty percent (20%) of the G&A Expenses (the "Maximum Initial G&A Percentage") of Borrower incurred from the Closing Date until the date on which the last Existing Pig is sold to a third-party purchaser but only to the extent provided for under the Approved Budget and Advances used to finance one hundred percent (100%) of the G&A Expenses (the "Maximum Second Phase G&A Percentage") incurred from the date on which the last Existing Pig is sold to a third-party purchaser until the DIP Loan Maturity Date but only to the extent provided for under the Approved Budget (collectively the "G&A Expense Advances"), and (iv) Advances used to finance thirty-eight percent (38%) of the Bankruptcy Expenses (the "Maximum First Phase BK Expense Percentage") of the Borrower incurred from the Closing Date until January 1, 2022 but only to the extent provided for under the Approved Budget and Advances used to finance one hundred percent (100%) of the Bankruptcy Expenses (the "Maximum Second Phase BK Expense Percentage" and together with the Maximum First Phase BK Expense Percentage, the Maximum Farrow to Wean Percentage, the Maximum Initial G&A Percentage and the Maximum Second Phase G&A Percentage, the "Maximum Percentages") of the Borrower incurred from January 1, 2022 until March 31, 2022 (or such later date as the parties may mutually agree to extend in writing) but only to the extent provided for under the Approved Budget (collectively, the "Bankruptcy Expense Advances"); provided in each case, no such Bankruptcy Expense Advances shall be permitted to be made unless and until all Operating Advances and G&A Expense Advances required to be made to pay the Operating Expenses and G&A Expenses of the Borrower as set forth in the Operating Budget for the applicable period have already been made and after giving effect to the making of such Advances the Borrower has availability to

borrow additional amounts under the DIP Loan Facility in an amount sufficient to pay all or a portion of the proposed Bankruptcy Expenses; provided further, that if the Borrower does not have availability to borrow under this DIP Loan Facility to pay Bankruptcy Expenses for any applicable period (the "Deferred Bankruptcy Expenses"), all such Bankruptcy Expenses shall continue to accrue and carry over until such time as the Borrower has availability to borrow under this DIP Loan Facility in an amount sufficient to first pay Operating Expenses and G&A Expenses in accordance with the Operating Budget and then pay all or a portion of such Deferred Bankruptcy Expenses.  The DIP Loan Facility permits multiple Advances by Lender to or for the benefit of Borrower (each a "DIP Loan" and collectively, the "DIP Loans").  The aggregate outstanding principal amount of the DIP Loans may fluctuate from time to time through repayments and reborrowings, provided that at no time shall the aggregate outstanding amount of all DIP Loans exceed the DIP Loan Facility Commitment.  The DIP Loan Facility is a revolving credit facility and any DIP Facility Loans that are repaid, may be reborrowed, subject to and in accordance with the terms of this Agreement. The Obligations of Borrower under the DIP Loan Facility, this Agreement and the other Loan Documents shall at all times be absolute and unconditional.

(c)     At the Closing, Borrower shall duly execute and deliver to Lender a promissory note made payable to the order of Lender in the maximum aggregate principal amount of the DIP Loan Facility Commitment (as the same may be amended, restated, modified, supplemented, replaced or refinanced from time to time, the "DIP Loan Note"). The DIP Loan Note shall evidence Borrower's absolute and unconditional obligation to repay Lender for the DIP Loans, with interest as herein and therein provided.  The DIP Loan Note is incorporated herein by reference and made a part hereof.  The DIP Loan Note shall be substantially in the form of Exhibit B attached hereto.

(d)     The term of the DIP Loan Facility shall expire on January 1, 2022 or, if later the effective date with respect to any plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code, at which time, the Lender's obligation to make any DIP Loans terminates and all outstanding and unpaid DIP Loans, all accrued and unpaid interest and any other amounts due and owing under this Agreement shall be automatically due and payable.  The DIP Loans shall be repaid on or before the later of (i) January 1, 2022, and (ii) the effective date with respect to any plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code; provided however, if the DIP Loan Facility or this Agreement are terminated prior to such date in accordance with the terms of this Agreement, on such earlier date of termination (such applicable date, the "DIP Loan Maturity Date). Notwithstanding the foregoing, it is envisioned that the DIP Loan Facility will be renewed annually, beginning January 1, 2022, subject in all respects to the internal approvals and determinations of the Lender in its sole discretion.

2.2.   Funding Procedures.

(a)     Borrower shall deliver to Lender a Borrowing Notice for an Advance under the DIP Loan Facility.  No more than one (1) Borrowing Notice for an Advance under the DIP Loan Facility shall be delivered to Lender in any week and any request for a Bankruptcy Expense Advance delivered after January 1, 2022 shall be accompanied by requests for G&A Expense Advances and Operating Expense Advances for the relevant period.

(b)     Any Advance to Borrower under the DIP Loan Facility shall be limited to the amount of Farrow-to Wean Operation Expenses, G&A Expenses and Bankruptcy Expenses to be paid by Borrower during the week commencing on the Effective Date, in each case up to the applicable Maximum Percentage for such expenses.  Any Borrowing Notice delivered to Lender for any Advance under the DIP Loan Facility shall be accompanied by an itemized list of all

Farrow-to-Wean Operation Expenses, G&A Expenses and Bankruptcy Expenses to be paid from such Advance, as well as the applicable Maximum Percentage for such expenses.  If Lender determines in its good faith reasonable discretion that the nature or amount of Farrow-to-Wean Operation Expenses, G&A Expenses and Bankruptcy Expenses to be paid from such Advance are not provided for under the Approved Budget, Lender may withhold such Advance. If Lender determines in its good faith reasonable discretion that any Advance requested to pay Bankruptcy Expenses after January 1, 2022 would not allow Borrower adequate availability to make Operating Advances and G&A Expense Advances necessary to pay Operating Expenses and G&A Expenses in accordance with the Approved Budget, Lender may withhold such Bankruptcy Expense Advance.

(c)     Subject to the terms and conditions of this Agreement and so long as no Event of Default or Unmatured Event of Default has occurred hereunder, Lender shall make Advances to Borrower under the DIP Loan Facility on the Effective Dates specified in Borrowing Notices received by Lender if the Borrowing Notice is delivered to Lender not less than the Minimum Notice Period prior to any respective Effective Date, and any other conditions set forth in this Agreement are satisfied (or the next applicable Business Day if the Borrowing Notice is delivered to Lender less than the Minimum Notice Period prior to the Effective Date).

(d)     Any such Advance under the DIP Loan Facility shall be deposited by Lender into the Designated Account or as otherwise directed in writing by Borrower.  Borrower may transfer any such Advance to another debtor-in-possession account of the Borrower for further distribution pursuant to the Approved Budget (the "Disbursement Account").

(e)     Subject to the terms and conditions of this Agreement and so long as no Event of Default or Unmatured Event of Default has occurred hereunder, effective upon entry of the Final Order and without the need for a Borrowing Notice or any further action by Borrower or Lender, the Pre-Petition Obligations shall be automatically "rolled-up" and deemed refinanced and replaced by a term loan (the "Term Loan") on a dollar-for-dollar basis, which roll-up, refinancing and replacement shall not constitute a novation.  The parties acknowledge and agree that there will be no advance of funds made in connection with the Term Loan.  The obligations with respect to the Term Loan will be evidenced by a promissory note substantially in the form of Exhibit C attached hereto (the "Term Note") that will be the joint and several obligation of the Borrower and the Guarantors. Interest on the Term Loan will be payable monthly as set forth in the term Note following the entry of the Final Order and prior to the effective date of the confirmed plan of reorganization. Principal and Interest on the Term Loan shall be payable in monthly installments as set forth in the term Note for the first three (3) years commencing on the effective date of the confirmed plan of reorganization, based upon a twenty-five (25) year amortization.  At the end of the third year (the "Term Loan Conversion Date"), the Term Loan will be restructured for a minimum new twelve (12) year term/amortization period with all amounts payable no later than the twelve year anniversary (the "Term Loan Maturity Date").

2.3.     Interest.

(a)     The DIP Loans shall bear interest on the outstanding principal amount thereof from the date made until the all of the DIP Loans are paid in full.  Borrower agrees to pay interest on the unpaid principal amount of the DIP Loans from time to time outstanding hereunder at the rate of interest per annum set forth in the Promissory Note applicable thereto.

(b)     If any Event of Default shall occur, the rate of interest applicable to the DIP Loans then outstanding shall be the Default Rate.  The Default Rate shall apply from the date of the Event of Default until the date such Event of Default is waived or cured, as determined by

Lender in its sole discretion, and interest accruing at the Default Rate shall be payable on demand.

(c) Interest shall be computed for on a 365/365 simple interest bases; that is, by applying the ratio of the interest rate over the number of days in a year (365 for all years, including leap years), multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Agreement and the applicable Promissory Notes is computed using this method.

(d) All contractual rates of interest chargeable on any outstanding DIP Loan shall continue to accrue and be paid even after default, maturity, acceleration, judgment, bankruptcy, insolvency proceedings of any kind or the happening of any similar event or occurrence.

(e) In no contingency or event whatsoever shall the aggregate of all amounts deemed interest hereunder and charged or collected pursuant to the terms of this Agreement exceed the highest rate of interest permissible under applicable law. In the event that any court of competent jurisdiction determines Lender has charged or received interest hereunder in excess of the highest applicable rate of interest, Lender may, in its sole discretion, apply and set off such excess interest received by Lender against other Obligations due or to become due and such rate of interest shall automatically be reduced to the maximum rate of interest permitted by such law.

2.4. Payments.

(a) All accrued interest on the DIP Loan shall be due and payable in arrears (i) on the first (1st) day of each month, commencing on June 1, 2021, until payment in full. All accrued interest on the Term Loan shall be due and payable in arrears (i) on the first (1st) day of each month, commencing on the first (1st) day of the month occurring after entry of the Final Order, until the Term Loan Maturity Date, (ii) on the Term Loan Maturity Date and (iii) upon payment in full, in each case, in accordance with the terms of the Term Note.

(b) If, at any time, the aggregate principal amount of all DIP Loans outstanding exceeds the DIP Loan Facility Commitment, the Borrower shall immediately make such principal prepayments of the DIP Loans as is necessary to eliminate such excess.

(c) The entire outstanding principal balance of the DIP Loans, together with all unpaid accrued interest thereon, shall be due and payable on the DIP Loan Maturity Date to the extent the same is not extended or renewed in the sole discretion of the Lender. Principal on the Term Loan shall be paid in accordance with the terms of the Term Note.

(d) Borrower may prepay, without premium or penalty, all or any part of the principal of the DIP Loans at any time.

(e) All payments and prepayments shall be applied first to unpaid interest, second to the principal of the Dip Loans, third as adequate protection (to the extent approved by the Bankruptcy Court) for Lender's Liens securing the Pre-Petition Loans (including Liens in the Cash Collateral), fourth to any unpaid fees and expenses (to the extent such expenses have been approved by the Bankruptcy Court), and thereafter to other amounts due Lender. Except as otherwise provided herein, all payments of principal, interest, fees or other amounts payable by Borrower hereunder shall be remitted to Lender in immediately available funds and in lawful money of the United States of America not later than 2:30 p.m., (Minneapolis time) on the day due, at Lender's principal office in Arden Hills, Minnesota, or at such other address as may be

designated by Lender in writing. Whenever any payment is stated as due on a day which is not a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day and interest shall continue to accrue during such extension.

(f) Borrower hereby authorizes Lender to automatically deduct the amount of any payment owed under this Agreement, the Promissory Notes or any other Loan Document from the Designated Account. If the funds in the account are insufficient to cover any payment, Lender shall not be obligated to advance funds to cover the payment.

2.5. Use of Proceeds. (a) The proceeds of the Farrow-to-Wean Advance shall be used exclusively to finance the assignment of FNBO's security interest in the Farrow-to-Wean Collateral to the Lender on or after the date of this Agreement. The proceeds of the Operating Advances shall be used exclusively to finance one hundred percent (100%) of the Farrow-to-Wean Operations Expenses incurred by Borrower from the Closing Date until the DIP Loan Maturity Date but only to the extent provided for under the Approved Budget. The proceeds of the G&A Expense Advances shall be used exclusively to finance (i) twenty percent (20%) of the G&A Expenses incurred by Borrower from the Closing Date until the date on which the last Existing Pig is sold to a third-party purchaser but only to the extent provided for under the Approved Budget and (ii) one hundred percent of the G&A Expenses incurred by Borrower from the date on which the last Existing Pig is sold to a third-party purchaser until the DIP Loan Maturity Date but only to the extent provided for under the Approved Budget. The Bankruptcy Expense Advances shall be used exclusively to finance thirty-eight percent (38%) of the Bankruptcy Expenses incurred by Borrower from the Closing Date until the DIP Loan Maturity Date but only to the extent provided for under the Approved Budget.

(b) No part of the proceeds of any DIP Loans under this Agreement, the loans under the Pre-Petition Loan Documents or the Cash Collateral shall be used (i) to investigate or prosecute, or for proceedings to contest, (A) the claims and Obligations of Lender under this Agreement or the Pre-Petition Loan Documents, (B) the security interests and Liens in favor of Lender that secure the Obligations under this Agreement or the Pre-Petition Loan Documents or (C) the Super-Priority Administrative Expense Claim or Post-Petition Liens or (ii) to prevent, hinder or delay any of Lender's rights or remedies arising under this Agreement or the Pre-Petition Loan Documents.

2.6. Late Fees. If any payment (other than the DIP Loan Maturity Date or Term Loan Maturity Date) hereunder is ten (10) days or more late, Borrower shall owe Lender a fee equal to the greater of (i) five percent (5%) of such payment or (ii) Twenty-Five Dollars ($25.00).

2.7. Super-Priority Administrative Expense Claim and Post-Petition Liens.

(a) Subject to entry and terms of the Authorizing Order, all of the Obligations shall, subject to the Carve-Out, at all times:

(i) pursuant to Section 364(c)(1) of the Bankruptcy Code and the Authorizing Order, constitute an allowed super-priority administrative expense claim against Borrower (without the need to file any proof of claim) with priority over any and all claims against Borrower, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 363, 364(c)(1), 365, 503(a), 503(b), 506(c) (upon entry of the Final Order),

507(a), 507(b), 507(d), 726, 1113 or 1114 of the Bankruptcy Code (including any adequate protection obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "Super-Priority Administrative Expense Claim"), which allowed Super-Priority Administrative Expense Claim shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered an administrative expense allowed under Section 503(b) of the Bankruptcy Code, and shall be payable from and have recourse to all pre- and post-petition assets and Property of Borrower, whether existing on the Petition Date or thereafter acquired, and all proceeds thereof (excluding Avoidance Actions), subject only to the Carve-Out and the Permitted Priority Liens. The Super-Priority Administrative Expense Claim shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event the Authorizing Order or any provision thereof is vacated, reversed, amended or otherwise modified, on appeal or otherwise. Notwithstanding any provision in this Agreement to the contrary, the amount of the Super-Priority Administrative Expense Claim shall not exceed the value of Lender's secured claim in the Collateral;

(ii) pursuant to Section 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, the Loan Documents and the Authorizing Order, be secured by a valid, binding, perfected, continuing, enforceable, non-avoidable first priority security interest in and Lien on all Collateral and all other Property of Borrower, subject only to the Carve-Out and the Permitted Priority Liens, to the extent such Collateral and Property is not subject to a valid, enforceable, perfected and non-avoidable Lien as of the Petition Date; and

(iii) pursuant to Sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the Loan Documents and the Authorizing Order, be secured by a valid, binding, perfected, continuing, enforceable, non-avoidable first priority security interest in and Lien on all Collateral and all other Property of Borrower (excluding Avoidance Actions), subject only to the Carve-Out and the Permitted Priority Liens which security interests and Liens shall, in each case, be senior to and prime all other security interests and Liens, subject only to the Carve-Out and the Permitted Priority Liens (the security interests and Liens described in subsections (ii) and (iii) of this Section 2.7(a) shall be referred to collectively as the "Post-Petition Liens").

(b) Pursuant to and in accordance with the Authorizing Order, the Post-Petition Liens shall not at any time be (i) made subject or subordinate to, or made pari passu with, any other Lien or claim existing as of the Petition Date, or created under Sections 363 or 364 of the Bankruptcy Code or otherwise, other than the Permitted Priority Liens, or (ii) avoidable or subject to preservation for the benefit of Borrower's estate under Section 551 of the Bankruptcy Code.

(c) Upon (and at all times after) the entry, and subject to the terms, of the Authorizing Order, the Authorizing Order and the Loan Documents are sufficient to provide the Super-Priority Administrative Expense Claim and Post-Petition Liens.

(d) Pursuant to and in accordance with the Authorizing Order and the Loan Documents, the Post-Petition Liens shall be deemed fully perfected Liens, effective and perfected upon the date of the Authorizing Order without the necessity of execution by Borrower of mortgages, security agreements, pledge agreements, financing agreements, financing statements or other agreements or instruments, such that no additional steps need be taken by Lender to perfect such interests. Subject to notice of hearing and entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other instrument or agreement that requires the consent or approval of one or more landlords, licensors or other parties in order for Borrower to pledge, grant, mortgage, sell, assign or otherwise transfer any fee or leasehold interest or the proceeds thereof or other Collateral or Property, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the transactions granting Lender the Post-Petition Liens on such fee, leasehold or other interest or other Collateral or Property or the proceeds of any assignment, sale or other transfer thereof.

(e) Pursuant to and in accordance with the Authorizing Order and the Loan Documents, the Super-Priority Administrative Expense Claim, Post-Petition Liens and other rights and remedies granted to Lender shall continue in the Bankruptcy Case, and such Super-Priority Administrative Expense Claim and Post-Petition Liens shall maintain their enforceability and priority until all the Obligations have been indefeasibly paid in full in cash and completely satisfied and the Facilities been terminated in accordance with this Agreement.

2.8. Increased Costs.

(a) If any Change in Law shall: (i) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, Lender; or (ii) impose on Lender or the London interbank market any other condition affecting this Agreement; and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by Lender (whether of principal, interest or otherwise), then Borrower shall pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

(b) If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on Lender's capital or on the capital of Lender's holding company, if any, as a consequence of this Agreement to a level below that which Lender or Lender's holding company, if any, would have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company, if any, with respect to capital adequacy), then from time to time Borrower shall pay to Lender such additional amount or amounts as will compensate Lender or Lender's holding company, if any, for any such reduction suffered.

(c) A certificate of Lender setting forth the amount or amounts necessary to compensate Lender or its holding company, if any, as specified in paragraphs (a) or (b) above shall be delivered to Borrower demonstrating in reasonable detail the calculation of the amounts, and shall be conclusive absent manifest error. Borrower shall pay Lender the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

(d) Failure or delay on the part of Lender to demand compensation pursuant to this Section 2.8 shall not constitute a waiver of Lender's right to demand such compensation; provided that Borrower shall not be required to compensate Lender pursuant to this Section 2.8 for any increased costs or reductions incurred more than one hundred eighty (180) days prior to

the date that Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive and if Lender notifies Borrower of such Change in Law within one hundred eighty (180) days after the adoption, enactment or similar act with respect to such Change in Law, then the one hundred eighty (180) day period referred to above shall be extended to include the period from the effective date of such Change in Law to the date of such notice.

2.9. Taxes.

(a) Any and all payments by or on account of any obligation of Borrower under this Agreement or any other Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions applicable to additional sums payable under this Section 2.9) Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions or withholdings and (iii) Borrower shall pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law.

(b) In addition, Borrower shall pay any Other Taxes to the relevant governmental authority in accordance with applicable law.

(c) Borrower shall indemnify Lender, within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by Lender on or with respect to any payment by or on account of any obligation of Borrower under this Agreement or any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.9) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to Borrower by Lender demonstrating in reasonable detail the calculation of the amounts, shall be conclusive absent manifest error. However, Lender shall not be entitled to receive any payment with respect to Indemnified Taxes or Other Taxes that are incurred or accrued more than one hundred eighty (180) days prior to the date Lender gives notice and demand thereof to Borrower.

(d) As soon as reasonably practicable after any payment of Indemnified Taxes or Other Taxes by Borrower to a governmental authority, Borrower shall deliver to Lender the original or a certified copy of a receipt issued by such governmental authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(e) Lender, if requested by Borrower, shall deliver such properly completed and executed documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not Lender is subject to backup withholding or information reporting requirements.

(f) If Lender determines, in its reasonable discretion, that it has received a refund of any taxes or Other Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section 2.9, it shall pay over such refund to Borrower (but only to the extent of indemnity payments made, or additional amounts

paid, by Borrower under this Section 2.9 with respect to the taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of Lender and without interest (other than any interest paid by the relevant governmental authority with respect to such refund); provided, that Borrower, upon the request of Lender, agree to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant governmental authority) to Lender in the event Lender is required to repay such refund to such governmental authority. This Section 2.9 shall not be construed to require Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to Borrower or any other Person.

SECTION 3. CLOSING AND CONDITIONS PRECEDENT TO ADVANCES

Closing under this Agreement and the making of each Advance are subject to the satisfaction or waiver of the following conditions precedent (all documents to be in form and substance satisfactory to Lender):

3.1. Conditions Precedent to Closing. Prior to the Closing, Borrower shall have delivered to Lender the following:

(a) A duly and fully executed Agreement and duly and fully executed Promissory Notes substantially in the forms attached hereto as Exhibit B and Exhibit C.

(b) A duly and fully executed security agreement by Borrower (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Security Agreement") and UCC-1 Financing Statement. The Security Agreement, UCC-1 Financing Statement and Authorizing Order shall secure the Obligations and create a first priority perfected security interest in the Personal Property, subject only to the Permitted Priority Liens.

(c) Duly and fully executed deeds of trust with respect to the Real Property (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Mortgages") and UCC-1 Fixture Filings. The Mortgages, UCC-1 Fixture Filings and Authorizing Order shall secure the Obligations and create a first priority lien on the Real Property.

(d) Duly and fully executed guaranty agreements by Guarantors (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Guaranty Agreement").

(e) Duly and fully executed control agreement with respect to the Designated Account (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Control Agreements"). The Control Agreements and Authorizing Order shall secure the Obligations and create a first priority perfected security interest on the hedging and commodity trading accounts set forth on Schedule 4.18 hereto, subject only to the Permitted Priority Liens.

(f) A duly and fully executed intercreditor agreement with FNBO (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Intercreditor Agreement").

(g) A duly and fully executed Pre-Petition Note and Pre-Petition Loan Documents.

(h)     Each instrument, document and agreement required to be executed under any provision of this Agreement or any other Loan Document.

(i)     A certified copy of (i) resolutions of the Governing Body of Borrower authorizing the execution, delivery and performance of this Agreement and the other Loan Documents and the transactions contemplated thereby and (ii) Borrower's organizational and governing documents and agreements.

(j)     An incumbency certificate identifying all Authorized Representatives and any Person executing this Agreement and the other Loan Documents, with specimen signatures.

(k)     A certificate of existence for Borrower issued by the appropriate governmental authority.

(l)     Satisfactory evidence of "all risk" property insurance coverage on Borrower's Property and general liability, business interruption, auto liability, worker's compensation and other insurance of Borrower, as may be required by any of the Loan Documents or Lender.

(m)     An inventory of the Existing Pigs as of the Petition Date.

(n)     The Approved Budget, in form and substance satisfactory to Lender.

(o)     The Borrower shall have finalized terms with and officially appointed Steve Weiss as chief restructuring officer (the "CRO") on terms and conditions satisfactory to the Lender, including without limitation, (a) that the CRO has the authority to run and oversee the day to day business operations of the Borrower during Bankruptcy, (b) that current management will serve at the discretion of the CRO and the former chief executive officer will no longer have authority over or responsibility for the operations or business activities of the Borrower, and (c) that the Lender has the ability to meet with or otherwise communicate directly with the CRO on a regular basis. Additionally, during the Bankruptcy proceeding, the CRO will conduct a search for a long term Chief Executive to oversee the restructured business plan of the Borrower, with the final determination of the new Chief Executive to be subject to approval by the board of the Borrower and the Lender.

(p)     The Interim Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been stayed, vacated, reversed or rescinded and any appeal of such order shall not have been timely filed. Borrower shall be in compliance in all respects with the Interim Order.

(q)     All other "first day orders" or other orders to be entered on prior to the Closing Date (including, without limitation, an order of the Bankruptcy Court approving the FNBO DIP Financing) shall be reasonably satisfactory to Lender in all respects, shall have been entered by the Bankruptcy Court and shall not have been stayed, vacated, reversed or rescinded and any appeal of such orders shall not have been timely filed.

(r)     All other instruments, certificates, documents, information and reports reasonably required or requested to be executed and/or delivered by Borrower or Guarantor in the sole discretion of Lender.

3.2. Conditions Precedent to Advances. Lender's obligation to make Advances shall be subject to the satisfaction of each of the following conditions:

(a) All representations and warranties of Borrower and Guarantor in this Agreement and the other Loan Documents shall be deemed reaffirmed as of the making of such Advance and shall be true, correct and complete in all material respects both before and after giving effect to such Advance (except for those representations and warranties which specifically relate to an earlier date, in which case such representations and warranties shall be true, correct and complete as of such earlier date); provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date.

(b) No Event of Default or Unmatured Event of Default shall have occurred and be continuing, Borrower and Guarantor shall be in compliance with this Agreement and the other Loan Documents and Borrower and Guarantor shall be deemed to have certified such matters to Lender.

(c) The Interim Order and, following entry of the Final Order, the Final Order, shall be in full force and effect, and shall not have been stayed, vacated, reversed or rescinded and any appeal of such order shall not have been timely filed.

(d) Since the Closing Date, there shall have been no change that has had or could reasonably be expected to have a Material Adverse Effect.

(e) No injunction, writ, restraining order or other order of any nature prohibiting, directly or indirectly, the extending of credit hereunder shall have been issued by any court of competent jurisdiction against Borrower, Lender or any of their Affiliates and remain in force.

(f) The Approved Budget shall be in full force and effect and acceptable to Lender in Lender's reasonable discretion. Since the Closing Date, Borrower shall have (i) conducted its operations and made disbursements within the Approved Budget, as determined in the aggregate, except to the extent consented to by Lender in writing, and (ii) obtained receipts and revenues in the amounts set forth in the Approved Budget, subject to the Applicable Variance.

(g) Borrower and Guarantor shall have taken such other actions, including the delivery of instruments, documents and agreements, as Lender may reasonably request.

3.3. Compliance with this Agreement. Borrower shall have performed and complied with all agreements, covenants and conditions contained herein including, without limitation, the provisions of Sections 5 and 6 hereof, which are required to be performed or complied with by Borrower before or at the Closing Date and as of the date of each Advance.

3.4. Closing. Subject to the conditions of this Section 3 and the other terms and conditions of this Agreement, the Facilities shall be made available to Borrower on the date (the "Closing Date") this Agreement is duly executed and delivered to Lender and all of the conditions contained in Section 3.1 hereof are satisfied or waived (the "Closing").

3.5. Non-Waiver of Rights. By completing the Closing hereunder, or by making Advances hereunder, Lender does not thereby waive a breach of any representation, warranty or covenant made by Borrower or Guarantor hereunder or under any agreement, document or instrument delivered to Lender or otherwise referred to herein, and any claims and rights of Lender resulting from any breach or misrepresentation by Borrower or Guarantor are specifically reserved by Lender.

SECTION 4. REPRESENTATIONS AND WARRANTIES

To induce Lender to complete the Closing and make Advances under the Facilities, Borrower represents and warrants to Lender that:

4.1. Pre-Petition Obligations. As of the Petition Date, Borrower and the Guarantors are indebted to Lender in the aggregate amount of Fourteen Million Two Hundred Forty One Thousand Five Hundred Fifteen and 27/100 United States Dollars ($14,241,515.27) under the Pre-Petition Loan Documents (the “Pre-Petition Obligations”), consisting of (i) Fourteen Million One Hundred Thirty Three Thousand Seven Hundred Fifty and 49/100 United States Dollars ($14,133,750.49) in principal, (ii) Forty Four Thousand Two Hundred Sixty Four and 78/100 United States Dollars ($44,264.78) in accrued interest, and (iii) $63,500 in fees, costs and expenses. The Pre-Petition Obligations, the Pre-Petition Loans and the Pre-Petition Liens are valid, binding and enforceable, and neither Borrower nor any Guarantor has any defense thereto.

4.2. Organization, Powers, Authorization, Enforceability and Pre-Petition Loans.

(a) Borrower is duly organized and validly existing under the laws of the state of its organization, has lawful power and authority to engage in the business it conducts and is qualified to do business and validly existing or in good standing, as applicable, in each state and other jurisdiction where the nature and extent of its business requires qualification, except where the failure to so qualify could not have a Material Adverse Effect.

(b) Borrower has all requisite power and authority to enter into and perform this Agreement and the other Loan Documents and to incur the Obligations herein provided for, and has taken all proper and necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents.

(c) This Agreement and the other Loan Documents, when executed and delivered, will be legal, valid and binding upon Borrower and Guarantor, as applicable, and enforceable against Borrower and Guarantor, as applicable, in accordance with their respective terms, except to the extent enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors’ rights generally and by general principles of equity.

4.3. No Conflicts. The execution, delivery and performance of this Agreement, the other Loan Documents and all related agreements and each document required by any provision hereof by Borrower will not violate any law, government rule or regulation, violate the organizational or governing documents and agreements of Borrower or violate or result in a default of (immediately or with the passage of time) any contract, agreement or instrument to which Borrower is a party, or by which Borrower or its Property is bound. Borrower is not in violation of nor has it knowingly caused any Person to violate any term of any agreement or instrument to which it is a party or by which it or its Property may be bound, which violation could reasonably be expected to have a Material Adverse Effect. Borrower is not in violation of its organizational or governing documents and agreements.

4.4. Financial Condition / Full Disclosure. Borrower has delivered to Lender the audited balance sheets, statements of income, statements of equity (deficit) and statements of cash flows of Borrower as of and for its fiscal year ended on March 31, 2020. Such financial statements present fairly the financial condition and results of operations and cash flows of Borrower as of such date and for such period in accordance with GAAP. The other financial statements and information relating to Borrower or Guarantor and delivered to Lender in connection with the negotiation of this Agreement present fairly the financial condition of Borrower or Guarantor, as applicable, as of the date thereof and the results of operations and cash flows as of the period thereof. Since the Petition Date, there has been no Material Adverse Effect. Neither the written statements furnished by Borrower to Lender in connection with the negotiation of this Agreement nor those contained in any financial statements or documents relating to Borrower or Guarantor contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading. Any projected financial statements and information relating to Borrower and delivered to Lender in connection with the negotiation of this Agreement have been prepared in good faith on the basis of assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation, it being understood that actual results may vary from such projections.

4.5. Governmental Approval. Neither the nature of Borrower or of Borrower's business or Property, nor any relationship between Borrower and any other Person, nor any circumstance affecting Borrower in connection with the issuance or delivery of any Loan Document, is such as to require a consent, approval or authorization of, or filing, registration or qualification with, any governmental authority on the part of Borrower in connection with the execution and delivery of this Agreement or the other Loan Documents, except for filings and recordings for collateral security purposes.

4.6. Pending Litigation. Except as set forth on Schedule 4.6 hereto, there are no judgments, judicial or administrative orders, suits, actions, proceedings or investigations (civil or criminal) pending, or to the knowledge of Borrower, threatened, against Borrower or affecting any of its Property in any court or before any governmental authority, regulatory agency or arbitration board or tribunal which, if adversely determined, could reasonably be expected to have a Material Adverse Effect. Borrower is not in default with respect to any order of any court, governmental authority, regulatory agency or arbitration board or tribunal. To the knowledge of Borrower, no shareholder, director, officer, employee or Affiliate of Borrower has been indicted or convicted in connection with or is engaging in any criminal conduct, or is currently subject to any lawsuit or proceeding or under investigation in connection with any anti-racketeering or other related conduct or activity.

4.7. Taxes. All tax returns required to be filed by Borrower in any jurisdiction have in fact been filed, and all taxes, assessments, fees and other governmental charges upon Borrower, or any of its Property, income or franchises, which are shown to be due and payable on such returns have been paid, except for those taxes being contested in good faith with due diligence by appropriate proceedings and for which adequate reserves are maintained. Borrower is not aware of any proposed additional material tax assessment or material tax to be assessed against or applicable to Borrower.

4.8. Insurance. All premiums due in respect of all insurance maintained by Borrower or with respect to its Property have been paid.

4.9. Contracts, Etc.

(a) Borrower is not a party to any contract or agreement, or subject to any other restriction, which unduly and unreasonably materially and adversely affects its business, financial condition, Property or prospects.

(b) Except as otherwise specifically provided in this Agreement, Borrower has not agreed or consented to cause or permit any of its Property to be subject in the future (upon the happening of a contingency or otherwise) to any Lien, except the Permitted Liens.

4.10. Compliance with Laws. Borrower is not in violation of, has not received written notice that it is in violation of, nor has it knowingly caused any Person to violate, any applicable statute, regulation or ordinance of the United States of America, or of any state, city, town, municipality, county or of any other jurisdiction, or of any agency, or department thereof (including without limitation, environmental laws and regulations), which violation could reasonably be expected to have a Material Adverse Effect.

4.11. Equity Interests. The authorized and outstanding equity interests of Borrower are owned as set forth on Schedule 4.11 hereto. All of the equity interests of Borrower have been duly and validly authorized and issued and are fully paid and non-assessable and have been sold and delivered to the holder thereof in compliance with, or under valid exemption from, all federal and state laws and the rules and regulations of all regulatory bodies thereof governing the sale and delivery of securities. There are no subscriptions, warrants, options, calls, commitments, rights or agreements by which Borrower is bound relating to the issuance, transfer, voting or redemption of Borrower's equity interests or any pre-emptive rights held by any Person with respect to the equity interests of Borrower. Borrower has not issued any securities convertible into or exchangeable for its equity interests or any options, warrants or other rights to acquire such equity interests or securities convertible into or exchangeable for such equity interests.

4.12. Investments and Subsidiaries. Borrower does not have any Investments, except Permitted Investments. Borrower does not have any Subsidiaries.

4.13. Labor Matters. There are no strikes, lockouts or slowdowns against Borrower pending or, to the knowledge of Borrower, threatened. The hours worked by and payments made to employees of Borrower have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters. All payments due from Borrower, or for which any claim may be made against Borrower, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Borrower.

4.14. ERISA. Neither Borrower nor any of its ERISA Affiliates has received any notice or has any knowledge to the effect that it is not in compliance in all material respect with any of the requirements of ERISA, the Code or applicable state law with respect to any Plan. No ERISA Event has occurred or is reasonably expected to occur. The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan.

4.15. Debt. Borrower does not have existing Debt, except Permitted Debt.

4.16. Title to Property. Borrower has good and marketable title to its Property, free from all Liens, except Permitted Liens. Borrower's Property is not subject to any right of first refusal, right of first offer, option to purchase or lease.

4.17. Collateral Locations. Attached hereto as Schedule 4.17 is a complete and accurate list showing all places at which the Collateral is located on the date hereof. Such list indicates whether the premises are owned or leased by Borrower or whether the premises are the premises of a lessor, warehouseman, bailee or other third party, and if owned by a third party, the name, address and telephone number of such third party.

4.18. Location of Bank and Brokerage Accounts. Attached hereto as Schedule 4.18 is a complete and accurate list of all deposit, checking, savings, securities, investment, hedging, commodity trading and other accounts maintained with any bank, broker or dealer and all other similar accounts maintained by Borrower on the date hereof, together with a description thereof. Each of the accounts set forth on Schedule 4.18 hereto is maintained with the corresponding financial institution indicated thereon.

4.19. Investment Company Act, Etc. Borrower is not (a) an "investment company," as defined in, or subject to regulations under, the Investment Company Act of 1940, as amended, (b) a "holding company," as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935, as amended, or (c) otherwise subject to any other regulatory scheme limiting its ability to incur Debt.

4.20. Intellectual Property. Borrower owns, licenses or possesses the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, licenses, technology, software, know-how, database rights, rights of privacy and publicity and other intellectual property rights (collectively, "IP Rights") that are necessary for the operation of its business as currently conducted, and, without infringement of the rights of any Person. The operation of the business of Borrower as currently conducted does not infringe upon, misuse, misappropriate or violate any IP Rights held by any Person. No claim or litigation regarding any IP Rights is pending or, to the knowledge of Borrower, threatened against Borrower which, if adversely determined, could reasonably be expected to have a Material Adverse Effect.

4.21. Environmental Compliance. Borrower has obtained all permits, licenses and other authorizations which are required under federal, state and local laws and regulations relating to emissions, discharges, releases of pollutants, contaminants, hazardous or toxic materials, or wastes into ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants or hazardous or toxic materials or wastes ("Environmental Laws") at its facilities or in connection with the operation of its facilities. Borrower and all activities of Borrower, at its facilities, comply in all material respects with all Environmental Laws and with all material terms and conditions of any required permits, licenses and authorizations applicable to such Person with respect thereto. Borrower is in compliance in all material respects with all limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in Environmental Laws or contained in any plan, order, decree, judgment or notice of which Borrower is aware. Borrower is not aware of, nor has Borrower received notice of, any events, conditions, circumstances, activities, practices, incidents, actions or plans which may interfere with or prevent continued compliance in all material respects with, or which may give rise to any liability under, any Environmental Laws.

