## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.: |
| | ) | |
| N. G. PURVIS FARMS, INC. | ) | 21-01068-5-SWH |
| | ) | |
| DEBTOR | ) | CHAPTER 11 |

### AFFIDAVIT OF STEVE WEISS IN SUPPORT OF THE DEBTOR'S
### CHAPTER 11 FILINGS AND FIRST DAY MOTIONS

PERSONALLY APPEARED BEFORE ME, Steve Weiss, who, first being duly sworn, deposes and says as follows:

1.      I am the President of NutriQuest Business Solutions, LLC ("NutriQuest"), which maintains offices at 3782 9th Street SW, Mason City, IA 50401.  NutriQuest is an advisory firm with significant experience in the field of restructuring and providing financial and operational services and guidance, and interim management, to farms in distressed situations.

2.      Except as otherwise noted, I have personal knowledge of the matters set forth herein.[1]

3.      NutriQuest has been employed by N. G. Purvis Farms, Inc. ("NGP"), the above-captioned debtor-in-possession (the "Debtor"), since June 30, 2020 to provide restructuring and financial advisory services, with myself leading these efforts.  In this capacity, I have become and am generally familiar with the Debtor's day-to-day operations, books and records, financial and accounting methods, business and financial affairs including the nature and extent of its assets and liabilities, suppliers, purchasers, lenders, and other constituencies.  My continued service to the Debtor, in the post-petition capacity as Chief Restructuring Officer ("CRO"), is desired by the

---

[1] Certain of the disclosures herein relate to matters within the knowledge of other professionals at NutriQuest and are based on information provided by them.

Debtor and consented to by its lenders and is the subject of an Emergency Motion to Employ NutriQuest Business Solutions, LLC and Designate Steve Weiss as Chief Restructuring Officer being filed simultaneously herewith, as addressed in further detail below.

4.      In light of ongoing financial challenges and in order to effectuate what I believe can be a successful restructuring of its operations and business model, the Debtor filed a voluntary petition for relief (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code").  The Debtor is operating its businesses as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.      To enable the Debtor to minimize the adverse effects of the commencement of the Chapter 11 Case on its ability to continue to operate its large scale market hog production, the Debtor has requested various types of relief in its "first day" motions and applications (each, a "First Day Motion" or "Motion").  The First Day Motions seek relief intended to allow the Debtor to perform and meet the obligations necessary to fulfill its duties as a debtor-in-possession in the Chapter 11 Case and to retain the professionals needed to guide it through the Chapter 11 Case.  I believe the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its operations or loss of productivity or value; (b) constitutes a critical element to achieving a successful reorganization of the Debtor; and (c) serves the interests of the Debtor's estate and creditors.

6.      I submit this Affidavit in support of the First Day Motions and the filing of the Chapter 11 Case.  Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, or information supplied to me by other members of the Debtor's management and the Debtor's professionals and my knowledge and experience in the swine

production industry.  I am authorized to submit this Affidavit on behalf of the Debtor, and if called upon to testify, I could and would testify competently as to the facts set forth herein.

## I.      GENERAL BACKGROUND AND OVERVIEW OF BUSINESS OPERATIONS

### A.      History and Overview of Operations

7.      In 1965, the Debtor was originally incorporated as Chatham Feed & Livestock, Inc. ("Chatham Feed").  In 1972, Chatham Feed merged with Super Feeds, Inc. and Purvis Poultry Company, Incorporated, with Chatham Feed being the surviving entity.  Subsequently, in 1980, B. & P. Poultry Co., Inc. and Morgan & Sons Poultry Co., Inc. merged with Chatham Feed and, again, Chatham Feed was the surviving entity.  On June 2, 1980, Chatham Feed changed its name to N. G. Purvis Farms, Inc.  In 1981, Seagrove Broilers, Inc. merged into N.G. Purvis Farms, Inc., which has filed the foregoing Chapter 11 Case and is operating as a debtor-in-possession.

8.      The Debtor owns and operates a large-scale farrow-to-finish pork production operation with farms in North Carolina and Georgia, which breeds, farrows, weans, and raises weaner pigs, feeder pigs and market hogs, which are then sold to pork processors.  The Debtor owns twelve (12) farms located in Montgomery, Moore, Chatham, Richmond, and Warren County, North Carolina and two (2) farms located in Oglethorpe County, Georgia, together with associated facilities, and leases and operates two (2) additional farms located in Randolph and Richmond County, North Carolina, respectively.  On these Debtor-owned and operated farms, it maintains herds of sows, breeds piglets, and raises market hogs.