## SECTION 5. BORROWER'S AFFIRMATIVE COVENANTS

Borrower covenants that until all of the Obligations are paid and satisfied in full and the Facilities have been terminated:

5.1. Financial and Business Information. Borrower shall deliver to Lender the following (all to be in form and substance satisfactory to Lender):

(a) as soon as available, but in any event within ninety (90) days after the end of each fiscal year of Borrower, financial statements of Borrower for such fiscal year which present fairly Borrower's financial condition, including balance sheets as of the end of such fiscal year and statements of income, statements of equity (deficit) and statements of cash flows for such fiscal year, all on a consolidated basis and accompanied by consolidating schedules, prepared in accordance with GAAP, and compiled by an independent certified public accounting firm of recognized standing selected by Borrower and reasonably satisfactory to Lender;

(b) as soon as available, but in any event within thirty (30) days after the end of each month, internally-prepared financial statements of Borrower for such month, along with year to date information and comparative information from the same periods of the preceding fiscal year, which present fairly Borrower's financial condition, including balance sheets as of the end of such month and statements of income for such month, prepared in accordance with GAAP (subject to the absence of footnotes);

(c) no later than 30 days prior to the end of the Borrower's fiscal year, a business plan and operating and capital budget of the Borrower for the ensuing one fiscal year, such plan to be prepared in accordance with GAAP and in form and substance satisfactory to the Lender;

(d) promptly upon receipt, daily and monthly electronic copies of all broker statements for Hedging Accounts showing all activity in each such account (including all open positions of Borrower in lean hog futures contracts traded on the CME and lean hog option contracts traded on the CME, which positions are maintained in Hedging Accounts for purposes of hedging finisher pigs against price decreases);

(e) as soon as available, but in any event (i) within two (2) Business Days after execution, copies of the contract with the Smithfield Foods and (ii) within ten (10) days after execution, copies of any other agreements entered into by Borrower providing for the sale of hogs and any amendments, restatements, modifications or supplements to any such agreements;

(f) as soon as available, and during the duration of the Approved Budget but in any event within six (6) days after the end of each week, the weekly actual cash flow reports of Borrower, compared to each line item in the Approved Budget for each such week;

(g) as soon as available, but in any event within six (6) days after the end of each week, an inventory of the Existing Pigs as of the last day of such week;

(h) as soon as available, but in any event within twenty (20) days after the end of each month, a report from the CRO setting forth the amount of all sows, suckling piglets, weaned pigs, growing gilts, mature gilts, boars, feed, and accounts payable as of the end of such month (each a "Swine and Inventory Report");

(i) view-only access to the online Disbursement Account;

(j) as soon as available, but in any event at least five (5) days prior to approval, a draft of the Hedging Policy, and a final copy of the Hedging Policy within five (5) days after approval; and

(k) such other data, reports, statements and information (financial or otherwise) as Lender may reasonably request.

5.2. Tax Returns and Reports. Upon the request of Lender, Borrower shall promptly furnish Lender with copies of the annual federal and state income tax returns of Borrower and Guarantor requested by Lender.

5.3. Certain Notices. Borrower shall deliver written notice to Lender of the occurrence of any of the following conditions or events promptly upon Borrower or any shareholder, director, officer, employee or Affiliate of Borrower becoming aware of any such condition or event:

(a) any condition or event which constitutes an Event of Default or Unmatured Event of Default, such notice to specify the nature and period of existence thereof and what action Borrower is taking (and proposes to take) with respect thereto;

(b) any condition or event which could reasonably be expected to have a Material Adverse Effect, such notice to specify the nature and period of existence thereof and such anticipated Material Adverse Effect;

(c) any litigation claiming in excess of One Hundred Thousand Dollars ($100,000) from Borrower, or which could otherwise have a Material Adverse Effect; or

(d) any damage, loss, theft or destruction in excess of One Hundred Thousand Dollars ($100,000) with respect to any portion of Borrower's Property, or which could otherwise have a Material Adverse Effect; or

(e) satisfaction of any Milestone or failure to satisfy any Milestone in accordance with Section 5.16 hereof.

5.4. Places of Business; Jurisdiction of Organization; Name. Borrower shall give thirty (30) days prior written notice to Lender of any changes in the location of its chief executive office or any other places of business, any changes in its jurisdiction of organization, change of name or the establishment of any new, or the discontinuance of any existing, place of business.

5.5. Business Conducted, Financial Records and Existence and Rights.

(a) Borrower shall continue in the primary business presently engaged in by it, it being agreed that Borrower may engage in businesses reasonably related to its primary business.

(b) Borrower shall keep current and accurate books of records and accounts in which full and correct entries will be made of all of its business transactions, and will reflect in its financial statements adequate accruals and appropriations to reserves, all in accordance with GAAP. All books of records and accounts shall separate all entries between the Farrow-to-Wean Operations and the Wean-to-Finish Operations including, but not limited to, all expenses and revenues. Borrower shall provide written notice to Lender promptly upon any change to its fiscal year end date.

(c) Borrower shall do (or cause to be done) all things reasonably necessary to preserve and keep in full force and effect its legal existence, rights and franchises.

5.6. Maintenance of Insurance.

(a) Borrower shall keep its business and the Collateral insured for such risks, in such amounts, with such deductibles and with such insurers as are customarily used by companies operating in the same industry as Borrower or which Borrower has historically used (and which is reasonably acceptable to Lender).

(b) Borrower shall maintain, or cause to be maintained, general liability, business interruption, auto liability, worker's compensation and other insurance in such amounts, with such deductibles and with such insurers as are customarily used by companies operating in the same industry as Borrower or which Borrower has historically used (and which is reasonably acceptable to Lender).

(c) The policies of all such insurance shall contain standard lender loss payable and additional insured clauses issued in favor of Lender pursuant to which all losses thereunder shall be paid to Lender as Lender's interests may appear. Such policies shall expressly provide that the requisite insurance cannot be materially altered or canceled without thirty (30) days prior written notice to Lender and shall insure Lender notwithstanding the act or neglect of the insured. Upon the request of Lender, Borrower shall furnish Lender with insurance certificates certified as true and correct and being in full force and effect or such other evidence of insurance as Lender may require. Such insurance certificates shall name Lender as loss payee and as additional insured. In the event Borrower fails to procure or cause to be procured any such insurance or to timely pay or cause to be paid the premium(s) on any such insurance, Lender may do so for Borrower, but Borrower shall continue to be liable for the same. Borrower hereby appoints Lender as its attorney-in-fact, exercisable at Lender's option, to endorse any check which may be payable to Borrower in order to collect the proceeds of such insurance.

5.7. Compliance with Laws. Borrower shall be in compliance with any and all laws, ordinances, governmental rules and regulations, and court or administrative orders or decrees to which it or its Property is subject, whether federal, state or local (including, without limitation, environmental or environmental-related laws, statutes, ordinances, rules, regulations and notices) and shall obtain and maintain any and all licenses, permits, franchises, certificates or other governmental authorizations necessary to the ownership of its Property and to the conduct of its businesses.

5.8. Payment of Obligations, Taxes and Claims. On a post-Petition Date basis, Borrower shall pay, before they become delinquent, all debts, obligations, taxes, assessments, governmental charges, levies and claims imposed upon it or upon its Property, except for those being contested in good faith with due diligence by appropriate proceedings and for which adequate reserves are maintained in accordance with GAAP.

5.9. Maintenance of Property / Inspection. Borrower shall keep and maintain its Property in good working order and condition, ordinary wear and tear excepted. Borrower shall, during regular business hours upon reasonable advance notice, permit any of Lender's officers or other representatives to visit and inspect Borrower's Property, to examine and audit all of Borrower's books of account, records, reports and other papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with the shareholders, directors, officers, employees, Affiliates and independent certified public accountants of Borrower.

5.10. Collateral Locations. Borrower shall keep the Collateral at the locations set forth on Schedule 4.17 hereto and not move any Collateral to any location not shown on Schedule 4.17 hereto, except in connection with sales of Collateral made in the ordinary course of Borrower's business.

5.11. Purchase of Farm Products. Borrower shall utilize reasonable good faith efforts in connection with its purchase or other acquisition of any Farm Products to ensure that all Liens in such Farm Products have been terminated or released.

5.12. Packers and Stockyards Act. Borrower shall comply with the Packers and Stockyards Act so that the trust for the benefit of all unpaid cash sellers or growers of livestock covered thereby shall not arise in connection with its purchase of any such livestock. Borrower shall not take any action which would impair its ability to benefit from the trust established under such Act in connection with any sales by Borrower of livestock covered by such Act.

5.13. Food Security Act Compliance.

(a) As Seller. Borrower agrees to deliver to Lender upon request a list of all Persons to or through whom Borrower may sell any of its Farm Products, such list to identify the name and address of such Person or Persons. Borrower agrees that it will, at any time, execute and assist in the preparation of any "effective financing statements" (as such term in utilized in the Food Security Act) with respect to each jurisdiction that has established a "central filing system" pursuant to the Food Security Act as Lender may reasonably request to protect its Liens under the Food Security Act as against the purchasers of its Farm Products. If Borrower shall fail to comply with the provisions of this Section 5.13 with respect to a sale of Farm Products, Borrower agrees to deliver the proceeds of such sale to Lender not later than ten (10) days after such sale. Borrower agrees to notify Lender of any type of Farm Product that Borrower undertakes to produce after the date hereof that is different from the Farm Products it produces on the date hereof.

(b) As Buyer. If Borrower acquires any Collateral which may have constituted Farm Products in the possession of the seller or supplier thereof, Borrower shall, at its own expense, use its best efforts to take such steps to insure that all Liens in such acquired Collateral are terminated or released, including, without limitation, in the case of such Farm Products produced in a state which has established a "central filing system" pursuant to the Food Security Act, registering with the secretary of state of such state (or such other party or office designated by such state) and otherwise take such reasonable actions necessary, as prescribed by the Food Security Act, to purchase Farm Products free of Liens, provided, however, that Borrower may contest and need not obtain the release or termination of any Lien asserted by any creditor of any seller of such Farm Products, so long as it shall be contesting the same in good faith with due diligence by appropriate proceedings and maintain adequate reserves therefor in accordance with GAAP. Upon Lender's request, Borrower agrees to forward to Lender promptly after receipt copies of all notices of Liens and master lists of "effective financing statements" (as such term is utilized in the Food Security Act) delivered to Borrower pursuant to the Food

Security Act, which notices and / or lists pertain to any of the Collateral. Upon Lender's request, Borrower agrees to provide Lender with the names of Persons who supply Borrower with such Farm Products and such other information as Lender may reasonably request with respect to such Persons.

5.14. Approved Budget. Borrower shall conduct its operations and make disbursements in compliance within the Approved Budget (as the same may be adjusted in connection with expense deviations within the Applicable Variance). Borrower shall obtain receipts and revenues in the amounts set forth in the Approved Budget (as the same may be adjusted in connection with revenue and expense deviations within the Applicable Variance).

5.15. Farrow to Wean Operations.

(a) Borrower shall specifically identify all Existing Pigs.

(b) Borrower shall specifically identify all weaned piglets and any other livestock that constitutes Senior LOLFC Collateral (as defined in the Intercreditor Agreement).

(c) Borrower shall cause all third party purchasers of Existing Pigs and weaned piglets to bifurcate payments between Existing Pigs and weaned piglets such that any payment does not include payment for both Existing Pigs and weaned piglets in the payment amount. All such payments received by the Company should be (i) separately accounted for and identified by the Company, (ii) be deposited into a debtor-in-possession account designated by FNBO to the extent a payment received in connection with the sale of an Existing Pig and (iii) be deposited into the Designated Account, to the extent a payment received in connection with the sale of a weaned piglet or any other livestock or other property that constitutes Senior LOLFC Collateral (as defined in the Intercreditor Agreement).

5.16. Milestones. Borrower shall satisfy the following events (the "Milestones") on or before the date indicated:

(a) Within seven (7) Business Days after the Petition Date, the Interim Order shall have been entered by the Bankruptcy Court.

(b) Within thirty (30) days after the Petition Date or such later time as the Bankruptcy Court determines, the Final Order shall have been entered by the Bankruptcy Court.

(c) By no later than December 31, 2021, the Bankruptcy Court shall have entered an order confirming a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code, acceptable to Lender in Lender's reasonable discretion and/or approved by the Bankruptcy Court.

SECTION 6. BORROWER'S NEGATIVE COVENANTS

Borrower covenants that until all of the Obligations are paid and satisfied in full and the Facilities have been terminated:

6.1. Debt. Borrower shall not create, incur, assume or permit to exist, voluntarily or involuntarily, any Debt, except Permitted Debt.

6.2. Liens. Borrower shall not (a) execute a negative pledge agreement with any Person covering any Property, except as set forth in this Agreement, or (b) cause or permit, voluntarily or involuntarily, or consent to cause or permit (upon the happening of a contingency or otherwise) its Property to be subject to any Lien, except Permitted Liens and the Carve-Out.

6.3. Investments. Borrower shall not purchase, hold, acquire, make or permit to exist, voluntarily or involuntarily, any Investment, except Permitted Investments.

6.4. Distributions. Borrower shall not declare, pay or make any form of Distribution.

6.5. Fundamental Changes.

(a) Borrower shall not sell, lease, license, transfer or otherwise dispose of its Property, agree to the same or convey any rights regarding the same, except (i) inventory sold in the ordinary course or ordinary operation of Borrower's business, (ii) subject to Section 6.5(b) hereof, Property sold for fair market value in accordance with a sale approved by the Bankruptcy Court under Section 363 of the Bankruptcy Code, (iii) pursuant to the agreements set forth on Schedule 4.16 hereto, (iv) worn-out or obsolete equipment and (v) as expressly set forth in the definitions of "Permitted Liens" and "Permitted Investments." Borrower shall not materially amend, restate, modify, supplement, extend, renew or take any similar material actions with respect to the agreements set forth on Schedule 4.16 hereto.

(b) Borrower shall not sell all or substantially all of its assets.

(c) Borrower shall not merge or consolidate with, or otherwise engage in any form of business combination with, any other Person, commence a dissolution or create or form any Subsidiary.

(d) Borrower shall not acquire all or substantially all of the assets of (or any assets constituting a business unit of) any other Person.

6.6. Change of Control of Borrower. No Change of Control shall occur with respect to Borrower. For the purposes of this Section 6.6, a "Change of Control" shall occur if the Guarantors (other than Borrower) cease to be the "beneficial owners" (as described in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) of at least eighty percent (80%) of the outstanding equity interests of Borrower entitled to vote for members of the Board of Directors or equivalent Governing Body of Borrower or to possess the power to direct or cause the direction of the management or policies of Borrower; provided, however, that this Section 6.6 shall not be violated by the Bankruptcy Court's approval of the employment of Steve Weiss as the Chief Restructuring Officer of Borrower or the elimination or sale of the equity interests of Borrower to a third party pursuant to a confirmed plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code in the Bankruptcy Case.

6.7. Transactions With Affiliates. Borrower shall not enter into any transaction, except Permitted Affiliate Transactions, with any Affiliate of Borrower including, without limitation, the purchase, sale, lease or exchange of Borrower's Property, or the loaning, capitalization or giving of funds to any such Affiliate, unless (a) such Affiliate is engaged in a business substantially related to the business of Borrower, (b) the transaction is in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon terms substantially the same and no less favorable to Borrower as it would obtain in a comparable arm's-length transaction with any Person not an Affiliate of Borrower and (c) such transaction is not otherwise prohibited hereunder.

6.8. Bank and Brokerage Accounts; Deposits. Borrower shall not establish any new deposit, checking, savings, securities, investment, hedging, commodity trading or other similar accounts, maintain any account other than those accounts specified on Schedule 4.18 hereto, deposit proceeds from the sale of Collateral in any account other than a deposit account specified on Schedule 4.18 hereto or permit the cash balance of the accounts set forth on Schedule 4.18 hereto to exceed the corresponding balance limit indicated on Schedule 4.18 hereto, in each case, except to the extent approved and authorized by the Bankruptcy Court. The accounts set forth on Schedule 4.18 hereto that are maintained with financial institutions other than FNBO and in which Lender does not have a first priority perfected security interest shall not have an aggregate balance limit in excess of One Hundred Thousand Dollars ($100,000), except for accounts used by Borrower for funds held or used for payroll or employee benefits.

6.9. Hedging. Borrower shall not (a) violate the Hedging Policy, (b) terminate, amend or otherwise modify, or grant any waiver or consent with respect to, the Hedging Policy or (c) fail to make any margin call on a Hedging Account when due. Borrower shall not conduct any hedging activity without prior notice and prior written consent of Lender, which consent may be withheld in Lender's sole discretion.

6.10. Capital Leases / Operating Leases. Borrower shall not have payment obligations under Capitalized Leases or operating leases that exceed Six Hundred Thousand Dollars ($600,000) in the aggregate in any fiscal year of Borrower. This Section 6.10 shall not include payment obligations of Borrower to growers.

6.11. Sale-Leaseback Transactions. Borrower shall not enter into any arrangement, directly or indirectly, with any other Person whereby Borrower shall sell or transfer any Property, whether now owned or hereafter acquired, and then or thereafter rent or lease as lessee such Property or any part thereof or any other property which Borrower intends to use for substantially the same purpose or purposes as the Property being sold or transferred.

6.12. Margin Regulations. None of the proceeds of the DIP Loans shall be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of such terms under Regulation U of the Board and Borrower shall not take, or authorize any agent acting on its behalf to take, any action which could result in a violation of any regulation of the Board.

6.13. Hazardous Substances. Borrower shall not cause or permit any Hazardous Substance to be disposed of in any manner which could reasonably be expected to result in any liability to Borrower on, under or at any real property which is operated by Borrower or in which Borrower has any interest.

SECTION 7. DEFAULT

7.1. Events of Default. Each of the following events shall constitute an event of default ("Event of Default") and Lender shall thereupon have the option to declare the Obligations immediately due and payable, all without demand, notice, presentment or protest or further action of any kind (it also being understood that the occurrence of any of the events or conditions set forth in subparagraphs (l), (m) or (n) shall automatically cause an acceleration of the Obligations):

(a) Payments - if Borrower fails to make any payment of principal or interest on the date when such payment is due and payable; or

(b) Other Charges - if Borrower fails to pay any other charges, fees, Expenses or other monetary obligations owing to Lender, whether arising out of or incurred in connection with this Agreement, any other Loan Document or otherwise, on the date when such payment is due and payable, whether upon maturity, acceleration, demand or otherwise, and such failure continues for a period of five (5) days after the earlier of Borrower becoming aware of such failure or Borrower receiving written notice from Lender of such failure; provided however, that the five (5) day grace period shall not be applicable if such payments are due and payable due to maturity, acceleration or demand, whether following an Event of Default, or otherwise; or

(c) Particular Covenant Defaults - if Borrower fails to perform, comply with or observe any covenant or undertaking contained in Sections 5.1, 5.6, 5.8, 5.9, 5.9, 5.10, 5.14, 5.15, 5.16, 6.1, 6.2, 6.3, 6.4, 6.5, 6.6, 6.7, 6.8, 6.9, 6.10, 6.11, 6.12 or 6.13 hereof; or

(d) General Covenant Defaults - if Borrower or Guarantor fails to perform, comply with or observe any covenant or undertaking contained in this Agreement or any other Loan Document, Authorizing Order, Interim Order or Final Order not otherwise described in this Section 7.1, and such failure continues for a period of thirty (30) days after the earlier of Borrower or Guarantor becoming aware of such failure or Borrower or Guarantor receiving written notice from Lender of such failure; provided, however, that if the default cannot by its nature be cured within the thirty (30) day period or cannot after diligent attempts by Borrower be cured within such thirty (30) day period, and such default is likely to be cured within a reasonable time, Borrower shall have an additional period (which shall not in any case exceed thirty (30) days) to attempt to cure such default, and within such reasonable time period the failure to cure the default shall not be deemed an Event of Default; or

(e) Financial Information - if any statement, report, financial statement or certificate made or delivered by Borrower or any of its shareholders, directors, officers, employees, Affiliates or agents to Lender is not true and correct in all material respects when made; or

(f) Representations or Warranties - if any representation, warranty or other statement by or on behalf of Borrower or Guarantor contained in or pursuant to this Agreement, any of the other Loan Documents or in any document, agreement or instrument furnished in compliance with, relating to or in reference to this Agreement, is false, erroneous or misleading in any material respect when made; or

(g) Other Agreements with Lender - if, after the passage of all applicable notice and cure or grace periods, Borrower or Guarantor breaches or violates the terms of, or if a default or an event of default occurs under, any other post-petition agreement or obligation between or among Borrower or Guarantor and Lender that is in any way related to this Agreement including, without limitation, the Loan Documents and Swap Obligations owed to Lender; or

(h) Uninsured Loss - if there shall occur any uninsured damage, loss, theft or destruction in excess of One Hundred Thousand Dollars ($100,000) with respect

to any portion of Borrower's Property, the result of which could reasonably be expected to have a Material Adverse Effect; or

(i) Judgments - if any final, non-appealable judgment for the payment of money in excess of One Hundred Thousand Dollars ($100,000) which is not covered by insurance or an appeal bond, or for which Borrower has not established a cash or cash equivalent reserve in the amount of such judgment, shall be rendered and shall remain unsatisfied and unstayed for a period of at least thirty (30) days; or

(j) FNBO DIP Financing - if (i) Borrower shall default under the FNBO DIP Financing and (A) such default consists of the failure to perform any covenant or agreement with respect to such Debt, if the effect of such default would, with the passage of time, giving of notice, or both, permit such creditor to cause the obligations of Borrower which are the subject thereof to become due prior to their maturity date or prior to their regularly scheduled date of payment, unless Borrower is in good faith with due diligence by appropriate proceedings contesting such default or obligation or (B) the result of such default could reasonably be expected to have a Material Adverse Effect; or (ii) the FNBO DIP Financing, or any order of the Bankruptcy Court authorizing the FNBO DIP Financing, ceases to be in full force and effect for any reason; or

(k) Bankruptcy – if any of the following shall have occurred in the Bankruptcy Case:

(i) the bringing of a motion or application by Borrower, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case: (A) to obtain additional post-petition financing under Section 364(c) or (d) of the Bankruptcy Code other the FNBO DIP Financing; (B) to grant any super-priority Lien upon or affecting any of the Collateral which is senior or pari passu with the Post-Petition Liens other than the Permitted Priority Liens; or (C) to grant any super-priority administrative expense claim which is senior or pari passu with Lender's claims under the Loan Documents other than those granted to FNBO under the FNBO DIP Financing; or

(ii) the bringing of a motion or application by Borrower, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case, to appoint an interim or permanent trustee, receiver of examiner in the Bankruptcy Case;

(iii) the bringing of a motion or application by Borrower, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case, to dismiss or convert the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

(iv) the bringing of a motion or application by Borrower, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case, to approve the sale of all or substantially all of the assets of Borrower;

(v) the confirmation of any plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code in the Bankruptcy Case, if it is not acceptable to Lender, in Lender's sole discretion;

(vi) the bringing of a motion or application, or the commencement of any proceeding, by Borrower or any Person challenging or contesting the validity, extent, perfection or priority of any Liens granted under or obligations arising under the Loan Documents or the Pre-Petition Loan Documents;

(vii) any attempt by Borrower to reduce, avoid, set off or subordinate the Obligations or the Liens securing the Obligations to any other debt;

(viii) the failure of Borrower to perform any of its obligations under the Authorizing Order or any violation of any of the terms of the Authorizing Order, subject to any applicable grace or cure periods set forth therein;

(ix) the Authorizing Order ceases to be in full force and effect for any reason;

(x) the Post-Petition Liens or Super-Priority Administrative Expense Claim granted with respect to this Agreement cease to be valid, perfected and enforceable in all respects;

(xi) the determination by the Bankruptcy Court that it will not approve the "roll-up", refinance and replacement of the Pre-Petition Obligations into the Term Loan under this Agreement, in a manner and on terms satisfactory to Lender;

(xii) the determination by the Bankruptcy Court that Lender's interests are not adequately protected; or

(xiii) the bringing of a motion or application by Borrower or any Person, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case, seeking to exercise rights under Section 506(c) of the Bankruptcy Code.

(l) Assignment for Benefit of Creditors, Etc. - if Guarantor makes or proposes an assignment for the benefit of creditors generally, offers a composition or extension to creditors or makes or sends notice of an intended bulk sale of any business or assets now or hereafter owned or conducted by Guarantor; or

(m) Bankruptcy, Dissolution, Etc. - upon the commencement of any action for the bankruptcy, dissolution or liquidation of Guarantor, or the commencement of any proceeding to avoid any transaction entered into by Guarantor, or the commencement of any case or proceeding for reorganization or liquidation of Guarantor, or any of their debts under the Bankruptcy Code or any other state or federal law, now or hereafter enacted for the relief of debtors, whether instituted by or against Guarantor (in each case, other than the commencement of any action, proceeding or case commenced by Lender); provided, however, that Guarantor shall have forty-five (45) days to obtain the dismissal or discharge of involuntary proceedings filed against Guarantor, it being understood that during such forty-five (45) day period, Lender shall not be obligated to make Advances hereunder and Lender may seek adequate protection in any bankruptcy proceeding; or

(n) Receiver - upon the appointment of a receiver, liquidator, custodian, trustee or similar official or fiduciary for Guarantor or for any portion of Guarantor's property

(other than one appointed in a proceeding commenced by Lender), the value of which exceeds One Hundred Thousand Dollars ($100,000) in the aggregate; provided, however, that Guarantor shall have forty-five (45) days to obtain the dismissal or discharge of the receiver; or

(o) Pension Benefits, Etc. - if Borrower fails to comply with ERISA, so that grounds exist to permit the appointment of a trustee under ERISA to administer Borrower's employee plans or to allow the Pension Benefit Guaranty Corporation to institute proceedings to appoint a trustee to administer such plans, or to permit the entry of a Lien to secure any deficiency or claim.

7.2. Cure. Nothing contained in this Agreement or the Loan Documents shall be deemed to compel Lender to accept a cure of any Event of Default hereunder, except as outlined in Section 7.1 hereof or in the Authorizing Order.

7.3. Rights and Remedies on Default.

(a) In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents, or otherwise available at law or in equity, upon or at any time after the occurrence and during the continuance of an Event of Default or Unmatured Event of Default, Lender may, in its discretion, subject to the Authorizing Order, withhold or cease making Advances.

(b) In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents, or otherwise available at law or in equity, upon or at any time after the occurrence and during the continuance of an Event of Default, Lender may, in its discretion, subject to the Authorizing Order, terminate any Facility or this Agreement.

(c) In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents, or otherwise available at law or in equity, upon or at any time after the occurrence and during the continuance of an Event of Default, Lender may, in its discretion, subject to the Authorizing Order, exercise all rights under the Uniform Commercial Code and any other applicable law or in equity, and under all Loan Documents permitted to be exercised after the occurrence of an Event of Default, including the following rights and remedies (which list is given by way of example and is not intended to be an exhaustive list of all such rights and remedies):

(i) The right to "take possession" of the Collateral, and notify all Account debtors of Lender's security interest in the Accounts and require payment under the Accounts to be made directly to Lender and Lender may, in its own name or in the name of Borrower, exercise all rights of a secured party with respect to the Collateral and collect, sue for and receive payment on all Accounts, and settle, compromise and adjust the same on any terms as may be satisfactory to Lender, in its discretion for any reason or without reason and Lender may do all of the foregoing with or without judicial process (including, without limitation, notifying the United States postal authorities to redirect mail addressed to Borrower, to an address designated by Lender); or

(ii) Require Borrower, at Borrower's expense, to assemble all or any part of the Collateral and make it available to Lender; or

(iii) The right to reduce or modify the DIP Loan Facility Commitment or to modify the terms and conditions upon which Lender may be willing to consider making Advances.

(d) Borrower hereby agrees that a notice received by it at least ten (10) days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable law, any Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Lender without prior notice to Borrower. Borrower covenants and agrees not to interfere with or impose any obstacle to Lender's exercise of its rights and remedies with respect to the Collateral.

7.4. Nature of Remedies. All rights and remedies granted Lender hereunder and under the Loan Documents, or otherwise available at law or in equity, shall be deemed concurrent and cumulative, and not alternative remedies, and Lender may proceed with any number of remedies at the same time until all Obligations are satisfied in full. The exercise of any one right or remedy shall not be deemed a waiver or release of any other right or remedy, and Lender, upon or at any time after the occurrence and during the continuance of an Event of Default, may proceed against Borrower at any time, under any agreement, with any available remedy and in any order.

7.5. [Reserved.]

## SECTION 8. MISCELLANEOUS

8.1. GOVERNING LAW. THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL RELATED AGREEMENTS AND DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF MINNESOTA. THE PROVISIONS OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL OTHER AGREEMENTS AND DOCUMENTS REFERRED TO HEREIN ARE TO BE DEEMED SEVERABLE, AND THE INVALIDITY OR UNENFORCEABILITY OF ANY PROVISION SHALL NOT AFFECT OR IMPAIR THE REMAINING PROVISIONS WHICH SHALL CONTINUE IN FULL FORCE AND EFFECT.

8.2. Integrated Agreement. The Notes, the Security Agreement, the UCC-1 Financing Statement, the Mortgages, the UCC-1 Fixture Filings, the Guaranty Agreements, the Control Agreements, the Intercreditor Agreement and the other Loan Documents, all related agreements and this Agreement shall be construed as integrated and complementary of each other and as augmenting and not restricting Lender's rights and remedies. If, after applying the foregoing, an inconsistency still exists, the provisions of this Agreement shall constitute an amendment thereto and shall control.

8.3. Waiver and Indemnity.

(a) No omission or delay by Lender in exercising any right or power under this Agreement or any related agreements and documents will impair such right or power or be construed to be a waiver of any default, or Event of Default or an acquiescence therein, and any single or partial exercise of any such right or power will not preclude other or further exercise thereof or the exercise of any other right, and as to Borrower no waiver will be valid unless in writing and signed by Lender and then only to the extent specified.

(b) Borrower shall indemnify Lender and its directors, officers, employees, agents and Affiliates (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any third party arising out of, in connection with or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) the Loans or the use or proposed use of the proceeds therefrom or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, and regardless of whether any Indemnitee is a party thereto; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c) To the fullest extent permitted by applicable law, Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Loans or the use of the proceeds thereof. No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(d) The agreements in this Section 8.3 shall survive the payment, satisfaction or discharge in full of all the Obligations.

8.4. Time. Except as otherwise set forth in this Agreement, whenever Borrower shall be required to make any payment, or perform any act, on a day which is not a Business Day, such payment may be made, or such act may be performed, on the next succeeding Business Day. Time is of the essence in Borrower's performance under all provisions of this Agreement and all related agreements and documents.

8.5. Expenses of Lender. Borrower shall pay all expenses reasonably incurred by Lender on demand (including, without limitation, search costs, audit fees, inspection fees, appraisal fees and the reasonable fees and expenses of legal counsel for Lender) relating to this Agreement, all related agreements and documents (including, without limitation, expenses incurred in the analysis, negotiation, preparation, closing, administration and enforcement of this Agreement and the other Loan Documents), the Loans and the Collateral, to the extent such expenses are approved by the Bankruptcy Court. In the event of any Event of Default which requires action by Lender in accordance with the terms of the Loan Documents, Borrower shall pay all expenses reasonably incurred by Lender relating to the enforcement, protection and defense of the rights of Lender in and to the Collateral or otherwise hereunder. Additionally, Borrower shall pay all expenses relating to extensions, amendments, modifications, waivers or consents pursuant to the provisions hereof, or any related agreements and documents or relating to agreements with other creditors (including in connection with a Transfer or Participation), or termination of this Agreement. The fees, expenses and other costs set forth in

this Section 8.5 are collectively referred to as the "Expenses."  Any Expenses not paid within thirty (30) days following demand by Lender shall bear interest at the Default Rate.

8.6.    [Intentionally Omitted].

8.7.    Notices.

(a)     Any notices, consents or other communications required or permitted by this Agreement shall be in writing and shall be deemed given if delivered in person or if sent by e-mail (with confirmation of receipt), facsimile (with confirmation of receipt) or by nationally recognized overnight courier, or via first class, certified or registered mail, postage prepaid, to the address of such party set forth below, unless such address is changed by written notice hereunder.

Address for notices to Borrower:

N.G. Purvis Farms, Inc.
2504 Spies Road
Robbins, North Carolina 27325
Attn:  Steve Weiss
E-mail: steve@nutriquest.com
Fax:  (910) 948-3213

With a copy (which shall not constitute notice) to:

Algernon L. Butler, III
BUTLER & BUTLER, L.L.P.
111 North Fifth Avenue
Wilmington, NC 28401
E-mail: albutleriii@butlerbutler.com
Fax: (910) 762-9441

Rebecca F. Redwine and
Jason L. Hendren
Hendren, Redwine & Malone, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
E-mail:rredwine@hendrenmalone.com;
jhendren@hendrenmalone.com
Fax: 919-420-0475

Robins May & Rich LLP
120 Applecross Road
Pinehurst, North Carolina 28374
Attn:  Stephen Later
E-mail:  sflater@rmrattorneys.com
Fax:  (910) 692-4900

Address for notices to Lender:

LOL Finance Co.
4001 Lexington Avenue North

Arden Hills, MN 55126
Attn: Daniel L. Glienke
E-mail: dlglienke@landolakes.com

(b) Any notice sent by Lender or Borrower by any of the above methods shall be deemed to be given when so received.

(c) Lender shall be fully entitled to rely upon any e-mail or facsimile transmission or other writing purported to be sent by any Authorized Representative (whether requesting an Advance or otherwise) as being genuine and authorized.

8.8. Headings. The headings of any paragraph or section of this Agreement are for convenience only and shall not be used to interpret any provision of this Agreement.

8.9. Survival. All representations, warranties and covenants made by Borrower herein, in any Loan Document or in any agreement referred to herein or on any certificate, document or other instrument delivered by it or on its behalf under this Agreement, shall be considered to have been relied upon by Lender, and shall survive the delivery to Lender of any Loan Document, regardless of any investigation made by Lender or on its behalf. All statements in any such certificate or other instrument prepared and/or delivered for the benefit of Lender shall constitute representations and warranties by Borrower hereunder. Except as otherwise expressly provided herein, all covenants made by Borrower hereunder, in any Loan Document or under any other agreement or instrument shall be deemed continuing until all Obligations are satisfied in full.

8.10. Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the successors and assigns of each of the parties. Except in accordance with Section 8.20 hereof, neither party may transfer, assign or delegate any of their duties, rights or obligations hereunder without the prior written consent of the other party.

8.11. Duplicate Originals and Counterparts. Two or more duplicate originals of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument. This Agreement may be executed in counterparts, all of which counterparts taken together shall constitute one completed fully executed document.

8.12. Amendment or Modification. No amendment or modification hereof or of any agreement referred to herein shall be binding or enforceable unless in writing and signed by Borrower and Lender.

8.13. Signatories. Each individual signatory hereto represents and warrants that such signatory is duly authorized to execute this Agreement on behalf of such signatory's principal and that such signatory executes the Agreement in such capacity and not as a party.

8.14. Third Parties. No rights are intended to be created hereunder, or under any related agreements or documents for the benefit of any third party donee, creditor or incidental beneficiary of Borrower. Nothing contained in this Agreement shall be construed as a delegation to Lender of Borrower's duty of performance, including, without limitation, Borrower's duties under any account or contract with any other Person.

8.15. Waivers.

(a) Borrower hereby irrevocably, unconditionally and fully subordinates in favor of Lender and waives any and all rights it may have at any time (whether arising, directly or indirectly, by operation of law or contract) to assert or receive payment on any claim against it, on account of payments made under this Agreement, including without limitation, any and all rights of subrogation, reimbursement, exoneration, contribution or indemnity. Borrower waives any event or circumstances which might constitute a legal or equitable defense of, or discharge of, Borrower. Furthermore, Borrower agrees that if any payment on the Obligations is recovered from or repaid by Lender in whole or in part in any bankruptcy, insolvency or similar proceeding instituted by or against Borrower, Borrower shall be obligated to the same extent as if the recovered or repaid payment had never been originally made on such Obligation.

(b) Borrower hereby consents and agrees that Lender, at any time or from time to time in its discretion, may: (i) settle, compromise or grant releases for liabilities of any Person or Persons liable for any Obligations, (ii) exchange, release, surrender, sell, subordinate or compromise any Collateral to the extent allowed under federal, state or local law, including without limitation administrative pronouncements, of any party now or hereafter securing any of the Obligations and (iii) following an Event of Default, apply any and all payments received at any time against the Obligations in any order as Lender may determine; all of the foregoing in such manner and upon such terms as Lender may see fit, without notice to or further consent from Borrower who hereby agrees and shall remain bound upon this Agreement notwithstanding any such action on Lender's part.

(c) The liability of Borrower hereunder is absolute and unconditional and shall not be reduced, impaired or affected in any way by reason of (i) any failure to obtain, retain or preserve, or the lack of prior enforcement of, any rights against any Person or Persons or in any Property, (ii) the invalidity or unenforceability of any Obligations or rights in any Collateral, (iii) any delay in making demand upon any other Person or Persons or any delay in enforcing, or any failure to enforce, any rights against any other Person or Persons or in any Collateral even if such rights are thereby lost, (iv) any failure, neglect or omission to obtain, perfect or retain any Lien upon, protect, exercise rights against, or realize on, any Property of Borrower, or any other party securing the Obligations, (v) the existence or non-existence of any defenses which may be available to any other Person or Persons with respect to the Obligations or (vi) the commencement of any bankruptcy, reorganization, liquidation, dissolution or receivership proceeding or case filed by or against Borrower.