9.      The Debtor also contracts with numerous independent growers to feed and finish, at their facilities, the Debtor's weaned pigs and feeder pigs to a market hog weight of 285 pounds after which the Debtor sells its market hogs to Smithfield Fresh Meats Corp. and to JBS USA Holdings, Inc.

3

10.     The necessity to restructure the Debtor's operations was driven in large part by significant feed cost increases, which raised the Debtor's growing costs to an unsustainable level in relationship to potential revenue.  Further, pursuant to the Debtor's governing market hog contracts and its attempts at renegotiating such contracts, the increased expenses cannot be passed on to its customers.

11.     Through this proceeding and commencing immediately, the Debtor intends to phase-out of its market hog production, by growing out and liquidating its market hogs in the ordinary course of its business and liquidating certain other assets associated with its finishing operations, and is in the process of transitioning from a farrow-to-finish operation to a farrow-to-wean operation whereby it will grow weaner pigs for sale to Murphy-Brown LLC pursuant to a Weaned Pig Supply and Purchase Agreement.  The Debtor intends to complete the growing out and liquidation of its market hogs and complete this transition within approximately the first six (6) months of the Chapter 11 Case.

**B.      <u>NGP's Skilled Workforce</u>**

12.     As of the date of the Debtor's' most recent payroll cycle, the Debtor has 132 full time employees and 17 part-time employees, whose hard work, skill and continued employment are vital to the Debtor's operations and reorganization efforts.

**C.      <u>Pre-petition Debt Structure</u>**

***(1)      <u>First National Bank of Omaha ("FNBO") Loans</u>***

13.     The Debtor and FNBO are parties to that certain Second Amended and Restated Credit Agreement dated April 1, 2019, pursuant to which FNBO, subject to the terms and conditions contained therein, agreed to make loans to the Debtor.

4

14.     As of the date of filing of the Chapter 11 Case (the "Petition Date"), the Debtor is indebted to FNBO under various pre-petition loan documents ("FNBO Loan Documents") in the approximate principal amount of $26,039,000 (excluding all accrued interest, fees, costs, expenses and other sums and charges payable by the Debtor under the FNBO Loan Documents).

15.     All of the Debtor's obligations to FNBO under the FNBO Loan Documents appear to be secured by a security interest in substantially all of the Debtor's personal property, exclusive of titled vehicles, as evidenced by the UCC-1 filed with the North Carolina Secretary of State on January 28, 2014 bearing file number 20140009091H, as well as a junior lien on certain real property and improvements owned by the Debtor.

### (2)      *LOL Finance Co. ("LOLFC") Loan*

16.     The Debtor, certain individual borrowers (comprising the Debtor's principals), and LOLFC are parties to certain pre-petition loan contracts, including Change in Terms Agreements dated December 23, 2020 (collectively, the "LOLFC Loan Documents"), pursuant to which LOLFC, subject to the terms and conditions contained therein, agreed to make loans to the Debtor.

17.     As of the date of this Affidavit, the Debtor is indebted to LOLFC under the LOLFC Loan Documents in the principal amount of $14,133,750.49 (excluding all accrued interest, fees, costs, expenses and other sums and charges payable by the Debtor under the LOLFC Loan Documents).

18.     All of the Debtor's obligations to LOLFC under the LOLFC Loan Documents are secured by senior liens in all or substantially all of real property and improvements owned by the Debtor.

### (3)      *Other Loans*

19.    The Debtor also finances and leases certain vehicles from, among others, Ford Motor Credit, Penske Truck Leasing Co., L.P., and Ryder Truck Rental, Inc.

## II.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

20.    The decision to restructure the Debtor's operations was driven in large part by significant feed cost increases, which raised the Debtor's growing costs to an unsustainable level in relationship to potential revenue.  Further, pursuant to the Debtor's governing market hog contracts and its attempt at renegotiating such contracts, the increased expenses cannot be passed on to its customers.