8.16. CONSENT TO JURISDICTION. BORROWER AND LENDER HEREBY IRREVOCABLY CONSENT TO THE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, ANY STATE OR FEDERAL COURT LOCATED IN MINNESOTA IN ANY AND ALL ACTIONS AND PROCEEDINGS WHETHER ARISING HEREUNDER OR UNDER ANY OTHER AGREEMENT OR UNDERTAKING. BORROWER WAIVES ANY OBJECTION TO IMPROPER VENUE AND FORUM NON-CONVENIENS TO PROCEEDINGS IN ANY SUCH COURT AND ALL RIGHTS TO TRANSFER FOR ANY REASON. BORROWER IRREVOCABLY AGREES TO SERVICE OF PROCESS BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED TO THE ADDRESS OF THE APPROPRIATE PARTY SET FORTH HEREIN.

8.17. WAIVER OF JURY TRIAL. BORROWER AND LENDER HEREBY WAIVE ANY AND ALL RIGHTS THEY MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION COMMENCED BY OR AGAINST LENDER WITH RESPECT TO RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO OR UNDER THE LOAN DOCUMENTS, WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

8.18. Discharge of Taxes, Borrower's Obligations, Etc. Lender, in its discretion, shall have the right at any time, and from time to time, with prior notice to Borrower, if Borrower fails to do so fifteen (15) Business Days after being requested in writing to do so by Lender, to: (a) pay for the performance of any of Borrower's obligations hereunder and (b) discharge taxes or Liens, at any time levied or placed on any of Borrower's Property in violation of this Agreement unless Borrower is in good faith with due diligence by appropriate proceedings contesting such taxes or Liens. Expenses and advances shall be deemed Advances hereunder and shall bear interest at the Default Rate from Borrower's notice thereof until reimbursed to Lender. Such payments and advances made by Lender shall not be construed as a waiver by Lender of an Event of Default under this Agreement.

8.19. Injunctive Relief. The parties acknowledge and agree that, in the event of a breach or threatened breach of any party's obligations hereunder, they may have no adequate remedy in money damages and, accordingly, shall be entitled to an injunction (including without limitation, a temporary restraining order, preliminary injunction, writ of attachment, or order compelling an audit) against such breach or threatened breach. However, no specification in this Agreement of a specific legal or equitable remedy shall be construed as a waiver or prohibition against any other legal or equitable remedies in the event of a breach or threatened breach of any provision of this Agreement.

8.20. Transfers and Participations.

(a) A material inducement to Lender's willingness to complete the transactions contemplated by this Agreement and the other Loan Documents is Borrower's agreement that Lender may, at any time, complete a Transfer or Participation with respect to any Note or any of the other Loan Documents.

(b) Borrower agrees to cooperate in good faith with Lender in connection with any such Transfer or Participation of any Note or any of the other Loan Documents, including, without limitation, providing such documents, financial and other data, and other information and materials which would typically be required with respect to Borrower by a transferee or participant involved with respect to such Transfer or Participation (collectively, the "Disclosures").

(c) Borrower consents to Lender providing the Disclosures, as well as any other information which Lender may now have or hereafter acquire with respect to Borrower, to each transferee or participant involved with respect to each Transfer or Participation, as applicable.

8.21. USA Patriot Act. IMPORTANT NOTICE: to help the government fight the funding of terrorism and money laundering activities, the USA Patriot Act requires all banks to obtain and verify the identity of each person or business that opens an account. When Borrower opens an account, Lender will ask Borrower for information that will allow Lender to properly identify Borrower and Lender will verify that information. If Lender cannot properly verify the identity of Borrower within thirty (30) calendar days, Lender reserves the right to declare the Obligations immediately due and payable.

8.22. Keepwell. Each Obligor that is a Qualified ECP when its Guaranty Agreement or other obligation with respect to, or grant of a security interest to secure, any Swap Obligation becomes effective hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide funds or other support to each Obligor with respect to such Swap Obligation as may be needed by such Obligor from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the

maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP's obligations and undertakings under this Section 8.22 voidable under any applicable fraudulent transfer or conveyance act). The obligations and undertakings of each Qualified ECP under this Section 8.22 shall remain in full force and effect until payment of all Obligations. Each Obligor intends this Section 8.22 to constitute, and this Section 8.22 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support or other agreement" for the benefit of, each Obligor for all purposes of the Commodity Exchange Act.

## SECTION 9. NOTICE - WRITTEN AGREEMENTS.

This notice is provided pursuant to Minnesota Statutes Section 513.33. This Agreement is a credit agreement. A credit agreement must be in writing to be enforceable under Minnesota law. To protect you and us from any misunderstandings or disappointments, any contract, promise, undertaking or offer to forebear repayment of money or to make any other financial accommodation in connection with this loan of money or grant or extension of credit, or any amendment of, cancellation of, waiver of or substitution for any or all of the terms or provisions of any instrument or document executed in connection with this loan of money or grant or extension of credit, must be in writing to be effective.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.

BORROWER:

N.G. PURVIS FARMS, INC.

By: ______________________________

Name: Jerry M. Purvis
Title: President

LENDER:

LOL FINANCE CO.

By: ______________________________

Name: Daniel L. Glienke
Title: President

GUARANTORS' CONSENT

The undersigned Guarantors hereby (a) consent to this Agreement and the transactions contemplated hereby and to any orders entered by the Bankruptcy Court related thereto, (b) acknowledge and agree that each of the Pre-Petition Notes to which such Guarantor is a party is in default and obligations of such Guarantor thereunder and the obligations of the Borrower under the respective Borrower Guaranties in connection therewith are due and payable in accordance with the terms thereof, (c) reaffirm their respective obligations under the Guaranty Agreements and all Pre-Petition Loan Documents to which they are a party, including, without limitation, the joint and several unconditional guarantee to Lender of the full and prompt payment and performance of the Guaranteed Obligations (as defined in the Guaranty Agreements), whether now existing or hereafter arising, and (c) represent and warrant that (i) the Guaranty Agreements and each of the Pre-Petition Notes and other Pre-Petition Loan Documents of the respective Guarantors continue to constitute the legal, valid and binding obligation of the respective Guarantors enforceable against such Guarantors in accordance with their terms, and (ii) there are no, and shall not be any, defenses to or counterclaims or rights of set-off against Lender's rights under the Guaranty Agreements, the Pre-Petition Notes and other Pre-Petition Loan Documents of the respective Guarantors.

______________________________
DAVID PHILLIP PURVIS

______________________________
MELVIN GREEN PURVIS

______________________________
JUDITH ESSARY PURVIS

______________________________
LARRY MCARTHUR PURVIS

______________________________
BETTY GARNER PURVIS

______________________________
ROBERT WORTH MCFAYDEN

______________________________
MARIE PURVIS MCFAYDEN

______________________________
JERRY MONROE PURVIS

# EXHIBIT A

Approved Budget

| | B | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT | BU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | |
| 3 | **N. G. Purvis Farms** | | | | | | | | | | | | |
| 4 | *Cash Flow Forecast* | | | | | | | | | | | | |
| 5 | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 |
| 6 | Fiscal Period | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 |
| 7 | Fiscal Week | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 8 | Bankruptcy week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 9 | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| 10 | Week Beginning Date | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 |
| 11 | Week Ending Date | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 |
| 12 | | | | | | | | | | | | | |
| 13 | Smithfield | 5,893 | 6,104 | 6,430 | 6,652 | 6,190 | 6,634 | 7,101 | 6,340 | 5,803 | 6,473 | 6,742 | 4,654 |
| 14 | JBS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 15 | Others | | | | | | | | | | | | |
| 16 | Market Hogs | 5,893 | 6,104 | 6,430 | 6,652 | 6,190 | 6,634 | 7,101 | 6,340 | 5,803 | 6,473 | 6,742 | 4,654 |
| 17 | Weaned Pigs | 7,586 | 7,411 | 7,750 | 8,355 | 8,089 | 8,000 | 8,224 | 7,402 | 8,037 | 8,243 | 8,025 | 8,025 |
| 18 | Cull Hogs | 151 | 153 | 155 | 157 | 158 | 159 | 160 | 158 | 150 | 141 | 131 | 121 |
| 19 | **Head** | **13,630** | **13,667** | **14,335** | **15,164** | **14,437** | **14,793** | **15,485** | **13,900** | **13,991** | **14,856** | **14,898** | **12,800** |
| 20 | | | | | | | | | | | | | |
| 21 | Smithfield | 1,679,620 | 1,739,504 | 1,832,457 | 1,895,881 | 1,764,168 | 1,890,729 | 2,023,804 | 1,807,024 | 1,653,925 | 1,844,762 | 1,921,330 | 1,326,444 |
| 22 | JBS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 23 | Others | | | | | | | | | | | | |
| 24 | Market Hogs | 1,679,620 | 1,739,504 | 1,832,457 | 1,895,881 | 1,764,168 | 1,890,729 | 2,023,804 | 1,807,024 | 1,653,925 | 1,844,762 | 1,921,330 | 1,326,444 |
| 25 | Cull Hogs | 28,672 | 29,095 | 29,514 | 29,897 | 30,093 | 30,196 | 30,343 | 29,951 | 28,557 | 26,731 | 24,894 | 22,934 |
| 26 | **Pounds** | **1,708,292** | **1,768,599** | **1,861,972** | **1,925,778** | **1,794,261** | **1,920,925** | **2,054,146** | **1,836,976** | **1,682,482** | **1,871,493** | **1,946,224** | **1,349,378** |
| 27 | | | | | | | | | | | | | |
| 28 | Smithfield | 1,390,042 | 1,471,122 | 1,549,733 | 1,619,761 | 1,507,231 | 1,613,147 | 1,681,533 | 1,501,416 | 1,374,209 | 1,558,259 | 1,637,804 | 1,130,705 |
| 29 | JBS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 30 | Others | | | | | | | | | | | | |
| 31 | Market Hogs | 1,390,042 | 1,471,122 | 1,549,733 | 1,619,761 | 1,507,231 | 1,613,147 | 1,681,533 | 1,501,416 | 1,374,209 | 1,558,259 | 1,637,804 | 1,130,705 |
| 32 | Cull Hogs | 49,228 | 50,549 | 50,788 | 51,466 | 51,577 | 52,514 | 51,972 | 51,750 | 50,959 | 50,025 | 48,533 | 47,470 |
| 33 | Sows | 34,067 | 34,803 | 34,803 | 34,803 | 34,803 | 34,803 | 34,765 | 34,765 | 34,765 | 34,765 | 33,247 | 33,247 |
| 34 | **Hog Sales** | **1,473,337** | **1,556,474** | **1,635,324** | **1,706,030** | **1,593,611** | **1,700,463** | **1,768,269** | **1,587,930** | **1,459,932** | **1,643,048** | **1,719,584** | **1,211,422** |
| 35 | Weaned Pigs | 333,785 | 326,065 | 341,012 | 304,945 | 295,240 | 292,003 | 300,182 | 270,183 | 293,349 | 300,854 | 292,920 | 292,920 |
| 36 | Feed | | | | | | | | | | | | |
| 37 | Other | | | | | | | | | | | | |
| 38 | **Total Sales** | **1,807,122** | **1,882,539** | **1,976,337** | **2,010,975** | **1,888,850** | **1,992,467** | **2,068,451** | **1,858,113** | **1,753,282** | **1,943,903** | **2,012,504** | **1,504,341** |
| 39 | | | | | | | | | | | | | |
| 40 | *Smithfield* | | | | | | | | | | | | |
| 41 | *Lbs./Head* | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 |
| 42 | *$/Head* | 235.86 | 241.03 | 241.03 | 243.49 | 243.49 | 243.16 | 236.80 | 236.80 | 236.80 | 240.74 | 242.94 | 242.94 |
| 43 | *$/cwt* | 82.76 | 84.57 | 84.57 | 85.44 | 85.44 | 85.32 | 83.09 | 83.09 | 83.09 | 84.47 | 85.24 | 85.24 |
| 44 | *$/ccwt* | 109.62 | 112.02 | 112.02 | 113.16 | 113.16 | 113.01 | 110.05 | 110.05 | 110.05 | 111.88 | 112.91 | 112.91 |
| 45 | *JBS* | | | | | | | | | | | | |
| 46 | *Lbs./Head* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 47 | *$/Head* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 48 | *$/cwt* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 49 | *$/ccwt* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 50 | *Others* | | | | | | | | | | | | |
| 51 | *Lbs./Head* | | | | | | | | | | | | |
| 52 | *$/Head* | | | | | | | | | | | | |
| 53 | *$/cwt* | | | | | | | | | | | | |
| 54 | *$/ccwt* | | | | | | | | | | | | |
| 55 | *Weaners/Head* | 44.00 | 44.00 | 44.00 | 36.50 | 36.50 | 36.50 | 36.50 | 36.50 | 36.50 | 36.50 | 36.50 | 36.50 |
| 56 | | | | | | | | | | | | | |
| 57 | Smithfield | 1,563,541 | 1,389,833 | 1,473,636 | 1,550,786 | 1,615,804 | 1,509,921 | 1,617,376 | 1,675,379 | 1,497,922 | 1,380,783 | 1,563,492 | 1,621,715 |
| 58 | JBS | - | - | - | - | - | - | - | - | - | - | - | - |
| 59 | Market Hogs | 1,563,541 | 1,389,833 | 1,473,636 | 1,550,786 | 1,615,804 | 1,509,921 | 1,617,376 | 1,675,379 | 1,497,922 | 1,380,783 | 1,563,492 | 1,621,715 |
| 60 | Weaned Pigs | - | 333,785 | 326,065 | 341,012 | 304,945 | 295,240 | 292,003 | 300,182 | 270,183 | 293,349 | 300,854 | 292,920 |
| 61 | Cull Hogs | 15,934 | 16,519 | 16,757 | 16,974 | 17,085 | 17,144 | 17,208 | 16,986 | 16,195 | 15,160 | 13,502 | 12,439 |
| 62 | GDU Non-Select Sales | 33,294 | 34,031 | 34,031 | 34,492 | 34,492 | 35,370 | 34,763 | 34,763 | 34,763 | 34,865 | 35,031 | 35,031 |
| 63 | Sows | 34,067 | 34,803 | 34,803 | 34,803 | 34,803 | 34,803 | 34,765 | 34,765 | 34,765 | 34,765 | 33,247 | 33,247 |
| 64 | **Hog Collections** | **1,646,836** | **1,808,970** | **1,885,291** | **1,978,068** | **2,007,129** | **1,892,477** | **1,996,115** | **2,062,075** | **1,853,829** | **1,758,922** | **1,946,126** | **1,995,352** |
| 65 | Feed | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| 66 | Cost of Feed Sold | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) |
| 67 | Market Price Adjustment | | | | | | | | | | | | |
| 68 | **Total Collections** | **1,656,836** | **1,818,970** | **1,895,291** | **1,988,068** | **2,017,129** | **1,902,477** | **2,006,115** | **2,072,075** | **1,863,829** | **1,768,922** | **1,956,126** | **2,005,352** |
| 69 | | | | | | | | | | | | | |
| 70 | Mixed (Sunrise & Mercer) 1 | | | | | | | | | | | | |
| 71 | Ingredients | (297,090) | (292,076) | (286,863) | (280,624) | (275,361) | (269,566) | (260,765) | (249,875) | (240,235) | (230,094) | (219,590) | (212,697) |
| 72 | Corn & Wheat | (740,387) | (759,418) | (760,952) | (759,279) | (762,318) | (721,462) | (703,041) | (675,032) | (648,049) | (562,856) | (560,812) | (483,525) |
| 73 | Change in AP | | | | | | | | | | | | |
| 74 | Less: Nursery Feed Cost Reductions | | | | | | | | | | | | |
| 75 | Less: Finisher Feed Cost Reductions | | | | | | | | | | | | |
| 76 | Feed Costs | (1,037,477) | (1,051,494) | (1,047,816) | (1,039,903) | (1,037,679) | (991,028) | (963,806) | (924,907) | (888,284) | (792,950) | (780,402) | (696,222) |
| 77 | Hauling | (50,339) | (52,187) | (54,939) | (56,670) | (52,825) | (53,958) | (60,100) | (53,724) | (49,439) | (52,724) | (57,303) | (40,151) |
| 78 | Contract Grower Closeout Fees 2 | (122,597) | (121,767) | (362,236) | (121,149) | (111,143) | (116,754) | (123,359) | (109,847) | (106,484) | (117,942) | (119,136) | (93,045) |
| 79 | Contract Grower Rent 3 | | | | | | | | | | | | |
| 80 | Medication & Veterinary Services | (49,894) | (48,052) | (47,970) | (47,890) | (46,185) | (45,855) | (46,967) | (43,231) | (45,866) | (46,743) | (45,443) | (45,339) |
| 81 | Cost of Sales Disbursements | (1,260,307) | (1,273,500) | (1,512,961) | (1,265,612) | (1,247,831) | (1,207,595) | (1,194,232) | (1,131,709) | (1,090,073) | (1,010,360) | (1,002,284) | (874,756) |
| 82 | | | | | | | | | | | | | |
| 83 | Payroll | (56,902) | (177,210) | (56,902) | (170,797) | (56,902) | (170,582) | (56,902) | (170,459) | (56,902) | (170,207) | (56,902) | (169,956) |
| 84 | Other Payroll | (28,387) | (26,982) | (25,385) | (29,328) | (26,590) | (26,306) | (27,657) | (24,105) | (26,660) | (27,509) | (25,725) | (25,459) |
| 85 | Payroll Taxes | - | - | - | - | - | - | - | - | - | - | - | - |
| 86 | Insurance & Benefits | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) |
| 87 | Payroll Disbursements | (92,383) | (211,287) | (89,382) | (207,220) | (90,587) | (203,983) | (91,654) | (201,659) | (90,657) | (204,812) | (89,722) | (202,510) |
| 88 | | | | | | | | | | | | | |
| 89 | Utilities | (118,697) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) |
| 90 | Property & Other Taxes | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) |
| 91 | Supplies | (3,956) | (3,905) | (3,834) | (3,677) | (3,660) | (3,661) | (3,652) | (3,633) | (3,614) | (3,595) | (3,574) | (3,560) |
| 92 | Legal, Accounting & Other | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) |
| 93 | Repairs & Maintenance | (13,016) | (12,631) | (12,113) | (9,320) | (9,188) | (9,192) | (9,163) | (9,103) | (9,048) | (8,987) | (8,924) | (8,879) |

| | B | BV | BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | **N. G. Purvis Farms** | | | | | | | | | | | | | |
| 4 | *Cash Flow Forecast* | | | | | | | | | | | | | |
| 5 | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 6 | Fiscal Period | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 7 | Fiscal Week | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | |
| 8 | Bankruptcy week | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 9 | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| 10 | Week Beginning Date | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 11 | Week Ending Date | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 12 | | | | | | | | | | | | | | |
| 13 | Smithfield | 7,249 | 2,385 | 2,636 | 7,757 | 7,616 | 7,364 | 7,355 | 7,628 | 6,636 | 6,799 | 6,918 | 903 | 146,264 |
| 14 | JBS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 15 | Others | | | | | | | | | | | | | - |
| 16 | Market Hogs | 7,249 | 2,385 | 2,636 | 7,757 | 7,616 | 7,364 | 7,355 | 7,628 | 6,636 | 6,799 | 6,918 | 903 | 146,264 |
| 17 | Weaned Pigs | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 191,449 |
| 18 | Cull Hogs | 112 | 103 | 95 | 91 | 83 | 71 | 60 | 49 | 37 | 27 | 17 | 6 | 2,544 |
| 19 | **Head** | **15,386** | **10,512** | **10,756** | **15,873** | **15,724** | **15,460** | **15,440** | **15,702** | **14,699** | **14,851** | **14,960** | **8,935** | **340,256** |
| 20 | | | | | | | | | | | | | | 0 |
| 21 | Smithfield | 2,065,892 | 679,624 | 751,351 | 2,210,799 | 2,170,576 | 2,098,739 | 2,096,279 | 2,174,105 | 1,891,312 | 1,937,680 | 1,971,684 | 257,468 | 41,685,158 |
| 22 | JBS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 23 | Others | | | | | | | | | | | | | - |
| 24 | Market Hogs | 2,065,892 | 679,624 | 751,351 | 2,210,799 | 2,170,576 | 2,098,739 | 2,096,279 | 2,174,105 | 1,891,312 | 1,937,680 | 1,971,684 | 257,468 | 41,685,158 |
| 25 | Cull Hogs | 21,236 | 19,476 | 18,040 | 17,256 | 15,726 | 13,506 | 11,348 | 9,237 | 7,099 | 5,070 | 3,166 | 1,231 | 483,268 |
| 26 | **Pounds** | **2,087,128** | **699,100** | **769,392** | **2,228,055** | **2,186,302** | **2,112,245** | **2,107,627** | **2,183,342** | **1,898,410** | **1,942,750** | **1,974,850** | **258,699** | **42,168,426** |
| 27 | | | | | | | | | | | | | | 0 |
| 28 | Smithfield | 1,761,034 | 488,769 | 529,916 | 1,559,239 | 1,481,462 | 1,432,432 | 1,453,068 | 1,507,015 | 1,321,844 | 1,354,252 | 1,141,996 | 149,125 | 32,215,113 |
| 29 | JBS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 30 | Others | | | | | | | | | | | | | - |
| 31 | Market Hogs | 1,761,034 | 488,769 | 529,916 | 1,559,239 | 1,481,462 | 1,432,432 | 1,453,068 | 1,507,015 | 1,321,844 | 1,354,252 | 1,141,996 | 149,125 | 32,215,113 |
| 32 | Cull Hogs | 46,549 | 38,454 | 36,589 | 36,232 | 33,744 | 32,735 | 31,989 | 31,030 | 30,772 | 29,850 | 24,146 | 23,458 | 1,002,376 |
| 33 | Sows | 33,247 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 21,784 | 21,784 | 740,990 |
| 34 | **Hog Sales** | **1,840,830** | **555,060** | **594,342** | **1,623,309** | **1,543,043** | **1,493,005** | **1,512,895** | **1,565,883** | **1,380,454** | **1,411,940** | **1,187,926** | **194,367** | **33,958,479** |
| 35 | Weaned Pigs | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 7,591,855 |
| 36 | Feed | | | | | | | | | | | | | - |
| 37 | Other | | | | | | | | | | | | | - |
| 38 | **Total Sales** | **2,169,863** | **884,093** | **923,375** | **1,952,342** | **1,872,076** | **1,822,038** | **1,841,928** | **1,894,916** | **1,709,487** | **1,740,973** | **1,516,959** | **523,401** | **41,550,335** |
| 39 | | | | | | | | | | | | | | - |
| 40 | *Smithfield* | | | | | | | | | | | | | - |
| 41 | *Lbs./Head* | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 | 285.00 |
| 42 | *$/Head* | 242.94 | 204.96 | 201.01 | 201.01 | 194.52 | 194.52 | 197.55 | 197.55 | 199.19 | 199.19 | 165.07 | 165.07 | 220.25 |
| 43 | *$/cwt* | 85.24 | 71.92 | 70.53 | 70.53 | 68.25 | 68.25 | 69.32 | 69.32 | 69.89 | 69.89 | 57.92 | 57.92 | 77.28 |
| 44 | *$/ccwt* | 112.91 | 95.26 | 93.42 | 93.42 | 90.40 | 90.40 | 91.81 | 91.81 | 92.57 | 92.57 | 76.72 | 76.72 | 102.36 |
| 45 | *JBS* | | | | | | | | | | | | | |
| 46 | *Lbs./Head* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 47 | *$/Head* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 48 | *$/cwt* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 49 | *$/ccwt* | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 50 | *Others* | | | | | | | | | | | | | |
| 51 | *Lbs./Head* | | | | | | | | | | | | | |
| 52 | *$/Head* | | | | | | | | | | | | | |
| 53 | *$/cwt* | | | | | | | | | | | | | |
| 54 | *$/ccwt* | | | | | | | | | | | | | |
| 55 | *Weaners/Head* | 41.00 | 41.00 | 41.00 | 41.00 | 41.00 | 41.00 | 41.00 | 41.00 | 41.00 | 41.00 | 41.00 | 41.00 | 952.50 |
| 56 | | | | | | | | | | | | | | - |
| 57 | Smithfield | 1,136,515 | 1,745,200 | 492,016 | 559,536 | 1,560,662 | 1,481,033 | 1,433,237 | 1,455,578 | 1,501,673 | 1,323,689 | 1,365,452 | 1,109,386 | 33,624,164 |
| 58 | JBS | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 59 | Market Hogs | 1,136,515 | 1,745,200 | 492,016 | 559,536 | 1,560,662 | 1,481,033 | 1,433,237 | 1,455,578 | 1,501,673 | 1,323,689 | 1,365,452 | 1,109,386 | 33,624,164 |
| 60 | Weaned Pigs | 292,920 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 7,262,822 |
| 61 | Cull Hogs | 11,518 | 8,845 | 8,193 | 7,836 | 7,142 | 6,133 | 5,154 | 4,195 | 3,224 | 2,302 | 1,125 | 438 | 258,006 |
| 62 | GDU Non-Select Sales | 35,031 | 29,609 | 28,396 | 28,396 | 26,602 | 26,602 | 26,836 | 26,836 | 27,548 | 27,548 | 23,021 | 23,021 | 744,370 |
| 63 | Sows | 33,247 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 21,784 | 21,784 | 740,990 |
| 64 | **Hog Collections** | **1,509,231** | **2,140,524** | **885,475** | **952,639** | **1,951,276** | **1,870,639** | **1,822,097** | **1,843,479** | **1,889,315** | **1,710,411** | **1,740,415** | **1,483,662** | **42,630,353** |
| 65 | Feed | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 6,000,000 |
| 66 | Cost of Feed Sold | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (5,760,000) |
| 67 | Market Price Adjustment | | | | | | | | | | | | | - |
| 68 | **Total Collections** | **1,519,231** | **2,150,524** | **895,475** | **962,639** | **1,961,276** | **1,880,639** | **1,832,097** | **1,853,479** | **1,899,315** | **1,720,411** | **1,750,415** | **1,493,662** | **42,870,353** |
| 69 | | | | | | | | | | | | | | - |
| 70 | Mixed (Sunrise & Mercer) 1 | | | | | | | | | | | | | - |
| 71 | Ingredients | (201,258) | (198,473) | (195,593) | (181,158) | (166,936) | (126,897) | (113,088) | (98,760) | (86,222) | (73,379) | (58,667) | (56,964) | (4,672,231) |
| 72 | Corn & Wheat | (468,939) | (479,253) | (465,391) | (555,431) | (396,753) | (330,235) | (285,681) | (243,326) | (206,036) | (167,332) | (110,095) | (105,482) | (11,951,086) |
| 73 | Change in AP | | | | | | | | | | | | | - |
| 74 | Less: Nursery Feed Cost Reductions | | | | | | | | | | | | | - |
| 75 | Less: Finisher Feed Cost Reductions | | | | | | | | | | | | | - |
| 76 | Feed Costs | (670,197) | (677,726) | (660,984) | (736,589) | (563,688) | (457,132) | (398,769) | (342,086) | (292,258) | (240,711) | (168,762) | (162,446) | (16,623,317) |
| 77 | Hauling | (45,041) | (13,901) | (17,084) | (46,348) | (45,282) | (43,845) | (41,750) | (45,455) | (39,854) | (40,778) | (40,219) | (6,922) | (1,060,838) |
| 78 | Contract Grower Closeout Fees 2 | (125,476) | (64,675) | (67,821) | (131,832) | (130,068) | (126,917) | (126,809) | (130,223) | (117,819) | (119,853) | (121,345) | (46,160) | (2,934,458) |
| 79 | Contract Grower Rent 3 | | | | | | | | | | | | | - |
| 80 | Medication & Veterinary Services | (45,181) | (45,125) | (45,065) | (44,898) | (44,734) | (44,577) | (44,421) | (44,259) | (44,119) | (43,976) | (43,831) | (43,812) | (1,093,432) |
| 81 | Cost of Sales Disbursements | (885,895) | (801,428) | (790,954) | (959,667) | (783,773) | (672,471) | (611,749) | (562,022) | (494,051) | (445,318) | (374,158) | (259,340) | (21,712,045) |
| 82 | | | | | | | | | | | | | | 0 |
| 83 | Payroll | (56,902) | (169,736) | (56,902) | (169,576) | (56,902) | (159,423) | (56,902) | (159,131) | (56,902) | (158,860) | (56,902) | (128,651) | (2,657,411) |
| 84 | Other Payroll | (25,056) | (24,914) | (24,758) | (24,332) | (23,915) | (23,513) | (23,113) | (22,700) | (22,342) | (21,977) | (21,607) | (21,558) | (599,877) |
| 85 | Payroll Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 86 | Insurance & Benefits | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (170,279) |
| 87 | Payroll Disbursements | (89,053) | (201,744) | (88,755) | (201,004) | (87,912) | (190,031) | (87,110) | (188,926) | (86,339) | (187,932) | (85,604) | (157,304) | (3,427,567) |
| 88 | | | | | | | | | | | | | | 0 |
| 89 | Utilities | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (7,547) | (7,547) | (607,283) |
| 90 | Property & Other Taxes | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (136,451) |
| 91 | Supplies | (3,538) | (3,530) | (3,521) | (3,498) | (3,476) | (3,454) | (3,432) | (3,410) | (3,390) | (3,370) | (3,350) | (3,348) | (85,638) |
| 92 | Legal, Accounting & Other | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (504,000) |
| 93 | Repairs & Maintenance | (8,812) | (8,788) | (8,763) | (8,692) | (8,622) | (8,555) | (8,488) | (8,420) | (8,360) | (8,299) | (8,237) | (8,229) | (221,830) |

**N. G. Purvis Farms**

*Cash Flow Forecast*

| Row | Item | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT | BU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 |
| 6 | Fiscal Period | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 |
| 7 | Fiscal Week | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 8 | Bankruptcy week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 9 | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| 10 | Week Beginning Date | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 |
| 11 | Week Ending Date | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 |
| 94 | Credit Cards | - | - | - | - | - | - | - | - | - | - | - | - |
| 95 | Rent | - | - | - | - | - | - | - | - | - | - | - | - |
| 96 | All Other | (58,862) | (58,693) | (58,462) | (57,946) | (57,812) | (57,816) | (57,785) | (57,720) | (57,660) | (57,593) | (57,525) | (57,477) |
| 97 | SG&A Disbursements | (221,216) | (124,462) | (123,642) | (120,176) | (119,894) | (119,901) | (119,834) | (119,688) | (119,555) | (119,408) | (119,255) | (119,148) |
| 98 | | | | | | | | | | | | | |
| 99 | **Operating Disbursements** | **(1,573,907)** | **(1,609,249)** | **(1,725,984)** | **(1,593,009)** | **(1,458,312)** | **(1,531,480)** | **(1,405,720)** | **(1,453,056)** | **(1,300,285)** | **(1,334,579)** | **(1,211,261)** | **(1,196,414)** |
| 100 | | | | | | | | | | | | | |
| 101 | **Net Operating Cash Flow** | **82,929** | **209,721** | **169,307** | **395,059** | **558,817** | **370,997** | **600,396** | **619,019** | **563,544** | **434,343** | **744,865** | **808,938** |
| 102 | **Cumulative Cash Flow** | **82,929** | **292,651** | **461,957** | **857,016** | **1,415,833** | **1,786,830** | **2,387,226** | **3,006,245** | **3,569,789** | **4,004,132** | **4,748,996** | **5,557,934** |
| 103 | | | | | | | | | | | | | |
| 104 | *Additional Lender Advance* | - | - | (5,966,311) | - | - | - | - | - | - | - | - | - |
| 105 | Principal Payments | (24,567) | - | 5,966,311 | - | (24,636) | - | - | - | - | (24,705) | - | - |
| 106 | Interest Expense | (96,873) | (56,639) | (56,286) | (42,257) | (102,827) | (40,447) | (39,690) | (38,396) | (37,056) | (97,156) | (35,126) | (33,488) |
| 107 | **Lender Receipts / (Disbursements)** | **(121,440)** | **(56,639)** | **(56,286)** | **(42,257)** | **(127,463)** | **(40,447)** | **(39,690)** | **(38,396)** | **(37,056)** | **(121,861)** | **(35,126)** | **(33,488)** |
| 108 | | | | | | | | | | | | | |
| 109 | Commodity Account | - | - | - | - | - | 0 | - | - | - | 0 | - | - |
| 110 | Required AP Catch-Up Payments | | | | | | | | | | | | |
| 111 | Professional Fees | | | | | | | | | | | | |
| 112 | All Other | - | - | - | - | - | - | - | - | - | - | - | - |
| 113 | CapEx | - | - | - | - | - | - | - | - | - | - | - | - |
| 114 | **Other Receipts / (Disbursements)** | - | - | - | - | - | **0** | - | - | - | **0** | - | - |
| 115 | | | | | | | | | | | | | |
| 116 | **Non-Operating Receipts / (Disbursements)** | **(121,440)** | **(56,639)** | **(56,286)** | **(42,257)** | **(127,463)** | **(40,447)** | **(39,690)** | **(38,396)** | **(37,056)** | **(121,861)** | **(35,126)** | **(33,488)** |
| 117 | | | | | | | | | | | | | |
| 118 | *Net Cash Flow* | *(38,510)* | *153,082* | *113,021* | *352,802* | *431,355* | *330,550* | *560,706* | *580,623* | *526,488* | *312,482* | *709,739* | *775,450* |
| 119 | Check | (0) | 0 | (5,966,311) | - | 0 | 2,493 | - | - | - | 2,355 | - | - |
| 120 | **Cumulative cash flow after P&I payments** | **(38,510)** | **114,572** | **227,593** | **580,395** | **1,011,750** | **1,342,299** | **1,903,005** | **2,483,628** | **3,010,115** | **3,322,597** | **4,032,336** | **4,807,787** |
| 121 | | | | | | | | | | | | | |
| 122 | Total G&A Costs | 87,892 | 43,533 | 62,488 | 43,533 | 87,815 | 43,456 | 62,412 | 43,456 | 62,412 | 68,859 | 62,412 | 43,456 |
| 123 | Allocation - FNBO | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% |
| 124 | 80% | | | | | | | | | | | | |
| 125 | Hog Revenues to FNBO | 1,579,475 | 1,406,352 | 1,490,393 | 1,567,761 | 1,632,890 | 1,527,064 | 1,634,584 | 1,692,365 | 1,514,117 | 1,395,943 | 1,576,994 | 1,634,154 |
| 126 | Outside Feed Net Revenues to FNBO | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| 127 | Margin Account | - | - | - | - | - | 0 | - | - | - | 0 | - | - |
| 128 | Interest paid to FNBO | (56,550) | (56,639) | (56,286) | (42,257) | (41,443) | (40,447) | (39,690) | (38,396) | (37,056) | (35,841) | (35,126) | (33,488) |
| 129 | Nursery expenses to FNBO | (117,166) | (105,778) | (74,407) | (45,791) | (27,698) | (10,812) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) |
| 130 | Finisher expenses to FNBO | (845,865) | (906,289) | (1,134,871) | (936,738) | (913,346) | (928,388) | (884,012) | (867,248) | (791,573) | (746,246) | (704,639) | (625,260) |
| 131 | Utility deposits | (68,267) | | | | | | | | | | | |
| 132 | Pork checkoff & freight to market | (50,339) | (52,187) | (54,939) | (56,670) | (52,825) | (53,958) | (60,100) | (53,724) | (49,439) | (52,724) | (57,303) | (40,151) |
| 133 | Sale: Sow and GDU Animals to LOLF | | | 5,966,311 | | | | | | | | | |
| 134 | 62% Bankruptcy costs | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) |
| 135 | G&A expenses to FNBO | (70,313) | (34,826) | (49,991) | (34,826) | (70,252) | (34,765) | (49,929) | (34,765) | (49,929) | (55,087) | (49,929) | (34,765) |
| 136 | Net cash flow - FNBO | 342,122 | 221,779 | 6,057,356 | 422,625 | 498,473 | 429,841 | 570,261 | 667,640 | 555,528 | 475,453 | 699,405 | 869,899 |
| 137 | Cumulative net cash flow - FNBO | 342,122 | 563,901 | 6,621,257 | 7,043,882 | 7,542,355 | 7,972,196 | 8,542,457 | 9,210,097 | 9,765,625 | 10,241,077 | 10,940,482 | 11,810,381 |
| 143 | Revenues to LOL | 67,361 | 402,619 | 394,898 | 410,307 | 374,239 | 365,413 | 361,531 | 369,710 | 339,711 | 362,979 | 369,132 | 361,198 |
| 144 | Interest paid to LOL | (39,486) | - | - | - | (60,617) | - | - | - | - | (60,617) | - | - |
| 145 | Sow unit expenses to LOL | (278,152) | (372,620) | (274,663) | (381,347) | (277,328) | (368,061) | (274,880) | (360,099) | (272,531) | (366,482) | (265,372) | (361,689) |
| 146 | GDU expenses to LOL | (61,080) | (66,176) | (61,949) | (66,264) | (62,037) | (64,138) | (59,911) | (64,124) | (59,924) | (61,266) | (57,131) | (61,453) |
| 147 | Utility deposits | (27,884) | | | | | | | | | | | |
| 148 | Purchase: Sow and GDU Animals from FNBO | | | (5,966,311) | | | | | | | | | |
| 149 | Bankruptcy costs | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) |
| 150 | G&A expenses to LOL | (17,578) | (8,707) | (12,498) | (8,707) | (17,563) | (8,691) | (12,482) | (8,691) | (12,482) | (13,772) | (12,482) | (8,691) |
| 151 | Net cash flow - LOL | (380,632) | (68,696) | (5,944,335) | (69,823) | (67,118) | (99,292) | (9,555) | (87,017) | (29,040) | (162,971) | 10,334 | (94,449) |
| 152 | Cumulative net cash flow - LOL | (380,632) | (449,329) | (6,393,664) | (6,463,487) | (6,530,605) | (6,629,897) | (6,639,452) | (6,726,469) | (6,755,509) | (6,918,480) | (6,908,146) | (7,002,595) |
| 154 | *Check* | - | 0 | - | - | 0 | 0 | 0 | (0) | 0 | - | (0) | - |
| 157 | | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 |
| 158 | | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 |
| 159 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 160 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 161 | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| 162 | | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 |
| 163 | | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 |
| 165 | **G&A Expenses** | | | | | | | | | | | | |
| 166 | Labor, contract labor | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 |
| 167 | Utilities | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 |
| 168 | Property & Other Taxes | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 |
| 169 | Repairs & Maintenance | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 |
| 170 | Insurance | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 |
| 171 | Purchase money debt payments | 25,403 | - | - | - | 25,403 | - | - | - | - | 25,403 | - | - |
| 172 | All Other | 1,981 | 1,981 | 1,981 | 1,981 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 |
| 173 | | 87,892 | 43,533 | 62,488 | 43,533 | 87,815 | 43,456 | 62,412 | 43,456 | 62,412 | 68,859 | 62,412 | 43,456 |
| 174 | | - | - | - | - | - | - | - | - | - | - | - | - |
| 175 | **Bankruptcy Costs** | | | | | | | | | | | | |