21.    Driven by smaller U.S. corn and soybean crops and grain demand, particularly from China in the modernization of its swine industry, the price of corn and soybean meal (comprising approximately 50% of the Debtor's cost of production) has increased significantly in the past year. May 2020 corn and soybean meal on the Chicago Mercantile Exchange traded at $3.20 per bushel and $290 per ton, respectively, compared to current prices of $5.90 and $400.  Moreover, the cost of transportation and regional supply differences have widened the differential (basis) between the cash cost of these commodities in the Southeast U.S. compared to the Midwest, resulting in inordinately higher costs for the Debtor's Southeast operations compared to producers operating in other parts of the U.S.  Supply disruption as a result of manufacturing and shipping disruption throughout the world also have caused increases of similar magnitude to non-grain costs of feedstuffs.

22.    Though hog prices also have increased significantly during this time, the Debtor has not been successful in the considerable efforts it has undertaken to renegotiate the terms of its hog pricing agreement with its key customer, Smithfield Foods, primarily due to the regional cost

disadvantage of the Debtor.  This same dynamic has resulted in the failure or significant down-sizing and restructuring of other large hog production companies located in North Carolina.

### III.   SUMMARY OF FIRST DAY MOTIONS

23.     To enable the Debtor to operate effectively and minimize the adverse effects of the commencement of the Chapter 11 Case on its ability to operate its business, the Debtor has requested various relief in its First Day Motions.  The First Day Motions seek authority to, among other things, obtain post-petition financing, use cash collateral, maintain employee morale by paying accrued prepetition payroll, provide continuity of utilities services, and otherwise ensure continued business operations without interruption.

24.     In connection with preparing for the Chapter 11 Case, I have reviewed the First Day Motions referenced below.  The First Day Motions were prepared with my input and assistance, or with the input and assistance of employees working under my supervision.  I believe the information contained in the First Day Motions is accurate and correct.  As set forth in more detail below, I believe that entry of orders granting the relief requested in the First Day Motions is critical to the Debtor's ability to preserve the value of its estate and succeed in its reorganization efforts.

#### A.     Motions to Use Cash Collateral and Pay Employees and Other Critical Obligations

##### (1)     *Debtor's Motion for Authority to Obtain Post-Petition Financing and to Use Cash Collateral*

25.     Contemporaneously with the filing of this Affidavit, the Debtor is filing a Motion for Emergency and Final Order (I) Authorizing the Debtor to Obtain Post-Petition Financing, (ii) Authorizing the Debtor to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to Prepetition Lenders, (V)

Scheduling a Final Hearing, and (VI) Granting Related Relief (the "DIP Financing/Cash Collateral Motion").

26.     The DIP Financing/Cash Collateral Motion is being brought on an emergency basis due to the immediate and irreparable harm that would be suffered by the Debtor and its creditors if it were denied use of Cash Collateral (as defined in the DIP Financing/Cash Collateral Motion) and financing needed to continue ongoing business operations during the early months of this case.

27.     The Debtor is entering this Chapter 11 Case with limited cash reserves on hand, and the Debtor requires immediate access to the liquidity provided by the FNBO DIP Facility and the LOLFC DIP Facility (each as defined in the DIP Financing/Cash Collateral Motion, and together, the "DIP Facilities") to operate its business going forward.  The DIP Facilities represent the most favorable financing transaction available to the Debtor.  Because the Debtor has no other viable source of available third-party DIP financing, on the terms negotiated, the Debtor would soon run out of cash and may be forced to convert this case to Chapter 7.  Under a forced liquidation in Chapter 7, the creditors and other stakeholders in this case would receive lesser recoveries than they would in the contemplated Chapter 11 reorganization, and all parties in interest would suffer as a result.  The requested relief is therefore necessary to avoid the immediate and irreparable harm that would result if the Debtor is denied the liquidity that would be provided through the DIP Facilities.

28.     Given the Debtor's financial position and prospects, industry market conditions, and regional market conditions which have resulted in a significant downsizing and abandonment of swine production facilities in the Southeast United States, all of which have significantly impaired the value of the Debtor's operations and assets, the DIP Facilities remain the best and only options available to the Debtor.  Negotiations with FNBO and LOLFC were conducted in

good faith and at arms' length, and the DIP Facilities provide reasonable milestones and covenants. The DIP Facilities appear to provide the only source of financing available to the Debtor that allow a reasonable prospect of a successful restructuring, thereby maximizing value for all stakeholders.