| Row | Item | BV | BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 6 | Fiscal Period | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 7 | Fiscal Week | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | |
| 8 | Bankruptcy week | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 9 | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| 10 | Week Beginning Date | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 11 | Week Ending Date | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 94 | Credit Cards | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 95 | Rent | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 96 | All Other | (57,404) | (57,378) | (57,350) | (57,273) | (57,197) | (57,124) | (57,052) | (56,977) | (56,912) | (56,846) | (56,779) | (56,770) | (1,380,411) |
| 97 | SG&A Disbursements | (118,986) | (118,929) | (118,867) | (118,695) | (118,527) | (118,366) | (118,205) | (118,039) | (117,895) | (117,748) | (102,599) | (102,579) | (2,935,614) |
| 98 | | | | | | | | | | | | | | 0 |
| 99 | **Operating Disbursements** | **(1,093,935)** | **(1,122,101)** | **(998,576)** | **(1,279,366)** | **(990,212)** | **(980,867)** | **(817,063)** | **(868,987)** | **(698,284)** | **(750,997)** | **(562,361)** | **(519,223)** | **(28,075,227)** |
| 100 | | | | | | | | | | | | | | 0 |
| 101 | **Net Operating Cash Flow** | **425,297** | **1,028,423** | **(103,101)** | **(316,727)** | **971,065** | **899,772** | **1,015,033** | **984,493** | **1,201,031** | **969,413** | **1,188,054** | **974,438** | **14,795,126** |
| 102 | **Cumulative Cash Flow** | **5,983,231** | **7,011,654** | **6,908,554** | **6,591,827** | **7,562,892** | **8,462,663** | **9,477,697** | **10,462,189** | **11,663,220** | **12,632,634** | **13,820,688** | **14,795,126** | **14,795,126** |
| 103 | | | | | | | | | | | | | | |
| 104 | *Additional Lender Advance* | - | - | - | - | - | - | - | - | - | - | - | - | (5,966,311) |
| 105 | Principal Payments | - | (24,774) | - | - | - | (24,844) | - | - | - | - | (24,913) | - | 5,817,872 |
| 106 | Interest Expense | (31,698) | (92,036) | (28,690) | (28,994) | (29,792) | (28,180) | (86,283) | (23,528) | (21,310) | (15,505) | (74,410) | (10,791) | (1,147,458) |
| 107 | **Lender Receipts / (Disbursements)** | **(31,698)** | **(116,810)** | **(28,690)** | **(28,994)** | **(29,792)** | **(53,023)** | **(86,283)** | **(23,528)** | **(21,310)** | **(15,505)** | **(99,324)** | **(10,791)** | **(1,295,897)** |
| 108 | | | | | | | | | | | | | | 0 |
| 109 | Commodity Account | - | 0 | - | - | - | - | - | - | 1,335,844 | - | - | - | 1,335,844 |
| 110 | Required AP Catch-Up Payments | | | | | | | | | | | | | - |
| 111 | Professional Fees | | | | | | | | | | | | | - |
| 112 | All Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 113 | CapEx | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 114 | **Other Receipts / (Disbursements)** | - | **0** | - | - | - | - | - | - | **1,335,844** | - | - | - | **1,335,844** |
| 115 | | | | | | | | | | | | | | 0 |
| 116 | **Non-Operating Receipts / (Disbursements)** | **(31,698)** | **(116,810)** | **(28,690)** | **(28,994)** | **(29,792)** | **(53,023)** | **(86,283)** | **(23,528)** | **1,314,534** | **(15,505)** | **(99,324)** | **(10,791)** | **39,947** |
| 117 | | | | | | | | | | | | | | - |
| 118 | *Net Cash Flow* | *393,598* | *911,614* | *(131,791)* | *(345,721)* | *941,272* | *846,748* | *928,750* | *960,965* | *2,515,565* | *953,908* | *1,088,730* | *963,647* | *14,835,073* |
| 119 | Check | (0) | 1,801 | 0 | - | - | - | 2,153 | - | - | - | - | - | (5,957,508) |
| 120 | **Cumulative cash flow after P&I payments** | **5,201,385** | **6,112,999** | **5,981,208** | **5,635,487** | **6,576,759** | **7,423,507** | **8,352,258** | **9,313,223** | **11,828,788** | **12,782,696** | **13,871,426** | **14,835,073** | |
| 121 | | | | | | | | | | | | | | |
| 122 | Total G&A Costs | 62,412 | 68,859 | 62,412 | 43,456 | 62,412 | 59,007 | 62,412 | 33,604 | 62,412 | 33,604 | 87,815 | 33,604 | 1,383,727 |
| 123 | Allocation - FNBO | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | |
| 124 | 80% | | | | | | | | | | | | | |
| 125 | Hog Revenues to FNBO | 1,148,033 | 1,754,044 | 500,208 | 567,372 | 1,567,803 | 1,487,166 | 1,438,390 | 1,459,773 | 1,504,896 | 1,325,992 | 1,366,577 | 1,109,824 | 33,882,170 |
| 126 | Outside Feed Net Revenues to FNBO | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 240,000 |
| 127 | Margin Account | - | 0 | - | - | - | - | - | - | 1,335,844 | - | - | - | 1,335,844 |
| 128 | Interest paid to FNBO | (31,698) | (30,790) | (28,690) | (28,994) | (29,792) | (27,620) | (25,666) | (23,528) | (21,310) | (15,505) | (13,304) | (10,791) | (800,907) |
| 129 | Nursery expenses to FNBO | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (412,952) |
| 130 | Finisher expenses to FNBO | (598,825) | (576,638) | (531,142) | (701,407) | (495,237) | (415,916) | (327,881) | (304,686) | (211,650) | (192,026) | (94,280) | (12,700) | (14,746,861) |
| 131 | Utility deposits | | | | | | | | | | | | | (68,267) |
| 132 | Pork checkoff & freight to market | (45,041) | (13,901) | (17,084) | (46,348) | (45,282) | (43,845) | (41,750) | (45,455) | (39,854) | (40,778) | (40,219) | (6,922) | (1,060,838) |
| 133 | Sale: Sow and GDU Animals to LOLF | | | | | | | | | | | | | 5,966,311 |
| 134 | 62% Bankruptcy costs | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (932,480) |
| 135 | G&A expenses to FNBO | (49,929) | (55,087) | (49,929) | (34,765) | (49,929) | (47,206) | (49,929) | (26,883) | (49,929) | (26,883) | (70,252) | (26,883) | (1,106,981) |
| 136 | Net cash flow - FNBO | 391,948 | 1,047,036 | (157,229) | (274,734) | 916,971 | 921,987 | 962,572 | 1,028,630 | 2,487,404 | 1,020,208 | 1,117,929 | 1,021,935 | 22,295,039 |
| 137 | Cumulative net cash flow - FNBO | 12,202,329 | 13,249,366 | **13,092,137** | **12,817,403** | **13,734,374** | **14,656,361** | **15,618,933** | **16,647,562** | **19,134,966** | **20,155,175** | **21,273,104** | **22,295,039** | 22,295,039 |
| 139 | | | | | | | | | | | | | **Total projected proceeds to FNBO** | **$22,295,039** |
| 140 | | | | | | | | | | | | | **FNBO debt** | 25,793,000 |
| 141 | | | | | | | | | | | | | **Deficiency** | **(3,497,961)** |
| 143 | Revenues to LOL | 361,198 | 386,480 | 385,267 | 385,267 | 383,473 | 383,473 | 383,706 | 383,706 | 384,419 | 384,419 | 373,838 | 373,838 | 8,748,183 |
| 144 | Interest paid to LOL | - | (60,617) | - | - | - | - | (60,617) | - | - | - | (60,617) | - | (342,570) |
| 145 | Sow unit expenses to LOL | (265,742) | (361,934) | (265,808) | (361,813) | (265,166) | (361,175) | (263,382) | (359,391) | (262,743) | (358,752) | (250,468) | (346,796) | (7,576,394) |
| 146 | GDU expenses to LOL | (57,510) | (61,766) | (57,725) | (61,936) | (57,709) | (61,922) | (57,233) | (61,446) | (57,219) | (61,432) | (50,576) | (54,796) | (1,446,725) |
| 147 | Utility deposits | | | | | | | | | | | | | (27,884) |
| 148 | Purchase: Sow and GDU Animals from FNBO | | | | | | | | | | | | | (5,966,311) |
| 149 | Bankruptcy costs | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (571,520) |
| 150 | G&A expenses to LOL | (12,482) | (13,772) | (12,482) | (8,691) | (12,482) | (11,801) | (12,482) | (6,721) | (12,482) | (6,721) | (17,563) | (6,721) | (276,745) |
| 151 | Net cash flow - LOL | 1,650 | (135,422) | 25,438 | (70,987) | 24,302 | (75,239) | (33,821) | (67,665) | 28,161 | (66,300) | (29,199) | (58,288) | **(7,459,965)** |
| 152 | Cumulative net cash flow - LOL | (7,000,944) | (7,136,367) | (7,110,929) | (7,181,916) | (7,157,614) | (7,232,854) | (7,266,675) | (7,334,339) | (7,306,179) | (7,372,479) | (7,401,677) | (7,459,965) | **(1,493,655)** |
| 154 | *Check* | 0 | - | (0) | 0 | 0 | - | - | - | (0) | - | (0) | - | 0 |
| 157 | | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 158 | | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 159 | | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 160 | | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 161 | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| 162 | | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 163 | | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 165 | **G&A Expenses** | | | | | | | | | | | | | |
| 166 | Labor, contract labor | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 28,159 | 56,967 | 28,159 | 56,967 | 28,159 | 56,967 | 28,159 | 1,100,327 |
| 167 | Utilities | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 28,011 |
| 168 | Property & Other Taxes | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 32,010 |
| 169 | Repairs & Maintenance | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 12,462 |
| 170 | Insurance | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 12,499 |
| 171 | Purchase money debt payments | - | 25,403 | - | - | - | 25,403 | - | - | - | - | 25,403 | - | 152,420 |
| 172 | All Other | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 45,998 |
| 173 | | 62,412 | 68,859 | 62,412 | 43,456 | 62,412 | 59,007 | 62,412 | 33,604 | 62,412 | 33,604 | 87,815 | 33,604 | 1,383,727 |
| 174 | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 175 | **Bankruptcy Costs** | | | | | | | | | | | | | |

| | A | B | C | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT | BU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | |
| 3 | **N. G. Purvis Farms** | | | | | | | | | | | | | | |
| 4 | *Cash Flow Forecast* | | | | | | | | | | | | | | |
| 5 | | Fiscal Year | | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 |
| 6 | | Fiscal Period | | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 |
| 7 | | Fiscal Week | | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 8 | | Bankruptcy week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 9 | | Actual / Forecast | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| 10 | | Week Beginning Date | | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 |
| 11 | | Week Ending Date | | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 |
| 176 | | Professional fees | | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 |
| 177 | | Additional bankruptcy costs | | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 |
| 178 | | | | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 |
| 179 | | | | - | - | - | - | - | - | - | - | - | - | - | - |
| 180 | | **FNBO BUDGET** | | | | | | | | | | | | | |
| 181 | | **Animal Inventories** | | | | | | | | | | | | | |
| 182 | | Nursery | | 44,290 | 35,853 | 27,206 | 19,716 | 12,131 | 4,493 | - | - | - | - | - | - |
| 183 | | Finishing | | 104,936 | 106,325 | 107,676 | 107,726 | 108,411 | 108,779 | 105,609 | 98,796 | 92,541 | 85,647 | 78,512 | 73,496 |
| 184 | | **Total** | | 149,226 | 142,178 | 134,882 | 127,442 | 120,542 | 113,272 | 105,609 | 98,796 | 92,541 | 85,647 | 78,512 | 73,496 |
| 185 | | **Hogs sold** | | | | | | | | | | | | | |
| 186 | | Market Hogs | | 5,751 | 5,961 | 6,287 | 6,509 | 6,047 | 6,491 | 6,958 | 6,198 | 5,660 | 6,330 | 6,599 | 4,511 |
| 187 | | Cull Hogs | | 151 | 153 | 155 | 157 | 158 | 159 | 160 | 158 | 150 | 141 | 131 | 121 |
| 188 | | **Head** | | 5,902 | 6,114 | 6,442 | 6,667 | 6,206 | 6,650 | 7,118 | 6,355 | 5,811 | 6,471 | 6,730 | 4,632 |
| 189 | | Market Hogs | | 1,679,620 | 1,739,504 | 1,832,457 | 1,895,881 | 1,764,168 | 1,890,729 | 2,023,804 | 1,807,024 | 1,653,925 | 1,844,762 | 1,921,330 | 1,326,444 |
| 190 | | Cull Hogs | | 28,672 | 29,095 | 29,514 | 29,897 | 30,093 | 30,196 | 30,343 | 29,951 | 28,557 | 26,731 | 24,894 | 22,934 |
| 191 | | **Pounds** | | 1,708,292 | 1,768,599 | 1,861,972 | 1,925,778 | 1,794,261 | 1,920,925 | 2,054,146 | 1,836,976 | 1,682,482 | 1,871,493 | 1,946,224 | 1,349,378 |
| 192 | | Market Hogs | | $1,390,042 | $1,471,122 | $1,549,733 | $1,619,761 | $1,507,231 | $1,613,147 | $1,681,533 | $1,501,416 | $1,374,209 | $1,558,259 | $1,637,804 | $1,130,705 |
| 193 | | Cull Hogs | | $49,228 | $50,549 | $50,788 | $51,466 | $51,577 | $52,514 | $51,972 | $51,750 | $50,959 | $50,025 | $48,533 | $47,470 |
| 194 | | **Hog Sales** | | $1,439,270 | $1,521,671 | $1,600,521 | $1,671,227 | $1,558,808 | $1,665,660 | $1,733,504 | $1,553,165 | $1,425,168 | $1,608,284 | $1,686,337 | $1,178,174 |
| 195 | | Butchers lbs/head | | 292.1 | 291.8 | 291.5 | 291.3 | 291.7 | 291.3 | 290.8 | 291.6 | 292.2 | 291.4 | 291.2 | 294.0 |
| 196 | | Butchers $/head | | $241.72 | $246.80 | $246.50 | $248.83 | $249.24 | $248.51 | $241.66 | $242.25 | $242.77 | $246.17 | $248.20 | $250.63 |
| 197 | | Butchers $/cwt | | $82.76 | $84.57 | $84.57 | $85.44 | $85.44 | $85.32 | $83.09 | $83.09 | $83.09 | $84.47 | $85.24 | $85.24 |
| 198 | | | | | | | | | | | | | | | |
| 199 | | **Revenues - cash basis** | | | | | | | | | | | | | |
| 200 | | Market Hogs | | 1,563,541 | 1,389,833 | 1,473,636 | 1,550,786 | 1,615,804 | 1,509,921 | 1,617,376 | 1,675,379 | 1,497,922 | 1,380,783 | 1,563,492 | 1,621,715 |
| 201 | | Cull Hogs | | 15,934 | 16,519 | 16,757 | 16,974 | 17,085 | 17,144 | 17,208 | 16,986 | 16,195 | 15,160 | 13,502 | 12,439 |
| 202 | | **Hog Collections** | | 1,579,475 | 1,406,352 | 1,490,393 | 1,567,761 | 1,632,890 | 1,527,064 | 1,634,584 | 1,692,365 | 1,514,117 | 1,395,943 | 1,576,994 | 1,634,154 |
| 203 | | Feed | | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| 204 | | **Total Collections** | | 1,829,475 | 1,656,352 | 1,740,393 | 1,817,761 | 1,882,890 | 1,777,064 | 1,884,584 | 1,942,365 | 1,764,117 | 1,645,943 | 1,826,994 | 1,884,154 |
| 205 | | | | - | - | - | - | - | - | - | - | - | - | - | - |
| 206 | | **Selling costs** | | | | | | | | | | | | | |
| 207 | | Pork checkoff | | 9,086 | 9,463 | 9,932 | 10,105 | 9,494 | 7,519 | 10,392 | 9,341 | 8,816 | 7,414 | 10,113 | 7,572 |
| 208 | | Freight | | 41,254 | 42,725 | 45,008 | 46,566 | 43,330 | 46,439 | 49,707 | 44,383 | 40,623 | 45,310 | 47,191 | 32,579 |
| 209 | | | | 50,339 | 52,187 | 54,939 | 56,670 | 52,825 | 53,958 | 60,100 | 53,724 | 49,439 | 52,724 | 57,303 | 40,151 |
| 210 | | **Nursery expenses** | | - | - | - | - | - | - | - | - | - | - | - | - |
| 211 | | Nursery Feed | | 90,529 | 76,971 | 58,323 | 42,249 | 25,959 | 9,074 | - | - | - | - | - | - |
| 212 | | Labor, contract labor | | 613 | 7,187 | 353 | 271 | - | - | - | - | - | - | - | - |
| 213 | | Drugs | | 5,470 | 4,478 | 3,151 | 345 | - | - | - | - | - | - | - | - |
| 214 | | Utilities | | 1,318 | 1,168 | 966 | 539 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 |
| 215 | | Utilities deposit | | 5,769 | | | | | | | | | | | |
| 216 | | Repairs/maintenance | | 2,188 | 1,791 | 1,261 | 138 | - | - | - | - | - | - | - | - |
| 217 | | Lease/grower | | 15,315 | 12,538 | 8,824 | 967 | - | - | - | - | - | - | - | - |
| 218 | | Insurance | | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 |
| 219 | | Taxes | | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 |
| 220 | | Other | | 481 | 394 | 277 | 30 | - | - | - | - | - | - | - | - |
| 221 | | | | 122,935 | 105,778 | 74,407 | 45,791 | 27,698 | 10,812 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 |
| 222 | | **Finishing expenses** | | 5,769 | - | - | - | - | - | - | - | - | - | - | - |
| 223 | | Finishing Feed | | 725,535 | 751,974 | 768,432 | 777,224 | 789,088 | 768,189 | 752,208 | 709,655 | 670,636 | 588,883 | 545,165 | 515,507 |
| 224 | | Cost of Feed Sold | | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| 225 | | Change in feed inventories | | (32,207) | (33,013) | (34,175) | (34,845) | (32,317) | (34,052) | (35,893) | (31,912) | (29,293) | (32,294) | (1,149) | (55,763) |
| 226 | | Payment on Smithfield feed/genetics AP | | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 |
| 227 | | Labor, contract labor | | 5,570 | 37,675 | 5,715 | 37,789 | 5,754 | 37,862 | 5,605 | 37,209 | 4,912 | 36,259 | 4,167 | 35,363 |
| 228 | | Drugs | | 2,179 | 2,208 | 2,236 | 2,237 | 2,252 | 2,259 | 2,193 | 2,052 | 1,922 | 1,779 | 1,631 | 1,526 |
| 229 | | Utilities | | 15,378 | 15,378 | 15,378 | 15,378 | 15,378 | 15,378 | 15,378 | 15,377 | 15,377 | 15,377 | 15,377 | 15,377 |
| 230 | | Utilities deposit | | 62,498 | | | | | | | | | | | |
| 231 | | Repairs/maintenance | | 928 | 941 | 953 | 953 | 959 | 962 | 934 | 874 | 819 | 758 | 695 | 650 |
| 232 | | Lease/grower | | 73,668 | 76,294 | 321,484 | 83,153 | 77,376 | 82,927 | 88,763 | 79,255 | 72,541 | 80,911 | 84,269 | 58,177 |
| 233 | | Insurance | | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 |
| 234 | | Taxes | | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 |
| 235 | | Other | | 1,312 | 1,329 | 1,346 | 1,347 | 1,355 | 1,360 | 1,320 | 1,235 | 1,157 | 1,071 | 981 | 919 |
| 236 | | | | 1,148,364 | 1,146,290 | 1,374,872 | 1,176,739 | 1,153,348 | 1,168,389 | 1,124,013 | 1,107,249 | 1,031,574 | 986,246 | 944,640 | 865,260 |
| 237 | | **Other expenses (income)** | | 62,499 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 238 | | Margin Account | | - | - | - | - | - | (0) | - | - | - | (0) | - | - |
| 239 | | Interest paid to FNBO | | 56,550 | 56,639 | 56,286 | 42,257 | 41,443 | 40,447 | 39,690 | 38,396 | 37,056 | 35,841 | 35,126 | 33,488 |
| 240 | | Sale: Sow and GDU Animals to LOLF | | - | - | (5,966,311) | - | - | - | - | - | - | - | - | - |
| 241 | 80% | G&A Allocation | | 70,313 | 34,826 | 49,991 | 34,826 | 70,252 | 34,765 | 49,929 | 34,765 | 49,929 | 55,087 | 49,929 | 34,765 |
| 242 | 62% | Bankruptcy Cost Allocation | | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 |
| 243 | | **Total Expenses** | | 1,487,355 | 1,434,576 | (4,316,961) | 1,395,138 | 1,384,420 | 1,347,226 | 1,314,326 | 1,274,726 | 1,208,591 | 1,170,492 | 1,127,590 | 1,014,257 |
| 244 | | | | - | (0) | (5,966,311) | (0) | 0 | 0 | 0 | (0) | 0 | 0 | 0 | (0) |
| 245 | | **Net Cash Flow - FNBO** | | **342,120** | **221,775** | **6,057,353** | **422,623** | **498,470** | **429,839** | **570,258** | **667,639** | **555,526** | **475,451** | **699,403** | **869,898** |
| 246 | | **Cumulative Net Cash Flow - FNBO** | | **342,120** | **563,895** | **6,621,249** | **7,043,871** | **7,542,342** | **7,972,180** | **8,542,438** | **9,210,077** | **9,765,603** | **10,241,054** | **10,940,458** | **11,810,355** |
| 247 | | | | (2) | (3) | (3) | (3) | (3) | (3) | (3) | (2) | (2) | (2) | (2) | (2) |
| 248 | | | | (2) | (5) | (8) | (10) | (13) | (16) | (18) | (20) | (21) | (23) | (25) | (26) |
| 249 | | | | | | | | | | | | | | | |
| 250 | | | | - | - | - | - | - | 0 | - | - | - | - | - | - |
| 251 | | **LOLF BUDGET** | | - | - | - | - | - | - | - | - | - | - | - | - |
| 252 | | **Animal Inventories** | | | | | | | | | | | | | |
| 253 | | Sows | | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 |
| 254 | | Boars | | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 |
| 255 | | GDU | | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 |
| 256 | | Pigs in farrowing (21 days' Inventory) | | 25,008 | 24,376 | 23,848 | 24,617 | 25,295 | 25,545 | 25,415 | 24,728 | 24,765 | 24,783 | 25,406 | 25,395 |
| 257 | | **Total** | | 52,806 | 52,175 | 51,647 | 52,416 | 53,094 | 53,344 | 53,213 | 52,527 | 52,564 | 52,582 | 53,205 | 53,193 |

| | B | BV | BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 6 | Fiscal Period | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 7 | Fiscal Week | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | |
| 8 | Bankruptcy week | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 9 | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | *Forecast* | Forecast | Forecast | Forecast | Forecast | |
| 10 | Week Beginning Date | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 11 | Week Ending Date | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 176 | Professional fees | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 504,000 |
| 177 | Additional bankruptcy costs | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 1,000,000 |
| 178 | | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 1,504,000 |
| 179 | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 180 | **FNBO BUDGET** | | | | | | | | | | | | | |
| 181 | **Animal Inventories** | | | | | | | | | | | | | |
| 182 | Nursery | - | - | - | - | - | - | - | - | - | - | - | - | |
| 183 | Finishing | 65,912 | 63,219 | 60,298 | 52,269 | 44,404 | 36,827 | 29,292 | 21,518 | 14,770 | 7,891 | 923 | 0 | |
| 184 | **Total** | 65,912 | 63,219 | 60,298 | 52,269 | 44,404 | 36,827 | 29,292 | 21,518 | 14,770 | 7,891 | 923 | 0 | |
| 185 | **Hogs sold** | | | | | | | | | | | | | |
| 186 | Market Hogs | 7,106 | 2,242 | 2,494 | 7,614 | 7,473 | 7,221 | 7,213 | 7,486 | 6,493 | 6,799 | 6,918 | 903 | 143,266 |
| 187 | Cull Hogs | 112 | 103 | 95 | 91 | 83 | 71 | 60 | 49 | 37 | 27 | 17 | 6 | 2,544 |
| 188 | **Head** | 7,218 | 2,344 | 2,589 | 7,705 | 7,556 | 7,292 | 7,272 | 7,534 | 6,531 | 6,826 | 6,935 | 910 | 145,809 |
| 189 | Market Hogs | 2,065,892 | 679,624 | 751,351 | 2,210,799 | 2,170,576 | 2,098,739 | 2,096,279 | 2,174,105 | 1,891,312 | 1,937,680 | 1,971,684 | 257,468 | 41,685,158 |
| 190 | Cull Hogs | 21,236 | 19,476 | 18,040 | 17,256 | 15,726 | 13,506 | 11,348 | 9,237 | 7,099 | 5,070 | 3,166 | 1,231 | 483,268 |
| 191 | **Pounds** | 2,087,128 | 699,100 | 769,392 | 2,228,055 | 2,186,302 | 2,112,245 | 2,107,627 | 2,183,342 | 1,898,410 | 1,942,750 | 1,974,850 | 258,699 | 42,168,426 |
| 192 | Market Hogs | $1,761,034 | $488,769 | $529,916 | $1,559,239 | $1,481,462 | $1,432,432 | $1,453,068 | $1,507,015 | $1,321,844 | $1,354,252 | $1,141,996 | $149,125 | $32,215,113 |
| 193 | Cull Hogs | $46,549 | $38,454 | $36,589 | $36,232 | $33,744 | $32,735 | $31,989 | $31,030 | $30,772 | $29,850 | $24,146 | $23,458 | $1,002,376 |
| 194 | **Hog Sales** | $1,807,583 | $527,223 | $566,504 | $1,595,472 | $1,515,205 | $1,465,167 | $1,485,057 | $1,538,045 | $1,352,616 | $1,384,102 | $1,166,142 | $172,583 | $33,217,489 |
| 195 | Butchers lbs/head | 290.7 | 303.1 | 301.3 | 290.3 | 290.4 | 290.6 | 290.6 | 290.4 | 291.3 | 285.0 | 285.0 | 285.0 | 291.0 |
| 196 | Butchers $/head | $247.82 | $218.02 | $212.51 | $204.77 | $198.23 | $198.36 | $201.46 | $201.32 | $203.57 | $199.19 | $165.07 | $165.07 | $224.86 |
| 197 | Butchers $/cwt | $85.24 | $71.92 | $70.53 | $70.53 | $68.25 | $68.25 | $69.32 | $69.32 | $69.89 | $69.89 | $57.92 | $57.92 | $77.28 |
| 198 | | | | | | | | | | | | | | |
| 199 | **Revenues - cash basis** | | | | | | | | | | | | | |
| 200 | Market Hogs | 1,136,515 | 1,745,200 | 492,016 | 559,536 | 1,560,662 | 1,481,033 | 1,433,237 | 1,455,578 | 1,501,673 | 1,323,689 | 1,365,452 | 1,109,386 | 33,624,164 |
| 201 | Cull Hogs | 11,518 | 8,845 | 8,193 | 7,836 | 7,142 | 6,133 | 5,154 | 4,195 | 3,224 | 2,302 | 1,125 | 438 | 258,006 |
| 202 | **Hog Collections** | 1,148,033 | 1,754,044 | 500,208 | 567,372 | 1,567,803 | 1,487,166 | 1,438,390 | 1,459,773 | 1,504,896 | 1,325,992 | 1,366,577 | 1,109,824 | 33,882,170 |
| 203 | Feed | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 6,000,000 |
| 204 | **Total Collections** | 1,398,033 | 2,004,044 | 750,208 | 817,372 | 1,817,803 | 1,737,166 | 1,688,390 | 1,709,773 | 1,754,896 | 1,575,992 | 1,616,577 | 1,359,824 | 39,882,170 |
| 205 | | - | - | - | - | - | - | - | - | - | - | - | - | 0 |
| 206 | **Selling costs** | | | | | | | | | | | | | |
| 207 | Pork checkoff | 10,899 | 2,669 | 4,667 | 9,812 | 9,410 | 9,160 | 7,106 | 9,525 | 8,597 | 8,755 | 7,635 | 2,667 | 200,149 |
| 208 | Freight | 34,142 | 11,232 | 12,417 | 36,536 | 35,872 | 34,684 | 34,644 | 35,930 | 31,256 | 32,023 | 32,585 | 4,255 | 860,689 |
| 209 | | 45,041 | 13,901 | 17,084 | 46,348 | 45,282 | 43,845 | 41,750 | 45,455 | 39,854 | 40,778 | 40,219 | 6,922 | 1,060,838 |
| 210 | **Nursery expenses** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 211 | Nursery Feed | - | - | - | - | - | - | - | - | - | - | - | - | 303,105 |
| 212 | Labor, contract labor | - | - | - | - | - | - | - | - | - | - | - | - | 8,424 |
| 213 | Drugs | - | - | - | - | - | - | - | - | - | - | - | - | 13,444 |
| 214 | Utilities | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 13,728 |
| 215 | Utilities deposit | | | | | | | | | | | | | 5,769 |
| 216 | Repairs/maintenance | - | - | - | - | - | - | - | - | - | - | - | - | 5,378 |
| 217 | Lease/grower | - | - | - | - | - | - | - | - | - | - | - | - | 37,644 |
| 218 | Insurance | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 19,767 |
| 219 | Taxes | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 10,280 |
| 220 | Other | - | - | - | - | - | - | - | - | - | - | - | - | 1,182 |
| 221 | | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 418,721 |
| 222 | **Finishing expenses** | - | - | - | - | - | - | - | - | - | - | - | - | 5,769 |
| 223 | Finishing Feed | 468,583 | 453,299 | 437,250 | 381,927 | 326,929 | 273,180 | 216,752 | 160,394 | 110,893 | 59,672 | 6,316 | 0 | 11,257,692 |
| 224 | Cost of Feed Sold | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 5,760,000 |
| 225 | Change in feed inventories | (35,522) | (12,609) | (13,682) | 117,576 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (331,151) |
| 226 | Payment on Smithfield feed/genetics AP | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 892,181 |
| 227 | Labor, contract labor | 3,498 | 34,597 | 3,200 | 33,857 | 2,357 | 32,736 | 1,555 | 31,631 | 784 | 30,637 | 49 | 9 | 428,789 |
| 228 | Drugs | 1,369 | 1,313 | 1,252 | 1,086 | 922 | 765 | 608 | 447 | 307 | 164 | 19 | 0 | 32,728 |
| 229 | Utilities | 15,377 | 15,377 | 15,377 | 15,376 | 15,376 | 15,376 | 15,376 | 15,376 | 15,376 | 15,376 | 376 | 376 | 339,049 |
| 230 | Utilities deposit | | | | | | | | | | | | | 62,498 |
| 231 | Repairs/maintenance | 583 | 559 | 533 | 462 | 393 | 326 | 259 | 190 | 131 | 70 | 8 | 0 | 13,940 |
| 232 | Lease/grower | 90,609 | 29,808 | 32,954 | 96,965 | 95,201 | 92,050 | 91,942 | 95,355 | 82,952 | 84,986 | 86,477 | 11,292 | 2,069,409 |
| 233 | Insurance | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 6,917 |
| 234 | Taxes | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 17,625 |
| 235 | Other | 824 | 790 | 754 | 653 | 555 | 460 | 366 | 269 | 185 | 99 | 12 | 0 | 19,697 |
| 236 | | 838,825 | 816,638 | 771,142 | 941,407 | 735,237 | 655,916 | 567,881 | 544,686 | 451,650 | 432,026 | 334,280 | 252,700 | 20,569,374 |
| 237 | **Other expenses (income)** | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | 62,513 |
| 238 | Margin Account | - | (0) | - | - | - | - | - | - | (1,335,844) | - | - | - | (1,335,844) |
| 239 | Interest paid to FNBO | 31,698 | 30,790 | 28,690 | 28,994 | 29,792 | 27,620 | 25,666 | 23,528 | 21,310 | 15,505 | 13,304 | 10,791 | 800,907 |
| 240 | Sale: Sow and GDU Animals to LOLF | - | - | - | - | - | - | - | - | - | - | - | - | (5,966,311) |
| 241 | G&A Allocation | 49,929 | 55,087 | 49,929 | 34,765 | 49,929 | 47,206 | 49,929 | 26,883 | 49,929 | 26,883 | 70,252 | 26,883 | 1,106,981 |
| 242 | Bankruptcy Cost Allocation | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 932,480 |
| 243 | **Total Expenses** | 1,006,087 | 957,009 | 907,438 | 1,092,106 | 900,833 | 815,179 | 725,819 | 681,143 | (732,508) | 555,783 | 498,648 | 337,889 | 17,649,661 |
| 244 | | 0 | 0 | 0 | 0 | 0 | - | (0) | 0 | - | - | - | - | (5,966,311) |
| 245 | **Net Cash Flow - FNBO** | **391,947** | **1,047,035** | **(157,230)** | **(274,734)** | **916,971** | **921,987** | **962,572** | **1,028,630** | **2,487,404** | **1,020,208** | **1,117,929** | **1,021,935** | **22,232,510** |
| 246 | **Cumulative Net Cash Flow - FNBO** | **12,202,302** | **13,249,337** | **13,092,107** | **12,817,373** | **13,734,344** | **14,656,331** | **15,618,903** | **16,647,532** | **19,134,937** | **20,155,145** | **21,273,074** | **22,295,009** | **22,295,009** |
| 247 | | (2) | (1) | (1) | - | - | - | - | - | - | - | - | - | (62,529) |
| 248 | | (28) | (29) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) |
| 249 | | | | | | | | | | | | | | |
| 250 | | - | 0 | - | - | - | - | - | - | - | - | - | - | - |
| 251 | **LOLF BUDGET** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 252 | **Animal Inventories** | | | | | | | | | | | | | |
| 253 | Sows | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | |
| 254 | Boars | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | |
| 255 | GDU | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | |
| 256 | Pigs in farrowing (21 days' Inventory) | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | |
| 257 | **Total** | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | |

| | A | B | C | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | **N. G. Purvis Farms** | | | | | | | | | | | | | |
| 4 | *Cash Flow Forecast* | | | | | | | | | | | | | |
| 5 | | Fiscal Year | | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 |
| 6 | | Fiscal Period | | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 |
| 7 | | Fiscal Week | | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 8 | | Bankruptcy week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 9 | | Actual / Forecast | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| 10 | | Week Beginning Date | | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 |
| 11 | | Week Ending Date | | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 |
| 258 | | | | | | | | | | | | | | |
| 259 | | **Hogs sold** | | | | | | | | | | | | |
| 260 | | Weaned Pigs | | 7,586 | 7,411 | 7,750 | 8,355 | 8,089 | 8,000 | 8,224 | 7,402 | 8,037 | 8,243 | 8,025 |
| 261 | | Sows | | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 |
| 262 | | Gilt - Non Select Sales | | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 |
| 263 | | **Head** | | 7,872 | 7,697 | 8,036 | 8,641 | 8,375 | 8,286 | 8,510 | 7,688 | 8,323 | 8,529 | 8,311 |
| 264 | | Weaner price/Head | | $44.00 | $44.00 | $44.00 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 |
| 265 | | | | | | | | | | | | | | |
| 266 | | Sow Price/Head | | $237.58 | $242.71 | $242.71 | $242.71 | $242.71 | $242.71 | $242.45 | $242.45 | $242.45 | $242.45 | $231.87 |
| 267 | | Gilt - Non Select Price/Head | | $233.23 | $238.39 | $238.39 | $241.62 | $241.62 | $247.77 | $243.52 | $243.52 | $243.52 | $244.23 | $245.40 |
| 268 | | | | | | | | | | | | | | |
| 269 | | **Revenues - cash basis** | | | | | | | | | | | | |
| 270 | | Weaned Pigs | | - | 333,785 | 326,065 | 341,012 | 304,945 | 295,240 | 292,003 | 300,182 | 270,183 | 293,349 | 300,854 |
| 271 | | Gilt - Non Select Sales | | 33,294 | 34,031 | 34,031 | 34,492 | 34,492 | 35,370 | 34,763 | 34,763 | 34,763 | 34,865 | 35,031 |
| 272 | | Sows | | 34,067 | 34,803 | 34,803 | 34,803 | 34,803 | 34,803 | 34,765 | 34,765 | 34,765 | 34,765 | 33,247 |
| 273 | | | | 67,361 | 402,619 | 394,898 | 410,307 | 374,239 | 365,413 | 361,531 | 369,710 | 339,711 | 362,979 | 369,132 |
| 274 | | **Sow unit expenses to LOL** | | - | - | - | - | - | - | - | - | - | - | - |
| 275 | | Feed | | 146,739 | 147,805 | 147,486 | 147,430 | 147,111 | 142,097 | 141,778 | 141,459 | 141,216 | 133,514 | 133,454 |
| 276 | | Labor, contract labor | | 21,885 | 116,845 | 18,997 | 119,580 | 20,517 | 116,541 | 21,733 | 114,870 | 21,429 | 118,972 | 21,239 |
| 277 | | Drugs | | 18,090 | 17,517 | 18,104 | 19,799 | 18,975 | 18,693 | 19,472 | 17,296 | 18,988 | 19,642 | 18,913 |
| 278 | | AI Expense | | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 |
| 279 | | Royalties | | 13,861 | 13,555 | 14,185 | 15,215 | 14,665 | 14,610 | 15,008 | 13,590 | 14,663 | 15,029 | 14,606 |
| 280 | | Utilities | | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 |
| 281 | | Utilities deposit | | 24,999 | | | | | | | | | | |
| 282 | | Repairs/maintenance | | 9,436 | 9,436 | 9,436 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 |
| 283 | | Lease/grower | | 33,316 | 32,636 | 31,630 | 36,731 | 33,469 | 33,529 | 34,298 | 30,293 | 33,644 | 36,733 | 34,569 |
| 284 | | Insurance | | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 |
| 285 | | Taxes | | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 |
| 286 | | Other | | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 |
| 287 | | | | 303,120 | 372,588 | 274,632 | 381,315 | 277,296 | 368,030 | 274,848 | 360,067 | 272,500 | 366,451 | 265,340 |
| 288 | | **GDU expenses to LOL** | | 24,967 | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) |
| 289 | | Feed | | 54,400 | 55,276 | 55,269 | 55,364 | 55,357 | 53,239 | 53,232 | 53,225 | 53,245 | 50,366 | 50,451 |
| 290 | | Labor, contract labor | | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 |
| 291 | | Drugs | | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 |
| 292 | | Utilities | | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 |
| 293 | | Utilities deposit | | 2,885 | | | | | | | | | | |
| 294 | | Repairs/maintenance | | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 |
| 295 | | Lease/grower | | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 |
| 296 | | Insurance | | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 |
| 297 | | Taxes | | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 |
| 298 | | Other | | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 |
| 299 | | | | 63,964 | 66,176 | 61,949 | 66,264 | 62,037 | 64,138 | 59,911 | 64,124 | 59,924 | 61,266 | 57,131 |
| 300 | | | | 2,884 | - | - | - | - | - | - | - | - | - | - |
| 301 | | Interest paid to LOL | | 39,486 | - | - | - | 60,617 | - | - | - | - | 60,617 | - |
| 302 | | Purchase: Sow and GDU Animals from FNBO | | - | - | 5,966,311 | - | - | - | - | - | - | - | - |
| 303 | 20% | G&A Allocation | | 17,578 | 8,707 | 12,498 | 8,707 | 17,563 | 8,691 | 12,482 | 8,691 | 12,482 | 13,772 | 12,482 |
| 304 | 38% | Bankruptcy Cost Allocation | | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 |
| 305 | | | | - | - | - | - | - | - | - | - | - | (0) | - |
| 306 | | **Total Expenses** | | 447,962 | 471,283 | 6,339,202 | 480,099 | 441,326 | 464,673 | 371,055 | 456,696 | 368,720 | 525,918 | 358,766 |
| 307 | | | | | | | | | | | | | | |
| 308 | | **Net Cash Flow - LOL** | | **(380,601)** | **(68,665)** | **(5,944,304)** | **(69,792)** | **(67,087)** | **(99,260)** | **(9,524)** | **(86,986)** | **(29,008)** | **(162,939)** | **10,366** |
| 309 | | **Cumulative Net Cash Flow - LOL** | | **(380,601)** | **(449,266)** | **(6,393,569)** | **(6,463,361)** | **(6,530,447)** | **(6,629,707)** | **(6,639,231)** | **(6,726,217)** | **(6,755,225)** | **(6,918,165)** | **(6,907,799)** |
| 310 | | | | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |
| 311 | | **Total Net Cash Flow** | | **(38,481)** | **153,110** | **113,050** | **352,831** | **431,384** | **330,579** | **560,734** | **580,653** | **526,518** | **312,512** | **709,769** |
| 312 | | **Total Cumulative Net Cash Flow** | | **(38,481)** | **114,630** | **227,680** | **580,511** | **1,011,894** | **1,342,473** | **1,903,207** | **2,483,860** | **3,010,378** | **3,322,890** | **4,032,659** |
| 313 | | | | 30 | 28 | 29 | 29 | 29 | 29 | 29 | 30 | 30 | 30 | 30 |
| 314 | | ***Difference > FNBO and LOL pieces*** | | 0 | (0) | 0 | 0 | (0) | (0) | (0) | 0 | (0) | 0 | 0 |

| | B | BU | BV | BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 6 | Fiscal Period | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 7 | Fiscal Week | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | |
| 8 | Bankruptcy week | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 9 | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | *Forecast* | Forecast | Forecast | Forecast | Forecast | |
| 10 | Week Beginning Date | 25-Jul-21 | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 11 | Week Ending Date | 31-Jul-21 | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 258 | | | | | | | | | | | | | | | |
| 259 | **Hogs sold** | | | | | | | | | | | | | | |
| 260 | Weaned Pigs | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 191,449 |
| 261 | Sows | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 3,441 |
| 262 | Gilt - Non Select Sales | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 3,426 |
| 263 | **Head** | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 198,317 |
| 264 | Weaner price/Head | $36.50 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $37.94 |
| 265 | | | | | | | | | | | | | | | |
| 266 | Sow Price/Head | $231.87 | $231.87 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $151.92 | $151.92 | $215.32 |
| 267 | Gilt - Non Select Price/Head | $245.40 | $245.40 | $207.42 | $198.92 | $198.92 | $186.35 | $186.35 | $187.99 | $187.99 | $192.98 | $192.98 | $161.26 | $161.26 | $217.27 |
| 268 | | | | | | | | | | | | | | | |
| 269 | **Revenues - cash basis** | | | | | | | | | | | | | | |
| 270 | Weaned Pigs | 292,920 | 292,920 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 7,262,822 |
| 271 | Gilt - Non Select Sales | 35,031 | 35,031 | 29,609 | 28,396 | 28,396 | 26,602 | 26,602 | 26,836 | 26,836 | 27,548 | 27,548 | 23,021 | 23,021 | 744,370 |
| 272 | Sows | 33,247 | 33,247 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 21,784 | 21,784 | 740,990 |
| 273 | | 361,198 | 361,198 | 386,480 | 385,267 | 385,267 | 383,473 | 383,473 | 383,706 | 383,706 | 384,419 | 384,419 | 373,838 | 373,838 | 8,748,183 |
| 274 | **Sow unit expenses to LOL** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 275 | Feed | 133,443 | 133,824 | 133,689 | 133,890 | 133,567 | 133,248 | 132,929 | 131,464 | 131,145 | 130,826 | 130,506 | 118,550 | 118,550 | 3,265,718 |
| 276 | Labor, contract labor | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 1,663,009 |
| 277 | Drugs | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 451,358 |
| 278 | AI Expense | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 142,877 |
| 279 | Royalties | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 348,865 |
| 280 | Utilities | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 151,047 |
| 281 | Utilities deposit | | | | | | | | | | | | | | 24,999 |
| 282 | Repairs/maintenance | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 191,386 |
| 283 | Lease/grower | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 820,239 |
| 284 | Insurance | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 137,118 |
| 285 | Taxes | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 105,223 |
| 286 | Other | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 298,797 |
| 287 | | 361,657 | 265,710 | 361,903 | 265,777 | 361,782 | 265,135 | 361,144 | 263,350 | 359,359 | 262,712 | 358,721 | 250,436 | 346,764 | 7,600,636 |
| 288 | **GDU expenses to LOL** | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | 24,242 |
| 289 | Feed | 50,554 | 50,830 | 50,867 | 51,045 | 51,037 | 51,030 | 51,023 | 50,554 | 50,547 | 50,540 | 50,533 | 43,896 | 43,896 | 1,235,772 |
| 290 | Labor, contract labor | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 58,300 |
| 291 | Drugs | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 104,160 |
| 292 | Utilities | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 13,130 |
| 293 | Utilities deposit | | | | | | | | | | | | | | 2,885 |
| 294 | Repairs/maintenance | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 11,126 |
| 295 | Lease/grower | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 7,166 |
| 296 | Insurance | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 5,719 |
| 297 | Taxes | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 3,324 |
| 298 | Other | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 8,028 |
| 299 | | 61,453 | 57,510 | 61,766 | 57,725 | 61,936 | 57,709 | 61,922 | 57,233 | 61,446 | 57,219 | 61,432 | 50,576 | 54,796 | 1,449,609 |
| 300 | | - | - | - | - | - | - | - | - | - | - | - | - | - | 2,884 |
| 301 | Interest paid to LOL | - | - | 60,617 | - | - | - | - | 60,617 | - | - | - | 60,617 | - | 342,570 |
| 302 | Purchase: Sow and GDU Animals from FNBO | - | - | - | - | - | - | - | - | - | - | - | - | - | 5,966,311 |
| 303 | G&A Allocation | 8,691 | 12,482 | 13,772 | 12,482 | 8,691 | 12,482 | 11,801 | 12,482 | 6,721 | 12,482 | 6,721 | 17,563 | 6,721 | 276,745 |
| 304 | Bankruptcy Cost Allocation | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 571,520 |
| 305 | | - | - | (0) | - | - | - | - | - | (0) | - | (0) | - | (0) | - |
| 306 | **Total Expenses** | 455,615 | 359,516 | 521,871 | 359,797 | 456,223 | 359,140 | 458,681 | 417,496 | 451,339 | 356,227 | 450,687 | 403,005 | 432,094 | 16,207,391 |
| 307 | | | | | | | | | | | | | | | |
| 308 | **Net Cash Flow - LOL** | **(94,417)** | **1,682** | **(135,391)** | **25,470** | **(70,956)** | **24,333** | **(75,208)** | **(33,790)** | **(67,633)** | **28,192** | **(66,268)** | **(29,167)** | **(58,256)** | **(7,459,208)** |
| 309 | **Cumulative Net Cash Flow - LOL** | **(7,002,216)** | **(7,000,534)** | **(7,135,925)** | **(7,110,456)** | **(7,181,412)** | **(7,157,078)** | **(7,232,286)** | **(7,266,076)** | **(7,333,709)** | **(7,305,517)** | **(7,371,785)** | **(7,400,952)** | **(7,459,208)** | **(7,459,208)** |
| 310 | | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 757 |
| 311 | **Total Net Cash Flow** | **775,480** | **393,628** | **911,644** | **(131,760)** | **(345,689)** | **941,304** | **846,780** | **928,782** | **960,996** | **2,515,596** | **953,940** | **1,088,762** | **963,679** | **14,773,301** |
| 312 | **Total Cumulative Net Cash Flow** | **4,808,139** | **5,201,768** | **6,113,411** | **5,981,651** | **5,635,962** | **6,577,265** | **7,424,045** | **8,352,827** | **9,313,824** | **11,829,420** | **12,783,360** | **13,872,122** | **14,835,801** | **14,835,801** |
| 313 | | 30 | 30 | 30 | 30 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | (61,772) |
| 314 | ***Difference > FNBO and LOL pieces*** | (0) | (0) | (0) | 0 | 0 | (0) | (0) | 0 | (0) | 0 | 0 | (0) | (0) | (0) |

**EXHIBIT B**

DIP Loan Note

# PROMISSORY NOTE

**Borrower:** **N. G. Purvis Farms, Inc.**
**2504 Spies Road**
**Robbins, NC 27325**

**Lender:** **LOL Finance Co.**
**Main Office**
**PO Box 64408**
**St. Paul, MN 55164-0408**

**Principal Amount: $7,600,000.00** **Initial Rate: 3.650%** **Date of Note: May [__], 2021**

**PROMISE TO PAY. N. G. Purvis Farms, Inc. ("Borrower") promises to pay to LOL Finance Co. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Seven Million Six Hundred Thousand & 00/100 Dollars ($7,600,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.**

**PAYMENT. Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in accordance with the following payment schedule:**

**Regular monthly payments of all unpaid accrued Interest beginning June 1, 2021. Interest is due through the last day of each month and payable by the 15th day of each following month and then monthly thereafter until January 1, 2022, or if applicable, such later date as the effective date with respect to any plan of reorganization or liquidation of the Borrower under Chapter 11 of the Bankruptcy Code in accordance with the terms of the DIP Credit Agreement (as defined below), at which time the entire outstanding Principal balance and all unpaid accrued Interest shall be due and payable in full.**

Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. **Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the LOL Finance Co. Variable Monthly Index ("VMI") (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each month. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 3.650% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate equal to the Index, resulting in an initial rate of 3.650% per annum. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and add a positive or negative margin (percentage added to or subtracted from the substitute index value) as part of the rate determination. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/365 simple interest basis; that is, by applying the ratio of the interest rate over the number of days in a year (365 for all years, including leap years), multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.**

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: LOL Finance Co., Main Office, PO Box 64408, St. Paul, MN 55164-0408.**

**LATE CHARGE.** If a payment is 20 days or more late, Borrower will be charged **5.000% of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 2.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note

or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.**   The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.**   Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan.   This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.   However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.**   Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.**   Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.**   A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.**   If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default:   (1)   cures the default within thirty (30) days; or   (2)   if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.**   Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.**   Lender may hire or pay someone else to help collect this Note if Borrower does not pay.   Borrower will pay Lender that amount.   This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.   If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.   This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Minnesota without regard to its conflicts of law provisions.   This Note has been accepted by Lender in the State of Minnesota.**

**RIGHT OF SETOFF.**   To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account).   This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future.   However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.   Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.**   Borrower acknowledges this Note is secured by

**Real Property located at Moore County, North Carolina, per Deed of Trust dated January 16, 2014, recorded in Book #4317, Page #337, on January 28, 2014; and, Real Property located at Richmond County, North Carolina, per Deed of Trust dated January 16, 2014, recorded in Book #1650, Page #233, on January 28, 2014; and, Real Property located at Chatham County, North Carolina, per Deed of Trust dated January 16, 2014, recorded in Book #1728, Page #0555, on January 28, 2014; and, Real Property located at Montgomery County, North Carolina, per Deed of Trust dated January 16, 2014, recorded in Book #730, Page #299, on January 28, 2014; and, Real Property located at Montgomery County, North Carolina, per Deed of Trust dated December 12, 2014, recorded in Book #745, Page #862, on December 15, 2014; and, Real Property located at Warren County, North Carolina, per Deed of Trust dated May 27, 2016, recorded in Book #00995, Page #0105, on May 27, 2016; and, Real Property located at Oglethorpe County, Georgia, per Security Deed dated June 5, 2017, recorded as Document #001736, on July 13, 2017; and, Real Property located at Oglethorpe County, Georgia, per Construction Security Deed dated October 19, 2017, recorded as Document #002675, on December 8, 2017; and, Real Property located at Montgomery County, North Carolina, per Deed of Trust dated June 1, 2020, recorded in Book #848, Page #206, on June 4, 2020; and, Real Property located at Moore County, North Carolina, per Deed of Trust dated June 1, 2020, recorded in Book #5341, Page #182, on June 4, 2020; and, All Business/Farm Assets, including, All Livestock (including Swine), Machinery, Equipment and Fixtures; and, All Inventory (including Feed), Contract Rights, Accounts Receivable, Deposit Accounts, Rights to Payment, Chattel, Chattel Paper, Instruments, General Intangibles, Investment Property and other Personal Property as further described per Commercial Security Agreement dated as of the date hereof.**

**The Loan/Line pursuant to this Note is subject to all the terms and conditions of all previously and simultaneously executed loan agreements and security instruments, including the Debtor-in-Possession Credit Agreement dated as of the date hereof (the "DIP Credit Agreement").**

**This Note is guaranteed by each of David Phillip Purvis, Melvin Green Purvis, Judith Essary Purvis, Larry McArthur Purvis, Betty Garner Purvis, Robert Worth McFayden, Marie Purvis McFayden and Jerry Monroe Purvis.   The foregoing Persons are hereinafter referred to individually and collectively as the "Guarantor" pursuant to those certain Guaranty Agreements dated as of the date hereof in favor of the Lender.**

**This Note is the "DIP Loan Note" as contemplated under the DIP Credit Agreement and is being delivered pursuant to Section 2.1(c) of the DIP Credit Agreement and amends, restates, and consolidates the Pre-Petition Notes (as defined and described below).   In the event of a conflict between the provisions in this Note and those of the DIP Credit Agreement, the DIP Credit Agreement shall control.**

**LINE OF CREDIT.**   This Note evidences a revolving line of credit.   Borrower agrees to be liable for all sums either:   (A)   advanced in accordance with the instructions of an authorized person or   (B)   credited to any of Borrower's accounts with Lender.   The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**CONVERSION FEE.**
**Once the loan documents have been executed and received by Lender, the Fee for conversion to another Loan Product or Pricing Tier ("Conversion Fee") will be 1.25% of the loan amount if within the first twelve (12) months of the Promissory Note date, or 0.50% of the loan amount, if thereafter**.

**SUCCESSOR INTERESTS.**   The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.**   Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: LOL Finance Co., Main Office, PO Box 64408, St. Paul, MN   55164-0408.

**GENERAL PROVISIONS.**   This Note is payable on demand.   The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand.   If any part of this Note cannot be enforced, this fact will not affect the rest of the Note.   Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them.   In addition, Lender shall have all the rights and remedies provided in the related documents or available at law, in equity, or otherwise.   Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently.   Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower shall not affect Lender's right to declare a default and to exercise its rights and remedies.   Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor.   Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.   All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.   All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.   The obligations under this Note are joint and several.

**SECTION DISCLOSURE.**   To the extent not preempted by federal law, this loan is made under Minnesota Statutes, Section 47.59.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

**N. G. PURVIS FARMS, INC.**

**By: ____________________________________________**

**Jerry Monroe Purvis, Director/Shareholder/President of N. G. Purvis Farms, Inc.**

**LENDER:**

**LOL FINANCE CO.**

**X ____________________________________________**
**Authorized Signer**

# EXHIBIT C

Term Loan Note

# PROMISSORY NOTE

**Borrower:** **N. G. Purvis Farms, Inc.; David Phillip Purvis; Melvin Green Purvis; Judith Essary Purvis; Larry McArthur Purvis; Betty Garner Purvis; Robert Worth McFayden; Marie Purvis McFayden; and Jerry Monroe Purvis**
**2504 Spies Road**
**Robbins, NC 27325**

**Lender:** **LOL Finance Co.**
**Main Office**
**PO Box 64408**
**St. Paul, MN 55164-0408**

**Principal Amount: $14,241,515.27** **Date of Note: May [__], 2021**

**PROMISE TO PAY. N. G. Purvis Farms, Inc.; David Phillip Purvis; Melvin Green Purvis; Judith Essary Purvis; Larry McArthur Purvis; Betty Garner Purvis; Robert Worth McFayden; Marie Purvis McFayden; and Jerry Monroe Purvis ("Borrower") jointly and severally promise to pay to LOL Finance Co. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Fourteen Million Two Hundred Forty One Thousand Five Hundred Fifteen and 27/100 United States Dollars ($14,241,515.27), together with interest on the unpaid principal balance from the date hereof, until paid in full.**

**PAYMENT. Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: regular monthly payments of all unpaid accrued Interest beginning June 1, 2021. Interest is due through the last day of each month and payable by the 15th day of each following month and then monthly thereafter until the effective date of the confirmed plan of reorganization with interest calculated on the unpaid principal balances using an interest rate of 4.130% per annum. Principal and Interest on this loan shall be payable in monthly installments for the first three (3) years commencing on the effective date of the confirmed plan of reorganization (the "Bankruptcy Effective Date"), based upon a twenty-five (25) year amortization with interest calculated on the unpaid principal balances using an interest rate of 4.130% per annum. Beginning with the last day of the month following the three (3) year anniversary of the Bankruptcy Effective Date, Principal and Interest on this loan shall be payable in monthly installments based upon a twelve (12) year amortization with interest calculated on the unpaid principal balances using an interest rate of 4.130% per annum. A final Principal and Interest payment shall be payable no later than the fifteen (15) year anniversary of the Bankruptcy Effective Date with interest calculated on the unpaid principal balances using an interest rate of 4.130% per annum. The final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/365 simple interest basis; that is, by applying the ratio of the interest rate over the number of days in a year (365 for all years, including leap years), multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.**

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: LOL Finance Co., Main Office, PO Box 64408, St. Paul, MN 55164-0408.**

**LATE CHARGE.** If a payment is 20 days or more late, Borrower will be charged **5.000% of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 2.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. After maturity, or after this Note would have matured had there been no default, the Default Rate Margin will continue to apply to the final interest rate described in this Note. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any

proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.**   Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan.   This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.   However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.**   Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.**   Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.**   A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.**   If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default:   (1)   cures the default within thirty (30) days; or   (2)   if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.**   Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.**   Lender may hire or pay someone else to help collect this Note if Borrower does not pay.   Borrower will pay Lender that amount.   This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.   If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.   This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Minnesota without regard to its conflicts of law provisions.   This Note has been accepted by Lender in the State of Minnesota.**

**RIGHT OF SETOFF.**   To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account).   This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future.   However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.   Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.**   Borrower acknowledges this Note is secured by

**Real Property located at Moore County, North Carolina, per Deed of Trust dated January 16, 2014, recorded in Book #4317, Page #337, on January 28, 2014; and, Real Property located at Richmond County, North Carolina, per Deed of Trust dated January 16, 2014, recorded in Book #1650, Page #233, on January 28, 2014; and, Real Property located at Chatham County, North Carolina, per Deed of Trust dated January 16, 2014, recorded in Book #1728, Page #0555, on January 28, 2014; and, Real Property located at Montgomery County, North Carolina, per Deed of Trust dated January 16, 2014, recorded in Book #730, Page #299, on January 28, 2014; and, Real Property located at Montgomery County, North Carolina, per Deed of Trust dated December 12, 2014, recorded in Book #745, Page #862, on December 15, 2014; and, Real Property located at Warren County, North Carolina, per Deed of Trust dated May 27, 2016, recorded in Book #00995, Page #0105, on May 27, 2016; and, Real Property located at Oglethorpe County, Georgia, per Security Deed dated June 5, 2017, recorded as Document #001736, on July 13, 2017; and, Real Property located at Oglethorpe County, Georgia, per Construction Security Deed dated October 19, 2017, recorded as Document #002675, on December 8, 2017; and, Real Property located at Montgomery County, North Carolina, per Deed of Trust dated June 1, 2020, recorded in Book #848, Page #206, on June 4, 2020; and, Real Property located at Moore County, North Carolina, per Deed of Trust dated June 1, 2020, recorded in Book #5341, Page #182, on June 4, 2020; and, All Business/Farm Assets, including, All Livestock (including Swine), Machinery, Equipment and Fixtures; and, All Inventory (including Feed), Contract Rights, Accounts Receivable, Deposit Accounts, Rights to Payment, Chattel, Chattel Paper, Instruments, General Intangibles, Investment Property and other Personal Property as further described per Commercial Security Agreement dated as of the date hereof.**

**The Loan/Line pursuant to this Note is subject to all the terms and conditions of all previously and simultaneously executed loan agreements and security instruments, including the Debtor-in-Possession Credit Agreement dated as of the date hereof (the "DIP Credit Agreement").**

**This Note is the "Term Note" as contemplated under the DIP Credit Agreement and is being delivered pursuant to Section 2.2(e) of the DIP Credit Agreement and amends, restates, and consolidates the Pre-Petition Notes (as defined and described below).   In the event of a conflict between the provisions in this Note and those of the DIP Credit Agreement, the DIP Credit Agreement shall control.**

**It is expressly intended, understood, and agreed that this Note shall replace each Pre-Petition Note as evidence of the indebtedness previously represented thereunder, and all indebtedness heretofore represented by any Pre-Petition Note, as of the date hereof, shall be considered consolidated and outstanding under this Note from and after the date hereof and shall not be considered paid (nor shall Borrower's obligation to pay the same be considered novated, discharged or satisfied) as a result of the issuance of this Note.   The Borrowers have previously executed and delivered the following notes, instruments and other supporting documents:**

(a)   David Philip Purvis and Tracey Bunting Purvis are jointly and severally indebted to the Lender pursuant to that certain (i) Promissory Note dated as of October 1, 2018 in the original principal amount of $2,351,688.04 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "David/Tracey October Note"), and (ii) Promissory Note dated as of December 4, 2018 in the original principal amount of $500,000 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "David/Tracey December Note" and with the David/Tracey October Note, collectively, the "David/Tracey Notes") and guaranteed by the Borrower pursuant to that certain Commercial Guaranty from the Borrower to the Lender and dated October 1, 2018 and that certain Commercial Guaranty from the Borrower to the Lender and dated December 4, 2018 (collectively, the "David/Tracey Guaranties");

(b) Jerry Monroe Purvis is indebted to the Lender pursuant to that certain (i) Promissory Note dated as of October 1, 2018 in the original principal amount of $2,351,688.04 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Jerry October Note"), and (ii) Promissory Note dated as of December 4, 2018 in the original principal amount of $500,000 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Jerry December Note" and with the Jerry October Note, collectively, the "Jerry Notes") and guaranteed by the Borrower pursuant to that certain Commercial Guaranty from the Borrower to the Lender and dated October 1, 2018 and that certain Commercial Guaranty from the Borrower to the Lender and dated December 4, 2018 (collectively, the "Jerry Guaranties");

(c) Larry McArthur Purvis and Betty Garner Purvis are jointly and severally indebted to the Lender pursuant to that certain (i) Promissory Note dated as of October 1, 2018 in the original principal amount of $2,351,688.04 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Larry/Betty October Note"), and (ii) Promissory Note dated as of December 4, 2018 in the original principal amount of $500,000 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Larry/Betty December Note" and with Larry/Betty October Note, collectively, the "Larry/Betty Notes") and guaranteed by the Borrower pursuant to that certain Commercial Guaranty from the Borrower to the Lender and dated October 1, 2018 and that certain Commercial Guaranty from the Borrower to the Lender and dated December 4, 2018 (collectively, the "Larry/Betty Guaranties");

(d) Melvin Green Purvis and Judith Essary Purvis are jointly and severally indebted to the Lender pursuant to that certain (i) Promissory Note dated as of October 1, 2018 in the original principal amount of $2,351,688.04 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Melvin/Judith October Note"), and (ii) Promissory Note dated as of December 4, 2018 in the original principal amount of $500,000 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Melvin/Judith December Note" and with the Melvin/Judith October Note, collectively, the "Melvin/Judith Notes") and guaranteed by the Borrower pursuant to that certain Commercial Guaranty from the Borrower to the Lender and dated October 1, 2018 and that certain Commercial Guaranty from the Borrower to the Lender and dated December 4, 2018 (collectively, the "Melvin/Judith Guaranties");

(e) Robert Worth McFayden and Marie Purvis McFayden are jointly and severally indebted to the Lender pursuant to that certain (i) Promissory Note dated as of October 1, 2018 in the original principal amount of $2,351,688.04 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Robert/Marie October Note"), and (ii) Promissory Note dated as of December 4, 2018 in the original principal amount of $500,000 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "Robert/Marie December Note" and with the Robert/Marie October Note, collectively, the "Robert/Marie Notes"; and the Robert/Marie Notes with the David/Tracey Notes, the Jerry Notes, the Larry/Betty Notes, and the Melvin/Judith Notes, collectively, the "2018 Notes") and guaranteed by the Borrower pursuant to that certain Commercial Guaranty from the Borrower to the Lender and dated October 1, 2018 and that certain Commercial Guaranty from the Borrower to the Lender and dated December 4, 2018 (collectively, the "Robert/Marie Guaranties" and together with the David/Tracey Guaranties, the Jerry Guaranties, the Larry/Betty Guaranties, and the Melvin/Judith Guaranties, collectively, the "Borrower Guaranties"); and

(f) Borrower jointly and severally issued in favor of the Lender that certain Promissory Note dated as of January 28, 2020 in the original principal amount of $1,000,000 (as amended, restated, supplemented, or otherwise modified in writing prior to the date hereof, the "2020 Note"; and the 2020 Note with the 2018 Notes, each a "Pre-Petition Note" and, collectively, the "Pre-Petition Notes").

**CONVERSION FEE.**
**Once the loan documents have been executed and received by Lender, the Fee for conversion to another Loan Product or Pricing Tier ("Conversion Fee") will be 1.25% of the loan amount if within the first twelve (12) months of the Promissory Note date, or 0.50% of the loan amount, if thereafter**.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: LOL Finance Co., Main Office, PO Box 64408, St. Paul, MN 55164-0408.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. In addition, Lender shall have all the rights and remedies provided in the related documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower shall not affect Lender's right to declare a default and to exercise its rights and remedies. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**SECTION DISCLOSURE.** To the extent not preempted by federal law, this loan is made under Minnesota Statutes, Section 47.59.

**PRIOR TO SIGNING THIS NOTE, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. EACH BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

**N. G. PURVIS FARMS, INC.**

**By: ______________________________________**

**Jerry Monroe Purvis,**
**Director/Shareholder/President of N. G. Purvis Farms, Inc.**

**X ______________________________________**

**David Phillip Purvis, Individually**

**X ______________________________________**

**Judith Essary Purvis, Individually**

**X ______________________________________**

**Betty Garner Purvis, Individually**

**X ______________________________________**

**Marie Purvis McFayden, Individually**

**X ______________________________________**

**Melvin Green Purvis, Individually**

**X ______________________________________**

**Larry McArthur Purvis, Individually**

**X ______________________________________**

**Robert Worth McFayden, Individually**

**X ______________________________________**

**Jerry Monroe Purvis, Individually**

**LENDER:**

**LOL FINANCE CO.**

**X ______________________________________**
**Authorized Signer**

**SCHEDULE 1.1(a)**

Permitted Debt

| Creditor | Date | Outstanding Balance as of 4/23/2021 |
|---|---|---|
| Pollitt Ventures, Inc. d/b/a Gilchrest Farms | | $150,000 |
| Ford Motor Credit | Various dates for 9 vehicle loans | ~$128,000 |
| North Moore Management, LLC | October 1, 2013 (three-year evergreen) | Lease/$74,800/year plus triple net lease terms |
| Copperhead Farms, LLC | October 10, 2006-October 31, 2021 | Lease/all operating and other costs which shall not exceed $338,856.57/year |

# SCHEDULE 1.1(b)

Permitted Investments

None.

**SCHEDULE 1.1(c)**

Permitted Liens

None.

**SCHEDULE 4.6**

Pending Litigation

*Sunrise Cooperative, Inc. v. N. G. Purvis Farms, Inc.*
Court of Common Pleas, Shelby County, Ohio, Case No.: 21 CV 000068

*Clinton R. Wood, Jr. d/b/a JR. Wood v. N. G. Purvis Farms, Inc. and Bonlee Mills LLC*
Davidson County District Court, Case No.: 21 CVD 386

*Travis Buchanan d/b/a Buchanan Farms v. N. G. Purvis Farms, Inc.*
Lee County Superior Court, Case No.: 21 CVS 225

**SCHEDULE 4.11**

Equity Interests of Purvis

| | |
|---|---|
| Marie P. McFayden | 20% |
| David Purvis | 20% |
| Jerry M. Purvis | 20% |
| Larry M. Purvis | 20% |
| Melvin G. Purvis | 20% |

**SCHEDULE 4.16**

Agreements Regarding Rights, Options and Leases

None.