29.     The Debtor intends to convert certain of its pre-petition obligations owed to FNBO under the FNBO Pre-Petition Loan Documents (as defined in the DIP Financing/Cash Collateral Motion), and certain of its pre-petition obligations owed to LOLFC under the LOLFC Pre-Petition Loan Documents (as defined in the DIP Financing/Cash Collateral Motion), into post-petition obligations following entry of the interim approval order as to the DIP Financing/Cash Collateral Motion (as set forth more particularly in the DIP Financing Agreements, as such term is defined in the DIP Financing/Cash Collateral Motion), and to draw on the DIP Facilities to fund the Debtor's working capital needs during the pendency of the Chapter 11 Case.  The conversion of the applicable pre-petition obligations into post-petition obligations will benefit the Debtor and the bankruptcy estate and is a necessary condition to the extension of the DIP Facilities.  The Debtor believes that the applicable pre-petition obligations are secured by perfected liens with respect to most of the Debtor's personal property (as to FNBO) and real property and improvements (as to LOLFC and FNBO).  The proposed conversion merely accelerates the satisfaction of the respective pre-petition obligations and converts them into post-petition obligations without affecting any recovery to other creditors.

30.     The Debtor's negotiations with FNBO and LOLFC were vigorous and were conducted at arms' length with the assistance of the Debtor's financial and legal advisors.  The Debtor reviewed and analyzed each alternative proposal with its advisors, and ultimately selected the financing provided by the DIP Facilities, which is fully-committed with favorable terms, including operational flexibility and appropriate case milestones.  No potential other third-party

financing provided a viable alternative for the Debtor, such that the DIP Facilities represent the best and only option to provide the Debtor with the liquidity necessary to bridge the Debtor from the Petition Date through its emergence from Chapter 11.

31.     The DIP Facilities will provide the Debtor the funding needed to operate and maintain its business, to navigate the anticipated transition from a farrow-to-finish operation to a farrow-to-wean operation, to pay necessary expenses during the pendency of this bankruptcy case, and to pursue what the Debtor believes is the best and only path to the continuation of its business as a going concern.  The Debtor anticipates the proposed DIP Facilities will work in tandem with the Debtor's Chapter 11 plan to facilitate a process that will maximize the value of the bankruptcy estate, increase the likelihood of a going-concern transaction for the benefit of all stakeholders, and promote confirmation of the Debtor's Chapter 11 plan.  Absent the DIP Facilities, the Debtor could be forced to liquidate its business, resulting in lesser recoveries for creditors than they would receive in a reorganization.  Furthermore, the use of cash collateral alone would potentially be insufficient to meet the Debtor's post-petition liquidity needs.

32.     The Debtor is unable to secure post-petition financing as unsecured credit under 11 U.S.C. §§ 364(a) or (b), allowable as an administrative expense under 11 U.S.C. § 503(b)(1). Furthermore, the Debtor is unable to secure post-petition financing as secured credit pursuant to 11 U.S.C. § 364(c) on more favorable terms from other sources.  Absent the DIP Facilities, the Debtor could be forced to liquidate its business, resulting in lesser recoveries for creditors than they would receive in a reorganization.

33.     Details of the proposed DIP Facilities are provided in the DIP Financing/Cash Collateral Motion and DIP Financing Agreements.

34.     The DIP Facilities are critical to the Debtor's ability to operate smoothly post-petition.  The Debtor enters Chapter 11 with insufficient liquidity to operate its business and continue paying its debts as they come due.  The costs of administering the Chapter 11 Case will also impose demands on the Debtor's liquidity, such that immediate access to the DIP Facilities and Cash Collateral is necessary to provide liquidity and ensure the Debtor's business is stabilized and its value maximized for the benefit of all parties in interest.

35.     Without the prompt infusion of funds from the DIP Facilities, access to Cash Collateral, and the cooperation of key business partners during the critical early stages of this Chapter 11 Case, the Debtor could face a destructive interruption to its business and lose essential support from important stakeholders upon whom the Debtor's business depends.  Such an interruption would hinder the Debtor's ability to maximize the value of the estate and force the Debtor to curtail its operations significantly to the detriment of the Debtor, the estate and their stakeholders.

36.     As noted previously, given the Debtor's financial position and prospects, industry market conditions, regional market conditions which have resulted in a significant downsizing and abandonment of swine production facilities in the Southeast United States, all of which have significantly impaired the value of the Debtor's operations and assets, the DIP Facilities remain the best and only options available to the Debtor.