# SCHEDULE 4.17

## Collateral Locations

| Farm Name | Address | City | State | Zip Code | Type | Ownership | Hogs | Equipment | Feed | Med/Supplies |
|---|---|---|---|---|---|---|---|---|---|---|
| Pollitt Ventures (Gilchrest Farm) | PO Box 936 | Clarkesville | GA | 30523 | Sow | Leased | This farm is empty | | | |
| P & F Farms, Inc. (P&F/Small Farm) | 1210 Lake Fork Road | Salisbury | NC | 28146 | Sow | Leased | x | | x | x |
| LMS, LLC (Cognac Farm) | 1227 Rockingham Road | Rockingham | NC | 28379 | Sow | Leased | x | | x | x |
| JD Farms (#327) | 170 Cognac Road | Marston | NC | 28363 | Nursery | Leased | x | | x | x |
| Spring Valley | 254 Spring Valley Road | Norlina | NC | 27563 | Nursery | Leased | x | | x | x |
| NC Farm of Wise (Engel Nursery) | 973 Kerr Lake Cole Bridge Rd. | Norlina | NC | 27563 | Nursery | Leased | x | | x | x |
| North Moore Management (Clearview) | 2504 Spies Road | Robbins | NC | 27325 | Finisher | Leased | x | | x | |
| Copperhead Farms | 2504 Spies Road | Robbins | NC | 27325 | Finisher | Leased | x | | x | |
| Key Farms, Inc. (Gilbert Key) | 596 Maness Road | Robbins | NC | 27325 | Finisher | Leased | x | | x | |
| JF Carroll Farms LLC | 526 County Line Rd | Ellerbe | NC | 28338 | Finisher | Leased | x | | x | |
| David Sullivan (#116) | 342 Linwood Lane | Rockingham | NC | 28379 | Finisher | Leased | x | | x | |
| Oakland Farms (Joe Cox #120) | 5567 Joe Dean Trail | Ramseur | NC | 27316 | Finisher | Leased | x | | x | |
| Jonathan Brent Jester (#126) | 1248 Wright Country Road | Ramseur | NC | 27316 | Finisher | Leased | x | | x | |
| Don A Gibbons Jr. (Loblolly #131) | 3796 Bethlehem Church Rd. | Carthage | NC | 28327 | Finisher | Leased | x | | x | |
| Nick Craven (#133) | 4718 Lambeth Mill Rd | Bennett | NC | 27208 | Finisher | Leased | x | | x | |
| Applefield Farms | 5403 Hwy 150-E | Brown Summitt | NC | 27214 | Finisher | Leased | x | | x | |
| Hill Top Finisher | 215 Cotton road | Riedsville | NC | 27320 | Finisher | Leased | x | | x | |
| Neal H. Grant (Mountain View #142) | 1794 N. U.S. Hwy. 220 | Ellerbe | NC | 28336 | Finisher | Leased | This farm is empty | | | |
| Melvin K. Huneycutt (#144) | 28376 Milling Port Road | Albemarle | NC | 28001 | Finisher | Leased | x | | x | |
| Dennis Loflin | 1007 Skeen Road | Denton | NC | 27239 | Finisher | Leased | x | | x | |
| Thurman Jessup (#161) | 6913 Brush Creek Road | Bennett | NC | 27208 | Finisher | Leased | x | | x | |
| Chris Redding Farm | 4100 Baker Farm Road | Sophia | NC | 27350 | Finisher | Leased | x | | x | |
| Spring Valley Finisher | 254 Spring Valley Road | Norlina | NC | 27563 | Finisher | Leased | x | | x | |
| NC-Engel Finisher | 847 Kerr Lake Cole Bridge Rd. | Norlina | NC | 27563 | Finisher | Leased | x | | x | |
| Mike and Robin Lackey (Beaver Creek #170) | 2425 Breeze Road | Hurdle Mills | NC | 27541 | Finisher | Leased | This farm is empty | | | |
| Rusty Cox | 5312 Dudley Road | Monroe | NC | 28112 | Finisher | Leased | x | | x | |
| Meadow Creek | 507 Alston Bridge Road | Siler City | NC | 27344 | Finisher | Leased | x | | x | |
| Davistown Farming | 1002 Ferndale Court | Wilson | NC | 27893 | Finisher | Leased | This farm is empty | | | |
| Bruce & Darlene Humble (#195) | 6632 Smithwood Rd | Liberty | NC | 27298 | Finisher | Leased | x | | x | |
| JD Farms (#196) | 170 Cognac Road | Marston | NC | 28363 | Finisher | Leased | x | | x | |
| James C Bell (#250) | 3100 B&S Road | Loris | SC | 29569 | Finisher | Leased | This farm is empty | | | |
| Jimmy Huggins / Huggins Farm (#251) | 5424 Bluff Road | Mullins | SC | 29574 | Finisher | Leased | x | | x | |
| Jimmy Bailey (#252) | 6400 Jordan Creek Rd. | Nichols | SC | 29581 | Finisher | Leased | x | | x | |
| Debra H. Barnhill (#253) | 460 River Front S | Conway | SC | 29527 | Finisher | Leased | x | | x | |
| Butler Farms | 1314 Pisgah Church Rd. | Aynor | SC | 29511 | Finisher | Leased | x | | x | |
| Floyd Smith | 6508 Cypress Swamp Road | Conway | SC | 29527 | Finisher | Leased | x | | x | |
| Drew Hog Farms | 4053 Bluff Rd | Mullins | SC | 29574 | Finisher | Leased | This farm is empty | | | |
| Edward Baxley | Boyd Atkinson Road | Marion | SC | 29571 | Finisher | Leased | This farm is empty | | | |
| C & M Hog Farms | 2678 Centerville Rd | Latta | SC | 29565 | Finisher | Leased | x | | x | |
| | | | | | | | | | | |
| **Farms Run by Mercer Landmark Inc** | 426 W Market St | Celina | OH | 45822 | | | | | | |
| Mike Holdhiede | 4150 Carthagena Road | St. Henry | OH | 45883 | Finisher | Leased | x | | x | |
| Westgerdes Farm | 8870 E 500 N | Portland | IN | 47371 | Finisher | Leased | x | | x | |
| David Knapke | 2310 Siegrist Jute Road | Fort Recovery | OH | 45846 | Finisher | Leased | x | | x | |
| Rick Alig | 8670 E 400 N | Portland | IN | 47371 | Finisher | Leased | x | | x | |
| Rick Alig Ohio | 5246 State Route 49 | Ft. Recovery | OH | 45846 | Finisher | Leased | x | | x | |
| Greg Alig 1 | 777 Schroeder Road | Celina | OH | 45822 | Finisher | Leased | x | | x | |
| Chris Ontrop | 5017 E 500 N | Portland | IN | 47371 | Finisher | Leased | x | | x | |
| Randy Siefring | 5684 Karch Road | Coldwater | OH | 45828 | Finisher | Leased | x | | x | |
| Jeff & Michelle Knapke | 5359 Township Line Road | Coldwater | OH | 45828 | Finisher | Leased | x | | x | |
| Timmerman (Jeff) | 400 N 850 E | Portland | IN | 47371 | Finisher | Leased | x | | x | |
| Doug Franke | 2675 State Route 127 | St. Henry | OH | 45883 | Finisher | Leased | x | | x | |
| Mike Chrisman | 7888 Guadalupe Road | Celina | OH | 45822 | Finisher | Leased | x | | x | |
| Ben & Neil Siefring | 2956 Menchhofer Road | Coldwater | OH | 45828 | Finisher | Leased | x | | x | |
| | | | | | | | | | | |
| **Owned Farms:** | | | | | | | | | | |
| Dixie | 365 Spivey Rd | Carthage | NC | 28327 | Nursery | Owned | x | x | x | x |
| Blue Ribbon | 2464 Kelly Plantation Rd | Carthage | NC | 28327 | Nursery | Owned | x | x | x | x |
| Little River | 2578 Thickety Creek Rd | Mount Gilead | NC | 27306 | Nursery | Owned | x | x | x | x |
| Naked Creek | 475 Haines Rd | Jackson Springs | NC | 27821 | Nursery | Owned | x | x | x | x |
| Circle P | 5223 Bonlee Bennet Rd | Bear Creek | NC | 27207 | Finisher | Owned | x | x | x | |
| Tarheel | 144 Windy Hill Farm Rd | Ellerbe | NC | 28338 | Sow | Owned | x | x | x | x |
| Wet Creek | 10470-A NC 705 | Eagle Springs | NC | 27242 | Sow | Owned | x | x | x | x |
| Green Acres | 400 Falkner Quarter Rd | Warrenton | NC | 27589 | Sow | Owned | x | x | x | x |
| Mossland | 484 Sims Cross Rd | Stephens | GA | 30667 | Sow | Owned | x | x | x | x |
| Holly Ridge | 10470-B NC 705 | Eagle Springs | NC | 27242 | Sow | Owned | x | x | x | x |
| Deerfield | 866-A Skill Rd | Eagle Springs | NC | 27242 | Sow | Owned | x | x | x | x |
| Indian Hills | 866-B Skill Rd | Eagle Springs | NC | 27242 | Sow | Owned | x | x | x | x |
| Stephens | 487 Sims Cross Rd | Stephens | GA | 30667 | Sow | Owned | x | x | x | x |
| Cabin Creek Boar Stud | 245 Mayfair Road | Star | NC | 27356 | Boars | Owned | x | x | x | x |
| Office | 2504 Spies Road | Robbins | NC | 27325 | | Owned | | x | | |
| Feed Mill | 3732 Old Hwy 421 S. | Siler City | NC | 27344 | | Owned | | x | | |
| New Truck Wash | 1193 NC Hwy 211 | Biscoe | NC | 27209 | | Owned | | x | | |
| Old Truck Wash | 10326 NC Hwy 705 | Eagle Springs | NC | 27242 | | Owned | | x | | |

**Vehicles/Other**

N.G. Purvis Farms, Inc.
2504 Spies Road
Robbins, NC 27325

**Feed Mill**

N.G. Purvis Farms, Inc.
3732 Old Hwy 421 S
Siler City, NC 27344

**SCHEDULE 4.18**

Location of Bank and Brokerage Accounts

| Bank | Account | Title | Location | Balance Limit |
|---|---|---|---|---|
| FNBO | 110392093 | Sweep (Deposit) | Omaha, NE | N/A |
| Fidelity Bank | 25141947 | Payroll Account | Fuquay-Varina, NC | N/A |
| ADM Investor Services, Inc. | 42046247 | Hedge Account | | N/A |
| AXOS Bank | 890000050223 | DIP Operating | San Diego, CA | N/A |
| AXOS Bank | 890000050231 | DIP Payroll Account | San Diego, CA | N/A |
| AXOS Bank | 890000050249 | DIP Tax Account | San Diego, CA | N/A |

**Exhibit C**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | **)** | |
| | **)** | |
| **N. G. PURVIS FARMS, INC.** | **)** | **Case No. 21-01068-5-SWH** |
| | **)** | **Chapter 11** |
| **Debtor.** | **)** | |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 502, 503, 507, AND 553 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTORTO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Upon the motion of the above-captioned debtor and debtor-in-possession (the "Debtor") pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 502, 503, 507, and 553 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (the "Motion")[1], seeking, among other things, an interim order:

[1] Capitalized terms not otherwise defined herein shall have the definitions contained in the Motion and DIP Financing Agreements, provided that if and to the extent the definitions differ, the definitions in the Motion shall control.

(1) authorizing the Debtor to obtain secured post-petition financing from First National Bank of Omaha ("FNBO") pursuant to a Debtor-in-Possession Credit Agreement between the Debtor and FNBO (the "FNBO DIP Credit Agreement") consisting of (i) a secured revolving credit facility up to the aggregate principal amount of $2,500,000 (the "Revolving Credit Facility (Operating)"), (ii) a $3,000,000 discretionary revolving credit facility (the "Revolving Credit Facility (Hedging)"), and (iii) a $26,115,744.66 "roll-up" term loan facility (the "Term Loan Facility") (collectively, the Revolving Credit Facility (Operating), Revolving Credit Facility (Hedging), and Term Loan Facility are referred to as the "FNBO DIP Facility"), the terms and conditions of which are summarized herein and more particularly described in the FNBO DIP Credit Agreement and related loan documents, and substantially in the form of **Exhibit A** (the "FNBO DIP Facility Documents");

(2) authorizing the Debtor to obtain secured post-petition financing from LOL Finance Co. ("LOLFC") pursuant to a Debtor-in-Possession Credit Agreement between the Debtor and LOLFC (the "LOLFC DIP Credit Agreement") consisting of (i) a secured revolving credit facility up to the aggregate principal amount of $7,600,000.00 (the "LOLFC Revolving Credit Facility"), and (ii) a $14,241,515.27 "roll-up" term loan facility (the "LOLFC Term Loan Facility") (collectively, the LOLFC Revolving Credit Facility and LOLFC Term Loan Facility are referred to as the "LOLFC DIP Facility"), the terms and conditions of which are summarized herein and more particularly described in the LOLFC DIP Credit Agreement and related loan documents, and substantially in the form of **Exhibit B** (the "LOLFC DIP Facility Documents");

(3) authorizing the Debtor to enter into, execute, deliver and perform the terms and conditions of the FNBO DIP Facility Documents and LOLFC DIP Facility Documents, together with any and all related agreements, instruments, pledge agreements, control agreements, and other loan documents related thereto, according to their respective terms (including any notes and security agreements) (collectively, the "DIP Financing Agreements") and to perform such other acts as may be necessary or desirable in connection with the DIP Financing Agreements;[2]

(4) authorizing the Debtor, subject to entry of the Final Order (as defined herein), to waive any rights, benefits or causes of action it has or may claim to have under Bankruptcy Code Section 506(c) related to the property securing the obligations owed to FNBO or LOLFC, and under Bankruptcy Code Section 553, authorizing the setoff rights allowed to FNBO and LOLFC under their respective DIP Financing Agreements;

(5) granting the FNBO DIP Facility and LOLFC DIP Facility and obligations owed thereunder and under, or secured by, the DIP Financing Agreements to FNBO and LOLFC (collectively, the "Post-Petition Obligations") an allowed super-priority administrative expense claim status in this bankruptcy case (the "Bankruptcy Case"), without the necessity of filing any claim, as more specifically described in the applicable DIP Financing Agreements;

(6) granting FNBO and LOLFC automatically perfected security interests in and liens on their respective Collateral (as defined in the DIP Financing Agreements), including property constituting "cash collateral," to the same extent that FNBO

[2] If and to the extent the terms of the DIP Financing Agreements and the description of those terms or their effect contained in this Interim Order differ, the terms of the DIP Financing Agreements shall control.

and LOLFC had liens in such Collateral prior to the filing of the Bankruptcy Case, including property constituting "cash collateral" as defined in Section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be subject to the priorities set forth in the DIP Financing Agreements, subject to the terms of this Interim Order;

(7) authorizing the Debtor to use the pre-petition collateral of FNBO and LOLFC, including the Cash Collateral of FNBO and LOLFC, as applicable, and providing adequate protection to FNBO and LOLFC in accordance with this Interim Order;

(8) scheduling a final hearing ("Final Hearing") within 30 days of the Petition Date (defined herein) to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing; and

(9) granting certain related relief as requested in the Motion.

The initial hearing on the Motion having been held by this Court on May 12, 2021 (the "Interim Hearing"), and upon the record made by the Debtor at the Interim Hearing, including the Motion, the Affidavit of Steve Weiss in Support of the Debtor's Chapter 11 Filing and First Day Motions, and the filings and pleadings in the Bankruptcy Case, this Court having found that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest, and represents a sound exercise of the Debtor's business judgment and is essential for the continued operations of the Debtor's business; and it appearing to this Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing, and that notice of the Motion, the relief requested therein, and the Interim Hearing (the "Notice") was appropriate under the circumstances, and the Notice having been served by the Debtor in accordance with Bankruptcy

Rules 4001 and 9014 on (i) the office of the Bankruptcy Administrator for the Eastern District of North Carolina; (ii) the holders of the twenty (20) largest unsecured claims against the Debtor; (iii) counsel for FNBO; (iv) counsel for LOLFC; and (v) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Noticed Parties"), and the opportunity for a hearing on the Motion was appropriate and no other notice need be provided, and after due deliberation and sufficient cause appearing therefore;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]

1. The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 6, 2021 ("Petition Date"). The Debtor continues to operate its business as a debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been requested and no creditors' committee has been appointed or designated in the Bankruptcy Case.

2. The Motion is hereby granted in accordance with the terms of this Interim Order. Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, resolved, or settled, are hereby denied and overruled.

3. This matter is a core proceeding pursuant to 28 U.S.C. § 157, this Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334, and venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This Court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984, by the United States District Court for the Eastern District of North Carolina.

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4. The statutory bases for the relief requested herein are 11 U.S.C. §§ 105, 361, 362, 363, 364, 502, 503, 507, and 553 and Bankruptcy Rules 2002, 4001 and 9014.

5. Proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and applicable Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of the Interim Order shall be required.

Secured Lending Background

6. FNBO has been the Debtor's primary lender since 2014. The Debtor is currently indebted to FNBO pursuant to the terms of the following pre-petition credit agreements and notes (the "FNBO Pre-Petition Credit Agreements and Notes"): The Second Amended and Restated Credit Agreement dated April 1, 2019, as amended by the (i) First Amendment to Second Amended and Restated Credit Agreement dated January 1, 2020; (ii) Second Amendment to Second Amended and Restated Credit Agreement dated January 22, 2020; (iii) Third Amendment to Second Amended and Restated Credit Agreement dated March 1, 2020; and (iv) Fourth Amendment to Second Amended and Restated Credit Agreement dated April 1, 2020. The foregoing are collectively referred to herein as the "FNBO Credit Agreement." In connection with the FNBO Credit Agreement, the Debtor executed a series of promissory notes which were similarly amended over the years: (i) Second Amended and Restated Revolving Credit Note (Operating) dated April 1, 2019, as amended by the First Amendment to Second Amended and Restated Revolving Credit Note (Operating) dated January 1, 2020; the Second Amendment to Second Amended and Restated Revolving Credit Note (Operating) dated January 22, 2020; the Third Amendment to Second Amended and Restated Revolving Credit Note (Operating) dated March 1, 2020; and the Fourth Amendment to Second Amended and Restated Revolving Credit

Note (Operating) dated April 1, 2020; (ii) the Revolving Credit Note (Hedging) dated April 1, 2019, as amended by the First Amendment to Revolving Credit Note (Hedging) dated January 1, 2020; the Second Amendment to Revolving Credit Note (Hedging) dated March 1, 2020; the Third Amendment to Revolving Credit Note (Hedging) dated April 1, 2020; and the Fourth Amendment to Revolving Credit Note (Hedging) dated March 24, 2021.

7. The Debtor defaulted to FNBO under the Pre-Petition FNBO Credit Agreement and Notes and the FNBO Pre-Petition Forbearance Agreement (sometimes collectively referred to as the "FNBO Pre-Petition Loan Documents"). FNBO's forbearance terminated under the FNBO Pre-Petition Forbearance Agreement on March 15, 2021, and on March 17, 2021, FNBO declared the Debtor in default under the FNBO Pre-Petition Loan Documents and invoked the default interest rate.

8. As of the Petition Date, the Debtor was indebted to FNBO under the FNBO Pre-Petition Loan Documents in the amount of $26,115,744.66 (inclusive of accrued interest but exclusive of fees, costs, expenses and other sums and charges payable by the Debtor under the FNBO Pre-Petition Loan Documents).

9. The Debtor's obligations to FNBO under the FNBO Pre-Petition Loan Documents are secured by (i) a first priority security interest in substantially all of the Debtor's personal property, subject only to limited purchase money security interests on certain equipment and motor vehicles, and (ii) a lien junior to LOLFC on certain real property and improvements owned by the Debtor. In addition, payment of the obligations owed to FNBO by the Debtor under the FNBO Pre-Petition Loan Documents is guaranteed by the Guarantors.

10. The Debtor, certain individual borrowers, and LOLFC are parties to certain pre-petition loan contracts, including Change in Terms Agreements dated December 23, 2020

(collectively, the "LOLFC Pre-Petition Loan Documents"), pursuant to which LOLFC, subject to the terms and conditions contained therein, agreed to make loans to the Debtor. As of the Petition Date, the Debtor was indebted to LOLFC under the LOLFC Pre-Petition Loan Documents in the amount of $14,241,515.27 (inclusive of accrued interest, fees, costs, expenses and other sums and charges payable by the Debtor under the LOLFC Pre-Petition Loan Documents). The FNBO Pre-Petition Loan Documents and LOLFC Pre-Petition Loan Documents are collectively referred to herein as the "Pre-Petition Loan Documents."

Post-Petition Financing

11. The Debtor has requested from FNBO and LOLFC, and FNBO and LOLFC are willing to extend, certain loans, advances and other financial accommodations on the terms and conditions set forth in this Interim Order and the DIP Financing Agreements.

12. The Debtor does not have sufficient available sources of working capital, including cash collateral, to operate its business in the ordinary course without the financing requested in the Motion. The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees, and to otherwise fund its operations is essential to the Debtor's continued viability as it seeks to maximize the value of the assets of the Estate (as defined below). The Debtor's ability to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with FNBO and LOLFC as set forth in this Interim Order and the DIP Financing Agreements, as applicable, is vital to the preservation and maintenance of the going concern value of the Debtor. Accordingly, the Debtor has an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of its business, minimize the disruption of its business operations, and preserve and maximize the

value of the assets of the Debtor's bankruptcy estate (as defined under Section 541 of the Bankruptcy Code, the "Estate") in order to maximize the value of the Estate.

13.     The Debtor is unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by each of FNBO and LOLFC pursuant to the DIP Financing Agreements.

14.     The Debtor has prepared and delivered to FNBO and LOLFC an initial projected budget (as updated from time to time in accordance with the DIP Financing Agreements, and as such term is defined in the FNBO DIP Credit Agreement and the LOLFC DIP Credit Agreement, the "Approved Budget") outlining the Debtor's post-petition cash needs following the Petition Date.  A copy of the Approved Budget is attached hereto as **Schedule 1**.  Such Approved Budget has been thoroughly reviewed by the Debtor and its management and sets forth, among other things, the projected cash receipts and disbursements of the Debtor for the period covered thereby. All references to the Approved Budget shall be subject in all respects to any permitted variances.

15.     The terms of the DIP Financing Agreements and this Interim Order are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Financing Agreements and this Interim Order have been negotiated in good faith and at arms' length by and among the Debtor, FNBO, and LOLFC, with all parties being represented by counsel.

16.     The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtor, its creditors and the Estate, as its implementation will, among other things, provide the Debtor with the necessary liquidity to (1) minimize

disruption to the Debtor's business and ongoing operations, (2) preserve and maximize the value of the Debtor's Estate for the benefit of all the Debtor's creditors, and (3) avoid immediate and irreparable harm to the Debtor, its creditors, its employees, and its assets.

17. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2). No party appearing in the Bankruptcy Case has filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** as follows:

1. The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2), to the extent provided in this Interim Order. Except as otherwise provided in this Interim Order, any objection to the entry of this Interim Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

2. The Debtor is hereby authorized and empowered to immediately incur indebtedness under the (i) Revolving Credit Facility (Operating) and Revolving Credit Facility (Hedging) of the FNBO DIP Facility, and (ii) the LOLFC Revolving Credit Facility of the LOLFC DIP Facility (collectively the "DIP Facilities"), during the period commencing on the date of this Interim Order and continuing through and including the entry of the Final Order (the "Interim Financing Period"), pursuant to the terms of the DIP Financing Agreements and this Interim Order (the "Post-Petition Obligations").

3. Subject to the terms and conditions contained in this Interim Order and the DIP Financing Agreements authorized by this Interim Order, the Debtor shall use the proceeds of the Post-Petition Obligations solely for payment of expenses set forth in the Approved Budget,

additional amounts consented to in writing by FNBO and LOLFC, and amounts allowed and owing to FNBO, LOLFC and Debtor's professionals, in accordance with the terms and conditions of the DIP Financing Agreements and this Interim Order. Further, Debtor's consent to the assignment or subordination of FNBO's lien in the Debtor's Farrow-to-Wean Collateral (as defined in the LOLFC DIP Credit Agreement) to LOLFC upon entry of this Interim Order, in exchange for direct payment from LOLFC, as contemplated by the Debtor, FNBO, and LOLFC, is hereby approved.

Post-Petition Financing

4. The Debtor is hereby authorized to enter into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the DIP Financing Agreements, as to the DIP Facilities. Upon execution and delivery of the DIP Financing Agreements authorized hereunder, such agreements and documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with the terms of such agreements, documents and this Interim Order. The Debtor is hereby authorized to pay, in accordance with this Interim Order, any principal, interest, fees, expenses and other amounts described in the DIP Financing Agreements, as to the DIP Facilities, as such become due and without need to obtain further Court approval, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order or the DIP Financing Agreements. Upon execution and delivery, the DIP Financing Agreements authorized by this Interim Order shall represent valid and binding obligations of the Debtor, enforceable against the Debtor and the Estate in accordance with their terms.

5. All terms, conditions and covenants set forth in the DIP Financing Agreements, as to the DIP Facilities, are approved to the extent necessary to implement the terms and provisions of this Interim Order. All such terms, conditions and covenants shall be sufficient and conclusive

evidence of (a) the borrowing arrangements by and among the Debtor, FNBO, and LOLFC, and (b) the Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Financing Agreements, as to the DIP Facilities, for all purposes, including, without limitation, and to the extent applicable, the payment of all Post-Petition Obligations arising thereunder, as more fully set forth in the DIP Financing Agreements.

6.      Subject to the terms and conditions of the DIP Financing Agreements authorized by this Interim Order, the Debtor, FNBO, and LOLFC may amend, modify, supplement or waive any provision of the DIP Financing Agreements (a "DIP Financing Amendment") without further approval or order of this Court, so long as (a) such DIP Financing Amendment is not material (for purposes hereof, a "material" DIP Financing Amendment shall mean any DIP Financing Amendment that operates to increase the amount or extent of the Debtor's obligations or collateral pledged, increase the interest rate other than as currently provided in the DIP Financing Agreements, increase the maximum credit, increase or add an additional early termination fee, prepayment or repayment premium, add specific new events of default or enlarge the nature and extent of default remedies available to FNBO and/or LOLFC following an event of default) and is undertaken in good faith by the Debtor, FNBO, and LOLFC; (b) the Debtor provides prior written notice of the DIP Financing Amendment (the "DIP Financing Amendment Notice") to (i) the Bankruptcy Administrator, and (ii) counsel to any Committee, or in the event no such Committee is appointed at the time of such DIP Financing Amendment, the twenty (20) Largest Unsecured Creditors (collectively, the "Notice Parties"), and (c) the Debtor files the DIP Financing Amendment Notice with this Court; provided, however, that neither consent of the Notice Parties nor approval of this Court will be necessary to effectuate any such amendment, modification or supplement, and provided further that such amendment, modification or supplement shall be

without prejudice to the right of any party in interest to be heard. Any material DIP Financing Amendment to the DIP Financing Agreements must be approved by this Court to be effective.

Post-Petition Liens; Super-priority Administrative Claim Status

7. To secure the prompt payment and performance of any and all of the Post-Petition Obligations, and to the extent provided for in the DIP Financing Agreements authorized by this Interim Order and subject to the Carve Out (defined herein) and payment of Bankruptcy Expenses, FNBO and LOLFC shall each have a continuing, valid, binding, enforceable, non-avoidable, and automatically and properly-perfected post-petition security interest in and lien on the Debtor's property without the necessity of filings or registration as provided herein (the "Post-Petition Liens").

8. The Post-Petition Liens shall not at any time be (i) made subject or subordinate to, or made pari passu with, any other lien or claim existing as of the Petition Date, or created under Sections 363 or 364 of the Bankruptcy Code or otherwise, other than the Permitted Priority Liens (defined in the FNBO DIP Credit Agreement and the LOLFC DIP Credit Agreement), or (ii) avoidable or subject to preservation for the benefit of the Estate under Section 551 of the Bankruptcy Code. The Post-Petition Liens shall be deemed fully perfected Liens, effective and perfected upon the entry of this Interim Order, without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing agreements, financing statements or other agreements or instruments, such that no additional steps need be taken by FNBO and LOLFC to perfect such interests.

9. Furthermore, as set forth in the DIP Financing Agreements, the Super-priority Administrative Expense Claim of FNBO shall be limited to the value of FNBO's secured claim in

the Collateral (as defined in the FNBO DIP Credit Agreement). The capitalized terms in this paragraph shall have the meanings assigned to them in the FNBO DIP Credit Agreement.

10.     This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien (a "Perfection Act"). Notwithstanding the foregoing, if either FNBO or LOLFC shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, then FNBO and LOLFC is each authorized to perform such act, and the Debtor is authorized to perform such act to the extent necessary or required by FNBO or LOLFC, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order, notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. FNBO or LOLFC may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law.  Should FNBO or LOLFC so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

11. To secure the prompt payment and performance of any and all of the Post-Petition Obligations, and to the extent provided for in the DIP Financing Agreements authorized by this Interim Order and subject to the Carve Out and payment of Bankruptcy Expenses, FNBO and LOLFC shall each have an allowed super-priority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code (the "Super-priority Administrative Expense Claims"), which shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event this Interim Order or any provision hereof is vacated, reversed, amended or otherwise modified, on appeal or otherwise.

Carve Out

12. As used in this Interim Order, the term "Carve Out" means the sum of (i) all bankruptcy filing and related fees required to be paid by the Debtor to the Bankruptcy Court; (ii) all quarterly fees due to the Office of the Bankruptcy Administrator for the Eastern District of North Carolina or the government from the Debtor; and (iii) to the extent allowed at any time, whether by interim or final order, procedural order, or otherwise, all fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtor pursuant to Section 327, 328 or 363 of the Bankruptcy Code, provided, however, those fees and expenses subject to the Carve Out shall not include any Allowed Professional Fees of the Debtor, any committee appointed pursuant to Section 1102 of the Bankruptcy Code, or any other party in interest that were incurred (a) as part of any challenge to (i) the validity, priority or extent of the Debtor's Pre-Petition Obligations to FNBO and LOLFC under the Pre-Petition Loan Documents and the Post-Petition Obligations under the DIP Financing Agreements, (ii) FNBO or LOLFC's security interests, liens, and rights under the DIP Financing Agreements, or (iii) any order entered

in connection with (i) or (ii) above, or (b) as part of any challenge to the amounts due to FNBO and LOLFC under the DIP Financing Agreements (collectively, the "Carve-Out Expenses").

Cash Collateral

13. Subject to the terms and conditions of this Interim Order and the DIP Financing Agreements authorized by this Interim Order, and in accordance with the Approved Budget, the Debtor shall be and is hereby authorized to use the Cash Collateral (as defined in Section 363 of the Bankruptcy Code) for the period commencing on the Petition Date and terminating thirty (30) days after the date on which FNBO or LOLFC delivers an Enforcement Notice (as defined below) to counsel for the Debtor, counsel for the Committee (if appointed), and the Bankruptcy Administrator; *provided* that (a) during the Default Notice Period (as defined herein), the Debtor may use Cash Collateral solely for the following amounts and expenses: (i) to pay Carve-Out Expenses; (ii) to meet payroll obligations; and (iii) as agreed by FNBO and LOLFC in their sole discretion, to pay expenses critical to the administration of the Debtor's Estate; and (b) after the delivery of an Enforcement Notice, the Debtor may use Cash Collateral as limited by the Approved Budget to pay Carve Out Expenses incurred (which for avoidance of doubt shall remain limited by the Carve Out's restrictions and shall not include professional fees incurred to contest the Event(s) of Default or Enforcement Notice) prior to 30 days after the Debtor's receipt of the Enforcement Notice and allowed (whether prior to or after the Enforcement Notice) by an interim or final order of the Bankruptcy Court. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtor or its Estate outside the ordinary course of business, or the Debtor's use of Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Interim Order, the DIP Financing Agreements and in accordance with the Approved Budget.

Default

14. The occurrence of any of the following events shall constitute an "Event of Default" under this Interim Order: (a) the Debtor's failure to perform, in any respect, any of its obligations under this Interim Order; or (b) an "Event of Default" under any of the DIP Financing Agreements.

15. Upon the occurrence of and during the continuance of an Event of Default, (a) the Debtor shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Order and the DIP Financing Agreements, and (b) FNBO and/or LOLFC shall, in accordance with the terms of the DIP Financing Agreements, be entitled to take any act or exercise any right or remedy as provided in this Interim Order or any DIP Financing Agreement, as applicable, including, without limitation, declaring all Post-Petition Obligations immediately due and payable, accelerating such obligations, ceasing to extend loans or advance funds, setting off any Post-Petition Obligations with Collateral or proceeds in FNBO or LOLFC's possession, and enforcing any and all rights with respect to the Collateral; provided, however, notwithstanding anything in this Interim Order to the contrary, neither FNBO nor LOLFC shall be permitted to set off any Post-Petition Obligations with Collateral or proceeds in FNBO or LOLFC's possession, or otherwise enforce rights with respect to the Collateral, in violation of the Intercreditor Agreement between FNBO and LOLFC to be executed in conjunction with the entry of the Interim Order. Except as set forth in the DIP Financing Agreements, FNBO and LOLFC shall have no obligation to lend or advance any additional funds to or on behalf of the Debtor, or provide any other financial accommodations to the Debtor, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

16.    The automatic stay provisions of Section 362 of the Bankruptcy Code, and any other restriction imposed by an order of this Court or applicable law, are hereby modified without further notice, application or order of this Court being necessary, to permit FNBO and/or LOLFC to perform any act authorized or permitted under, or by virtue of, this Interim Order or the DIP Financing Agreements, including, without limitation:  (a) to implement the post-petition financing arrangements authorized by this Interim Order and pursuant to the terms of the DIP Financing Agreements; (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral; (c) to assess, charge, advance, deduct and receive payments with respect to the Post-Petition Obligations, including, without limitation, all interest, fees, costs and expenses permitted under the DIP Financing Agreements, and apply such payments to the Post-Petition Obligations pursuant to the DIP Financing Agreements and/or this Interim Order; (d) upon an Event of Default, to declare a termination, reduction or restriction on the ability of the Debtor to use Cash Collateral; and (e) to take any other action and exercise all other rights and remedies provided by this Interim Order, the DIP Financing Agreements or applicable law.

17.    Notwithstanding the foregoing paragraph, neither FNBO nor LOLFC shall be permitted to exercise rights and remedies to proceed against and realize upon the Collateral, except as follows: Upon the occurrence of an Event of Default, and after providing appropriate notice and right to cure pursuant to the DIP Financing Agreement (the "Default Notice Period") and prior written notice (the "Enforcement Notice"), to the extent provided for under the DIP Financing Agreements, to (i) counsel for the Debtor, (ii) counsel for the Committee (if appointed), and (iii) the Bankruptcy Administrator, FNBO and LOLFC, without further notice, application or order of this Court, shall (subject to hearing rights set forth in the DIP Financing Agreements) be entitled to take any action and exercise all rights and remedies provided to them by this Interim Order, the

DIP Financing Agreements or applicable law, that they may deem appropriate, to proceed against and realize upon the Collateral or any other assets or properties of Debtor's Estate upon which they have been or may hereafter be granted liens or security interests, to obtain the full and indefeasible repayment of all obligations (subject to the terms of the DIP Financing Agreements) owing to them. During the Default Notice Period, the Debtor and the Committee (if appointed) shall be entitled to seek an emergency hearing, and FNBO and LOLFC shall consent to such emergency hearing, within the Default Notice Period with this Court; *provided* that the sole issue that may be raised by the Debtor is whether an Event of Default has occurred and/or is continuing, and the Debtor hereby waives its right to and shall not be entitled to seek relief, including under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of FNBO and/or LOLFC set forth in this Interim Order or the DIP Financing Agreements. Notwithstanding anything to the contrary herein, FNBO and LOLFC each agree that, if FNBO or LOLFC seeks to exercise its respective rights and remedies to proceed against and realize upon the Collateral, FNBO and LOLFC shall provide notice to the other party and such other party shall be entitled to seek an emergency hearing, as above described.

Other Rights

18. Notwithstanding (a) any stay, modification, amendment, supplement, vacatur, revocation or reversal of this Interim Order, the DIP Financing Agreements or any term hereunder or thereunder, (b) the failure to obtain a Final Order pursuant to Bankruptcy Rule 4001(c)(2), or (c) the dismissal or conversion of the Bankruptcy Case (each, a "Subject Event"), (i) the acts taken by each of FNBO and LOLFC in accordance with this Interim Order, and (ii) the Post-Petition Obligations incurred or arising prior to FNBO's and/or LOLFC's notice of any Subject Event shall, in each instance, be governed in all respects by the original provisions of this Interim Order, and

the acts taken by FNBO and LOLFC in accordance with this Interim Order, and the post-petition liens granted to FNBO and LOLFC in the Collateral, and all other rights, remedies, privileges, and benefits in favor of FNBO and LOLFC pursuant to this Interim Order and the DIP Financing Agreements authorized by this Interim Order, shall remain valid and in full force and effect pursuant to Section 364(e) of the Bankruptcy Code.  For purposes of this Interim Order, the term "appeal," as used in Section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by this Court or any other tribunal.

19.     The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral outside the ordinary course of business, other than pursuant to the terms of the DIP Financing Agreements authorized by this Interim Order and the Approved Budget, without the prior written consent of FNBO and/or LOLFC, as applicable, or an order of this Court.

20.     The provisions of this Interim Order and the DIP Financing Agreements authorized by this Interim Order, the Post-Petition Obligations, the Super-priority Administrative Expense Claims and any and all rights, remedies, privileges and benefits in favor of each of FNBO and LOLFC provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order, notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h) and 7062, shall continue in full force and effect, and shall survive entry of any such other order converting the Bankruptcy Case to any other chapter under the Bankruptcy Code, or dismissing the Bankruptcy Case.

21.     The rights granted pursuant to the terms of this Interim Order, including the Super-Priority Administrative Expense Claims, Post-Petition Liens, and all other rights and remedies granted to FNBO and LOLFC under the DIP Financing Agreements authorized by this Interim

Order, shall remain enforceable in the priority set forth herein until all Post-Petition Obligations have been paid and satisfied in full.  Any order dismissing the Bankruptcy Case under Section 1112 or otherwise, shall so provide (in accordance with Sections 105 and 349 of the Bankruptcy Code), and this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing all such claims, liens, protections and rights.

22.     In the event this Court modifies any of the provisions of this Interim Order or the DIP Financing Agreements following a Final Hearing, such modifications shall not affect the rights or priorities of FNBO and LOLFC pursuant to this Interim Order with respect to any portion of the respective obligations which arises or is incurred or is advanced prior to such modifications, and this Interim Order shall otherwise remain in full force and effect to such extent.

23.     This Interim Order shall be binding upon the Debtor, all parties in interest in the Bankruptcy Case and their respective successors and assigns, including any trustee or other fiduciary appointed in the Bankruptcy Case or any subsequently converted bankruptcy case of the Debtor.  This Interim Order shall also inure to the benefit of the Debtor, FNBO, LOLFC, and each of their respective successors and assigns.

24.     In the event of a conflict between the terms and provisions of any of the DIP Financing Agreements and this Interim Order, the terms and provisions of this Interim Order shall control.

25.     This Court retains jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order and the DIP Financing Agreements.

Final Hearing

26. The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for __________________, 2021, at _____ __p.m. before this Court. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time on _______________, 2021. The Debtor shall promptly mail copies of this Interim Order to the Noticed Parties, and to any other party that has filed a request for notices with this Court and to any Committee (if appointed) and such Committee's counsel, if same shall have filed a request for notice. Such notice is deemed good and sufficient and no further notice need be given. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) counsel for the Debtor, (b) counsel for FNBO, (c) counsel for LOLFC, (d) counsel to the Committee (if appointed); (e) the Office of the Bankruptcy Administrator for the Eastern District of North Carolina, and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002, and shall be filed with the Clerk of the United States Bankruptcy Court for the Eastern District of North Carolina to allow actual receipt of the foregoing no later than ten (10) days prior to the Final Hearing.