37.     Substantially all of the Debtor's material and tangible assets, exclusive of titled vehicles, are encumbered under the existing capital structure with FNBO and LOLFC.  This fact, combined with the Debtor's uncertain financial condition, restricts the availability of, and options for, post-petition financing.  The DIP Facilities are the best post-petition financing options available to the Debtor at this time.

11

38.     It is anticipated that the Debtor will require significant post-petition financing to support its operational and Chapter 11 activities.  The Debtor is in need of an immediate capital infusion, yet substantially all of the Debtor's existing assets are encumbered under its existing capital structure.  Considering these precarious circumstances inhibiting the potential of other potential lenders providing post-petition financing, the best financing option would be one that was provided by the Debtor's existing lenders.  Without post-petition financing, the Debtor lacks sufficient funds to operate its enterprise, continue paying its debts as they come due, and cover the projected costs of this Chapter 11 Case.  Absent the DIP Facilities, the value of the bankruptcy estate would be significantly impaired to the detriment of all stakeholders.  The undersigned believes that the terms of the DIP Facilities, as set forth in the DIP Financing/Cash Collateral Motion and DIP Financing Agreements, are fair, reasonable, and adequate.

39.     The undersigned does not believe that any alternative sources of financing exist or are reasonably available to the Debtor given the realities imposed by the Debtor's existing capital structure and its unsuccessful solicitation of alternative financing proposals.  The DIP Facilities are believed to provide the most favorable terms available to the Debtor under the circumstances to fund the Chapter 11 Case.

40.     Regarding the Debtor's use of Cash Collateral, the Debtor proposes to provide FNBO and LOLFC with a variety of forms of adequate protection to protect against the post-petition diminution in value of the Cash Collateral (as well as their other pre-petition collateral) resulting from the use of the Cash Collateral (and other pre-petition collateral) by the Debtor including (i) continuing, valid, binding, enforceable, non-avoidable and perfected post-petition security interests in and liens on property of the Debtor; and (ii) super-priority administrative claims under Section 507(b) of the Bankruptcy Code.

41.    As set forth in the DIP Financing Agreements, the DIP Facilities include a roll-up of certain pre-petition obligations.  The conversion of the pre-petition obligations into post-petition obligations is a condition of and will therefore create availability under the DIP Facilities, allowing the Debtor to continue operating in the ordinary course during the Chapter 11 Case.

42.    The repayment of the pre-petition obligations as a condition of the DIP Facilities is believed to be a sound exercise of the Debtor's business judgment, is a material component of the structure of the DIP Facilities, and was required by FNBO and LOLFC as a condition to their commitment to provide post-petition financing.  The Debtor was unable to obtain DIP financing on similar terms.

43.    FNBO and LOLFC are unlikely to continue to lend to the Debtor post-petition without some assurance regarding their prepetition claims.  Absent their support, the first months of the Debtor's Chapter 11 Case would likely devolve into costly fights over cash collateral and lien priority between FNBO and LOLFC, severely jeopardizing the Debtor's ability to reorganize its operations and emerge as a going concern.

### (2)    *Debtor's Emergency Motion for Order Authorizing Payment of Pre-Petition Wages, Salaries and Other Compensation to Employees, Associated Taxes, and Other Employee Benefits and Request for Hearing*

44.    Contemporaneously with the filing of this Affidavit, the Debtor is filing an Emergency Motion for Order Authorizing Payment of Pre-Petition Wages, Salaries and Other Compensation to Employees, Associated Taxes, and Other Employee Benefits and Request for Hearing (the "Payroll Motion").

45.    As noted above and in the Payroll Motion, the Debtor has 132 full time employees and 17 part-time employees.  Approximately 20% of the workforce is salaried and 80% is hourly. The Debtor does not have any employees who are members of any union.

46.     The Debtor's employees are paid their wages and salaries every other Thursday, and approximately two weeks and four days in arrears.  Prior to the Petition Date, the Debtor paid payroll to its employees on Thursday, May 6, 2021 for the period April 19 through May 2, 2021. The Debtor's next payroll is scheduled to be paid on May 20, 2021 for the period May 3 through May 16, 2021.

47.     In additional to the regular wages and salaries earned by its employees, the Debtor also is obligated to withhold taxes and other amounts from its employees' paychecks, to pay those withholdings and associated taxes to the relevant governmental entities, and to pay additional amounts its employees and third parties as employee benefits, all of which are paid each payroll period for the benefit of its employees in the ordinary course of business.