END OF DOCUMENT

Schedule 1

| | A | B | C | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT | BU | BV | BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | **N. G. Purvis Farms** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 4 | *Cash Flow Forecast* | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 5 | | Fiscal Year | | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 6 | | Fiscal Period | | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 7 | | Fiscal Week | | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | |
| 8 | | Bankruptcy week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 9 | | Actual / Forecast | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| 10 | | Week Beginning Date | | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 11 | | Week Ending Date | | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 12 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 13 | | Smithfield | | 5,893 | 6,104 | 6,430 | 6,652 | 6,190 | 6,634 | 7,101 | 6,340 | 5,803 | 6,473 | 6,742 | 4,654 | 7,249 | 2,385 | 2,636 | 7,757 | 7,616 | 7,364 | 7,355 | 7,628 | 6,636 | 6,799 | 6,918 | 903 | 146,264 |
| 14 | | JBS | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 15 | | Others | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 16 | | Market Hogs | | 5,893 | 6,104 | 6,430 | 6,652 | 6,190 | 6,634 | 7,101 | 6,340 | 5,803 | 6,473 | 6,742 | 4,654 | 7,249 | 2,385 | 2,636 | 7,757 | 7,616 | 7,364 | 7,355 | 7,628 | 6,636 | 6,799 | 6,918 | 903 | 146,264 |
| 17 | | Weaned Pigs | | 7,586 | 7,411 | 7,750 | 8,355 | 8,089 | 8,000 | 8,224 | 7,402 | 8,037 | 8,243 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 191,449 |
| 18 | | Cull Hogs | | 151 | 153 | 155 | 157 | 158 | 159 | 160 | 158 | 150 | 141 | 131 | 121 | 112 | 103 | 95 | 91 | 83 | 71 | 60 | 49 | 37 | 27 | 17 | 6 | 2,544 |
| 19 | | **Head** | | **13,630** | **13,667** | **14,335** | **15,164** | **14,437** | **14,793** | **15,485** | **13,900** | **13,991** | **14,856** | **14,898** | **12,800** | **15,386** | **10,512** | **10,756** | **15,873** | **15,724** | **15,460** | **15,440** | **15,702** | **14,699** | **14,851** | **14,960** | **8,935** | **340,256** |
| 20 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 21 | | Smithfield | | 1,679,620 | 1,739,504 | 1,832,457 | 1,895,881 | 1,764,168 | 1,890,729 | 2,023,804 | 1,807,024 | 1,653,925 | 1,844,762 | 1,921,330 | 1,326,444 | 2,065,892 | 679,624 | 751,351 | 2,210,799 | 2,170,576 | 2,098,739 | 2,096,279 | 2,174,105 | 1,891,312 | 1,937,680 | 1,971,684 | 257,468 | 41,685,158 |
| 22 | | JBS | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 23 | | Others | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 24 | | Market Hogs | | 1,679,620 | 1,739,504 | 1,832,457 | 1,895,881 | 1,764,168 | 1,890,729 | 2,023,804 | 1,807,024 | 1,653,925 | 1,844,762 | 1,921,330 | 1,326,444 | 2,065,892 | 679,624 | 751,351 | 2,210,799 | 2,170,576 | 2,098,739 | 2,096,279 | 2,174,105 | 1,891,312 | 1,937,680 | 1,971,684 | 257,468 | 41,685,158 |
| 25 | | Cull Hogs | | 28,672 | 29,095 | 29,514 | 29,897 | 30,093 | 30,196 | 30,343 | 29,951 | 28,557 | 26,731 | 24,894 | 22,934 | 21,236 | 19,476 | 18,040 | 17,256 | 15,726 | 13,506 | 11,348 | 9,237 | 7,099 | 5,070 | 3,166 | 1,231 | 483,268 |
| 26 | | **Pounds** | | **1,708,292** | **1,768,599** | **1,861,972** | **1,925,778** | **1,794,261** | **1,920,925** | **2,054,146** | **1,836,976** | **1,682,482** | **1,871,493** | **1,946,224** | **1,349,378** | **2,087,128** | **699,100** | **769,392** | **2,228,055** | **2,186,302** | **2,112,245** | **2,107,627** | **2,183,342** | **1,898,410** | **1,942,750** | **1,974,850** | **258,699** | **42,168,426** |
| 27 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 28 | | Smithfield | | 1,390,042 | 1,471,122 | 1,549,733 | 1,619,761 | 1,507,231 | 1,613,147 | 1,681,533 | 1,501,416 | 1,374,209 | 1,558,259 | 1,637,804 | 1,130,705 | 1,761,034 | 488,769 | 529,916 | 1,559,239 | 1,481,462 | 1,432,432 | 1,453,068 | 1,507,015 | 1,321,844 | 1,354,252 | 1,141,996 | 149,125 | 32,215,113 |
| 29 | | JBS | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 30 | | Others | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 31 | | Market Hogs | | 1,390,042 | 1,471,122 | 1,549,733 | 1,619,761 | 1,507,231 | 1,613,147 | 1,681,533 | 1,501,416 | 1,374,209 | 1,558,259 | 1,637,804 | 1,130,705 | 1,761,034 | 488,769 | 529,916 | 1,559,239 | 1,481,462 | 1,432,432 | 1,453,068 | 1,507,015 | 1,321,844 | 1,354,252 | 1,141,996 | 149,125 | 32,215,113 |
| 32 | | Cull Hogs | | 49,228 | 50,549 | 50,788 | 51,466 | 51,577 | 52,514 | 51,972 | 51,750 | 50,959 | 50,025 | 48,533 | 47,470 | 46,549 | 38,454 | 36,589 | 36,232 | 33,744 | 32,735 | 31,989 | 31,030 | 30,772 | 29,850 | 24,146 | 23,458 | 1,002,376 |
| 33 | | Sows | | 34,067 | 34,803 | 34,803 | 34,803 | 34,803 | 34,803 | 34,765 | 34,765 | 34,765 | 34,765 | 33,247 | 33,247 | 33,247 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 21,784 | 21,784 | 740,990 |
| 34 | | **Hog Sales** | | **1,473,337** | **1,556,474** | **1,635,324** | **1,706,030** | **1,593,611** | **1,700,463** | **1,768,269** | **1,587,930** | **1,459,932** | **1,643,048** | **1,719,584** | **1,211,422** | **1,840,830** | **555,060** | **594,342** | **1,623,309** | **1,543,043** | **1,493,005** | **1,512,895** | **1,565,883** | **1,380,454** | **1,411,940** | **1,187,926** | **194,367** | **33,958,479** |
| 35 | | Weaned Pigs | | 333,785 | 326,065 | 341,012 | 304,945 | 295,240 | 292,003 | 300,182 | 270,183 | 293,349 | 300,854 | 292,920 | 292,920 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 7,591,855 |
| 36 | | Feed | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 37 | | Other | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 38 | | **Total Sales** | | **1,807,122** | **1,882,539** | **1,976,337** | **2,010,975** | **1,888,850** | **1,992,467** | **2,068,451** | **1,858,113** | **1,753,282** | **1,943,903** | **2,012,504** | **1,504,341** | **2,169,863** | **884,093** | **923,375** | **1,952,342** | **1,872,076** | **1,822,038** | **1,841,928** | **1,894,916** | **1,709,487** | **1,740,973** | **1,516,959** | **523,401** | **41,550,335** |
| 39 | | | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 40 | | *Smithfield* | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 41 | | *Lbs./Head* | | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* | *285.00* |
| 42 | | *$/Head* | | *235.86* | *241.03* | *241.03* | *243.49* | *243.49* | *243.16* | *236.80* | *236.80* | *236.80* | *240.74* | *242.94* | *242.94* | *242.94* | *204.96* | *201.01* | *201.01* | *194.52* | *194.52* | *197.55* | *197.55* | *199.19* | *199.19* | *165.07* | *165.07* | *220.25* |
| 43 | | *$/cwt* | | *82.76* | *84.57* | *84.57* | *85.44* | *85.44* | *85.32* | *83.09* | *83.09* | *83.09* | *84.47* | *85.24* | *85.24* | *85.24* | *71.92* | *70.53* | *70.53* | *68.25* | *68.25* | *69.32* | *69.32* | *69.89* | *69.89* | *57.92* | *57.92* | *77.28* |
| 44 | | *$/ccwt* | | *109.62* | *112.02* | *112.02* | *113.16* | *113.16* | *113.01* | *110.05* | *110.05* | *110.05* | *111.88* | *112.91* | *112.91* | *112.91* | *95.26* | *93.42* | *93.42* | *90.40* | *90.40* | *91.81* | *91.81* | *92.57* | *92.57* | *76.72* | *76.72* | *102.36* |
| 45 | | *JBS* | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 46 | | *Lbs./Head* | | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* |
| 47 | | *$/Head* | | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* |
| 48 | | *$/cwt* | | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* |
| 49 | | *$/ccwt* | | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* | *N/A* |
| 50 | | *Others* | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 51 | | *Lbs./Head* | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 52 | | *$/Head* | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 53 | | *$/cwt* | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 54 | | *$/ccwt* | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 55 | | *Weaners/Head* | | *44.00* | *44.00* | *44.00* | *36.50* | *36.50* | *36.50* | *36.50* | *36.50* | *36.50* | *36.50* | *36.50* | *36.50* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *41.00* | *952.50* |
| 56 | | | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 57 | | Smithfield | | 1,563,541 | 1,389,833 | 1,473,636 | 1,550,786 | 1,615,804 | 1,509,921 | 1,617,376 | 1,675,379 | 1,497,922 | 1,380,783 | 1,563,492 | 1,621,715 | 1,136,515 | 1,745,200 | 492,016 | 559,536 | 1,560,662 | 1,481,033 | 1,433,237 | 1,455,578 | 1,501,673 | 1,323,689 | 1,365,452 | 1,109,386 | 33,624,164 |
| 58 | | JBS | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 59 | | Market Hogs | | 1,563,541 | 1,389,833 | 1,473,636 | 1,550,786 | 1,615,804 | 1,509,921 | 1,617,376 | 1,675,379 | 1,497,922 | 1,380,783 | 1,563,492 | 1,621,715 | 1,136,515 | 1,745,200 | 492,016 | 559,536 | 1,560,662 | 1,481,033 | 1,433,237 | 1,455,578 | 1,501,673 | 1,323,689 | 1,365,452 | 1,109,386 | 33,624,164 |
| 60 | | Weaned Pigs | | - | 333,785 | 326,065 | 341,012 | 304,945 | 295,240 | 292,003 | 300,182 | 270,183 | 293,349 | 300,854 | 292,920 | 292,920 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 7,262,822 |
| 61 | | Cull Hogs | | 15,934 | 16,519 | 16,757 | 16,974 | 17,085 | 17,144 | 17,208 | 16,986 | 16,195 | 15,160 | 13,502 | 12,439 | 11,518 | 8,845 | 8,193 | 7,836 | 7,142 | 6,133 | 5,154 | 4,195 | 3,224 | 2,302 | 1,125 | 438 | 258,006 |
| 62 | | GDU Non-Select Sales | | 33,294 | 34,031 | 34,031 | 34,492 | 34,492 | 35,370 | 34,763 | 34,763 | 34,763 | 34,865 | 35,031 | 35,031 | 35,031 | 29,609 | 28,396 | 28,396 | 26,602 | 26,602 | 26,836 | 26,836 | 27,548 | 27,548 | 23,021 | 23,021 | 744,370 |
| 63 | | Sows | | 34,067 | 34,803 | 34,803 | 34,803 | 34,803 | 34,803 | 34,765 | 34,765 | 34,765 | 34,765 | 33,247 | 33,247 | 33,247 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 21,784 | 21,784 | 740,990 |
| 64 | | **Hog Collections** | | **1,646,836** | **1,808,970** | **1,885,291** | **1,978,068** | **2,007,129** | **1,892,477** | **1,996,115** | **2,062,075** | **1,853,829** | **1,758,922** | **1,946,126** | **1,995,352** | **1,509,231** | **2,140,524** | **885,475** | **952,639** | **1,951,276** | **1,870,639** | **1,822,097** | **1,843,479** | **1,889,315** | **1,710,411** | **1,740,415** | **1,483,662** | **42,630,353** |
| 65 | | Feed | | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 6,000,000 |
| 66 | | Cost of Feed Sold | | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (5,760,000) |
| 67 | | Market Price Adjustment | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 68 | | **Total Collections** | | **1,656,836** | **1,818,970** | **1,895,291** | **1,988,068** | **2,017,129** | **1,902,477** | **2,006,115** | **2,072,075** | **1,863,829** | **1,768,922** | **1,956,126** | **2,005,352** | **1,519,231** | **2,150,524** | **895,475** | **962,639** | **1,961,276** | **1,880,639** | **1,832,097** | **1,853,479** | **1,899,315** | **1,720,411** | **1,750,415** | **1,493,662** | **42,870,353** |
| 69 | | | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 70 | | Mixed (Sunrise & Mercer) 1 | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 71 | | Ingredients | | (297,090) | (292,076) | (286,863) | (280,624) | (275,361) | (269,566) | (260,765) | (249,875) | (240,235) | (230,094) | (219,590) | (212,697) | (201,258) | (198,473) | (195,593) | (181,158) | (166,936) | (126,897) | (113,088) | (98,760) | (86,222) | (73,379) | (58,667) | (56,964) | (4,672,231) |
| 72 | | Corn & Wheat | | (740,387) | (759,418) | (760,952) | (759,279) | (762,318) | (721,462) | (703,041) | (675,032) | (648,049) | (562,856) | (560,812) | (483,525) | (468,939) | (479,253) | (465,391) | (555,431) | (396,753) | (330,235) | (285,681) | (243,326) | (206,036) | (167,332) | (110,095) | (105,482) | (11,951,086) |
| 73 | | Change in AP | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 74 | | Less: Nursery Feed Cost Reductions | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 75 | | Less: Finisher Feed Cost Reductions | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 76 | | Feed Costs | | (1,037,477) | (1,051,494) | (1,047,816) | (1,039,903) | (1,037,679) | (991,028) | (963,806) | (924,907) | (888,284) | (792,950) | (780,402) | (696,222) | (670,197) | (677,726) | (660,984) | (736,589) | (563,688) | (457,132) | (398,769) | (342,086) | (292,258) | (240,711) | (168,762) | (162,446) | (16,623,317) |
| 77 | | Hauling | | (50,339) | (52,187) | (54,939) | (56,670) | (52,825) | (53,958) | (60,100) | (53,724) | (49,439) | (52,724) | (57,303) | (40,151) | (45,041) | (13,901) | (17,084) | (46,348) | (45,282) | (43,845) | (41,750) | (45,455) | (39,854) | (40,778) | (40,219) | (6,922) | (1,060,838) |
| 78 | | Contract Grower Closeout Fees 2 | | (122,597) | (121,767) | (362,236) | (121,149) | (111,143) | (116,754) | (123,359) | (109,847) | (106,484) | (117,942) | (119,136) | (93,045) | (125,476) | (64,675) | (67,821) | (131,832) | (130,068) | (126,917) | (126,809) | (130,223) | (117,819) | (119,853) | (121,345) | (46,160) | (2,934,458) |
| 79 | | Contract Grower Rent 3 | | | | | | | | | | | | | | | | | | | | | | | | | | - |
| 80 | | Medication & Veterinary Services | | (49,894) | (48,052) | (47,970) | (47,890) | (46,185) | (45,855) | (46,967) | (43,231) | (45,866) | (46,743) | (45,443) | (45,339) | (45,181) | (45,125) | (45,065) | (44,898) | (44,734) | (44,577) | (44,421) | (44,259) | (44,119) | (43,976) | (43,831) | (43,812) | (1,093,432) |
| 81 | | Cost of Sales Disbursements | | (1,260,307) | (1,273,500) | (1,512,961) | (1,265,612) | (1,247,831) | (1,207,595) | (1,194,232) | (1,131,709) | (1,090,073) | (1,010,360) | (1,002,284) | (874,756) | (885,895) | (801,428) | (790,954) | (959,667) | (783,773) | (672,471) | (611,749) | (562,022) | (494,051) | (445,318) | (374,158) | (259,340) | (21,712,045) |
| 82 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 83 | | Payroll | | (56,902) | (177,210) | (56,902) | (170,797) | (56,902) | (170,582) | (56,902) | (170,459) | (56,902) | (170,207) | (56,902) | (169,956) | (56,902) | (169,736) | (56,902) | (169,576) | (56,902) | (159,423) | (56,902) | (159,131) | (56,902) | (158,860) | (56,902) | (128,651) | (2,657,411) |
| 84 | | Other Payroll | | (28,387) | (26,982) | (25,385) | (29,328) | (26,590) | (26,306) | (27,657) | (24,105) | (26,660) | (27,509) | (25,725) | (25,459) | (25,056) | (24,914) | (24,758) | (24,332) | (23,915) | (23,513) | (23,113) | (22,700) | (22,342) | (21,977) | (21,607) | (21,558) | (599,877) |
| 85 | | Payroll Taxes | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 86 | | Insurance & Benefits | | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (7,095) | (170,279) |
| 87 | | Payroll Disbursements | | (92,383) | (211,287) | (89,382) | (207,220) | (90,587) | (203,983) | (91,654) | (201,659) | (90,657) | (204,812) | (89,722) | (202,510) | (89,053) | (201,744) | (88,755) | (201,004) | (87,912) | (190,031) | (87,110) | (188,926) | (86,339) | (187,932) | (85,604) | (157,304) | (3,427,567) |
| 88 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| 89 | | Utilities | | (118,697) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (22,547) | (7,547) | (7,547) | (607,283) |
| 90 | | Property & Other Taxes | | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (136,451) |
| 91 | | Supplies | | (3,956) | (3,905) | (3,834) | (3,677) | (3,660) | (3,661) | (3,652) | (3,633) | (3,614) | (3,595) | (3,574) | (3,560) | (3,538) | (3,530) | (3,521) | (3,498) | (3,476) | (3,454) | (3,432) | (3,410) | (3,390) | (3,370) | (3,350) | (3,348) | (85,638) |
| 92 | | Legal, Accounting & Other | | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (504,000) |
| 93 | | Repairs & Maintenance | | (13,016) | (12,631) | (12,113) | (9,320) | (9,188) | (9,192) | (9,163) | (9,103) | (9,048) | (8,987) | (8,924) | (8,879) | (8,812) | (8,788) | (8,763) | (8,692) | (8,622) | (8,555) | (8,488) | (8,420) | (8,360) | (8,299) | (8,237) | (8,229) | (221,830) |

| | A | B | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT | BU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | **N. G. Purvis Farms** | | | | | | | | | | | | | |
| 4 | *Cash Flow Forecast* | | | | | | | | | | | | | |
| 5 | | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 |
| 6 | | Fiscal Period | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 |
| 7 | | Fiscal Week | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 8 | | Bankruptcy week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 9 | | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| 10 | | Week Beginning Date | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 |
| 11 | | Week Ending Date | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 |
| 94 | | Credit Cards | - | - | - | - | - | - | - | - | - | - | - | - |
| 95 | | Rent | - | - | - | - | - | - | - | - | - | - | - | - |
| 96 | | All Other | (58,862) | (58,693) | (58,462) | (57,946) | (57,812) | (57,816) | (57,785) | (57,720) | (57,660) | (57,593) | (57,525) | (57,477) |
| 97 | | SG&A Disbursements | (221,216) | (124,462) | (123,642) | (120,176) | (119,894) | (119,901) | (119,834) | (119,688) | (119,555) | (119,408) | (119,255) | (119,148) |
| 98 | | | | | | | | | | | | | | |
| 99 | | **Operating Disbursements** | **(1,573,907)** | **(1,609,249)** | **(1,725,984)** | **(1,593,009)** | **(1,458,312)** | **(1,531,480)** | **(1,405,720)** | **(1,453,056)** | **(1,300,285)** | **(1,334,579)** | **(1,211,261)** | **(1,196,414)** |
| 100 | | | | | | | | | | | | | | |
| 101 | | **Net Operating Cash Flow** | **82,929** | **209,721** | **169,307** | **395,059** | **558,817** | **370,997** | **600,396** | **619,019** | **563,544** | **434,343** | **744,865** | **808,938** |
| 102 | | **Cumulative Cash Flow** | **82,929** | **292,651** | **461,957** | **857,016** | **1,415,833** | **1,786,830** | **2,387,226** | **3,006,245** | **3,569,789** | **4,004,132** | **4,748,996** | **5,557,934** |
| 103 | | | | | | | | | | | | | | |
| 104 | | *Additional Lender Advance* | - | - | *(5,966,311)* | - | - | - | - | - | - | - | - | - |
| 105 | | Principal Payments | (24,567) | - | 5,966,311 | - | (24,636) | - | - | - | - | (24,705) | - | - |
| 106 | | Interest Expense | (96,873) | (56,639) | (56,286) | (42,257) | (102,827) | (40,447) | (39,690) | (38,396) | (37,056) | (97,156) | (35,126) | (33,488) |
| 107 | | **Lender Receipts / (Disbursements)** | **(121,440)** | **(56,639)** | **(56,286)** | **(42,257)** | **(127,463)** | **(40,447)** | **(39,690)** | **(38,396)** | **(37,056)** | **(121,861)** | **(35,126)** | **(33,488)** |
| 108 | | | | | | | | | | | | | | |
| 109 | | Commodity Account | - | - | - | - | - | 0 | - | - | - | 0 | - | - |
| 110 | | Required AP Catch-Up Payments | | | | | | | | | | | | |
| 111 | | Professional Fees | | | | | | | | | | | | |
| 112 | | All Other | - | - | - | - | - | - | - | - | - | - | - | - |
| 113 | | CapEx | - | - | - | - | - | - | - | - | - | - | - | - |
| 114 | | **Other Receipts / (Disbursements)** | **-** | **-** | **-** | **-** | **-** | **0** | **-** | **-** | **-** | **0** | **-** | **-** |
| 115 | | | | | | | | | | | | | | |
| 116 | | **Non-Operating Receipts / (Disbursements)** | **(121,440)** | **(56,639)** | **(56,286)** | **(42,257)** | **(127,463)** | **(40,447)** | **(39,690)** | **(38,396)** | **(37,056)** | **(121,861)** | **(35,126)** | **(33,488)** |
| 117 | | | | | | | | | | | | | | |
| 118 | | *Net Cash Flow* | *(38,510)* | *153,082* | *113,021* | *352,802* | *431,355* | *330,550* | *560,706* | *580,623* | *526,488* | *312,482* | *709,739* | *775,450* |
| 119 | | Check | (0) | 0 | (5,966,311) | - | 0 | 2,493 | - | - | - | 2,355 | - | - |
| 120 | | **Cumulative cash flow after P&I payments** | **(38,510)** | **114,572** | **227,593** | **580,395** | **1,011,750** | **1,342,299** | **1,903,005** | **2,483,628** | **3,010,115** | **3,322,597** | **4,032,336** | **4,807,787** |
| 121 | | | | | | | | | | | | | | |
| 122 | | Total G&A Costs | 87,892 | 43,533 | 62,488 | 43,533 | 87,815 | 43,456 | 62,412 | 43,456 | 62,412 | 68,859 | 62,412 | 43,456 |
| 123 | | Allocation - FNBO | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% |
| 124 | | 80% | | | | | | | | | | | | |
| 125 | | Hog Revenues to FNBO | 1,579,475 | 1,406,352 | 1,490,393 | 1,567,761 | 1,632,890 | 1,527,064 | 1,634,584 | 1,692,365 | 1,514,117 | 1,395,943 | 1,576,994 | 1,634,154 |
| 126 | | Outside Feed Net Revenues to FNBO | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| 127 | | Margin Account | - | - | - | - | - | 0 | - | - | - | 0 | - | - |
| 128 | | Interest paid to FNBO | (56,550) | (56,639) | (56,286) | (42,257) | (41,443) | (40,447) | (39,690) | (38,396) | (37,056) | (35,841) | (35,126) | (33,488) |
| 129 | | Nursery expenses to FNBO | (117,166) | (105,778) | (74,407) | (45,791) | (27,698) | (10,812) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) |
| 130 | | Finisher expenses to FNBO | (845,865) | (906,289) | (1,134,871) | (936,738) | (913,346) | (928,388) | (884,012) | (867,248) | (791,573) | (746,246) | (704,639) | (625,260) |
| 131 | | Utility deposits | (68,267) | | | | | | | | | | | |
| 132 | | Pork checkoff & freight to market | (50,339) | (52,187) | (54,939) | (56,670) | (52,825) | (53,958) | (60,100) | (53,724) | (49,439) | (52,724) | (57,303) | (40,151) |
| 133 | | Sale: Sow and GDU Animals to LOLF | | | 5,966,311 | | | | | | | | | |
| 134 | 62% | Bankruptcy costs | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) |
| 135 | | G&A expenses to FNBO | (70,313) | (34,826) | (49,991) | (34,826) | (70,252) | (34,765) | (49,929) | (34,765) | (49,929) | (55,087) | (49,929) | (34,765) |
| 136 | | Net cash flow - FNBO | 342,122 | 221,779 | 6,057,356 | 422,625 | 498,473 | 429,841 | 570,261 | 667,640 | 555,528 | 475,453 | 699,405 | 869,899 |
| 137 | | Cumulative net cash flow - FNBO | 342,122 | 563,901 | 6,621,257 | 7,043,882 | 7,542,355 | 7,972,196 | 8,542,457 | 9,210,097 | 9,765,625 | 10,241,077 | 10,940,482 | 11,810,381 |
| 138 | | | | | | | | | | | | | | |
| 139 | | | | | | | | | | | | | | |
| 140 | | | | | | | | | | | | | | |
| 141 | | | | | | | | | | | | | | |
| 142 | | | | | | | | | | | | | | |
| 143 | | Revenues to LOL | 67,361 | 402,619 | 394,898 | 410,307 | 374,239 | 365,413 | 361,531 | 369,710 | 339,711 | 362,979 | 369,132 | 361,198 |
| 144 | | Interest paid to LOL | (39,486) | - | - | - | (60,617) | - | - | - | - | (60,617) | - | - |
| 145 | | Sow unit expenses to LOL | (278,152) | (372,620) | (274,663) | (381,347) | (277,328) | (368,061) | (274,880) | (360,099) | (272,531) | (366,482) | (265,372) | (361,689) |
| 146 | | GDU expenses to LOL | (61,080) | (66,176) | (61,949) | (66,264) | (62,037) | (64,138) | (59,911) | (64,124) | (59,924) | (61,266) | (57,131) | (61,453) |
| 147 | | Utility deposits | (27,884) | | | | | | | | | | | |
| 148 | | Purchase: Sow and GDU Animals from FNBO | | | (5,966,311) | | | | | | | | | |
| 149 | | Bankruptcy costs | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) |
| 150 | | G&A expenses to LOL | (17,578) | (8,707) | (12,498) | (8,707) | (17,563) | (8,691) | (12,482) | (8,691) | (12,482) | (13,772) | (12,482) | (8,691) |
| 151 | | Net cash flow - LOL | (380,632) | (68,696) | (5,944,335) | (69,823) | (67,118) | (99,292) | (9,555) | (87,017) | (29,040) | (162,971) | 10,334 | (94,449) |
| 152 | | Cumulative net cash flow - LOL | (380,632) | (449,329) | (6,393,664) | (6,463,487) | (6,530,605) | (6,629,897) | (6,639,452) | (6,726,469) | (6,755,509) | (6,918,480) | (6,908,146) | (7,002,595) |
| 153 | | | | | | | | | | | | | | |
| 154 | | *Check* | - | 0 | - | - | 0 | 0 | 0 | (0) | 0 | - | (0) | - |
| 155 | | | | | | | | | | | | | | |
| 156 | | | | | | | | | | | | | | |
| 157 | | | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 |
| 158 | | | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 |
| 159 | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 160 | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 161 | | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| 162 | | | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 |
| 163 | | | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 |
| 164 | | | | | | | | | | | | | | |
| 165 | | **G&A Expenses** | | | | | | | | | | | | |
| 166 | | Labor, contract labor | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 38,011 |
| 167 | | Utilities | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 |
| 168 | | Property & Other Taxes | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 |
| 169 | | Repairs & Maintenance | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 |
| 170 | | Insurance | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 |
| 171 | | Purchase money debt payments | 25,403 | - | - | - | 25,403 | - | - | - | - | 25,403 | - | - |
| 172 | | All Other | 1,981 | 1,981 | 1,981 | 1,981 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 |
| 173 | | | 87,892 | 43,533 | 62,488 | 43,533 | 87,815 | 43,456 | 62,412 | 43,456 | 62,412 | 68,859 | 62,412 | 43,456 |
| 174 | | | - | - | - | - | - | - | - | - | - | - | - | - |
| 175 | | **Bankruptcy Costs** | | | | | | | | | | | | |

| | B | BV | BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 6 | Fiscal Period | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 7 | Fiscal Week | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | |
| 8 | Bankruptcy week | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 9 | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| 10 | Week Beginning Date | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 11 | Week Ending Date | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 94 | Credit Cards | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 95 | Rent | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 96 | All Other | (57,404) | (57,378) | (57,350) | (57,273) | (57,197) | (57,124) | (57,052) | (56,977) | (56,912) | (56,846) | (56,779) | (56,770) | (1,380,411) |
| 97 | SG&A Disbursements | (118,986) | (118,929) | (118,867) | (118,695) | (118,527) | (118,366) | (118,205) | (118,039) | (117,895) | (117,748) | (102,599) | (102,579) | (2,935,614) |
| 98 | | | | | | | | | | | | | | 0 |
| 99 | **Operating Disbursements** | **(1,093,935)** | **(1,122,101)** | **(998,576)** | **(1,279,366)** | **(990,212)** | **(980,867)** | **(817,063)** | **(868,987)** | **(698,284)** | **(750,997)** | **(562,361)** | **(519,223)** | **(28,075,227)** |
| 100 | | | | | | | | | | | | | | 0 |
| 101 | **Net Operating Cash Flow** | **425,297** | **1,028,423** | **(103,101)** | **(316,727)** | **971,065** | **899,772** | **1,015,033** | **984,493** | **1,201,031** | **969,413** | **1,188,054** | **974,438** | **14,795,126** |
| 102 | **Cumulative Cash Flow** | **5,983,231** | **7,011,654** | **6,908,554** | **6,591,827** | **7,562,892** | **8,462,663** | **9,477,697** | **10,462,189** | **11,663,220** | **12,632,634** | **13,820,688** | **14,795,126** | **14,795,126** |
| 103 | | | | | | | | | | | | | | - |
| 104 | *Additional Lender Advance* | - | - | - | - | - | - | - | - | - | - | - | - | *(5,966,311)* |
| 105 | Principal Payments | - | (24,774) | - | - | - | (24,844) | - | - | - | - | (24,913) | - | 5,817,872 |
| 106 | Interest Expense | (31,698) | (92,036) | (28,690) | (28,994) | (29,792) | (28,180) | (86,283) | (23,528) | (21,310) | (15,505) | (74,410) | (10,791) | (1,147,458) |
| 107 | **Lender Receipts / (Disbursements)** | **(31,698)** | **(116,810)** | **(28,690)** | **(28,994)** | **(29,792)** | **(53,023)** | **(86,283)** | **(23,528)** | **(21,310)** | **(15,505)** | **(99,324)** | **(10,791)** | **(1,295,897)** |
| 108 | | | | | | | | | | | | | | 0 |
| 109 | Commodity Account | - | 0 | - | - | - | - | - | - | 1,335,844 | - | - | - | 1,335,844 |
| 110 | Required AP Catch-Up Payments | | | | | | | | | | | | | - |
| 111 | Professional Fees | | | | | | | | | | | | | - |
| 112 | All Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 113 | CapEx | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 114 | **Other Receipts / (Disbursements)** | **-** | **0** | **-** | **-** | **-** | **-** | **-** | **-** | **1,335,844** | **-** | **-** | **-** | **1,335,844** |
| 115 | | | | | | | | | | | | | | 0 |
| 116 | **Non-Operating Receipts / (Disbursements)** | **(31,698)** | **(116,810)** | **(28,690)** | **(28,994)** | **(29,792)** | **(53,023)** | **(86,283)** | **(23,528)** | **1,314,534** | **(15,505)** | **(99,324)** | **(10,791)** | **39,947** |
| 117 | | | | | | | | | | | | | | - |
| 118 | *Net Cash Flow* | *393,598* | *911,614* | *(131,791)* | *(345,721)* | *941,272* | *846,748* | *928,750* | *960,965* | *2,515,565* | *953,908* | *1,088,730* | *963,647* | *14,835,073* |
| 119 | Check | (0) | 1,801 | 0 | - | - | - | 2,153 | - | - | - | - | - | (5,957,508) |
| 120 | **Cumulative cash flow after P&I payments** | **5,201,385** | **6,112,999** | **5,981,208** | **5,635,487** | **6,576,759** | **7,423,507** | **8,352,258** | **9,313,223** | **11,828,788** | **12,782,696** | **13,871,426** | **14,835,073** | |
| 121 | | | | | | | | | | | | | | |
| 122 | Total G&A Costs | 62,412 | 68,859 | 62,412 | 43,456 | 62,412 | 59,007 | 62,412 | 33,604 | 62,412 | 33,604 | 87,815 | 33,604 | 1,383,727 |
| 123 | Allocation - FNBO | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | |
| 124 | 80% | | | | | | | | | | | | | |
| 125 | Hog Revenues to FNBO | 1,148,033 | 1,754,044 | 500,208 | 567,372 | 1,567,803 | 1,487,166 | 1,438,390 | 1,459,773 | 1,504,896 | 1,325,992 | 1,366,577 | 1,109,824 | 33,882,170 |
| 126 | Outside Feed Net Revenues to FNBO | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 240,000 |
| 127 | Margin Account | - | 0 | - | - | - | - | - | - | 1,335,844 | - | - | - | 1,335,844 |
| 128 | Interest paid to FNBO | (31,698) | (30,790) | (28,690) | (28,994) | (29,792) | (27,620) | (25,666) | (23,528) | (21,310) | (15,505) | (13,304) | (10,791) | (800,907) |
| 129 | Nursery expenses to FNBO | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (1,739) | (412,952) |
| 130 | Finisher expenses to FNBO | (598,825) | (576,638) | (531,142) | (701,407) | (495,237) | (415,916) | (327,881) | (304,686) | (211,650) | (192,026) | (94,280) | (12,700) | (14,746,861) |
| 131 | Utility deposits | | | | | | | | | | | | | (68,267) |
| 132 | Pork checkoff & freight to market | (45,041) | (13,901) | (17,084) | (46,348) | (45,282) | (43,845) | (41,750) | (45,455) | (39,854) | (40,778) | (40,219) | (6,922) | (1,060,838) |
| 133 | Sale: Sow and GDU Animals to LOLF | | | | | | | | | | | | | 5,966,311 |
| 134 | Bankruptcy costs | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (38,853) | (932,480) |
| 135 | G&A expenses to FNBO | (49,929) | (55,087) | (49,929) | (34,765) | (49,929) | (47,206) | (49,929) | (26,883) | (49,929) | (26,883) | (70,252) | (26,883) | (1,106,981) |
| 136 | Net cash flow - FNBO | 391,948 | 1,047,036 | (157,229) | (274,734) | 916,971 | 921,987 | 962,572 | 1,028,630 | 2,487,404 | 1,020,208 | 1,117,929 | 1,021,935 | 22,295,039 |
| 137 | Cumulative net cash flow - FNBO | 12,202,329 | 13,249,366 | **13,092,137** | **12,817,403** | **13,734,374** | **14,656,361** | **15,618,933** | **16,647,562** | **19,134,966** | **20,155,175** | **21,273,104** | **22,295,039** | 22,295,039 |
| 138 | | | | | | | | | | | | | | |
| 139 | | | | | | | | | | | | | **Total projected proceeds to FNBO** | **$22,295,039** |
| 140 | | | | | | | | | | | | | **FNBO debt** | 25,793,000 |
| 141 | | | | | | | | | | | | | **Deficiency** | **(3,497,961)** |
| 142 | | | | | | | | | | | | | | |
| 143 | Revenues to LOL | 361,198 | 386,480 | 385,267 | 385,267 | 383,473 | 383,473 | 383,706 | 383,706 | 384,419 | 384,419 | 373,838 | 373,838 | 8,748,183 |
| 144 | Interest paid to LOL | - | (60,617) | - | - | - | - | (60,617) | - | - | - | (60,617) | - | (342,570) |
| 145 | Sow unit expenses to LOL | (265,742) | (361,934) | (265,808) | (361,813) | (265,166) | (361,175) | (263,382) | (359,391) | (262,743) | (358,752) | (250,468) | (346,796) | (7,576,394) |
| 146 | GDU expenses to LOL | (57,510) | (61,766) | (57,725) | (61,936) | (57,709) | (61,922) | (57,233) | (61,446) | (57,219) | (61,432) | (50,576) | (54,796) | (1,446,725) |
| 147 | Utility deposits | | | | | | | | | | | | | (27,884) |
| 148 | Purchase: Sow and GDU Animals from FNBO | | | | | | | | | | | | | (5,966,311) |
| 149 | Bankruptcy costs | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (23,813) | (571,520) |
| 150 | G&A expenses to LOL | (12,482) | (13,772) | (12,482) | (8,691) | (12,482) | (11,801) | (12,482) | (6,721) | (12,482) | (6,721) | (17,563) | (6,721) | (276,745) |
| 151 | Net cash flow - LOL | 1,650 | (135,422) | 25,438 | (70,987) | 24,302 | (75,239) | (33,821) | (67,665) | 28,161 | (66,300) | (29,199) | (58,288) | **(7,459,965)** |
| 152 | Cumulative net cash flow - LOL | (7,000,944) | (7,136,367) | (7,110,929) | (7,181,916) | (7,157,614) | (7,232,854) | (7,266,675) | (7,334,339) | (7,306,179) | (7,372,479) | (7,401,677) | (7,459,965) | **(1,493,655)** |
| 153 | | | | | | | | | | | | | | |
| 154 | *Check* | 0 | - | (0) | 0 | 0 | - | - | - | (0) | - | (0) | - | 0 |
| 155 | | | | | | | | | | | | | | |
| 156 | | | | | | | | | | | | | | |
| 157 | | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 158 | | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 159 | | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 160 | | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 161 | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| 162 | | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 163 | | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 164 | | | | | | | | | | | | | | |
| 165 | **G&A Expenses** | | | | | | | | | | | | | |
| 166 | Labor, contract labor | 56,967 | 38,011 | 56,967 | 38,011 | 56,967 | 28,159 | 56,967 | 28,159 | 56,967 | 28,159 | 56,967 | 28,159 | 1,100,327 |
| 167 | Utilities | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 1,167 | 28,011 |
| 168 | Property & Other Taxes | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 1,334 | 32,010 |
| 169 | Repairs & Maintenance | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 519 | 12,462 |
| 170 | Insurance | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 521 | 12,499 |
| 171 | Purchase money debt payments | - | 25,403 | - | - | - | 25,403 | - | - | - | - | 25,403 | - | 152,420 |
| 172 | All Other | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 1,904 | 45,998 |
| 173 | | 62,412 | 68,859 | 62,412 | 43,456 | 62,412 | 59,007 | 62,412 | 33,604 | 62,412 | 33,604 | 87,815 | 33,604 | 1,383,727 |
| 174 | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 175 | **Bankruptcy Costs** | | | | | | | | | | | | | |