48.     On May 6, 2021, the Debtor delivered payroll checks to its employees for the most recent payroll period, but many of these checks have not yet cleared the bank.  The Debtor issues paper checks, instead of using direct deposit.  The Debtor therefore, and out of an abundance of caution, requests that the Court authorize payment of the regular pre-petition payroll to its employees for the period of April 19 – May 2, 2021 ("April 19 – May 2 Payroll") and for all pre-petition checks written to its employees for this payroll period to clear the bank.  The gross amount of the April 19 – May 2 Payroll totals approximately $205,411.32.  The Debtor requests authority for applicable banks and financial institutions to honor such checks or electronic transfers on a post-petition basis or to authorize the Debtor to issue new checks or electronic transfers on a post-petition basis in the event such obligations were not honored prior to the Petition Date.

49.     The gross amount of the pre-petition payroll to the Debtor's employees for the period May 3, 2021 through the Petition Date ("May 3 – Petition Date Payroll," and together with

14

the April 19 – May 2 Payroll, the "Pre-petition Payrolls") is estimated to total approximately $$72,780.19.

50.    It is believed that the pre-petition tax withholdings owing to the IRS for the April 19 – May 2 Payroll were paid by ACH on May 6, 2021.  The gross amount owing to the applicable federal and state taxing authorities of all taxes associated with the Pre-petition Payrolls ("Associated Taxes") is estimated to total approximately $20,382.13 (taxes withheld from employees' paychecks are included within the gross amounts of the Pre-petition Payrolls).

51.    The Debtor administers a 401(k) plan for the benefit of its employees titled the N.G. Purvis Farms, Inc. Profit Sharing Plan.  As some of its employees have elected to defer a portion of their wages into their accounts under this plan, the Debtor seeks authority to pay into the plan for its employees any deferrals its employees elect to make in connection with the Pre-petition Payrolls ("401K Deferrals").  The amounts of the 401K Deferrals are included in the amounts of the Pre-petition Payrolls.

52.    Some of the Debtor's employees have elected to pay insurance premiums for their dependents' health insurance coverage by means of deductions from their paychecks, and the Debtor seeks authority to pay those insurance premiums as directed by its employees out of the gross amount of wages owed to such employees ("Insurance Deductions").  The amounts of the Insurance Deductions are included in the amounts of the Pre-petition Payrolls.

53.    The Debtor owes certain mileage reimbursements to its drivers for use of their own vehicles for company purposes for the pre-petition period ("Mileage Reimbursement").  The amount of the Mileage Reimbursement is estimated to total approximately $408.11.

54.    The Debtor owes to each of its long-distance drivers a stipend of approximately $25 per day for each day they were on the road away from home during the pre-petition period

covered by the Pre-petition Payrolls, which stipends assists the Debtor's driver employees with expenses such as food and incidentals while on the road ("Driver Stipends"). The amount of the Driver Stipends is estimated to total approximately $350.

55.     The Debtor provides health insurance to certain of its employees through ACS Insurance, for which the Debtor pays the premiums approximately one month in arrears ("Health Insurance Premiums"). The amount of the Health Insurance Premiums is estimated to total approximately $0.00 as these are believed to have been paid up to date.

56.     The Debtor provides to certain of its employees' health insurance under a self-insured medical plan pursuant to which the Debtor is obligated to pay allowed charges for medical services and prescription drugs provided for the benefit of its employees ("Self-Insured Medical Expenses"). The amount of the Self-Insured Medical Expenses is estimated to total approximately $15,700. The Mileage Reimbursement, Driver Stipends, Health Insurance Premiums and Self-Insured Medical Expenses may be referred to collectively as the "Pre-petition Employee Benefits."

57.     The Debtor's reorganization efforts require the continued and uninterrupted service of its employees to support continuing operations. Any delay or disruption in the payment of compensation or provision of benefits would impair employee confidence in the Debtor and impair workforce morale at this critical time. The commencement of the Chapter 11 Case will likely cause some level of uncertainty and concern among the Debtor's employees. The employees' valuable skills sets, institutional knowledge, and understanding of the Debtor's operations make them essential to the success of the Chapter 11 Case. The Debtor cannot risk the substantial disruption of its operations and the immediate harm that would result from the Debtor's failure to make employee wage, compensation, and benefit payments in the ordinary course of business.