| Row | A | B | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT | BU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | **N. G. Purvis Farms** | | | | | | | | | | | | |
| 4 | | *Cash Flow Forecast* | | | | | | | | | | | | |
| 5 | | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 |
| 6 | | Fiscal Period | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 |
| 7 | | Fiscal Week | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 8 | | Bankruptcy week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 9 | | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| 10 | | Week Beginning Date | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 |
| 11 | | Week Ending Date | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 |
| 176 | | Professional fees | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 |
| 177 | | Additional bankruptcy costs | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 |
| 178 | | | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 |
| 179 | | | - | - | - | - | - | - | - | - | - | - | - | - |
| 180 | | FNBO BUDGET | | | | | | | | | | | | |
| 181 | | **Animal Inventories** | | | | | | | | | | | | |
| 182 | | Nursery | 44,290 | 35,853 | 27,206 | 19,716 | 12,131 | 4,493 | - | - | - | - | - | - |
| 183 | | Finishing | 104,936 | 106,325 | 107,676 | 107,726 | 108,411 | 108,779 | 105,609 | 98,796 | 92,541 | 85,647 | 78,512 | 73,496 |
| 184 | | **Total** | 149,226 | 142,178 | 134,882 | 127,442 | 120,542 | 113,272 | 105,609 | 98,796 | 92,541 | 85,647 | 78,512 | 73,496 |
| 185 | | **Hogs sold** | | | | | | | | | | | | |
| 186 | | Market Hogs | 5,751 | 5,961 | 6,287 | 6,509 | 6,047 | 6,491 | 6,958 | 6,198 | 5,660 | 6,330 | 6,599 | 4,511 |
| 187 | | Cull Hogs | 151 | 153 | 155 | 157 | 158 | 159 | 160 | 158 | 150 | 141 | 131 | 121 |
| 188 | | **Head** | 5,902 | 6,114 | 6,442 | 6,667 | 6,206 | 6,650 | 7,118 | 6,355 | 5,811 | 6,471 | 6,730 | 4,632 |
| 189 | | Market Hogs | 1,679,620 | 1,739,504 | 1,832,457 | 1,895,881 | 1,764,168 | 1,890,729 | 2,023,804 | 1,807,024 | 1,653,925 | 1,844,762 | 1,921,330 | 1,326,444 |
| 190 | | Cull Hogs | 28,672 | 29,095 | 29,514 | 29,897 | 30,093 | 30,196 | 30,343 | 29,951 | 28,557 | 26,731 | 24,894 | 22,934 |
| 191 | | **Pounds** | 1,708,292 | 1,768,599 | 1,861,972 | 1,925,778 | 1,794,261 | 1,920,925 | 2,054,146 | 1,836,976 | 1,682,482 | 1,871,493 | 1,946,224 | 1,349,378 |
| 192 | | Market Hogs | $1,390,042 | $1,471,122 | $1,549,733 | $1,619,761 | $1,507,231 | $1,613,147 | $1,681,533 | $1,501,416 | $1,374,209 | $1,558,259 | $1,637,804 | $1,130,705 |
| 193 | | Cull Hogs | $49,228 | $50,549 | $50,788 | $51,466 | $51,577 | $52,514 | $51,972 | $51,750 | $50,959 | $50,025 | $48,533 | $47,470 |
| 194 | | **Hog Sales** | $1,439,270 | $1,521,671 | $1,600,521 | $1,671,227 | $1,558,808 | $1,665,660 | $1,733,504 | $1,553,165 | $1,425,168 | $1,608,284 | $1,686,337 | $1,178,174 |
| 195 | | Butchers lbs/head | 292.1 | 291.8 | 291.5 | 291.3 | 291.7 | 291.3 | 290.8 | 291.6 | 292.2 | 291.4 | 291.2 | 294.0 |
| 196 | | Butchers $/head | $241.72 | $246.80 | $246.50 | $248.83 | $249.24 | $248.51 | $241.66 | $242.25 | $242.77 | $246.17 | $248.20 | $250.63 |
| 197 | | Butchers $/cwt | $82.76 | $84.57 | $84.57 | $85.44 | $85.44 | $85.32 | $83.09 | $83.09 | $83.09 | $84.47 | $85.24 | $85.24 |
| 198 | | | | | | | | | | | | | | |
| 199 | | **Revenues - cash basis** | | | | | | | | | | | | |
| 200 | | Market Hogs | 1,563,541 | 1,389,833 | 1,473,636 | 1,550,786 | 1,615,804 | 1,509,921 | 1,617,376 | 1,675,379 | 1,497,922 | 1,380,783 | 1,563,492 | 1,621,715 |
| 201 | | Cull Hogs | 15,934 | 16,519 | 16,757 | 16,974 | 17,085 | 17,144 | 17,208 | 16,986 | 16,195 | 15,160 | 13,502 | 12,439 |
| 202 | | **Hog Collections** | 1,579,475 | 1,406,352 | 1,490,393 | 1,567,761 | 1,632,890 | 1,527,064 | 1,634,584 | 1,692,365 | 1,514,117 | 1,395,943 | 1,576,994 | 1,634,154 |
| 203 | | Feed | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| 204 | | **Total Collections** | 1,829,475 | 1,656,352 | 1,740,393 | 1,817,761 | 1,882,890 | 1,777,064 | 1,884,584 | 1,942,365 | 1,764,117 | 1,645,943 | 1,826,994 | 1,884,154 |
| 205 | | | - | - | - | - | - | - | - | - | - | - | - | - |
| 206 | | **Selling costs** | | | | | | | | | | | | |
| 207 | | Pork checkoff | 9,086 | 9,463 | 9,932 | 10,105 | 9,494 | 7,519 | 10,392 | 9,341 | 8,816 | 7,414 | 10,113 | 7,572 |
| 208 | | Freight | 41,254 | 42,725 | 45,008 | 46,566 | 43,330 | 46,439 | 49,707 | 44,383 | 40,623 | 45,310 | 47,191 | 32,579 |
| 209 | | | 50,339 | 52,187 | 54,939 | 56,670 | 52,825 | 53,958 | 60,100 | 53,724 | 49,439 | 52,724 | 57,303 | 40,151 |
| 210 | | **Nursery expenses** | - | - | - | - | - | - | - | - | - | - | - | - |
| 211 | | Nursery Feed | 90,529 | 76,971 | 58,323 | 42,249 | 25,959 | 9,074 | - | - | - | - | - | - |
| 212 | | Labor, contract labor | 613 | 7,187 | 353 | 271 | - | - | - | - | - | - | - | - |
| 213 | | Drugs | 5,470 | 4,478 | 3,151 | 345 | - | - | - | - | - | - | - | - |
| 214 | | Utilities | 1,318 | 1,168 | 966 | 539 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 |
| 215 | | Utilities deposit | 5,769 | | | | | | | | | | | |
| 216 | | Repairs/maintenance | 2,188 | 1,791 | 1,261 | 138 | - | - | - | - | - | - | - | - |
| 217 | | Lease/grower | 15,315 | 12,538 | 8,824 | 967 | - | - | - | - | - | - | - | - |
| 218 | | Insurance | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 |
| 219 | | Taxes | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 |
| 220 | | Other | 481 | 394 | 277 | 30 | - | - | - | - | - | - | - | - |
| 221 | | | 122,935 | 105,778 | 74,407 | 45,791 | 27,698 | 10,812 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 |
| 222 | | **Finishing expenses** | 5,769 | - | - | - | - | - | - | - | - | - | - | - |
| 223 | | Finishing Feed | 725,535 | 751,974 | 768,432 | 777,224 | 789,088 | 768,189 | 752,208 | 709,655 | 670,636 | 588,883 | 545,165 | 515,507 |
| 224 | | Cost of Feed Sold | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| 225 | | Change in feed inventories | (32,207) | (33,013) | (34,175) | (34,845) | (32,317) | (34,052) | (35,893) | (31,912) | (29,293) | (32,294) | (1,149) | (55,763) |
| 226 | | Payment on Smithfield feed/genetics AP | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 |
| 227 | | Labor, contract labor | 5,570 | 37,675 | 5,715 | 37,789 | 5,754 | 37,862 | 5,605 | 37,209 | 4,912 | 36,259 | 4,167 | 35,363 |
| 228 | | Drugs | 2,179 | 2,208 | 2,236 | 2,237 | 2,252 | 2,259 | 2,193 | 2,052 | 1,922 | 1,779 | 1,631 | 1,526 |
| 229 | | Utilities | 15,378 | 15,378 | 15,378 | 15,378 | 15,378 | 15,378 | 15,378 | 15,377 | 15,377 | 15,377 | 15,377 | 15,377 |
| 230 | | Utilities deposit | 62,498 | | | | | | | | | | | |
| 231 | | Repairs/maintenance | 928 | 941 | 953 | 953 | 959 | 962 | 934 | 874 | 819 | 758 | 695 | 650 |
| 232 | | Lease/grower | 73,668 | 76,294 | 321,484 | 83,153 | 77,376 | 82,927 | 88,763 | 79,255 | 72,541 | 80,911 | 84,269 | 58,177 |
| 233 | | Insurance | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 |
| 234 | | Taxes | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 |
| 235 | | Other | 1,312 | 1,329 | 1,346 | 1,347 | 1,355 | 1,360 | 1,320 | 1,235 | 1,157 | 1,071 | 981 | 919 |
| 236 | | | 1,148,364 | 1,146,290 | 1,374,872 | 1,176,739 | 1,153,348 | 1,168,389 | 1,124,013 | 1,107,249 | 1,031,574 | 986,246 | 944,640 | 865,260 |
| 237 | | **Other expenses (income)** | 62,499 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 238 | | Margin Account | - | - | - | - | - | (0) | - | - | - | (0) | - | - |
| 239 | | Interest paid to FNBO | 56,550 | 56,639 | 56,286 | 42,257 | 41,443 | 40,447 | 39,690 | 38,396 | 37,056 | 35,841 | 35,126 | 33,488 |
| 240 | | Sale: Sow and GDU Animals to LOLF | - | - | (5,966,311) | - | - | - | - | - | - | - | - | - |
| 241 | 80% | G&A Allocation | 70,313 | 34,826 | 49,991 | 34,826 | 70,252 | 34,765 | 49,929 | 34,765 | 49,929 | 55,087 | 49,929 | 34,765 |
| 242 | 62% | Bankruptcy Cost Allocation | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 |
| 243 | | **Total Expenses** | 1,487,355 | 1,434,576 | (4,316,961) | 1,395,138 | 1,384,420 | 1,347,226 | 1,314,326 | 1,274,726 | 1,208,591 | 1,170,492 | 1,127,590 | 1,014,257 |
| 244 | | | - | (0) | (5,966,311) | (0) | 0 | 0 | 0 | (0) | 0 | 0 | 0 | (0) |
| 245 | | **Net Cash Flow - FNBO** | **342,120** | **221,775** | **6,057,353** | **422,623** | **498,470** | **429,839** | **570,258** | **667,639** | **555,526** | **475,451** | **699,403** | **869,898** |
| 246 | | **Cumulative Net Cash Flow - FNBO** | **342,120** | **563,895** | **6,621,249** | **7,043,871** | **7,542,342** | **7,972,180** | **8,542,438** | **9,210,077** | **9,765,603** | **10,241,054** | **10,940,458** | **11,810,355** |
| 247 | | | (2) | (3) | (3) | (3) | (3) | (3) | (3) | (2) | (2) | (2) | (2) | (2) |
| 248 | | | (2) | (5) | (8) | (10) | (13) | (16) | (18) | (20) | (21) | (23) | (25) | (26) |
| 249 | | | | | | | | | | | | | | |
| 250 | | | - | - | - | - | - | 0 | - | - | - | - | - | - |
| 251 | | LOLF BUDGET | - | - | - | - | - | - | - | - | - | - | - | - |
| 252 | | **Animal Inventories** | | | | | | | | | | | | |
| 253 | | Sows | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 |
| 254 | | Boars | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 |
| 255 | | GDU | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 |
| 256 | | Pigs in farrowing (21 days' Inventory) | 25,008 | 24,376 | 23,848 | 24,617 | 25,295 | 25,545 | 25,415 | 24,728 | 24,765 | 24,783 | 25,406 | 25,395 |
| 257 | | **Total** | 52,806 | 52,175 | 51,647 | 52,416 | 53,094 | 53,344 | 53,213 | 52,527 | 52,564 | 52,582 | 53,205 | 53,193 |

| Row | A | B | BV | BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | |
| 3 | | **N. G. Purvis Farms** | | | | | | | | | | | | | |
| 4 | | *Cash Flow Forecast* | | | | | | | | | | | | | |
| 5 | | Fiscal Year | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 6 | | Fiscal Period | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 7 | | Fiscal Week | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | |
| 8 | | Bankruptcy week | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 9 | | Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | *Forecast* | Forecast | Forecast | Forecast | Forecast | |
| 10 | | Week Beginning Date | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 11 | | Week Ending Date | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 176 | | Professional fees | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 504,000 |
| 177 | | Additional bankruptcy costs | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 1,000,000 |
| 178 | | | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 62,667 | 1,504,000 |
| 179 | | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 180 | | FNBO BUDGET | | | | | | | | | | | | | |
| 181 | | **Animal Inventories** | | | | | | | | | | | | | |
| 182 | | Nursery | - | - | - | - | - | - | - | - | - | - | - | - | |
| 183 | | Finishing | 65,912 | 63,219 | 60,298 | 52,269 | 44,404 | 36,827 | 29,292 | 21,518 | 14,770 | 7,891 | 923 | 0 | |
| 184 | | **Total** | 65,912 | 63,219 | 60,298 | 52,269 | 44,404 | 36,827 | 29,292 | 21,518 | 14,770 | 7,891 | 923 | 0 | |
| 185 | | **Hogs sold** | | | | | | | | | | | | | |
| 186 | | Market Hogs | 7,106 | 2,242 | 2,494 | 7,614 | 7,473 | 7,221 | 7,213 | 7,486 | 6,493 | 6,799 | 6,918 | 903 | 143,266 |
| 187 | | Cull Hogs | 112 | 103 | 95 | 91 | 83 | 71 | 60 | 49 | 37 | 27 | 17 | 6 | 2,544 |
| 188 | | **Head** | 7,218 | 2,344 | 2,589 | 7,705 | 7,556 | 7,292 | 7,272 | 7,534 | 6,531 | 6,826 | 6,935 | 910 | 145,809 |
| 189 | | Market Hogs | 2,065,892 | 679,624 | 751,351 | 2,210,799 | 2,170,576 | 2,098,739 | 2,096,279 | 2,174,105 | 1,891,312 | 1,937,680 | 1,971,684 | 257,468 | 41,685,158 |
| 190 | | Cull Hogs | 21,236 | 19,476 | 18,040 | 17,256 | 15,726 | 13,506 | 11,348 | 9,237 | 7,099 | 5,070 | 3,166 | 1,231 | 483,268 |
| 191 | | **Pounds** | 2,087,128 | 699,100 | 769,392 | 2,228,055 | 2,186,302 | 2,112,245 | 2,107,627 | 2,183,342 | 1,898,410 | 1,942,750 | 1,974,850 | 258,699 | 42,168,426 |
| 192 | | Market Hogs | $1,761,034 | $488,769 | $529,916 | $1,559,239 | $1,481,462 | $1,432,432 | $1,453,068 | $1,507,015 | $1,321,844 | $1,354,252 | $1,141,996 | $149,125 | $32,215,113 |
| 193 | | Cull Hogs | $46,549 | $38,454 | $36,589 | $36,232 | $33,744 | $32,735 | $31,989 | $31,030 | $30,772 | $29,850 | $24,146 | $23,458 | $1,002,376 |
| 194 | | **Hog Sales** | $1,807,583 | $527,223 | $566,504 | $1,595,472 | $1,515,205 | $1,465,167 | $1,485,057 | $1,538,045 | $1,352,616 | $1,384,102 | $1,166,142 | $172,583 | $33,217,489 |
| 195 | | Butchers lbs/head | 290.7 | 303.1 | 301.3 | 290.3 | 290.4 | 290.6 | 290.6 | 290.4 | 291.3 | 285.0 | 285.0 | 285.0 | 291.0 |
| 196 | | Butchers $/head | $247.82 | $218.02 | $212.51 | $204.77 | $198.23 | $198.36 | $201.46 | $201.32 | $203.57 | $199.19 | $165.07 | $165.07 | $224.86 |
| 197 | | Butchers $/cwt | $85.24 | $71.92 | $70.53 | $70.53 | $68.25 | $68.25 | $69.32 | $69.32 | $69.89 | $69.89 | $57.92 | $57.92 | $77.28 |
| 198 | | | | | | | | | | | | | | | |
| 199 | | **Revenues - cash basis** | | | | | | | | | | | | | |
| 200 | | Market Hogs | 1,136,515 | 1,745,200 | 492,016 | 559,536 | 1,560,662 | 1,481,033 | 1,433,237 | 1,455,578 | 1,501,673 | 1,323,689 | 1,365,452 | 1,109,386 | 33,624,164 |
| 201 | | Cull Hogs | 11,518 | 8,845 | 8,193 | 7,836 | 7,142 | 6,133 | 5,154 | 4,195 | 3,224 | 2,302 | 1,125 | 438 | 258,006 |
| 202 | | **Hog Collections** | 1,148,033 | 1,754,044 | 500,208 | 567,372 | 1,567,803 | 1,487,166 | 1,438,390 | 1,459,773 | 1,504,896 | 1,325,992 | 1,366,577 | 1,109,824 | 33,882,170 |
| 203 | | Feed | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 6,000,000 |
| 204 | | **Total Collections** | 1,398,033 | 2,004,044 | 750,208 | 817,372 | 1,817,803 | 1,737,166 | 1,688,390 | 1,709,773 | 1,754,896 | 1,575,992 | 1,616,577 | 1,359,824 | 39,882,170 |
| 205 | | | - | - | - | - | - | - | - | - | - | - | - | - | 0 |
| 206 | | **Selling costs** | | | | | | | | | | | | | |
| 207 | | Pork checkoff | 10,899 | 2,669 | 4,667 | 9,812 | 9,410 | 9,160 | 7,106 | 9,525 | 8,597 | 8,755 | 7,635 | 2,667 | 200,149 |
| 208 | | Freight | 34,142 | 11,232 | 12,417 | 36,536 | 35,872 | 34,684 | 34,644 | 35,930 | 31,256 | 32,023 | 32,585 | 4,255 | 860,689 |
| 209 | | | 45,041 | 13,901 | 17,084 | 46,348 | 45,282 | 43,845 | 41,750 | 45,455 | 39,854 | 40,778 | 40,219 | 6,922 | 1,060,838 |
| 210 | | **Nursery expenses** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 211 | | Nursery Feed | - | - | - | - | - | - | - | - | - | - | - | - | 303,105 |
| 212 | | Labor, contract labor | - | - | - | - | - | - | - | - | - | - | - | - | 8,424 |
| 213 | | Drugs | - | - | - | - | - | - | - | - | - | - | - | - | 13,444 |
| 214 | | Utilities | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 487 | 13,728 |
| 215 | | Utilities deposit | | | | | | | | | | | | | 5,769 |
| 216 | | Repairs/maintenance | - | - | - | - | - | - | - | - | - | - | - | - | 5,378 |
| 217 | | Lease/grower | - | - | - | - | - | - | - | - | - | - | - | - | 37,644 |
| 218 | | Insurance | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 19,767 |
| 219 | | Taxes | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 428 | 10,280 |
| 220 | | Other | - | - | - | - | - | - | - | - | - | - | - | - | 1,182 |
| 221 | | | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 1,739 | 418,721 |
| 222 | | **Finishing expenses** | - | - | - | - | - | - | - | - | - | - | - | - | 5,769 |
| 223 | | Finishing Feed | 468,583 | 453,299 | 437,250 | 381,927 | 326,929 | 273,180 | 216,752 | 160,394 | 110,893 | 59,672 | 6,316 | 0 | 11,257,692 |
| 224 | | Cost of Feed Sold | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 5,760,000 |
| 225 | | Change in feed inventories | (35,522) | (12,609) | (13,682) | 117,576 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (331,151) |
| 226 | | Payment on Smithfield feed/genetics AP | 52,481 | 52,481 | 52,481 | 52,481 | 52,481 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 892,181 |
| 227 | | Labor, contract labor | 3,498 | 34,597 | 3,200 | 33,857 | 2,357 | 32,736 | 1,555 | 31,631 | 784 | 30,637 | 49 | 9 | 428,789 |
| 228 | | Drugs | 1,369 | 1,313 | 1,252 | 1,086 | 922 | 765 | 608 | 447 | 307 | 164 | 19 | 0 | 32,728 |
| 229 | | Utilities | 15,377 | 15,377 | 15,377 | 15,376 | 15,376 | 15,376 | 15,376 | 15,376 | 15,376 | 15,376 | 376 | 376 | 339,049 |
| 230 | | Utilities deposit | | | | | | | | | | | | | 62,498 |
| 231 | | Repairs/maintenance | 583 | 559 | 533 | 462 | 393 | 326 | 259 | 190 | 131 | 70 | 8 | 0 | 13,940 |
| 232 | | Lease/grower | 90,609 | 29,808 | 32,954 | 96,965 | 95,201 | 92,050 | 91,942 | 95,355 | 82,952 | 84,986 | 86,477 | 11,292 | 2,069,409 |
| 233 | | Insurance | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 288 | 6,917 |
| 234 | | Taxes | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 734 | 17,625 |
| 235 | | Other | 824 | 790 | 754 | 653 | 555 | 460 | 366 | 269 | 185 | 99 | 12 | 0 | 19,697 |
| 236 | | | 838,825 | 816,638 | 771,142 | 941,407 | 735,237 | 655,916 | 567,881 | 544,686 | 451,650 | 432,026 | 334,280 | 252,700 | 20,569,374 |
| 237 | | **Other expenses (income)** | 1 | 1 | 1 | - | - | - | - | - | - | - | - | - | 62,513 |
| 238 | | Margin Account | - | (0) | - | - | - | - | - | - | (1,335,844) | - | - | - | (1,335,844) |
| 239 | | Interest paid to FNBO | 31,698 | 30,790 | 28,690 | 28,994 | 29,792 | 27,620 | 25,666 | 23,528 | 21,310 | 15,505 | 13,304 | 10,791 | 800,907 |
| 240 | | Sale: Sow and GDU Animals to LOLF | - | - | - | - | - | - | - | - | - | - | - | - | (5,966,311) |
| 241 | 80% | G&A Allocation | 49,929 | 55,087 | 49,929 | 34,765 | 49,929 | 47,206 | 49,929 | 26,883 | 49,929 | 26,883 | 70,252 | 26,883 | 1,106,981 |
| 242 | 62% | Bankruptcy Cost Allocation | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 38,853 | 932,480 |
| 243 | | **Total Expenses** | 1,006,087 | 957,009 | 907,438 | 1,092,106 | 900,833 | 815,179 | 725,819 | 681,143 | (732,508) | 555,783 | 498,648 | 337,889 | 17,649,661 |
| 244 | | | 0 | 0 | 0 | 0 | 0 | - | (0) | 0 | - | - | - | - | (5,966,311) |
| 245 | | **Net Cash Flow - FNBO** | **391,947** | **1,047,035** | **(157,230)** | **(274,734)** | **916,971** | **921,987** | **962,572** | **1,028,630** | **2,487,404** | **1,020,208** | **1,117,929** | **1,021,935** | **22,232,510** |
| 246 | | **Cumulative Net Cash Flow - FNBO** | **12,202,302** | **13,249,337** | **13,092,107** | **12,817,373** | **13,734,344** | **14,656,331** | **15,618,903** | **16,647,532** | **19,134,937** | **20,155,145** | **21,273,074** | **22,295,009** | **22,295,009** |
| 247 | | | (2) | (1) | (1) | - | - | - | - | - | - | - | - | - | (62,529) |
| 248 | | | (28) | (29) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) |
| 249 | | | | | | | | | | | | | | | |
| 250 | | | - | 0 | - | - | - | - | - | - | - | - | - | - | - |
| 251 | | LOLF BUDGET | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 252 | | **Animal Inventories** | | | | | | | | | | | | | |
| 253 | | Sows | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | 16,809 | |
| 254 | | Boars | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | |
| 255 | | GDU | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | 10,849 | |
| 256 | | Pigs in farrowing (21 days' Inventory) | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | 25,177 | |
| 257 | | **Total** | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | 52,976 | |

| | A | B | C | BJ | BK | BL | BM | BN | BO | BP | BQ | BR | BS | BT | BU | BV | BW | BX | BY | BZ | CA | CB | CC | CD | CE | CF | CG | CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | **N. G. Purvis Farms** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 4 | *Cash Flow Forecast* | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 5 | | Fiscal Year | | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | 2022 | |
| 6 | | Fiscal Period | | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | |
| 7 | | Fiscal Week | | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | |
| 8 | | Bankruptcy week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | |
| 9 | | Actual / Forecast | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | *Forecast* | Forecast | Forecast | Forecast | Forecast | |
| 10 | | Week Beginning Date | | 9-May-21 | 16-May-21 | 23-May-21 | 30-May-21 | 6-Jun-21 | 13-Jun-21 | 20-Jun-21 | 27-Jun-21 | 4-Jul-21 | 11-Jul-21 | 18-Jul-21 | 25-Jul-21 | 1-Aug-21 | 8-Aug-21 | 15-Aug-21 | 22-Aug-21 | 29-Aug-21 | 5-Sep-21 | 12-Sep-21 | 19-Sep-21 | 26-Sep-21 | 3-Oct-21 | 10-Oct-21 | 17-Oct-21 | |
| 11 | | Week Ending Date | | 15-May-21 | 22-May-21 | 29-May-21 | 5-Jun-21 | 12-Jun-21 | 19-Jun-21 | 26-Jun-21 | 3-Jul-21 | 10-Jul-21 | 17-Jul-21 | 24-Jul-21 | 31-Jul-21 | 7-Aug-21 | 14-Aug-21 | 21-Aug-21 | 28-Aug-21 | 4-Sep-21 | 11-Sep-21 | 18-Sep-21 | 25-Sep-21 | 2-Oct-21 | 9-Oct-21 | 16-Oct-21 | 23-Oct-21 | **TOTALS** |
| 258 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 259 | | **Hogs sold** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 260 | | Weaned Pigs | | 7,586 | 7,411 | 7,750 | 8,355 | 8,089 | 8,000 | 8,224 | 7,402 | 8,037 | 8,243 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 8,025 | 191,449 |
| 261 | | Sows | | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 3,441 |
| 262 | | Gilt - Non Select Sales | | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 143 | 3,426 |
| 263 | | **Head** | | 7,872 | 7,697 | 8,036 | 8,641 | 8,375 | 8,286 | 8,510 | 7,688 | 8,323 | 8,529 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 8,311 | 198,317 |
| 264 | | Weaner price/Head | | $44.00 | $44.00 | $44.00 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 | $36.50 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $41.00 | $37.94 |
| 265 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 266 | | Sow Price/Head | | $237.58 | $242.71 | $242.71 | $242.71 | $242.71 | $242.71 | $242.45 | $242.45 | $242.45 | $242.45 | $231.87 | $231.87 | $231.87 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $194.14 | $151.92 | $151.92 | $215.32 |
| 267 | | Gilt - Non Select Price/Head | | $233.23 | $238.39 | $238.39 | $241.62 | $241.62 | $247.77 | $243.52 | $243.52 | $243.52 | $244.23 | $245.40 | $245.40 | $245.40 | $207.42 | $198.92 | $198.92 | $186.35 | $186.35 | $187.99 | $187.99 | $192.98 | $192.98 | $161.26 | $161.26 | $217.27 |
| 268 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 269 | | **Revenues - cash basis** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 270 | | Weaned Pigs | | - | 333,785 | 326,065 | 341,012 | 304,945 | 295,240 | 292,003 | 300,182 | 270,183 | 293,349 | 300,854 | 292,920 | 292,920 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 329,033 | 7,262,822 |
| 271 | | Gilt - Non Select Sales | | 33,294 | 34,031 | 34,031 | 34,492 | 34,492 | 35,370 | 34,763 | 34,763 | 34,763 | 34,865 | 35,031 | 35,031 | 35,031 | 29,609 | 28,396 | 28,396 | 26,602 | 26,602 | 26,836 | 26,836 | 27,548 | 27,548 | 23,021 | 23,021 | 744,370 |
| 272 | | Sows | | 34,067 | 34,803 | 34,803 | 34,803 | 34,803 | 34,803 | 34,765 | 34,765 | 34,765 | 34,765 | 33,247 | 33,247 | 33,247 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 27,838 | 21,784 | 21,784 | 740,990 |
| 273 | | | | 67,361 | 402,619 | 394,898 | 410,307 | 374,239 | 365,413 | 361,531 | 369,710 | 339,711 | 362,979 | 369,132 | 361,198 | 361,198 | 386,480 | 385,267 | 385,267 | 383,473 | 383,473 | 383,706 | 383,706 | 384,419 | 384,419 | 373,838 | 373,838 | 8,748,183 |
| 274 | | **Sow unit expenses to LOL** | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 275 | | Feed | | 146,739 | 147,805 | 147,486 | 147,430 | 147,111 | 142,097 | 141,778 | 141,459 | 141,216 | 133,514 | 133,454 | 133,443 | 133,824 | 133,689 | 133,890 | 133,567 | 133,248 | 132,929 | 131,464 | 131,145 | 130,826 | 130,506 | 118,550 | 118,550 | 3,265,718 |
| 276 | | Labor, contract labor | | 21,885 | 116,845 | 18,997 | 119,580 | 20,517 | 116,541 | 21,733 | 114,870 | 21,429 | 118,972 | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 21,239 | 117,567 | 1,663,009 |
| 277 | | Drugs | | 18,090 | 17,517 | 18,104 | 19,799 | 18,975 | 18,693 | 19,472 | 17,296 | 18,988 | 19,642 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 18,913 | 451,358 |
| 278 | | AI Expense | | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 5,953 | 142,877 |
| 279 | | Royalties | | 13,861 | 13,555 | 14,185 | 15,215 | 14,665 | 14,610 | 15,008 | 13,590 | 14,663 | 15,029 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 14,606 | 348,865 |
| 280 | | Utilities | | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 6,294 | 151,047 |
| 281 | | Utilities deposit | | 24,999 | | | | | | | | | | | | | | | | | | | | | | | | 24,999 |
| 282 | | Repairs/maintenance | | 9,436 | 9,436 | 9,436 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 7,766 | 191,386 |
| 283 | | Lease/grower | | 33,316 | 32,636 | 31,630 | 36,731 | 33,469 | 33,529 | 34,298 | 30,293 | 33,644 | 36,733 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 34,569 | 820,239 |
| 284 | | Insurance | | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 5,713 | 137,118 |
| 285 | | Taxes | | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 4,384 | 105,223 |
| 286 | | Other | | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 12,450 | 298,797 |
| 287 | | | | 303,120 | 372,588 | 274,632 | 381,315 | 277,296 | 368,030 | 274,848 | 360,067 | 272,500 | 366,451 | 265,340 | 361,657 | 265,710 | 361,903 | 265,777 | 361,782 | 265,135 | 361,144 | 263,350 | 359,359 | 262,712 | 358,721 | 250,436 | 346,764 | 7,600,636 |
| 288 | | **GDU expenses to LOL** | | 24,967 | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | 24,242 |
| 289 | | Feed | | 54,400 | 55,276 | 55,269 | 55,364 | 55,357 | 53,239 | 53,232 | 53,225 | 53,245 | 50,366 | 50,451 | 50,554 | 50,830 | 50,867 | 51,045 | 51,037 | 51,030 | 51,023 | 50,554 | 50,547 | 50,540 | 50,533 | 43,896 | 43,896 | 1,235,772 |
| 290 | | Labor, contract labor | | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 319 | 4,539 | 58,300 |
| 291 | | Drugs | | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 4,340 | 104,160 |
| 292 | | Utilities | | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 547 | 13,130 |
| 293 | | Utilities deposit | | 2,885 | | | | | | | | | | | | | | | | | | | | | | | | 2,885 |
| 294 | | Repairs/maintenance | | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 11,126 |
| 295 | | Lease/grower | | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 299 | 7,166 |
| 296 | | Insurance | | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 238 | 5,719 |
| 297 | | Taxes | | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 138 | 3,324 |
| 298 | | Other | | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 8,028 |
| 299 | | | | 63,964 | 66,176 | 61,949 | 66,264 | 62,037 | 64,138 | 59,911 | 64,124 | 59,924 | 61,266 | 57,131 | 61,453 | 57,510 | 61,766 | 57,725 | 61,936 | 57,709 | 61,922 | 57,233 | 61,446 | 57,219 | 61,432 | 50,576 | 54,796 | 1,449,609 |
| 300 | | | | 2,884 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2,884 |
| 301 | | Interest paid to LOL | | 39,486 | - | - | - | 60,617 | - | - | - | - | 60,617 | - | - | - | 60,617 | - | - | - | - | 60,617 | - | - | - | 60,617 | - | 342,570 |
| 302 | | Purchase: Sow and GDU Animals from FNBO | | - | - | 5,966,311 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 5,966,311 |
| 303 | 20% | G&A Allocation | | 17,578 | 8,707 | 12,498 | 8,707 | 17,563 | 8,691 | 12,482 | 8,691 | 12,482 | 13,772 | 12,482 | 8,691 | 12,482 | 13,772 | 12,482 | 8,691 | 12,482 | 11,801 | 12,482 | 6,721 | 12,482 | 6,721 | 17,563 | 6,721 | 276,745 |
| 304 | 38% | Bankruptcy Cost Allocation | | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 23,813 | 571,520 |
| 305 | | | | - | - | - | - | - | - | - | - | - | (0) | - | - | - | (0) | - | - | - | - | - | (0) | - | (0) | - | (0) | - |
| 306 | | **Total Expenses** | | 447,962 | 471,283 | 6,339,202 | 480,099 | 441,326 | 464,673 | 371,055 | 456,696 | 368,720 | 525,918 | 358,766 | 455,615 | 359,516 | 521,871 | 359,797 | 456,223 | 359,140 | 458,681 | 417,496 | 451,339 | 356,227 | 450,687 | 403,005 | 432,094 | 16,207,391 |
| 307 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 308 | | **Net Cash Flow - LOL** | | **(380,601)** | **(68,665)** | **(5,944,304)** | **(69,792)** | **(67,087)** | **(99,260)** | **(9,524)** | **(86,986)** | **(29,008)** | **(162,939)** | **10,366** | **(94,417)** | **1,682** | **(135,391)** | **25,470** | **(70,956)** | **24,333** | **(75,208)** | **(33,790)** | **(67,633)** | **28,192** | **(66,268)** | **(29,167)** | **(58,256)** | **(7,459,208)** |
| 309 | | **Cumulative Net Cash Flow - LOL** | | **(380,601)** | **(449,266)** | **(6,393,569)** | **(6,463,361)** | **(6,530,447)** | **(6,629,707)** | **(6,639,231)** | **(6,726,217)** | **(6,755,225)** | **(6,918,165)** | **(6,907,799)** | **(7,002,216)** | **(7,000,534)** | **(7,135,925)** | **(7,110,456)** | **(7,181,412)** | **(7,157,078)** | **(7,232,286)** | **(7,266,076)** | **(7,333,709)** | **(7,305,517)** | **(7,371,785)** | **(7,400,952)** | **(7,459,208)** | **(7,459,208)** |
| 310 | | | | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 757 |
| 311 | | **Total Net Cash Flow** | | **(38,481)** | **153,110** | **113,050** | **352,831** | **431,384** | **330,579** | **560,734** | **580,653** | **526,518** | **312,512** | **709,769** | **775,480** | **393,628** | **911,644** | **(131,760)** | **(345,689)** | **941,304** | **846,780** | **928,782** | **960,996** | **2,515,596** | **953,940** | **1,088,762** | **963,679** | **14,773,301** |
| 312 | | **Total Cumulative Net Cash Flow** | | **(38,481)** | **114,630** | **227,680** | **580,511** | **1,011,894** | **1,342,473** | **1,903,207** | **2,483,860** | **3,010,378** | **3,322,890** | **4,032,659** | **4,808,139** | **5,201,768** | **6,113,411** | **5,981,651** | **5,635,962** | **6,577,265** | **7,424,045** | **8,352,827** | **9,313,824** | **11,829,420** | **12,783,360** | **13,872,122** | **14,835,801** | **14,835,801** |
| 313 | | | | 30 | 28 | 29 | 29 | 29 | 29 | 29 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | (61,772) |
| 314 | | ***Difference > FNBO and LOL pieces*** | | 0 | (0) | 0 | 0 | (0) | (0) | (0) | 0 | (0) | 0 | 0 | (0) | (0) | (0) | 0 | 0 | (0) | (0) | 0 | (0) | 0 | 0 | (0) | (0) | (0) |