58.     The total amount which the Debtor seeks to pay through the Payroll Motion is approximately $315,034.75.  The amounts requested to be paid through the Payroll Motion constitute priority claims against the Debtor for wages and employee benefits accrued within the 180 days prior to the Petition Date and for taxes pursuant to § 507(a)(4), (5), and (8) of the Bankruptcy Code, and the combined amounts requested to be paid as to each employee are below the threshold for priority wage and benefit claims set forth in § 507(a)(4) and (5).

59.     It is essential that the Debtor pay the Pre-petition Payrolls (including the amounts owing for tax withholdings, 401K Deferrals, and Insurance Deductions), Associated Taxes, and the Pre-petition Employee Benefits owing to and for the benefit of its employees for the pre-petition period in order to ensure that these employees continue to provide services that are essential to Debtor's continued operation and reorganization.  If the Debtor were not allowed to pay its employees' Pre-petition Payrolls and Pre-petition Employee Benefits as requested herein, it is likely that its employees would stop working and resign their employment, thereby forcing the Debtor's operations to cease and causing a substantial detriment to the estate.

60.     The payments requested in the Payroll Motion are in the best interests of the Debtor, its creditors, and its employees.  The Court has the authority to authorize payment of these claims under the circumstances set forth herein and pursuant to the authority granted to the Bankruptcy Court under Title 11 of the United States Code, including 11 U.S.C. §§ 105, 363, 507, 1107 and 1108.

61.     No payments to or for the benefit of any principals of the Debtor are requested to be paid in the Payroll Motion.

62.     The Debtor provides to its employees and pays in advance for other employee benefits in addition to those requested to be paid in the Payroll Motion (such as cell phone

allowances, and health and life insurance premiums).  As these other employee benefits are paid in advance, the Debtor does not owe any amounts for them attributable to the pre-petition period and intends to simply continue to pay them in the ordinary course of its business for post-petition periods going forward.

### B.    Other Motions Relating to Business Operations

#### *(1)    Debtor's Motion Regarding Utilities*

63.    Contemporaneously with the filing of this Affidavit, the Debtor is filing an Emergency Motion for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing, or Disconnecting Services on Account of Pre-Petition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Requests for Additional Assurance of Payment (the "Utilities Motion").

64.    In the ordinary course of its business, the Debtor obtains water, electricity, land line telephone service, cell phone service, internet service, waste removal, animal waste removal, propane gas, and similar utility products and services (collectively, the "Utility Services") from approximately sixteen (16) utility companies (collectively, the "Utility Companies").  The Debtor is seeking an order from the Court prohibiting the Utility Companies from altering or discontinuing services and establishing procedures to provide the Utility Companies with adequate assurance of future performance.

65.    The uninterrupted Utility Services are essential to the Debtor's ongoing operations and the success of the Chapter 11 Case.  Should any utility refuse to provide service, even for a brief period of time, the Debtor's operations could be severely disrupted and jeopardize the Debtor's reorganization efforts.  Thus, I believe it is essential that the Utility Services continue uninterrupted during the Chapter 11 Case.

66.    Based upon cash flow from operations as well as the Debtor's proposed use of Cash Collateral and the DIP Facilities, the Debtor expects to have ample liquidity to timely pay all post-petition obligations owed to the Utility Companies.  Nevertheless, the Debtor proposes to provide a deposit equal to one (1) month of billings for each Utility Service, calculated as a historical average over the past twelve months, to any Utility Company that requests such a deposit (the "Adequate Assurance Deposit").  I believe the Adequate Assurance Deposit would constitute sufficient adequate assurance to any Utility Company.  However, in light of the severe consequences to the Debtor, upon any interruption of services by the Utility Companies, and recognizing the Utility Companies have the right to evaluate the proposed adequate assurance, if any Utility Company believes additional assurance is needed, then the Debtor has proposed procedures for the Utility Companies to request such additional adequate assurance.

67.    Accordingly, the Debtor has requested the entry of a final order (a) determining that the Utility Companies have been provided with adequate assurance of payment; (b) approving the Debtor's proposed procedures for Utility Companies to request additional or different adequate assurance; (c) prohibiting the Utility Companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or any perceived inadequacy of the Debtor's proposed Adequate Assurance Deposit; (d) providing procedures for the Utility Companies to object to the Debtor's proposed adequate assurance procedures; and (e) determining the Debtor is not required to provide additional adequate assurance beyond what is requested in the Motion.

### C.    Professional Retention Matters

#### (1)    *Debtor's Application to Employ and Retain Butler & Butler, LLP as Bankruptcy Co-Counsel for the Debtor and Debtor in Possession*

68.    The Debtor seeks to employ Butler & Butler, LLP ("Butler & Butler") as bankruptcy co-counsel, as Butler & Butler has extensive experience and knowledge and an

excellent reputation for providing high quality legal services in the field of debtor protections, creditors' rights, and business reorganizations under chapter 11 of the Bankruptcy Code.  Butler & Butler has represented the Debtor in connection with their financial affairs since March of 2020. During this period of time and in preparing for the Chapter 11 Case, Butler & Butler has become familiar with the Debtor's business and the legal issues that may arise in the case.  Therefore, Butler & Butler is well-qualified and uniquely able to represent the Debtor in the Chapter 11 Case.

### (2)    *Debtor's Application to Employ and Retain Hendren, Redwine & Malone, PLLC as Bankruptcy Co-Counsel for the Debtor and Debtor in Possession*

69.    The Debtor seeks to employ Hendren, Redwine & Malone, PLLC ("Hendren, Redwine") as co-counsel because Hendren, Redwine has extensive experience and knowledge and an excellent reputation for providing high quality legal services in the field of debtor protections and complex litigation under chapter 11 of the Bankruptcy Code.  In addition, in preparing for the Chapter 11 Case, Hendren, Redwine has become familiar with the Debtor's business and the legal issues that may arise in this case.  Therefore, Hendren, Redwine is well-qualified and uniquely able to represent the Debtor in the Chapter 11 Case.

### (3)    *Debtor's Application to Employ Stephen F. Later and Robbins May & Rich LLP as Special Counsel for the Debtor and Debtor in Possession*

70.    The Debtor seeks to employ Mr. Stephen F. Later, Esq. and the law firm Robbins May & Rich LLP ("Special Counsel)" as special counsel for the Debtor to represent and assist it with regulatory, agricultural, employment, and general corporate issues and matters that may arise in the operation of the Debtor's business during the course of its reorganization.  The Debtor has selected Special Counsel for the reason that it is familiar with the affairs of the Debtor having represented the Debtor with regard to these types of matters for multiple years prior to the Petition Date, it is capable and has knowledge of the Debtor and experience in matters of this character,

and it is well qualified to represent it in on these types of matters which may arise during this reorganization.  Therefore, Special Counsel is well-qualified and uniquely able to represent the Debtor in the Chapter 11 Case.

### (4) *Debtor's Application to Employ and Retain NutriQuest Business Solutions, LLC to Provide Restructuring Services and to Designate Steve Weiss as Chief Restructuring Officer*

71.     The Debtor seeks to retain NutriQuest to provide it with restructuring services and to designate myself as CRO.  I believe NutriQuest has extensive experience in providing restructuring advisory services and has an excellent reputation for services it has rendered in complex chapter 11 cases in the pork and dairy industries on behalf of debtors and creditors throughout the United States.  NutriQuest has provided interim management and advisory services to such companies in financial distress and has provided such services in a number of farm restructurings.  Therefore, I believe NutriQuest is highly qualified to provide restructuring services to the Debtor in this Chapter 11 Case.

72.     In addition, I believe I am personally well-qualified to act as CRO of the Debtor.  I have worked as a restructuring consultant and president of NutriQuest and/or its sole parent company NutriQuest, LLC for 13 plus years.  I have extensive experience in cash management and cost reduction, negotiations with various constituencies, financial and operational analysis, and debt restructuring and have particular experience in representing both debtors and creditors in restructurings involving entities in the livestock industry.  During my years as a restructuring professional, I have acted in an interim management role in a number of significant and complex bankruptcy reorganizations, including serving in the role of CRO and court-appointed Receiver.

* * * * * * * *

\* \* \* \* \* \* \* \*

73.    I have reviewed the First Day Motions and the facts stated therein are true and correct to the best of my information and belief, and I believe the relief sought in each of the First Day Motions: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to business operations and (b) constitutes a critical element in achieving a successful reorganization of the Debtor.

By:    _____
Steve Weiss

SWORN to and subscribed before me

this __7__ day of May, 2021.

Elizabeth B Culbverson

Notary Public for Chatham County NC

My Commission Expires: 6-26-2021

