**SO ORDERED.**

**SIGNED this 11 day of April, 2022.**

_____

**David M. Warren**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **Case No.: 21-01068-5-DMW** |
| **N. G. PURVIS FARMS, INC.** | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |

## ORDER CONFIRMING PLAN

The Plan of Reorganization under Chapter 11 of the Bankruptcy Code filed by the Debtor on September 3, 2021 [DE # 324], as modified by the Debtor's Modification to Plan of Reorganization filed on November 30, 2021 [DE # 510], the Debtor's Second Modification to Plan of Reorganization filed on December 1, 2021 [DE # 515], the Debtor's Third Modification to Plan of Reorganization filed on February 8, 2022 [DE # 633], the Debtor's Fourth Modification to Plan of Reorganization filed on February 25, 2022 [DE # 655], the Debtor's Fifth Modification to Plan of Reorganization filed on February 28, 2022 [DE # 662], and the Notice of Overbid Procedures Regarding Sale of Equity in Reorganized Debtor ("Overbid Procedures") filed on March 3, 2022 [DE # 673]   (together with all modifications the "Plan") having been transmitted to creditors and equity security holders;

The Court having conducted hearings on notice to all parties in interest on the approval of the Debtor's Disclosure Statement filed by the Debtor on September 3, 2021 ("Disclosure Statement"), and confirmation of the Plan in the United States Bankruptcy Court in Raleigh, North Carolina on March 1, 2022 and April 5, 2022 ("Confirmation Hearing");

The Court having been advised as to the acceptance of the Plan by all classes of impaired claims entitled to vote, having considered the record in this case, and having considered the evidence presented at the Confirmation Hearing by the Debtor and the statements made at the Confirmation Hearing by counsel for the Debtor, the Official Committee of Unsecured Creditors, LOL Finance Co., Mercer Landmark, Inc., Sunrise Cooperative, Inc., and the Bankruptcy Administrator; and

The Court having been advised that pursuant to Class VIII of the Plan and the Overbid Procedures, a Court Auction for the sale of the equity security interests in the Debtor was held immediately preceding the Confirmation Hearing at which the existing equity security holders (consisting of Jerry M. Purvis, Sr., Melvin Green Purvis, David P. Purvis, Larry Purvis, and Marie Purvis McFayden) ("Purvises") submitted the highest bid in the amount of $310,000 for the equity interest in the Debtor ("Purvis Bid");

The Court makes the following findings of fact and conclusions of law:

A.      The Disclosure Statement was provided with the Plan to each holder of a claim or interest that was solicited to accept or reject the Plan at the time of or before such solicitation and contains adequate information within the meaning of 11 U.S.C. § 1125;

B.      The Plan complies with all applicable provisions of Chapter 11 of the Bankruptcy Code including, but not limited to, the confirmation requirements of Section 1129(a);

C.      All applicable requirements for confirmation of the Plan set forth in 11 U.S.C. § 1129 have been satisfied; and

D.      The Court determines that the Purvis Bid is the highest and best bid for the equity interest in the Debtor.

NOW, THEREFORE, based on the foregoing findings of fact and conclusions of law, it is ORDERED that:

1.      The Disclosure Statement filed by the Debtor on September 3, 2021 is APPROVED, as modified.

2.      The Plan as modified is CONFIRMED under the provisions of 11 U.S.C. § 1129(a). A complete version of the final, integrated Plan including all amendments and modifications is attached as Exhibit 1.

3.      All objections filed to the Plan and Disclosure Statement, to the extent that they have not been withdrawn, are hereby OVERRULED.

4.      To the extent any language in the Plan is inconsistent with the provisions of this Order the provisions of this Order shall govern.

5.      The closing of the sale of the equity interest in the Debtor pursuant to the Purvis Bid shall occur on or before April 15, 2022, after which closing the Purvises shall hold and retain all equity security interests in the Debtor.

4.      The Debtor shall file post-confirmation reports with the Clerk of the U.S. Bankruptcy Court and serve a copy thereof on the Bankruptcy Administrator pursuant to 11 U.S.C. § 1106(a)(7).  The first post-confirmation report shall be due July 31, 2022 for the second calendar quarter of 2022.  The Debtor shall file subsequent reports within 30 days after the end of every

succeeding quarter (April 30, July 31, October 31, or January 31) until the Plan is substantially consummated. Quarterly Reports shall reflect any progress made towards consummating the Plan during the period covered by the report and shall be prepared in a format prescribed by the Bankruptcy Administrator.

5.      Within thirty (30) days of substantial consummation of the Plan, as defined by 11 U.S.C. § 1101(2), the Debtor shall file a final report, in a format prescribed by the Bankruptcy Administrator, reflecting the payments made for all costs of administration and each class of creditor, and a motion for the entry of a Final Decree pursuant to Fed. R. Bank. P. 3022.

6.      The Debtor shall pay to the Clerk, United States Bankruptcy Court, the sum of $0.00 for court costs. The Debtor shall continue to pay quarterly fees until it applies for its Final Decree.

7.      The Debtor shall serve a copy of this Order on all creditors within five (5) days of its entry and promptly file a Certificate of Service with the Clerk.

END OF DOCUMENT

<u>EXHIBIT 1</u>

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **Case No.: 21-01068-5-SWH** |
| **N. G. PURVIS FARMS, INC.** | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |

**PLAN OF REORGANIZATION**
(Final integrated with all modifications through confirmation)

JASON L. HENDREN
N.C. State Bar #26869
REBECCA F. REDWINE
N.C. State Bar #37012
BENJAMIN E.F.B. WALLER
N.C. State Bar #27680

HENDREN, REDWINE & MALONE, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone:  (919) 573-1422
Facsimile:  (919) 420-0475
Email:  jhendren@hendrenmalone.com
rredwine@hendrenmalone.com
bwaller@hendrenmalone.com

CO-COUNSEL FOR THE DEBTOR

ALGERNON L. BUTLER, III
N.C. State Bar No. 20881

BUTLER & BUTLER, LLP
P.O. Box 38
Wilmington, NC 28402
Telephone: (910) 762-1908
Facsimile: (910) 762-9441
Email: albutleriii@butlerbutler.com

CO-COUNSEL FOR THE DEBTOR

## EXHIBIT 1

**TABLE OF CONTENTS**

I.       Summary of Plan.................................................................................................3

II.      Definitions.........................................................................................................4

III.     Treatment of Administrative and Priority Tax Claims ...........................................9

      A.  Administrative Claims ...........................................................................9
      B.  Professional Fee Claims.........................................................................9
      C.  Priority Tax Claims ...............................................................................10

IV.      Classification and Treatment of Claims and Interests ..........................................10

      Class I – Priority Non-Tax Claims....................................................................11
      Class II – Secured Tax Claims..........................................................................11
      Class III – Ford Motor Credit Company LLC ("Ford Motor Credit") ..................11
      Class IV – Westfield Bank................................................................................14
      Class V – First National Bank of Omaha ("FNBO") ...........................................15
      Class VI – LOL Finance Co. ("LOLFC") ............................................................17
      Class VII – General Unsecured Claims .............................................................21
      Class VIII – Equity Security Holders ................................................................23

V.       Means of Implementation and Execution of the Plan...........................................25

VI.      Similar Treatment for Each Claim within a Class ................................................30

VII.     Provisions Governing Distributions....................................................................30

VIII.    Treatment of Executory Contracts and Unexpired Leases ...................................31

IX.      Post-Confirmation Management.........................................................................35

X.       Release of Title to Property ..............................................................................36

XI.      Acceptance or Rejection of Plan: Effect of Rejection by an Impaired Class ........36

XII.     "Cramdown" for Impaired Creditors Not Accepting the Plan...............................38

XIII.    Retention of Jurisdiction..................................................................................38

XIV.     Miscellaneous Provisions.................................................................................39

<u>EXHIBIT 1</u>

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **Case No.: 21-01068-5-SWH** |
| **N. G. PURVIS FARMS, INC.** | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |

<u>**PLAN OF REORGANIZATION**</u>

Pursuant to the provisions of Section 1123 of the Bankruptcy Code (11 U.S.C. § 1123), the Debtor, N. G. Purvis Farms, Inc. (hereinafter "Debtor" or "NGP"), hereby submits the following Plan of Reorganization:

## I.  <u>SUMMARY OF PLAN</u>

The Debtor is a North Carolina corporation which has been engaged in business for over fifty-five (55) years.  The Debtor operates throughout the Southeast as a farrow-to-finish pork producer which breeds, farrows, weans, and raises weaner pigs, feeder pigs and market hogs, which are then sold to pork processors.  On the Petition Date, the Debtor owned and operated twelve (12) farms in North Carolina and two (2) farms in Georgia, together with associated facilities, on which it maintained herds of sows, bred piglets, and raised market hogs.  In addition, the Debtor contracted with numerous independent growers to feed and finish at their facilities weaned pigs and feeder pigs furnished and owned by the Debtor into market hogs.

Through this proceeding, based on the history set forth in the Disclosure Statement, the Debtor intends to phase-out of its market hog production and transition from a farrow-to-finish operation to a farrow-to-wean operation by growing out and liquidating its market hogs in the ordinary course of its business, liquidating certain other assets associated with its finishing operations, and restructuring its operations as a debtor-in-possession for the benefit of its creditors. The component of the Debtor's reorganization involving the growing out and liquidation of its market hogs in the ordinary course of its business is anticipated to take approximately six (6) months from the Petition Date.  The Debtor's Plan of Reorganization ("Plan") is based upon the Debtor's belief that the interests of its creditors and interest holders will be best served if it is allowed to (a) orderly transition from a farrow-to-finish operation to a farrow-to-wean operation as described above; (b) liquidate real and personal property that is not necessary to an effective reorganization; and (c) generate future cash flows from reorganized operations sufficient to service all plan obligations.

The Debtor's liabilities will be paid according to the priorities of the Bankruptcy Code and the Orders of this Court.  The specific amounts and terms of payment will be according to the treatment of each respective creditor set forth below.

## EXHIBIT 1

### II. **DEFINITIONS**

1.　　"ADMINISTRATIVE CLAIM" shall mean a Claim pursuant to Sections 503(b), 507(a)(2), or 1114(e)(2) of the Bankruptcy Code that has not been paid by the Debtor.

2.　　"ALLOWED," with respect to a Claim, shall mean any such Claim against the Debtor (a) that has been allowed pursuant to a Final Order of the Bankruptcy Court; (b) as to which a proof of claim was timely filed unless by order of the Bankruptcy Court was not required to be filed; or (c) that has been listed in the Schedules as liquidated in amount and not disputed or contingent, and in each such case in (b) or (c) above, as to which either (1) no objection to the allowance thereof or other similar pleading has been filed within the applicable period, or (2) an objection or other similar pleading has been filed and the Claim has been allowed by a Final Order of the Bankruptcy Court, but only to the extent so allowed.  Except to the extent otherwise provided in this Plan or by a Final Order of the Bankruptcy Court allowing such Claim, an Allowed Claim shall not include interest on the amount of such Claim from and after the Petition Date.

3.　　"BANKRUPTCY CAUSES OF ACTION" shall mean any Claim or Cause of Action which may be asserted by the Debtor under 11 U.S.C. §§ 541, 542, 543, 544, 546, 547, 548, 549, 550, or 553.

4.　　"BANKRUPTCY CODE" shall mean the United States Bankruptcy Code, Title 11 of the United States Code, as enacted in 1978 and thereafter amended.  References to "§___" herein shall refer to a section of the Bankruptcy Code, 11 U.S.C. § 101, et seq.

5.　　"BANKRUPTCY RULES" shall mean the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to Chapter 11 cases.

6.　　"BORROWING BASE" shall mean the sum of:
  (a)　80% of Accounts Receivable; plus
  (b)　80% of the Value of Prepaid Expenses; plus
  (c)　75% of the Value of Feed & Supplies; plus
  (d)　75% of all Sows, based on an assumed value of $250 each; plus
  (e)　75% of all Boars, based on an assumed value of $1,000 each; plus
  (f)　75% of all Developing Gilts, based on an assumed value of $250 each; plus
  (g)　75% of all Unweaned Pigs, based on an assumed value of $35 each; plus
  (h)　75% of all Nursery Pigs, based on an assumed value of $70 each; plus
  (i)　75% of all Finisher Pigs, based on an assumed value of $150 each; plus
  (j)　100% of the Value of all Cash Accounts; plus
  (k)　100% of the Value of all Hedging Accounts; plus
  (l)　$1,500,000 as a Real Estate Credit; minus
  (m)　100% of accounts payable related to Feed and/or Livestock; minus
  (n)　100% of outstanding checks.

7.　　"CARVE OUT" shall have the meaning defined and as set forth in the Final DIP Order.

## EXHIBIT 1

8.      "CLAIM"  shall have the meaning set forth in § 101(5) of the Bankruptcy Code.

9.      "CLASS" shall mean any one of the Classes of Claims or Equity Interests designated in Section IV of the Plan.

10.      "CONFIRMATION DATE" shall mean the date of entry by the Court of an order confirming the Plan at or after a hearing pursuant to 11 U.S.C. § 1129.

11.      "CONFIRMATION HEARING" shall mean the hearing conducted by the Court regarding confirmation of the Plan pursuant to 11 U.S.C. § 1129.

12.      "CONFIRMATION ORDER" shall mean the order of the Court confirming the Plan.

13.      "COURT" shall mean the United States Bankruptcy Court for the Eastern District of North Carolina, including the United States Bankruptcy Judge presiding in the Chapter 11 case of the Debtor.

14.      "CREDITOR" shall mean a person or entity holding a Claim against the Debtor of any character whatsoever, regardless of whether such Claim is an Allowed Claim.

15.      "DEBTOR" shall mean N. G. Purvis Farms, Inc.

16.      "DIP AGREEMENTS" shall mean the FNBO DIP Agreement and the LOLFC DIP Agreement.

17.      "DIP CLAIM" shall mean any Claim asserted by any DIP Lender against the Debtor on or after the Petition Date, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and all other obligations arising under the DIP Agreements as well as any claims including adequate protections claims allowed in accordance with the DIP Orders.

18.      "DIP FINANCING MOTION" shall mean the Motion for Emergency and Final Order (I) Authorizing the Debtor to Obtain Post-Petition Financing, (ii) Authorizing the Debtor to Use Cash Collateral, (iii) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to Prepetition Lenders, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief filed by the Debtor on May 7, 2021 [DE# 24].

19.      "DIP LENDERS" shall mean FNBO and LOLFC.

20.      "DIP ORDERS" shall mean the Interim DIP Orders together with the Final DIP Order.

21.      "DISCLOSURE STATEMENT" shall mean the Disclosure Statement describing this Plan prepared in accordance with § 1125 and approved by order of the Court, to be distributed to the holders of Claims whose votes with respect to this Plan are to be solicited.

## EXHIBIT 1

22.     "DISPUTED CLAIM" shall mean any Claim (a) that is scheduled by the Debtor as disputed, contingent or unliquidated, or for an "unknown" or $0.00 amount; or (b) that is scheduled by the Debtor, or proof of which has been filed with the Court, and with respect to which a timely objection to allowance, in whole or in part, has been filed and which objections have not been (i) withdrawn or settled, or (ii) determined by a Final Order.  For the avoidance of doubt, if no proof of Claim has been filed by the applicable deadline and the Claim is not listed on the Schedules or has been or hereafter is listed on the Schedules as $0.00, disputed, contingent, or unliquidated, such Claim shall be Disallowed and shall be disregarded for all purposes.

23.     "EQUITY INTEREST" shall mean any equity security (as defined in 11 U.S.C. § 101(16)) in the Debtor.

24.     "EFFECTIVE DATE"   shall be that date which is the first business day of the month following the date that is 14 days after the entry of the Confirmation Order.  If, however, a stay of the Confirmation Order is in effect on that date, the Effective Date will be the first business day after the date on which the stay of the confirmation order expires or is otherwise terminated.

25.     "FINAL DECREE" shall mean the order of this Court pursuant to Bankruptcy Rule 3022 closing this case.

26.     "FINAL DIP ORDER" shall mean the Final Order allowing the DIP Financing Motion entered on August 13, 2021 [DE# 280].

27.     "FINAL ORDER" shall mean an order of the Court that has been entered and either (a) the time for appeal from such entered order has expired; or (b) any appeal that has been timely filed has been dismissed or otherwise finally determined.

28.     "FNBO" shall mean First National Bank of Omaha.

29.     "FNBO DIP Agreement" shall mean that post-petition Debtor-in-Possession Credit Agreement entered between the Debtor and FNBO, as and to the extent approved and modified by the DIP Orders.

30.     "FNBO DIP FACILITY" shall have the meaning ascribed to it in Section IV(E)(1) herein.

31.     "FNBO SECURED CLAIM DETERMINATION DATE" shall mean December 31, 2021.

32.     "FREE CASH FLOW" shall mean and be equal to: Earnings Before Interest and Taxes (EBIT) – Interest (including distributions for interest payments on the LOLFC Secured Claim) – Taxes (including distributions for estimated owner level income taxes resulting from company operations) + Depreciation/Amortization (non-cash cost) – Reasonable and necessary capital expenditures - Change in working capital (except cash) – Principal payments on debt (including distributions for principal payments on the LOLFC Secured Claim).  The Debtor's Free

6

# EXHIBIT 1

Cash Flow shall be determined annually based on the Debtor's fiscal year.  In determining Free Cash Flow, the following elements shall be subject to approval of LOLFC, with such approval not to be unreasonably withheld: (i) capital expenditures over $25,000, (ii) any new debt incurred outside of the ordinary course of business, (iii) the amount of distributions for estimated owner level income taxes resulting from company operations distributions to shareholders, and (iv) any other distributions to shareholders.

33.     "GENERAL UNSECURED CLAIM" shall mean any Claim, whether or not liquidated or contingent, other than a Priority Tax Claim, Administrative Claim, or Secured Claim.

34.     "IMPAIRED" shall mean, with respect to a Claim or Equity Interest (or Class of Claims or Equity Interests) addressed in the Plan, treatment of such Claim or Equity Interest which (i) alters the legal, equitable, or contractual rights to which the holder of such Claim or Equity Interest would otherwise be entitled under applicable non-bankruptcy law, or (ii) will not result in the holder of the Claim or Equity Interest (or Class of Claims or Equity Interests) receiving property with a value, as of the Effective Date of the Plan, of the full amount of each such Allowed Claim or Equity Interest (or Class of Claims or Equity Interests).

35.     "INTERIM DIP ORDERS" shall mean the Interim Order allowing the DIP Financing Motion entered on May 14, 2021 [DE# 55] and the Second Interim Order entered on July 16, 2021 [DE# 195].

36.     "LIQUIDATION PROCEEDS" shall mean all funds resulting from the partial liquidation of the Debtor's real and personal property assets, less costs of liquidation as more fully described in the Means of Execution, Section V herein.

37.     "LOLFC" shall mean LOL Finance Co.

38.     "LOLFC DIP AGREEMENT" shall mean that post-petition Debtor-in-Possession Credit Agreement entered between the Debtor and LOLFC, as and to the extent approved and modified by the DIP Orders.

39.     "LOLFC DIP FACILITY" shall have the meaning ascribed to it in Section IV(F)(1) herein.

40.     "LOLFC SECURED CLAIM DETERMINATION DATE" shall mean March 31, 2022 or such other later date as may be established pursuant to paragraph 2.1(b) of the LOLFC DIP Agreement.

41.     "PETITION DATE" shall mean the date upon which the Debtor filed the voluntary Chapter 11 petition, to wit, May 6, 2021.

42.     "PLAN" shall mean this Plan of Reorganization in its present form or as it may be amended or modified.

43.     "PRIORITY CLAIM" shall mean any Claim to the extent entitled to priority in

7

## EXHIBIT 1

payment under § 507.

44.     "PRIORITY TAX CLAIM" shall mean any unsecured Claim entitled to priority in treatment pursuant to § 507(a)(8).

45.     "PROFESSIONAL" shall mean any person or entity employed pursuant to a Bankruptcy Court order in accordance with Sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered or reimbursed for expenses incurred pursuant to Sections 327, 328, 329, 330 or 331 of the Bankruptcy Code.

46.     "PROFESSIONAL FEE CLAIMS" shall mean all Administrative Claims for the compensation of and/or reimbursement of expenses incurred by Professionals to the extent such fees and expenses have not been previously paid.

47.     "PRO-RATA" shall mean the amount of cash or property to be paid or distributed to a claimant with respect to an Allowed Claim on a particular date, in accordance with the ratio, as of such date, of the dollar amount of the Allowed Claim of such person in the indicated class to the aggregate dollar amount of Claims in the indicated class (including, in each such calculation, the full amount of Disputed Claims in the class which have been asserted or are otherwise pending and which have not yet been allowed or otherwise disposed of).

48.     "SECURED CLAIM" shall mean a Claim (a) secured by a lien, security interest, or other encumbrance on property in which the Debtor has an interest, to the extent that such lien, security interest, or other encumbrance is valid, perfected and enforceable pursuant to applicable law or by reason of a Final Order entered by the Court, and to the extent of the value of the Creditor's interest in the Debtor's interest in such property as determined pursuant to 11 U.S.C. § 506(a) and not subject to subordination; (b) subject to setoff pursuant to 11 U.S.C. § 553, to the extent of the value of the property subject to setoff; or (c) otherwise Allowed pursuant to the Plan as a Secured Claim.  Secured Claim does not include that portion of the Creditor's Claim exceeding the value of the collateral or the Creditor's interest in the Debtor's interest in the collateral and does not include the value of any avoidable portion of such lien.

49.     "SECURED CREDITOR" shall mean a Creditor who holds a Secured Claim against the Debtor or the Debtor's property.  The Claim of such Creditor exceeding the value of the collateral, or the Creditor's interest in the Debtor's interest in the collateral, and the Claim of such Creditor to the extent of the present amount of any avoidable lien, shall be an Unsecured Claim.

50.     "SECURED TAX CLAIM" shall mean any Claim for taxes, including any associated penalties and interest, which is a Secured Claim.

51.     "STATUTORY RATE" shall mean, with respect to interest proposed to be paid on account of any Priority Tax Claim, the interest rate required by 11 U.S.C. § 511(a) and computed pursuant to 26 U.S.C. § 6621 and/or N.C. Gen. Stat. § 105-360, as applicable.

## EXHIBIT 1

### III.  TREATMENT OF ADMINISTRATIVE AND PRIORITY TAX CLAIMS

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Equity Interests set forth in Section IV hereof.

A.    *Administrative Claims (other than Professional Fee Claims)*

Except as otherwise provided in this Section III(A) and except with respect to Professional Fee Claims, requests for allowance and/or payment of Administrative Claims **must be filed and served on the Debtor within sixty (60) days of the Effective Date.**

**Holders of Administrative Claims that are required to, but do not, file and serve a request for allowance and/or payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its property, and such Administrative Claims shall be deemed discharged as of the Effective Date.**

Except with respect to Professional Fee Claims, and except to the extent that a holder of an Administrative Claim and the Debtor agree to less favorable treatment, each Allowed Administrative Claim shall be paid in cash and in full on the Effective Date of the Plan.  To the extent that an Administrative Claim (other than a Professional Fee Claim) has not been allowed as of the Effective Date, such Administrative Claim shall be paid in cash and in full within five (5) business days of the entry of a Final Order allowing the same or pursuant to any agreement between the Debtor and the holder of such Allowed Administrative Claim.  Allowed Administrative Claims (other than Professional Fee Claims) remaining unpaid thirty (30) days following the Effective Date (or on the entry of a Final Order allowing the same to the extent that an Administrative Claim has not been approved as of the Effective Date) shall accrue interest at a rate of 4% per annum.

B.    *Professional Fee Claims*

1.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for allowance of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be filed no later than sixty (60) days after the Effective Date.  All such final requests will be subject to approval by the Court after notice and opportunity for a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Court, and once approved by the Court, shall be promptly paid by the Debtor up to the full allowed amount, in accordance with the terms of the Final DIP Order and the DIP Agreements.  To the extent that available funds in accordance with the terms of the Final DIP Order are insufficient to satisfy the amount of Allowed Professional Fee Claims, such claims shall be paid from future cash flow generated by the Debtor over a period not to exceed one (1) year from the Effective Date, with interest at the rate of 4%.

## EXHIBIT 1

2.      Post-Confirmation Date Professional Fee Claims

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtor shall, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Court, pay in cash in accordance with the terms of the Final DIP Order and the DIP Agreements the reasonable and documented legal, professional, and other fees and expenses incurred by Professionals employed by the Debtor after the Confirmation Date.  Upon the Confirmation Date, any requirement that Professionals employed by the Debtor comply with Sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Professional employed by it in the ordinary course of business without any further notice to, or action, order, or approval of, the Court.

Post-Confirmation Date Professional Fee Claims of Professionals employed by entities other than the Debtor shall remain subject to application to and allowance by the Court, and the allowed amount of such Professional Fee Claims shall be paid upon allowance in accordance with the terms of the Final DIP Order and the DIP Agreements.

C.      *Priority Tax Claims*

1.      Except to the extent that a holder of a Priority Tax Claim and the Debtor agree to less favorable treatment, Priority Tax Claims shall be paid consistent with 11 U.S.C. § 1129(a)(9)(C) in equal quarterly installments over a period not exceeding five (5) years from the Petition Date.  Quarterly payments shall commence on the earlier of January 15, April 15, July 15, or October 15 following the Effective Date and shall continue quarterly thereafter and shall include interest at the Statutory Rate from the Effective Date. (As of the date of the Plan, the Statutory Rate applicable to the claim of the IRS is 3%, and the Statutory Rate applicable to the claim of the NCDOR is 5%). These claims shall be further reduced by any distributions made to Allowed Claim holders from the Liquidation Proceeds, if any.

2.      Penalties - Any Claim or demand for a penalty relating to any Priority Tax Claim (other than a penalty of the type specified in § 507(a)(8)(G) of the Bankruptcy Code) shall be included in the class of, and shall be treated as, General Unsecured Claims as set forth below. Except as provided in the Plan, any holder of a Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtor, the Estate, or the Debtor's assets and property.

3.      Unsecured Claims of taxing authorities not entitled to priority under § 507(a)(8) of the Bankruptcy Code are included in the class of, and shall be treated as, General Unsecured Claims as set forth below.

For feasibility purposes, the Debtor estimates that the total amount of Priority Tax Claims are nominal.

## IV.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and are excluded from the following Classes.  Section

## EXHIBIT 1

III above describes the treatment of Administrative Claims and Priority Tax Claims.  For the purposes of this Plan, holders of Claims against, or Equity Interests in, the Debtor are classified as follows in accordance with Section 1122(a) of the Bankruptcy Code:

A.      **Class I – Priority Non-Tax Claims.**

(1)      Classification.  This Class consists of all Allowed Priority Claims that have not been paid by the Debtor, other than Priority Tax Claims and Administrative Claims.  The Debtor does not believe there are any Claims in this Class.

(2)      Treatment.  On the Effective Date, the holders of Allowed Claims in this Class shall receive (a) all amounts to which such holder is entitled on account of such Allowed Claim on the later of (i) the Effective Date or (ii) the date when such Allowed Claim becomes due and payable according to its terms and conditions, or (b) such other, less favorable treatment as is agreed upon by the Debtor and the holder of such Allowed Priority Non-Tax Claim.  The Debtor does not believe there are any Claims in this class.

(3)      Impairment.  This Class is Impaired by the Plan, although the Debtor does not believe there are any Claims in this class.

B.      **Class II – Secured Tax Claims.**

(1)      Classification.  This Class consists of all Secured Tax Claims that have not been paid by the Debtor, including ad valorem property tax claims based on real property and personal property to the extent secured by property of the Debtor.

(2)      Treatment.  Except to the extent that a holder of a Secured Tax Claim and the Debtor agree to less favorable treatment, Secured Tax Claims shall be paid consistent with 11 U.S.C. § 1129(a)(9)(C) and (D) in equal quarterly installments over a period not exceeding five (5) years from the Petition Date.  Quarterly payments shall commence on the earlier of January 15, April 15, July 15, or October 15 following the Effective Date and shall continue quarterly thereafter and shall include interest at the Statutory Rate from the Effective Date. The Debtor shall be permitted to pre-pay without penalty a portion or all of any Secured Tax Claims.

(3)      Impairment.  This Class is Impaired by the Plan.

C.      **Class III – Ford Motor Credit Company LLC (“Ford Motor Credit”).**

(1)      Classification.  This Class consists of all Claims of Ford Motor Credit.  The Debtor is indebted to Ford Motor Credit pursuant to nine (9) retail installment contracts (each a “Ford Contract” and collectively, the “Ford Contracts”) each of which is secured by a properly perfected first-priority lien on a separate Ford vehicle, as follows:

a.      Ford Contract 1 (Account 9543):  On or about November 21, 2017, the Debtor entered into a Vehicle Retail Installment Contract (“Ford Contract 1”) subsequently assigned to Ford Credit for the purchase of a 2017 Ford Super Duty F-350 SRW, VIN

11

## EXHIBIT 1

1FD8X3FT1HEE29241. Ford Contract 1 provides for sixty (60) monthly payments in the amount of $1,049.18 each, commencing on January 5, 2018, with interest at the annual rate of 4.84%. According to the proof of claim (POC No. 6) filed by Ford Credit on May 18, 2021, the outstanding balance due under Ford Contract 1 as of the Petition Date was $20,200.47.

b.      Ford Contract 2 (Account 2544):  On or about October 30, 2017, the Debtor entered into a Vehicle Retail Installment Contract ("Ford Contract 2") subsequently assigned to Ford Credit for the purchase of a 2017 Ford Super Duty F-350 SRW, VIN 1FD8X3FT6HEE92223. Ford Contract 2 provides for sixty (60) monthly payments in the amount of $1,073.05 each, commencing on December 14, 2017, with interest at the annual rate of 4.90%. According to the proof of claim (POC No. 7) filed by Ford Credit on May 18, 2021, the outstanding balance due under Ford Contract 2 as of the Petition Date was $19,597.01.

c.      Ford Contract 3 (Account 8311):  On or about December 15, 2017, the Debtor entered into a Vehicle Retail Installment Contract ("Ford Contract 3") subsequently assigned to Ford Credit for the purchase of a 2017 Ford Transit van, VIN 1FTYE1YMXHKA39129.  Ford Contract 3 provides for fifty-nine (59) monthly payments in the amount of $572.89 each, commencing on January 29, 2018, followed by a final payment of $572.46 due on December 29, 2022, with interest at the annual rate of 0.0%.  According to the proof of claim (POC No. 8) filed by Ford Credit on May 18, 2021, the outstanding balance due under  Ford Contract 3 as of the Petition Date was $12,030.26.

d.      Ford Contract 4 (Account 5930):  On or about December 5, 2016, the Debtor entered into a Vehicle Retail Installment Contract ("Ford Contract 4") subsequently assigned to Ford Credit for the purchase of a 2016 Ford F-150, VIN 1FTEW1EF7GFD14338. Ford Contract 4 provides for sixty (60) monthly payments in the amount of $763.53 each, commencing on January 19, 2017, with interest at the annual rate of 3.90%.  According to the proof of claim (POC No. 9) filed by Ford Credit on May 18, 2021, the outstanding balance due under Ford Contract 4 as of the Petition Date was $6,877.40.

e.      Ford Contract 5 (Account 2494):  On or about October 30, 2017, the Debtor entered into a Vehicle Retail Installment Contract ("Ford Contract 5") subsequently assigned to Ford Credit for the purchase of a 2017 Ford F-150, VIN 1FTEX1EF4HKE44082.  Ford Contract 5 provides for forty-seven (47) monthly payments in the amount of $757.89, commencing on November 29, 2017, followed by a final payment of $757.47 due on October 29, 2021, with interest at the annual rate of 0.0%.  According to the proof of claim (POC No. 10) filed by Ford Credit on May 18, 2021, the outstanding balance due under Ford Contract 5 as of the Petition Date was $5,304.81.

f.      Ford Contract 6 (Account 4134):  On or about March 15, 2018, the Debtor entered into a Vehicle Retail Installment Contract ("Ford Contract 6") subsequently assigned to Ford Credit for the purchase of a 2018 Ford F-150, VIN 1FTFX1E57JFC24848.  Ford Contract 6 provides for sixty (60) monthly payments in the amount of $720.11 each, commencing on April 29, 2018, with interest at the annual rate of 4.79%.  According to the proof of claim (POC No. 13) filed by Ford Credit on May 20, 2021, the outstanding balance due under Ford Contract 6 as of the Petition Date was $16,518.55.

12

<u>EXHIBIT 1</u>

g.      <u>Ford Contract 7 (Account 7533)</u>:  On or about April 11, 2018, the Debtor entered into a Vehicle Retail Installment Contract ("Ford Contract 7") subsequently assigned to Ford Credit for the purchase of a 2018 Ford F-150, VIN 1FTEX1E51JKC76205.  Ford Contract 7 provides for sixty (60) monthly payments in the amount of $695.41 each, commencing on May 26, 2018, with interest at the annual rate of 4.79%.  According to the proof of claim (POC No. 14) filed by Ford Credit on May 20, 2021, the outstanding balance due under Ford Contract 7 as of the Petition Date was $15,886.68.

h.      <u>Ford Contract 8 (Account 2367)</u>:  On or about February 8, 2018, the Debtor entered into a Vehicle Retail Installment Contract ("Ford Contract 8") subsequently assigned to Ford Credit for the purchase of a 2018 Ford F-150, VIN 1FTEX1E58JKC76136.  Ford Contract 8 provides for sixty (60) monthly payments in the amount of $711.01 each, commencing on March 25, 2018, with interest at the annual rate of 4.80%.  According to the proof of claim (POC No. 15) filed by Ford Credit on May 20, 2021, the outstanding balance due under Ford Contract 8 as of the Petition Date was $14,936.07.

i.      <u>Ford Contract 9 (Account 7154)</u>:  On or about October 4, 2016, the Debtor entered into a Vehicle Retail Installment Contract ("Ford Contract 9") subsequently assigned to Ford Credit for the purchase of a 2016 Ford F-150, VIN 1FTFW1EF1GFD58307.  Ford Contract 9 provides for seventy-one (71) monthly payments in the amount of $608.39, commencing on November 3, 2016, followed by a final payment of $607.78 due on October 3, 2022, with interest at the annual rate of 0.0%.  According to the proof of claim (POC No. 16) filed by Ford Credit on May 20, 2021, the outstanding balance due under Ford Contract 9 as of the Petition Date was $10,950.41.

(2)     <u>Treatment</u>.  Each of the Ford Contracts shall be treated as a separate, fully secured claim for the amount set forth in its respective Proof of Claim, to be amortized and paid in full over sixty (60) months with interest at the rate of 5.25% *per annum*.  Payments will begin on July 15, 2021, with any then-remaining principal, accrued unpaid interest and/or late fees/other charges accrued over the 60-month term being payable with the last monthly payment.

Ford Credit shall retain its lien on each of these vehicles with the priority thereof as it existed on the Petition Date pursuant to 11 U.S.C. § 1129(b)(2)(A)(i)(I), until the amount for each set forth above is paid in full, after which payment in full Ford Credit shall promptly cancel its lien on the financed vehicle(s) in question.

The default provisions in each of Ford Credit's contracts relative to these vehicles, including the payment of applicable late fees and Ford Credit's self-help repossession remedies upon default, shall remain in full force and effect notwithstanding any provisions to the contrary herein.

If the Debtor defaults after confirmation under the terms of any of the contracts (as modified above) and the corresponding vehicle is liquidated as a result, any deficiency balance remaining due for the liquidated vehicle after sale will be paid as a Class VII General Unsecured

13

## EXHIBIT 1

Claim under the Plan upon Ford Credit's written notification to the Debtor and filing of an amended proof of claim setting forth the amount of such deficiency claim.

The modified payment terms set forth herein shall be applicable only to the Debtor and will have no effect on any obligation owed to Ford Credit by any third party with respect to the obligation owed to Ford Credit that is secured by any one or more of the above vehicles.

The 60 scheduled payments on each contract shall be in the following monthly amounts:

a.       Ford Contract 1 (Account 9543 - 2017 Ford Super Duty F-350 SRW VIN 1FD8X3FT1HEE29241): $383.53 per month.

b.       Ford Contract 2 (Account 2544 - 2017 Ford Super Duty F-350 SRW VIN 1FD8X3FT6HEE92223): $372.07 per month.

c.       Ford Contract 3 (Account 8311 - 2017 Ford Transit van VIN 1FTYE1YMXHKA39129): $228.41 per month.

d.       Ford Contract 4 (Account 5930 - 2016 Ford F-150 VIN 1FTEW1EF7GFD14338): $130.58 per month.

e.       Ford Contract 5 (Account 2494 - 2017 Ford F-150 VIN 1FTEX1EF4HKE44082): $100.72 per month.

f.       Ford Contract 6 (Account 4134 - 2018 Ford F-150 VIN 1FTFX1E57JFC24848): $313.63 per month.

g.       Ford Contract 7 (Account 7533 - 2018 Ford F-150 VIN 1FTEX1E51JKC76205): $301.63 per month.

h.       Ford Contract 8 (Account 2367 - 2018 Ford F-150 VIN 1FTEX1E58JKC76136): $283.58 per month.

i.       Ford Contract 9 (Account 7154 - 2016 Ford F-150 VIN 1FTFW1EF1GFD58307): $207.91 per month.

The Debtor estimates that that the aggregate monthly payment to Ford Motor Credit on the Ford Contracts under this Class will be approximately $2,322.06.

(3)     Impairment.  This Class is Impaired by the Plan.

**D.     Class IV – Westfield Bank, FSB ("Westfield Bank").**

(1)     Classification.   This Class consists of all Claims of Westfield Bank. Pursuant to an insurance Premium Finance Agreement dated February 1, 2021, the Debtor is

14

## EXHIBIT 1

indebted to Westfield Bank in the approximate amount of $108,451.28 as of the Petition Date. As security for its obligations under the Premium Finance Agreement, the Debtor assigned to Westfield Bank all unearned premiums and dividends which may become payable under the underlying insurance policies and loss payments which reduce the unearned premiums, subject to any mortgagee or loss payee interests.

(2)     Treatment.  This obligation shall be treated as a fully secured, non-default loan with an outstanding principal balance owing in the amount of $108,451.28 as of the Petition Date.  The Debtor has continued to pay this obligation in the ordinary course since the Petition Date.  This obligation will be satisfied in full on or before October 31, 2021 according to the terms of the Premium Finance Agreement and, therefore, will be unimpaired as of the Effective Date.

(3)     Impairment.  This Class is unimpaired by the Plan.

**E.     Class V - First National Bank of Omaha ("FNBO").**

(1)     Classification & Background. FNBO has been the Debtor's primary lender since 2014.  Prior to the Petition Date, the Debtor was indebted to FNBO pursuant to the terms of among other loan documents, various pre-petition credit agreements, notes and various related agreements. As of the Petition Date, the Debtor was indebted to FNBO under the FNBO pre-petition credit agreements, notes and related agreements in the amount of $26,115,744.66 (inclusive of accrued interest but exclusive of fees, costs, expenses and other sums and charges payable by the Debtor). The Debtor's pre-petition obligations to FNBO were secured by (i) a first-priority security interest in substantially all of the Debtor's personal property, and exclusive of titled vehicles and approximately $384,000 of funds deposited with Fidelity Bank on the Petition Date, subject only to limited purchase money security interests on certain equipment and motor vehicles, and (ii) a lien junior to LOLFC on certain real property and improvements owned by the Debtor. Following the Petition Date, the Debtor filed the DIP Financing Motion [DE# 24]. The Interim DIP Orders allowing the DIP Financing Motion were entered on May 14, 2021 [DE# 55] and July 16, 2021 [DE# 195] and the Final DIP Order was entered on August 13, 2021 [DE# 280]. Pursuant to the DIP Orders, FNBO was granted certain first priority replacement liens and administrative expense claim status to the extent and as set forth more particularly in the DIP Orders. Pursuant to the DIP Orders, underlying FNBO DIP Agreement and related documents, FNBO provided post-petition financing to the Debtor consisting of (i) a secured revolving credit facility up to the aggregate principal amount of $2,500,000 (the "Revolving Credit Facility (Operating)"), (ii) a $3,000,000 discretionary revolving credit facility (the "Revolving Credit Facility (Hedging)"), and (iii) a refinancing of the $26,115,744.66 amount owing to FNBO on the Petition Date pursuant to a term loan facility (the "Term Loan Facility") (collectively, the Revolving Credit  Facility (Operating), Revolving Credit Facility (Hedging), and Term Loan Facility, as and to the extent approved and modified by the DIP Orders, are referred to as the "FNBO DIP Facility").

In accordance with the Means of Execution set forth in Section V herein and other terms of this Plan, the Debtor is phasing out of its market hog production and transitioning from a farrow-to-finish operation to a farrow-to-wean operation by growing out and liquidating its market hogs in the ordinary course of its business, liquidating certain other real property and personal

15

## EXHIBIT 1

property assets associated with its finishing operations, and restructuring its operations as a debtor-in-possession for the benefit of its creditors. In connection with this transition, the sum of $6,087,485.90 was paid to FNBO on or around May 25, 2021 from financing provided by LOLFC pursuant to the LOLFC Revolving Credit Facility in order to facilitate the assignment to LOLFC of FNBO's lien on the Debtor's farrow-to-wean personal property. The component of the Debtor's reorganization involving the growing out and liquidation of its market hogs in the ordinary course of its business is anticipated to take approximately six (6) months from the Petition Date. Net proceeds from the liquidation of the Debtor's market hogs (and any other property of the Debtor securing FNBO's claims) shall be distributed to FNBO in accordance with its Secured Claim.

(2)    Treatment. In accordance with the terms of the Final DIP Order, the FNBO DIP Facility obligation remaining as of the Confirmation Date shall be treated as an Allowed Secured Claim of FNBO against the Debtor, and FNBO shall hold an Allowed Secured Claim under this Plan in an amount equal to the value of FNBO's interest in the Debtor's interest in the collateral securing such claim as of the FNBO Secured Claim Determination Date. To determine and satisfy the final allowed amount of FNBO's Secured Claim a two-part analysis will occur.

The First Step of the analysis was the CRO's completion his final true-up of the accounts between LOLC and FNBO, including the costs and expenses incurred during the liquidation (including Bankruptcy Costs and G&A Expenses) required to be paid by LOLFC and FNBO under the DIP Orders. The CRO has completed that analysis, which the Debtor, FNBO and LOLFC have accepted, and determined that FNBO has substantially overpaid its share of expenses that were due from it during the case. As a result, as FNBO and LOLFC have further agreed, FNBO has satisfied 100% of its obligations to pay G&A Expenses and Bankruptcy Expenses as required under the DIP Orders. As such, and in full and final resolution of LOLFC and FNBO's rights and obligations vis-à-vis each other in connection with the G&A Expenses and the Bankruptcy Expenses, LOLFC and FNBO have agreed that (1)   LOLFC shall assume responsibility for payment of 100% of all G&A Expenses and Bankruptcy Expenses (including professional fees) that are incurred by the Estate and remain unpaid in the case and that would otherwise be FNBO's responsibility under the DIP Orders; and (2) LOLFC will pay  $211,915.00 to FNBO (the "Overpayment Adjustment Amount") to be applied to FNBO's Allowed Secured Claim, such payment to be made by LOLFC within five (5) business days of the final determination of the Adversary Proceeding recently commenced in this Court by Mercer against the Debtor and FNBO, located at Adv. P. No. 21-00113-5 (the "Mercer Adversary").

The Second Step of the analysis is dependent on the final resolution of the Mercer Adversary.  The Mercer Adversary seeks to recover an equitable lien against the Debtor and FNBO for alleged benefits and profits received post-petition, and certain amounts against the Debtor for feed and medicine provided prior to the Petition Date.  Any amount that is found by a final order of a court of competent jurisdiction to be an equitable lien against the proceeds resulting from the liquidation of the Debtor's market hogs that primes FNBO's existing pre and post-petition first priority lien in and to the proceeds resulting from the liquidation of the Debtor's market hogs shall be paid to Mercer by FNBO (the "Mercer Lien Amount").

Thus under the Plan, FNBO's Allowed Secured Claim shall consist of (i) the Overpayment Adjustment Amount, and (ii) the Mercer Lien Amount if any, which shall be deemed

16

<u>EXHIBIT 1</u>

satisfied as follows: (a) the Overpayment Adjustment Amount shall be paid to FNBO by LOLFC within five (5) business days of the final determination of the Mercer Adversary, and (b) the Mercer Lien Amount shall be treated and paid to FNBO by the Debtor as a current, non-default loan, the unpaid principal balance of which shall be amortized over a 15 year period from the Effective Date, at the fixed interest rate of 5.25% per annum, and be payable in equal monthly payments of principal and interest which shall commence on the later of the Effective Date or completion of the determination of the amount of the FNBO Allowed Secured Claim, as provided above, with a final balloon payment equal to all amounts then remaining due to FNBO by the Debtor to be due on the first day of the 60th month after the commencement of this payment stream.

Under the Plan, FNBO shall retain all of its liens and security interests granted under the DIP Orders, to the full extent of the value of FNBO's collateral until such time as the Mercer Adversary Proceeding is finally resolved, by either a final binding settlement with Mercer or final order of this Court. The Debtor agrees that the amount due under the FNBO Allowed Secured Claim shall be increased up to the full value of FNBO's collateral by any amounts found due to Mercer from FNBO in the Mercer Adversary Proceeding.

The FNBO Allowed Secured Claim, following its determination as provided above shall not be subject to challenge or avoidance, and other than as expressly modified herein (including the modifications to FNBO's responsibility for the continuing payment of G&A Expenses or Bankruptcy Costs as provided in the DIP Orders), the terms and conditions of the FNBO DIP Facility, as approved and provided for in the DIP Orders, and with the protections therein shall remain unchanged and in full force and effect under this Plan. The Debtor agrees to execute such promissory notes, loan agreements and other agreements reasonably requested by FNBO to properly memorialize the terms and obligations of the FNBO Allowed Secured Claim.

The post-petition liens and administrative expense claims granted to FNBO pursuant to the terms of the DIP Orders which are included within the FNBO Allowed Secured Claim shall not extend to any property of the Debtor or the Estate upon which FNBO did not have a valid, enforceable, and perfected lien prior to the Petition Date.  Other than as expressly modified herein, FNBO shall retain its liens and all other protections granted to it pursuant to the DIP Orders until the FNBO Allowed Secured Claim is paid in full. Any remaining amounts owed to FNBO over and above the amount of the FNBO Allowed Secured Claim shall be treated as a General Unsecured Claim under Class VII. Notwithstanding any other provision of this Plan or the Confirmation Order nothing therein is intended to or shall constitute a defense, waiver, or release of any guarantor or other third party's obligations to FNBO related to the amounts owed to it by the Debtor.

(3)    <u>Impairment</u>. This Class is impaired by the Plan.

**F.    <u>Class VI - LOL Finance Co. ("LOLFC").</u>**

(1)    <u>Classification and Background.</u>  Prior to the Petition Date, the Debtor was indebted to LOLFC pursuant to the terms of various pre-petition loan contracts and notes.  As of the Petition Date, the Debtor was indebted to LOLFC under the pre-petition loan contracts and

## EXHIBIT 1

notes in the amount of $14,241,515.27 (inclusive of accrued interest, fees, costs, expenses and other sums and charges payable by the Debtor). The Debtor's pre-petition obligations to LOLFC were secured by senior liens on all or substantially all of the real property and improvements owned by the Debtor. Following the Petition Date, on May 7, 2021, the Debtor filed the DIP Financing Motion [DE# 24]. The Interim DIP Orders allowing the DIP Financing Motion were entered on May 14, 2021 [DE# 55] and July 16, 2021 [DE# 195], and the Final DIP Order allowing the DIP Financing Motion was entered on August 13, 2021 [DE# 280]. Pursuant to the Interim DIP Orders and the Final DIP Order, LOLFC was granted certain liens and super-priority administrative expense claim status to the extent and as set forth more particularly in the DIP Orders. Pursuant to the DIP Orders and underlying LOLFC DIP Agreement and related documents, LOLFC provided post-petition financing to the Debtor consisting of (i) a secured revolving credit facility up to the aggregate principal amount of $7,600,000 (the "LOLFC Revolving Credit Facility"), and (ii) a refinancing of the $14,241,515.27 amount owing to LOLFC on the Petition Date, pursuant to a term loan facility (the "LOLFC Term Loan Facility") (collectively, the LOLFC Revolving Credit Facility and LOLFC Term Loan Facility, as and to the extent approved and modified by the DIP Orders, are referred to as the "LOLFC DIP Facility").

In accordance with the Means of Execution set forth in Section V herein and other terms of this Plan, the Debtor is phasing out of its market hog production and transitioning from a farrow-to-finish operation to a farrow-to-wean operation by growing out and liquidating its market hogs in the ordinary course of its business, liquidating certain other real property and personal property assets associated with its finishing operations, and restructuring its operations as a debtor-in-possession for the benefit of its creditors. In connection with this transition, the sum of $6,087,485.90 was paid to FNBO on or around May 25, 2021 from financing provided by LOLFC pursuant to the LOLFC Revolving Credit Facility, in order to facilitate the assignment to LOLFC of FNBO's lien on the Debtor's Farrow-to-Wean Collateral (as defined in the LOLFC DIP Agreement), including the feed ingredient inventory. The component of the Debtor's reorganization involving the growing out and liquidation of its market hogs in the ordinary course of its business was completed on October 15, 2021.

(2)    Treatment. In accordance with the terms of the Final DIP Order, the LOLFC DIP Facility obligation shall be treated as a fully secured obligation of the Debtor in the amount of LOLFC's claim as of the LOLFC Secured Claim Determination Date, calculated in accordance with 11 U.S.C. Sections 503 and 506 (collectively, the "LOLFC Secured Claim"). The LOLFC Secured Claim shall be paid in full as follows:

(a)    LOLFC Revolving Credit Facility. The LOLFC Revolving Credit Facility shall be treated as a fully secured, current, non-default loan. The outstanding principal amount of the LOLFC Revolving Credit Facility may fluctuate from time to time, through repayments and reborrowings, but at no time shall the outstanding principal amount of the LOLFC Revolving Credit Facility exceed the lesser of (i) $7,600,000, or (ii) the Borrowing Base. LOLFC shall not in any case be obligated to advance loan proceeds under the LOLFC Revolving Credit Facility if the outstanding principal balance of the LOLFC Revolving Credit Facility exceeds the Borrowing Base. In the event that the outstanding principal balance of the LOLFC Revolving Credit Facility shall at any time exceed the Borrowing Base, the Debtor will immediately upon discovery of the existence of such excess, make a principal payment which will reduce the

## EXHIBIT 1

outstanding principal balance of the LOLFC Revolving Credit Facility to an amount which does not exceed the Borrowing Base. The Debtor shall submit a Borrowing Base Report to LOLFC each month. Interest under the LOLFC Revolving Credit Facility shall accrue on the unpaid principal balance at a variable rate based on the LOLFC Variable Monthly Index (as defined in the note evidencing the LOLFC Revolving Credit Facility), with an initial rate of 3.65% per annum. Accrued interest on the LOLFC Revolving Credit Facility shall be due and payable in arrears on the first day of each calendar month following the Effective Date, until paid in full. The LOLFC Revolving Credit Facility is scheduled to expire on the later of January 1, 2022 or the Effective Date. Notwithstanding the foregoing, LOLFC has agreed to renew the LOLFC Revolving Credit Facility for a one-year period. Further, it is anticipated that the LOLFC Revolving Credit Facility will be renewed annually thereafter, subject to the internal approvals and determinations of LOLFC. Other than as expressly modified herein, the terms and conditions of the LOLFC Revolving Credit Facility, as and to the extent approved and modified by the DIP Orders, shall remain unchanged.

(b) <u>LOLFC Term Loan Facility</u>. The LOLFC Term Loan Facility shall be treated as a fully secured, current, non-default loan in the amount of the LOLFC Secured Claim on the LOLFC Secured Claim Determination Date, less the amount of the LOLFC Revolving Credit Facility existing on that date, plus any amounts paid or advanced on or after that date by LOLFC to satisfy the Debtor's 11 U.S.C. § 503(b)(9) and/or administrative obligations. LOLFC will advance to the Debtor under the LOLFC Term Loan Facility the amount necessary to pay allowed § 503(b)(9) claims, but the cumulative amount of such advances shall not exceed $1,666,330.00 and shall be secured by the Debtor's personal property and certain real estate owned by Jerry Purvis and Melvin Purvis. From and after the LOLFC Secured Claim Determination Date, interest under the LOLFC Term Loan Facility shall accrue on the unpaid principal balance at the fixed rate of 4.13% per annum. Other than as expressly modified herein, the terms and conditions of the LOLFC Term Loan Facility, as and to the extent approved and modified by the DIP Orders, shall remain unchanged. The LOLFC Term Loan Facility shall be paid as follows:

(i) Note A: The sum of $9,000,000 shall constitute Note A. Principal and interest shall be payable in monthly installments commencing on April 1, 2022, based upon a 25-year amortization. A final payment of all unpaid amounts owing under Note A (including, without limitation, all principal, accrued interest and other unpaid amounts) shall be payable no later than the date that is ten (10) years after the Effective Date.

(ii) Note B: Note B shall be in an amount equal to the LOLFC Term Loan Facility (including the amount advanced to pay allowed § 503(b)(9) claims) less the amount of Note A. Accrued interest on Note B shall be due and payable in arrears on the first day of each calendar month following the Effective Date, until paid in full. The Debtor also shall make annual payments to LOLFC to be applied to the principal balance of Note B in an amount equal to 75% of the Debtor's Free Cash Flow (as defined in Article II) (the "Term Loan Free Cash Flow Payments"). The Debtor shall make annual payments to LOLFC of the remaining 25% of the Debtor's Free Cash Flow, to be applied to the principal balance of the LOLFC Revolving Credit Facility (the "Revolving Credit Facility Free Cash Flow Payments" and, together with the Term Loan Free Cash Flow Payments, collectively, the "Free Cash Flow Payments"). The Free Cash Flow Payments shall be due on July 1st of each year, with the first payment due on July 1, 2023.

## EXHIBIT 1

A final payment of all unpaid amounts owing under Note B shall be payable no later than the date that is ten (10) years after the Effective Date.

(c)　　Application of Net Proceeds from Sales of LOLFC Collateral.

(i)　　The Debtor shall have the right to sell, by private or public sale, any real or personal property securing the LOLFC Secured Claim, but only with the prior consent of LOLFC. Any such sales shall be free and clear of all liens, encumbrances, Claims, interests, and other obligations. Upon the sale of such property, all liens, encumbrances, Claims, interests, and other obligations secured by such property shall attach, with the same dignity, priority, and extent as held against such property prior to the sale, to the net sales proceeds remaining after payment, first, of all reasonable and ordinary costs of sale and closing costs, including ad valorem taxes, costs of advertising and any broker or auctioneer commissions, all quarterly fees pursuant to 28 U.S.C. § 1930 attributable to such sales (if applicable), all income and capital gains taxes incurred by the Debtor and any equity holders as a result of the sale, and all other costs allowed under § 506(c) of the Bankruptcy Code.

(ii)　　The net sales proceeds shall be applied to the LOLFC Term Loan Facility in such order as LOLFC determines in its discretion, whereupon LOLFC will adjust the scheduled principal and interest payment amounts accordingly, to maintain the remaining amortization period. Such changes will be evidenced by an executed Change in Terms Agreement.

(d)　　Results of True-Up. The CRO has completed his final true-up of the accounts between LOLFC and FNBO, including the costs and expenses incurred during the liquidation (including Bankruptcy Expenses and G&A Expenses, each as defined in the DIP Financing Motion) required to be paid by LOLFC and FNBO under the DIP Orders. The Debtor, FNBO and LOLFC have accepted that analysis, which determined that FNBO has overpaid its share of expenses that were due from it during the case. As a result, FNBO has satisfied 100% of its obligations to pay G&A Expenses and Bankruptcy Expenses as required under the DIP Orders. As such, and in full and final resolution of LOLFC and FNBO's rights and obligations vis-à-vis each other in connection with the G&A Expenses and the Bankruptcy Expenses, LOLFC and FNBO have agreed that (1) LOLFC shall assume responsibility for payment of 100% of all G&A Expenses and Bankruptcy Expenses (including professional fees) that are incurred by the Estate and remain unpaid in the case and that would otherwise be FNBO's responsibility under the DIP Orders; and (2) LOLFC will pay $211,915.00 to FNBO to be applied to FNBO's Allowed Secured Claim, such payment to be made by LOLFC within five (5) business days of the final determination of the Adversary Proceeding recently commenced in this Court by Mercer against the Debtor and FNBO, located at Adv. P. No. 21-00113-5.

Except as otherwise set forth herein, the post-petition liens and administrative expense claims granted to LOLFC pursuant to the terms of the DIP Orders and which are included within the LOLFC Secured Claim shall not extend to any property of the Debtor or the Estate upon which LOLFC did not have a valid, enforceable, and perfected lien prior to the Petition Date. LOLFC shall retain its liens granted pursuant to the DIP Orders until the LOLFC Secured Claim is paid in full. The terms of the Final DIP Order and the protections therein afforded to LOLFC are incorporated herein by reference, except to the extent that the terms of the Final DIP Order conflict

## EXHIBIT 1

with the terms of this Plan as set forth herein.

(e)     Notwithstanding the foregoing, the amount of the Free Cash Flow Payments to be made to LOLFC under the Plan shall be reduced to the extent necessary to enable the GUC Free Cash Flow payments.

(f)     LOLFC will advance funds under the LOLFC Term Loan Facility to pay the GUC $290,000 (representing approximately 85% of the projected premium earned on the sale of weaned pigs) within 30 days of the Effective Date of the Plan.

(g)     To the extent that the total amount of allowed § 503(b)(9) claims is less than $1,333,064, LOLFC will advance under the LOLFC Term Loan Facility the amount of the difference which will be paid to the General Unsecured Claims.  The Official Committee of Unsecured Creditors may object to § 503(b)(9) claims at its sole expense.

(h)     In consideration of the concessions and plan contributions provided by LOLFC, LOLFC shall be released from any liability to the Estate or the Debtor arising out of the Loan Documents (as defined in the Amended and Restated Debtor-In-Possession Credit Agreement) and the loans related thereto as of and prior to the Confirmation Date.

(3)     Impairment.  This Class is impaired by the Plan.

**G.     Class VII –General Unsecured Claims.**

(1)     Classification.  This Class consists of all Allowed General Unsecured Claims.

(2)     Treatment.  In accordance with the Liquidation Analysis attached as an Exhibit to the Disclosure Statement (as amended), the Debtor believes that creditors in this Class would not receive any distribution whatsoever should this case be converted to a Chapter 7 proceeding.  Notwithstanding that, the Debtor proposes the following distributions to holders of Allowed Claims in this Class:

(a)     Bankruptcy Causes of Action.  The Debtor shall investigate and pursue Bankruptcy Causes of Action.  The balance of any net funds (actual amounts recovered by the Debtor less all costs, expenses, and professional fees and expenses [including fees and expenses of any attorneys, accountants, consultants, and witnesses] incurred in the investigation, prosecution, and negotiation of the recoveries, and all quarterly fees pursuant to 28 U.S.C. § 1930 attributable to such recoveries) collected through such actions and remaining after the satisfaction of all Claims of a higher priority pursuant to 11 U.S.C. § 507 shall be distributed to holders of Allowed Claims in this Class.

(b)     Proceeds from Sale of Equity.  To satisfy the absolute priority rule, there will be a due diligence and competitive bidding process acceptable to all parties for the equity in the Debtor.  The amount of funds paid to the Debtor for the equity in the Debtor shall be no less than $250,000 which shall be paid as follows: (i) the Debtor shall first be reimbursed for the

21

## EXHIBIT 1

amount of the costs and expenses, including professional fees, incurred by the Debtor as a result of the approved due diligence and overbid procedures, in an amount not to exceed $50,000, and (ii) the balance shall be paid to the Class of Allowed General Unsecured Claims.

(c)      Payment of $290,000.  Debtor shall pay $290,000 to the General Unsecured Claims (representing approximately 85% of the projected premium earned on the sale of weaned pigs) within 30 days of the Effective Date, which funds shall be advanced by LOLFC under the LOLFC Term Loan Facility.

(d)      Free Cash Flow Sharing.  For the Debtor's fiscal years ending 2024 through 2029, the Debtor will make annual payments to the General Unsecured Claims in the amount of 40% of the Debtor's annual GUC Free Cash Flow.  "GUC Free Cash Flow" is defined as the amount by which the Debtor's Net Margin exceeds $12,500,000 annually, with Net Margin defined as Net Livestock Revenues (livestock sales revenue less direct selling expenses) less Livestock Feed Expense.

The amount of the Free Cash Flow Payments to be made to LOLFC under the Debtor's Plan shall be reduced to the extent necessary to enable the GUC Free Cash Flow payments.

The Debtor shall report to the PCC on an annual basis as to its compliance with this provision of the Plan.

(e)      Payment of Excess Proceeds upon Liquidity Event.  If the Debtor experiences a Liquidity Event (defined as the sale or change of control of all or substantially all the Debtor's assets, business operations, or stock, but not including any sale of the equity in the Debtor pursuant to Class VIII or the overbid procedure of the Plan, in a transaction agreed to or closed by December 31, 2031), then the GUC class will receive the net proceeds of the transaction first (before equity receives any net proceeds) to the extent necessary for the GUC class to have received $4 million pursuant to the Plan (if the GUC class has not already received at least $4 million pursuant to the Plan), and to the extent that there are any remaining proceeds the GUC class will receive fifty percent (50%) of the balance of net proceeds flowing to equity.  Net proceeds are proceeds after costs of sale, payment of all then existing liens, post-petition creditors of the Debtor including any unpaid administrative expenses, and taxes, including distributions for estimated owner level income taxes resulting from the sale transaction.  The Debtor shall not agree to a Liquidity Event that does not ensure that the GUC class will have received $4 million pursuant to the Plan.  The Debtor shall notify the PCC of any Liquidity Event as soon as possible, but, in no event less than 30 days before such Liquidity Event is scheduled to occur.

(f)      Section 503(b)(9) Savings.  To the extent that the total amount of allowed § 503(b)(9) claims is less than $1,333,064, LOLFC will advance under the LOLFC Term Loan Facility the amount of the difference which will be paid to the General Unsecured Claims. The PCC may respond to § 503(b)(9) claims and, where appropriate, contest those claims, at its sole expense.

(g)      Smithfield Waiver and Payment.  In exchange for the Smithfield entities being released per the terms of the Plan Modification, Smithfield and its affiliates will

22

## EXHIBIT 1

waive any and all Section 503(b)(9) and unsecured claims that such entities may have against the Debtor, and Smithfield will pay on the Effective Date $250,000 to the trust account of Debtor's counsel to be held in trust for the benefit of the Class of General Unsecured Claims, representing the approximate amount held by Smithfield and its affiliates as security deposits in full and final satisfaction thereof.

All distributions to this Class shall be made on a Pro-Rata basis.

(3)     Impairment.  This Class is Impaired by the Plan.

**H.     Class VIII – Equity Security Holders.**

(1)     Classification.  This Class consists of the shareholders of the Debtor as follows:

David Purvis - 20% ownership interest
Jerry M. Purvis, Sr. - 20% ownership interest
Marie P. McFayden - 20% ownership interest
Melvin G. Purvis - 20% ownership interest
Larry M. Purvis - 20% ownership interest

(2)     Treatment.    To satisfy the absolute priority rule, there will be a due diligence and competitive bidding process acceptable to all parties for the equity in the Debtor. The amount of funds paid to the Debtor for the equity in the Debtor shall be no less than $250,000 which shall be paid as follows: (i) the Debtor shall first be reimbursed for the amount of the costs and expenses, including professional fees, incurred by the Debtor as a result of the approved due diligence and overbid procedures, in an amount not to exceed $50,000, and (ii) the balance shall be paid to the Class of Allowed General Unsecured Claims.

The Purvises as the existing equity holders of the Debtor propose to provide the following consideration (the "Purvis Offer") within thirty (30) days of the Effective Date (except as provided pursuant to the Overbid Procedures below) in order to retain their equity interests in the Debtor:

(a)     The sum of $250,000.00 as working capital for the Debtor's post-confirmation operations;

(b)     Unless enjoined by an order of a court or the Purvises are not the prevailing bidder at the equity sale, Jerry Purvis, Sr., will grant a first position lien on his real estate in Moore County – his residence and 31 acres, more or less – to LOLFC to secure payment of Section 503(b)(9) expenses.  The property is described in Deed Book 2019E, Page 4, Moore County Registry.  This property is appraised for tax purposes at $206,800.00 and is otherwise unencumbered;

(c)     Unless enjoined by an order of a court or the Purvises are not the prevailing bidder at the equity sale, Melvin and Judy Purvis will grant a first position lien against their real property in Myrtle Beach, Horry County, South Carolina, to LOLFC for the same

## EXHIBIT 1

purpose.  This property is described as Unit 1203, Sand Dunes North Tower, and is more particularly described in that deed recorded at Book 2458, Page 1265, Horry County Registry.  The property is appraised for tax purposes at $175,950.00 and is otherwise unencumbered; and

(d)  Copperhead Farms, LLC ("Copperhead") owns real estate in Randolph County which recently appraised for $1,526,000.00 and which the Debtor uses as a farm to raise gilts (sows used for breeding) ("Copperhead Farms").  The property is over-encumbered by liens in favor of LOLFC.  The equity security holders who are members of Copperhead, will permit the Debtor to lease Copperhead Farms for 10 years after July 2022, with rent limited to payment of taxes, insurance, and repairs and maintenance only.  The Debtor shall have the right to renew the lease for additional 10-year periods after the initial 10-year period expires at fair market value.

**Overbid Procedures:**

By March 3, 2022, the Debtor will send out a notice to all creditors and parties in interest in the case with an opportunity to submit to counsel for the Debtor higher and better offers in accordance with the following procedures:

1.  On or before March 15, 2022 (the "Submission Deadline"), interested parties wishing to be designated as qualified bidders, must submit to counsel for the Debtor a request to be considered a qualified bidder, a nondisclosure agreement to be provided by counsel for the Debtor, and an information package substantiating their financial condition and their knowledge and experience in the industry (the "Bidder Request").  On or before March 20, 2022, the Debtor and LOLFC will notify interested parties of their determination as to whether they are deemed qualified to participate in the auction process (the "Qualified Bidder Designation," with each such individual or entity being a "Qualified Bidder").  Existing equity has already been approved as a Qualified Bidder.  In the event that any interested party is not deemed to be a Qualified Bidder, the party may request an expedited hearing before the Court for it to determine if the party is to be considered to be a Qualified Bidder.

2.  Qualified Bidders shall have until March 31, 2022 to conduct due diligence (the "Due Diligence Period").  The Debtor will provide Qualified Bidders with a secure electronic data link for the purpose of accessing due diligence materials upon request.  Further, the Debtor will cooperate with Qualified Bidders on arranging site visits at a mutually convenient time.

3.  Qualified Bidders must submit to counsel for the Debtor any bid for the equity interest in the Debtor on or before Noon (Eastern Standard Time) on March 31, 2022 (the "Bid Deadline"). A qualifying bid must be made on a standard form provided upon request by counsel the Debtor and must be in the amount of no less than $300,000.00 (a "Qualifying Bid").

4.  In the event that no Qualified Bidder submits a Qualifying Bid by the Bid Deadline, then the Purvis Offer (as defined in the Fifth Modification to Plan of Reorganization) shall be deemed to be sufficient new value under the absolute priority rule of § 1129(b)(2)(B)(ii) the Bankruptcy Code and the Purvises as existing equity shall retain their equity interests in the Debtor

<u>EXHIBIT 1</u>

in exchange for the payment of the required consideration within ten (10) days after the expiration of the Bid Deadline.

5.      In the event that another Qualified Bidder submits a Qualifying Bid by the Bid Deadline, a court auction for the sale of the equity interest in the Debtor shall be held on April 5, 2022 at 9:30 a.m. at the United States Bankruptcy Court, 3rd Floor Courtroom located at 300 Fayetteville Street, Raleigh, North Carolina (the "Court Auction").  At the Court Auction, overbids must be in increments of at least $10,000.00.  Following the Court Auction, the Court will conduct a hearing to determine the highest and best auction offer, to confirm the sale, and to resume and conclude the hearing on confirmation of the Debtor's Plan of Reorganization, as modified.

6.      Closing of the sale of the equity interest to the prevailing bidder shall occur within ten (10) days of the Court's determination of the highest and best auction offer and confirmation of the sale ("Closing Date").

7.      This procedure shall be deemed to satisfy the requirements of the absolute priority rule of § 1129(b)(2)(B)(ii) and the "new value" corollary to that rule.

8.      The Debtor shall be reimbursed out of the prevailing bid the amount of the costs and expenses, including professional fees, incurred by the Debtor as a result of these overbid procedures, in an amount not to exceed $50,000, and the balance of the amount of funds paid to the Debtor for the equity in the Debtor shall be paid to the Class of Allowed General Unsecured Claims.

(3)      <u>Impairment</u>.    This Class is impaired by the Plan.

## V.  <u>MEANS OF IMPLEMENTATION AND EXECUTION OF THE PLAN</u>

A.      <u>Transition of Business</u>.  The Debtor intends to phase out of its market hog production and transition from a farrow-to-finish operation to a farrow-to-wean operation by growing out and liquidating its market hogs in the ordinary course of its business, liquidating certain other real property and personal property assets associated with its finishing operations, and restructuring its operations as a debtor-in-possession for the benefit of its creditors.  The component of the Debtor's reorganization involving the growing out and liquidation of its market hogs in the ordinary course of its business is anticipated to take approximately six (6) months from the Petition Date.  The Debtor shall make payments under the Plan from the liquidation of assets and from revenues generated from ongoing business operations as set forth herein.

B.      <u>Liquidation of Assets</u>.  The Debtor shall have the right to sell, by private or public sale, certain real and personal property assets free and clear of all liens, Claims and encumbrances, with such liens, Claims and encumbrances to attach to the proceeds of sale.

1.      At the present time the property that the Debtor contemplates may be sold includes the following:

a.      Approximately 0.3 acres of land known as an orphan parcel in Chatham County (NC);

25

## EXHIBIT 1

b. Approximately 12 acres of land adjacent to Circle P Farm (NC);

c. Approximately 221 acres of land and facilities known as Naked Creek Farm (NC);

d. Approximately 107 acres of land and facilities known Little River Farm (NC);

e. Approximately 210 acres of land and facilities known as Mossland Farm (GA);

f. Approximately 257 acres of land and facilities known as Stephens Farm (GA); and

g. Excess vehicles with approximate value of $15,000.00.

2. All Sales Free and Clear of Liens. All property owned by the Debtor that is sold pursuant to this Plan will be sold free and clear of all liens, encumbrances, Claims, interests, and other obligations. Upon the sale of such property, all liens, encumbrances, Claims, interests, and other obligations secured by such property shall attach to the net sales proceeds remaining after payment first of all reasonable and ordinary costs of sale and closing costs, including ad valorem taxes, costs of advertising and any broker or auctioneer commissions, all quarterly fees pursuant to 28 U.S.C. § 1930 attributable to such sales (if applicable), all income and capital gains taxes incurred by the Debtor as a result of the sale, and all other costs allowed under § 506(c) of the Bankruptcy Code.

3. The proceeds from the sale of any of the Debtor's real and personal property shall be distributed as follows:

a. First, to pay all reasonable and ordinary costs of sale and closing costs including costs of advertising and any broker or auctioneer commissions, all quarterly fees pursuant to 28 U.S.C. § 1930 attributable to such sales (if applicable), all income and capital gains taxes incurred by the Debtor as a result of the sale, and 11 U.S.C. § 506(c) expenses approved by the Court;

b. Second, to holders of properly perfected liens against the property in the order of priority;

c. Third, the net proceeds remaining after the distributions described above, if any, shall be used to satisfy unpaid Allowed Administrative Claims;

d. Fourth, the net proceeds remaining after the distribution described above, if any, shall be used to satisfy Priority Claims;

e. Fifth, the net proceeds remaining after the distributions described above, if any, shall be distributed to holders of General Unsecured Claims, *pro rata*, up to the full amount of such Allowed Claims; and

f. Sixth, the net proceeds remaining after the distributions described above, if any, shall be distributed to the equity security holders.

C. Unclaimed Property. If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered, or attempted to be delivered, such unclaimed property shall be forfeited by such holder of the Claim or Equity Interest and the Debtor shall not attempt to make

26

## EXHIBIT 1

any further distribution to such holder of the Claim.  Undistributed property shall be returned to the Debtor for distribution in accordance with the Plan.

D.     The Debtor will execute and deliver all documentation to the Court and to all parties in interest who are entitled to receive the same as required by the terms of the Plan and the Bankruptcy Code.

E.     The Debtor shall take such other action as necessary to satisfy the other terms and requirements of the Plan and the Bankruptcy Code.

F.     Except as expressly stated in the Plan, or allowed by a Final Order of the Court, no interest, penalty, late charge, or other fee or expense shall be allowed on any Claim subsequent to the Petition Date, unless otherwise required by the Code.  No attorney's fees or expenses shall be paid with respect to any Claim except as specified herein or as allowed by a Final Order of the Court.

G.     Confirmation of this Plan shall constitute a finding that the Debtor does not waive, release or discharge, but rather retains and reserves any and all pre-petition Claims and any and all post-petition Claims that it could or might assert against any party or entity arising under or otherwise related to any state or federal statute, state or federal common law, and, any and all violations arising out of rights or claims provided for by Title 11 of the United States Code, by the Federal Rules of Bankruptcy Procedure, or by the Local Rules of this Court, including all Bankruptcy Causes Of Action and all rights to assert and pursue any and all avoidance actions, preference actions, and any other actions pursuant to, without limitation, 11 U.S.C. §§ 544, 545, 546, 547, 548, 549 and 550, except to the extent such avoidance actions, preference actions, or other actions were assigned to a creditor(s) as part of the Debtor's Plan.  Further, the Debtor retains its rights to assert and pursue all claims under 11 U.S.C. § 542, including without limitation actions to seek turnover of estate assets, actions to recover accounts receivable, and/or actions to invalidate setoffs.

H.     All objections to claims, fee applications and adversary proceedings will be filed with the Court within one hundred eighty (180) days of the Effective Date, unless such period is extended by order of the Court or agreement between the potential parties to such actions. Provided however, that any objections to any Proof of Claim that has already been timely filed and that asserts an administrative claim under 11 U.S.C. § 503(b)(9) shall be filed within 60 days of the Effective Date.

I.     <u>Injunction</u>.  From and after the Confirmation Date, all holders of "Claims" or "Equity Interests" (including, without limitation, Secured Claims, General Unsecured Claims, and all Priority Claims) against the Debtor or the Debtor-in-Possession are permanently restrained and enjoined (a) from commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim or Equity Interest against the Debtor, (b) from enforcing, attaching, collecting, or recovering by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or the property of the Debtor, (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtor, and

27

## EXHIBIT 1

(e) from performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; provided, however, that each holder of a contested Claim or Equity Interest may continue to prosecute its Proof of Claim in accordance with the Plan and all holders of Claims and Equity Interests shall be entitled to enforce their rights under the Plan. Notwithstanding the foregoing, (i) all rights and defenses to setoff under 11 U.S.C. § 553 shall be preserved and retained by the Debtor and any applicable creditors subject to the Bankruptcy Court's authority to adjudicate any disputes regarding the proper application of any setoff, and (ii) nothing herein shall be construed to in any way limit or prevent FNBO and/or LOLFC from pursuing non-debtor third-party obligors.

J.      Revocation of Plan.  The Debtor has reserved the right to revoke and withdraw this Plan before the entry of the Confirmation Order.  If the Debtor revokes or withdraws this Plan, or if confirmation of this Plan does not occur, then, with respect to the Debtor, this Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor, as the case may be, or any other person or to prejudice in any manner the rights of the Debtor or any other person, as the case may be,  in any further proceedings involving the Debtor.

K.      Authority of the Debtor.  The Debtor shall have the authority to implement any term or provision of this Plan.  To the extent that any right is granted to the Debtor under the Plan, then the Debtor shall have authority for so long as the corporation is in existence to carry out any and all acts necessary to fulfill the terms of the Plan.

L.      Exemption from Transfer Taxes.  Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, deeds, or bills of sale or assignments of personal property executed in connection with any of the transactions contemplated under the Plan, will not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.  All sale transactions consummated by the Debtor and approved by the Court on and after the Petition Date through and including the date of the final decree in this case, including, without limitation, the sale by the Debtor of owned property pursuant to Section 363(h) of the Bankruptcy Code and the assumption, assignment and sale by the Debtor of unexpired leases of non-residential Property pursuant to Section 365(a) of the Bankruptcy Code, will be deemed to have been made under, in furtherance of, or in connection with the Plan and, thus, will not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.  In addition, each of the relevant state or local governmental officials or agents will forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment consistent with the applicable provisions of this Plan.

M.      Refinance of Real Property and Distribution of Proceeds.  The Debtor reserves the right to seek to refinance any or all of the existing Claims secured by any property of the Debtor. The Debtor shall not be required to seek Court approval for any such refinancing.

28

## EXHIBIT 1

N.      <u>Determination of Secured Claims</u>.  No action independent from the confirmation of this Plan with the requisite notice and hearing, if necessary, shall be necessary to liquidate and determine the value and extent of the Secured Claims set forth herein, or to avoid any liens or security interests to be avoided hereunder and, absent objection, the confirmation of this Plan shall effect and constitute a waiver of any right to insist upon such determination and/or avoidance by adversary proceeding or any action other than the confirmation of this Plan.

O.      <u>Interest</u>.  All interest paid or payable under the Plan shall be paid in arrears.  All interest paid or payable under the Plan shall be simple interest.  Except as required by 11 U.S.C. § 506(b) or otherwise provided in the Plan, any interest provided to be paid under this Plan shall begin to accrue on the Effective Date.

P.      <u>Termination of Unsecured Creditors Committee</u>. The Official Committee of Unsecured Creditors shall be terminated and cease to exist as of the Effective Date of the Plan, and the role of its counsel shall be terminated as of the Effective Date of the Plan, except that the Committee may file and defend its pending and final fee applications.

Q.      <u>Formation of Post Confirmation Committee</u>.  From and after the Effective Date of the Plan, a Post Confirmation Committee ("PCC") shall be formed and continue to exist until final distribution to the General Unsecured Claims are paid pursuant to the Plan.  The PCC shall consist of no less than three (3) and no more than five (5) creditors holding Allowed General Unsecured Claims.  The PCC shall monitor the Debtor's compliance with the Plan and shall have standing to bring legal action for default against the Debtor in the event of failure to fulfill the provisions of the Plan with respect to General Unsecured Claims and to hire counsel of its choosing to represent it in any such a proceeding.  The PCC shall also have standing at any hearing related in any way to the sale of the Debtor's equity.  The Debtor shall not be liable for any fees or expenses of the PCC.  For notice purposes, the PCC shall file with the Court within thirty (30) days of the Effective Date of the Plan a list of its members and counsel, if any, along with contact information for each such party.

R.      Actions to avoid any transfer and/or obligation shall only be brought in the event that the Debtor and the PCC agree, with any disagreement to be resolved by the Bankruptcy Court. The foregoing sentence shall not apply after any conversion of this case to Chapter 7.

S.      <u>Copperhead Farms Lease</u>.  Copperhead Farms, LLC owns real estate in Randolph County which the Debtor uses as a farm to raise gilts ("Copperhead Farms").  The Debtor's equity security holders who are members of Copperhead will permit the Debtor to lease Copperhead Farms for 10 years after July 2022, with rent limited to payment of taxes, insurance, and repairs and maintenance only.  The Debtor shall have the right to renew the lease for additional 10-year periods after the initial 10-year period expires at fair market value.  This agreement to permit the Debtor to lease Copperhead Farms shall apply regardless of whether or not the Purvises are the prevailing bidder at any equity sale.  In consideration for this lease agreement, the Debtor waives any legal or equitable claims it has to the Copperhead property except for the right to lease the property as provided in the Plan and the existing lease.

T.      In consideration of the concessions and plan contributions provided by the Purvises

<u>EXHIBIT 1</u>

and LOLFC, the Purvis family and all of its members and LOLFC shall receive from the Debtor on behalf of itself and its bankruptcy estate a global release from any liability to the Bankruptcy Estate or the Debtor through the Confirmation Hearing.

## VI.  **SIMILAR TREATMENT FOR EACH CLAIM WITHIN A CLASS**

The Claims stated herein, by modification, Court Order, or other legally appropriate manner, might be modified throughout the course of payment under this Plan.  The Debtor, upon full payment as called for under any notes and deeds of trust, shall be entitled to have the notes marked paid and satisfied and the deeds of trust canceled as a matter of record, by the Trustee, or by appropriate application to this Court, and upon a showing that the full amount of the monthly payments were made by the Debtor.

## VII.  **PROVISIONS GOVERNING DISTRIBUTIONS**

A.      <u>Delivery of Distributions in General</u>.  Distributions to holders of Allowed Claims shall be made: (i) at the addresses set forth in the proofs of claim filed by such holders; (ii) at the addresses set forth in any written notices of address change submitted to the Court or Attorney for the Debtor after the date on which any related proof of claim was filed; or, if the information described in clauses (i) or (ii) is not available, (iii) at the addresses reflected in the Debtor's schedules of liabilities.

B.      <u>Distribution Dates</u>.  It is the intent of this Plan that the distribution shall occur as early as practicable following the Effective Date, unless otherwise stated herein.  Any distribution required to be made hereunder on a day other than a business day shall be made on the next succeeding business day.

C.      <u>Prepayment</u>.  The Debtor shall be authorized to prepay without penalty any amount or the entire amount of the remaining balance of any of the Claims under the confirmed Plan.

D.      <u>Setoff</u>.  The Debtor may, but shall not be required to, set-off any of the distributions to be made pursuant to the Plan, against the Claims, obligations, rights, causes of action and liabilities of any nature that the Debtor may hold against the holder of an Allowed Claim; provided, however, that neither the failure to effect such a set-off nor the allowance of any Claim hereunder shall constitute a waiver or release of any Claims, rights and/or causes of action that the Debtor has or may have against such holder.

E.      <u>De Minimis Distributions</u>.  The Debtor shall not be required to make any distribution of less than $50.00 to any holder of an Allowed Unsecured Claim.  Instead, the Debtor shall have the option of retaining such funds to be distributed to such Creditor at the time of the final distribution to be made to the class of Creditors containing such Claim.

F.      <u>No Distributions on Disputed Claims</u>.  Except as may be otherwise agreed with respect to any Disputed Claim, no distribution under this Plan shall be made with respect to any portion of a Disputed Claim until such Disputed Claim shall have become an Allowed Claim or settled by the Debtor.   Notwithstanding any date specified earlier in this Plan for the

30

## EXHIBIT 1

commencement of payments under this Plan on any particular Claim, if an objection to a Claim has been filed but not resolved at the time distribution on such Claim would otherwise commence if such Claim were an Allowed Claim, the first payment on such Claim under this Plan shall commence on the first day of the second month following the allowance of the Claim by Final Order, withdrawal of objection, or other resolution or compromise. If commencement of payments on any Claim are delayed under this Article, any payments subsequent to the first payment otherwise due under this Plan before the delayed commencement date shall, at the option of the Debtor in its sole discretion, be deferred to the end of the payment term and the payment term shall be extended so as to allow such payment to be made on the same periodic basis as the immediately preceding payments under the Plan.

G.     Application of Payments.  All payments made by the Debtor shall be applied as indicated in the respective treatment for each Creditor, or if no such application of payments is specified, then payments shall be applied to principal and interest on a monthly basis according to the amortization schedule proposed for each Creditor.  In the event that a Creditor is entitled to costs and/or attorneys' fees post-petition under § 506(b) of the Bankruptcy Code, such Creditor must file an application in accordance with the Bankruptcy Code and/or Bankruptcy Rules requesting the approval of costs and/or attorney fees and have such allowed by Final Order prior to such costs and/or attorneys' fees becoming part of the Creditor's Allowed Claim.  Confirmation of the Plan shall impose an affirmative duty and legal obligation on the holders and/or the servicers of any Claims secured by liens, mortgages and/or deeds of trust to apply payments in the manner set forth in the Plan in accordance with § 524(i) of the Bankruptcy Code.

H.     Payment into Trust of Distributions to General Unsecured Claims.  The Pro-Rata amount that the holders of General Unsecured Claims shall receive will not be determinable until all objections to General Unsecured Claims have been resolved and the Allowed amount of each Claim in that Class is known.  Accordingly, in the event that a distribution to General Unsecured Claims is to be made under this Plan before all objections to General Unsecured Claims have been resolved and the Allowed amount of each Claim in this Class is known, the cumulative amount of such distribution shall be paid into a trust account of counsel for the Debtor to be held in trust for the benefit of the Class of General Unsecured Claims and to be distributed to the holders of Allowed Claims in the Class upon determination of the Allowed amount of each Claim in the Class

## VIII.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     Assumption or Rejection of Executory Contracts and Leases. All executory contracts and unexpired leases of the Debtor shall be assumed or rejected in accordance with this Section, unless assumed or rejected by a separate order of the Court entered prior to the Confirmation Order.

B.     Executory Contracts and Leases to be Assumed. The Debtor shall file with the Court a Schedule of Executory Contracts and Unexpired Leases to be Assumed (including the proposed amount necessary to cure any default thereunder ("Proposed Cure Amount")) no later than thirty (30) days prior to the Confirmation Hearing, which schedule shall be served upon the affected parties in accordance with Bankruptcy Rules 6006 and 9014.  Any objection by a counterparty to an executory contract or unexpired lease to a proposed assumption or Proposed Cure Amount must be filed, served, and actually received by the Debtor no later than fourteen (14)

## EXHIBIT 1

days after the filing of the Schedule of Executory Contracts and Unexpired Leases to be Assumed. Any such objections will be scheduled to be heard by the Court at or prior to the Confirmation Hearing, unless resolved by the parties prior to that time. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or Proposed Cure Amount will be deemed to have assented to such assumption and Proposed Cure Amount. To the extent that any dispute regarding the assumption of an executory contract or unexpired lease is not consensually resolved by the parties or otherwise resolved prior to the Effective Date, such assumption will be deemed to occur retroactively to the date of the Confirmation Hearing if approved by the Bankruptcy Court.

Notwithstanding the foregoing, the Debtor shall assume any agreement for the renewal or the extension of any loan or funds, binding and in effect between the Debtor and any Secured Creditor or other entity on the Confirmation Date.

C.  Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. Any monetary defaults under each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to § 365(b)(l) of the Bankruptcy Code, by payment of the Proposed Cure Amount, or such other amount as may be determined by order of the Court, in cash within six (6) months of the Effective Date, subject to the limitation described below, or on such other terms as the parties to such executory contract or unexpired lease may otherwise agree. In the event of a dispute between the Debtor and a counterparty as to the assumption or Proposed Cure Amount as to any executory contract or unexpired lease that is not resolved between the parties by the Effective Date, any monetary defaults under such executory contract or unexpired lease involved in such unresolved dispute shall be satisfied, pursuant to § 365(b)(l) of the Bankruptcy Code, by payment of the Proposed Cure Amount, or such other amount as may be determined by order of the Court, within thirty (30) days of the entry of a Final Order resolving the dispute and approving the assumption, which Final Order or orders may, for the avoidance of doubt, be entered (and any related hearing may be held) after the Effective Date. The amount necessary to cure any default existing under any executory contract or lease to be assumed shall be deemed fully satisfied, released, and discharged upon payment by the Debtor of any one of the following: (1) the Proposed Cure Amount (if no objection to the Proposed Cure Amount is filed within the applicable objection period), (2) any amount agreed to by the Debtor and the applicable counterparty, or (3) any other amount as ordered by the Court.

D.  Executory Contracts and Leases to be Rejected. All executory contracts and unexpired leases existing as of the Petition Date between the Debtor and any entity, whether such contract be in writing or oral, that are not assumed by the terms of this Plan or which have not prior to the Confirmation Date been rejected or assumed by orders of the Court, are and shall be deemed to be specifically rejected upon confirmation of this Plan; provided, however, that this provision is not intended to reject and does not reject any agreement for the renewal or the extension of any loan or funds, presently binding and in effect between the Debtor and any Secured Creditor or other entity. All Claims arising from the rejection of any executory contract or unexpired lease shall be forever barred unless a proof of claim or request for allowance of claim for such is filed with the Court on or before the earlier of (i) any applicable claims bar date specified by the Court as to such rejection, or (ii) within 30 days after the Confirmation Date. Any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Court

32

## EXHIBIT 1

within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, the Estate, or its property without the need for any objection by the Debtor or further notice to, or action, order, or approval of the Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

E.        Treatment of Murphy-Brown Contracts.  Subject at all times to entry of a final, nonappealable order (the "Order") approving this Plan, each in a form satisfactory to the Debtor and Murphy-Brown LLC (an affiliate of Smithfield Foods) ("Murphy-Brown"), and notwithstanding the Schedule of Executory Contracts and Unexpired Leases to be Assumed and Notice of Proposed Cure Amounts filed by the Debtor, the following executory contracts of Murphy-Brown, and the claims between the Debtor and Murphy-Brown arising under and related to such contracts shall be treated as follows:

1.        The Debtor and Murphy-Brown are parties to the following executory contracts:

a.        Weaned Pig Supply and Purchase Agreement dated May 3, 2021 between the Debtor as seller and Murphy-Brown as buyer ("Weaned Pig Agreement"), the initial term of which is for 12 months subject to renewal for successive 6-month periods.  Pursuant to the Weaned Pig Agreement, and among other things, the Debtor shall sell to Murphy-Brown, and Murphy-Brown shall buy from the Debtor a "Required Quantity" of at least 95,940 weaned pigs per quarter, and Debtor's failure to fulfill 90% of the Required Quantity constitutes a default and subjects the Debtor to a $5 per head Deficiency Fee.

b.        Genetic Supply Agreement dated May 14, 2018 between Murphy-Brown as owner/licensor and the Debtor as licensee ("Genetic Agreement"), which is terminable by either party upon 120 days' notice or in the event of default(s) thereunder.  Pursuant to the Genetic Agreement, and among other things, Murphy-Brown agreed to sell to the Debtor for breeding purposes sows and boars with Smithfield genetics (and granted the Debtor a limited, non-exclusive, non-transferrable, and non-sublicensable right and license for such purpose) and the Debtor agreed to pay Murphy-Brown a royalty on each breeding boar or gilt purchased.  In addition, the Genetic Agreement provides that the Debtor is prohibited from selling live pigs to entities other than Smithfield affiliates and from breeding any pigs with Smithfield genetics with pigs without Smithfield genetics.  Murphy-Brown asserts that there is a pre-petition arrearage under the Genetic Agreement in the amount of $97,304.63.

2.        Subject at all times to entry of a final, nonappealable Order and Plan in forms satisfactory to the Debtor and Murphy-Brown, and as Debtor and Murphy-Brown have agreed, the agreements and the claims between the parties related to and arising thereunder shall be treated as follows:

a.        The Weaned Pig Agreement shall be modified to incorporate terms including the following, a copy of the modified agreement is attached hereto as Exhibit A (the "Amended Weaned Pig Agreement"), and the contract as modified shall be assumed by the Debtor:

## EXHIBIT 1

i.      The Required Quantity shall be reduced to 47,970, and Murphy-Brown shall be permitted to designate the farms from which the Debtor will provide weaned pigs, and the Debtor shall be relieved from the Required Quantity in the event of disease including PEDV.

b.      The Genetic Agreement shall be modified to incorporate terms including the following, a copy of the modified agreement is attached hereto as Exhibit B (the "Amended Genetic Agreement"), and the contract as modified shall be assumed by the Debtor:

i.      The term of the agreement shall be extended until the earlier of (i) November 1, 2023, or (ii) such time as the Debtor is able to repopulate its boar studs with non-Smithfield boars before that date;

ii.      The Debtor shall be allowed to produce and sell progeny produced from non-Smithfield sows and semen purchased from Smithfield or from pigs purchased from Smithfield to other buyers; and

iii.      As Smithfield and its affiliates have agreed to waive any and all Section 503(b)(9) and unsecured claims that such entities may have against the Debtor, the pre-petition arrears due under the Genetic Agreement are thereby and likewise waived.

c.      The Debtor shall be permitted to continue to buy medications through Ag ProVision (a Smithfield affiliate) on mutually acceptable terms.

d.      The Debtor on behalf of itself and its bankruptcy estate, and Murphy-Brown and its direct and indirect affiliates (collectively "Smithfield"), shall receive mutual and global releases of any and all other claims between the parties (the "Mutual Releases"). Provided however, contractual payments due between the parties and future obligations and performance under the Debtor's existing contracts with Smithfield (the Amended Genetic Agreement, the Amended Weaned Pig Agreement, a "Confidential Transportation Agreement" dated November 2, 2021, and a "Swine Nursery Agreement" dated November 5, 2021) shall continue unimpaired.

e.      The Amended Weaned Pig Agreement and the Amended Genetic Agreement have been executed and are effective on an interim basis as of March 1, 2022, and will become finally effective, if at all, upon the Effective Date of the Plan provided that the Bankruptcy Court approves the Mutual Releases as set forth herein or in form and substance satisfactory to the Smithfield Affiliates in their sole discretion, by May 2, 2022. The Mutual Releases shall be effectuated solely pursuant to the terms of this Section VIII E of the Plan as confirmed and shall be effective as of the Effective Date of the Plan.

f.      In exchange for the Smithfield entities being released per the terms of the Plan Modification, Smithfield will waive any and all Section 503(b)(9) and unsecured claims that such entities may have against the Debtor, and Smithfield will pay on the Effective Date $250,000 to the trust account of Debtor's counsel to be held in trust for the benefit of the Class of

34

## EXHIBIT 1

General Unsecured Claims, representing the approximate amount held by Smithfield as security deposits in full and final satisfaction thereof.

g.      The agreement of Murphy-Brown to these terms shall be evidenced by its delivery to Debtor's counsel of a ballot accepting the Plan conditioned on the incorporation into the Plan of this treatment.

Partial consideration for the global releases are the following substantial and valuable concessions and agreements by Murphy-Brown to:  (i) substantially reduce the Required Quantity under the Weaned Pig Agreement which shall allow the Debtor to sell weaned pigs to other buyers potentially at prices in excess of the Purchase Price cap of $44 per weaned pig; (ii) reduce the Required Quantity under the Weaned Pig Agreement on account of disease which will enable the Debtor to avoid Deficiency Fees which might otherwise result from disease; (iii) release the Debtor from the terms of the Genetic Agreement that prohibit the Debtor from selling progeny produced from Smithfield genetics to other buyers which shall allow the Debtor to sell weaned pigs to other buyers potentially at prices in excess of the Purchase Price cap of $44 per weaned pig; (iv) extend the term of the Genetic Agreement which will permit the Debtor continue to produce weaned pigs from boars obtained from Smithfield as it transitions its boar herd to other sources; and (v) permit the Debtor to buy medications through Ag ProVision on mutually acceptable terms which will ensure continuity of supply and favorable price for necessary medications.  It appears to the Debtor that Murphy-Brown's release of the Debtor shall include a release of the pre-petition general unsecured (non-priority) claims of Murphy-Brown and Smithfield against the Debtor which total approximately $735,087.16 according to Murphy-Brown's Proof of Claim # 69.

### IX.  POST-CONFIRMATION MANAGEMENT & EMPLOYMENT

On August 17, 2021, the Court entered a Final Order Authorizing Employment of NutriQuest Business Solutions, LLC and Designation of Steve Weiss as Chief Restructuring Officer for the Debtor [DE 291].  Pursuant to that order, NutriQuest Business Solutions, LLC and Mr. Steve Weiss of that firm were employed as Chief Restructuring Officer for the Debtor (together the "CRO") with authority to manage the affairs of the Debtor during this Chapter 11 case.

On behalf of the Debtor and as part of its restructuring, the CRO intends to conduct a search for and retain a qualified general manager or management company to manage the affairs of the Debtor and oversee the Debtor's reorganization on a long-term basis post-confirmation.  The CRO will continue managing the affairs of the Debtor until such general manager or management company is located and retained.

Pursuant to 11 U.S.C. § 1129(a)(5)(B), the following insiders are currently "at-will" employees of the Debtor, and their employment is and shall continue to be subject to the discretion of the CRO and the successor general manager or management company once that position is filled: Anthony Moore, Kelly Lambert, Brad Purvis, and Jerry M. Purvis, Jr.

## EXHIBIT 1

### X.  RELEASE OF TITLE TO PROPERTY

A.        Vehicles.  Upon the satisfaction or other discharge of a Secured Claim as to or a security interest in a motor vehicle, mobile home, or in any other Property of the Debtor for which the certificate of title is in the possession of the secured party, the secured party shall, within 10 days after demand and, in any event, within 30 days of receipt of the payment in full of such Secured Claim pursuant to the Plan, execute a release of its security interest on such title or certificate in the space provided therefore on the certificate or as the Division of Motor Vehicles prescribes, and mail or deliver the certificate and release to the Debtor.  Confirmation of this Plan shall impose an affirmative and direct duty on each such secured party to comply with this provision.  This provision may be enforced in a proceeding filed before the Bankruptcy Court and each Creditor consents to such jurisdiction by failure to file any timely objection to this Plan that is sustained by the Bankruptcy Court.  Such an enforcement proceeding may be filed by the Debtor in this case either before or after the closing of this case.  The Debtor specifically reserves the right to file a motion to reopen this case under § 350 to pursue the rights and claims provided for herein.

B.        Real Property.  Pursuant to N.C.G.S. § 45-36.9, upon the satisfaction or other discharge of a Secured Claim as to or a security interest in real property for which a Creditor holds a properly secured mortgage or deed of trust, the secured party shall, within 30 days after demand or within thirty 30 days of payment in full of the Secured Claim pursuant to the Plan, submit for recording with the Office of the Register of Deeds for the applicable County a satisfaction of its security interest and mail or deliver the recorded satisfaction document or documents to the Debtor. The failure of any such party to comply with this section shall result in the imposition of statutory damages of $1,000.00, actual damages, costs and legal fees as provided for by Section 45-36.9(c) of the N.C. General Statutes.  Confirmation of this Plan shall impose an affirmative and direct duty on each such secured party to comply with this provision.  This provision may be enforced in a proceeding filed before the Bankruptcy Court and each such Creditor consents to such jurisdiction by failure to file any timely objection to this Plan that is sustained by the Bankruptcy Court.  Such an enforcement proceeding may be filed by the Debtor in this case either before or after the closing of this case.  The Debtor specifically reserves the right to file a motion to reopen this case under § 350 to pursue the rights and claims provided for herein including all remedies for damages and attorney fees under applicable State and Federal statutes.

### XI. ACCEPTANCE OR REJECTION OF PLAN;
### EFFECT OF REJECTION BY AN IMPAIRED CLASS

A.        Each Impaired Class Entitled to Vote Separately.  Each Impaired Class of Claims shall be entitled to have the holders of Claims therein vote separately as a Class to accept or reject the Plan.

B.        Acceptance by a Class of Creditors.  Consistent with § 1126(c) of the Bankruptcy Code, and except as provided in § 1126(e) of the Bankruptcy Code, a Class of Claims shall have accepted the Plan if the Plan is accepted by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of that Class that have timely and properly voted to accept or reject the Plan.

## EXHIBIT 1

C.    Claimants Entitled to Vote.  Holders of Impaired Claims shall be entitled to vote if:

1.    Such Claim has been filed against the Debtor in a liquidated amount or has been listed on the Debtor's schedules other than as contingent, unliquidated or disputed, and as to which no proof of claim has been filed, in which cases the Claim shall be allowed solely for the purpose of voting on the Plan in the amount for which such Claim has been filed or listed on the Debtor's schedules;

2.    Such Claim has been filed against the Debtor or listed on the Debtor's schedules and is the subject of an existing objection filed by the Debtor, and is temporarily allowed for voting purposes by order of the Court in accordance with Bankruptcy Rule 3018; or

3.    Such Claim has been filed in an undetermined amount, in which case the creditor shall not be entitled to vote unless the Debtor and the holder of the Claim agree on an amount for voting purposes or the Court enters an order setting the amount of the Claim that the creditor may ballot.

Any entity holding two or more duplicate Claims shall be entitled to vote only one Claim.

D.    Confirmation Hearing.  The Court will set a hearing on the confirmation of the Plan to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied.

E.    Acceptances Necessary to Confirm the Plan.  At the hearing of confirmation of the Plan, the Court shall determine, among other things, whether the Plan has been accepted by each Impaired Class.  Under § 1126 of the Bankruptcy Code, an Impaired Class of Creditors is deemed to accept the Plan if at least two-thirds (2/3) in amount and more than one-half (1/2) in number vote to accept the Plan.  Further, unless there is unanimous acceptance of the Plan by an Impaired Class, the Court must also determine that Class members will receive property with a value, as of the Effective Date of the Plan, that is not less than the amount that such Class member would receive or retain if the Debtor were liquidated as of the Effective Date of the Plan under Chapter 7 of the Bankruptcy Code.

F.    Confirmation of Plan Without Necessary Acceptances.  The Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted by all Impaired Classes.  In order to be confirmed without the requisite number of acceptances of each Impaired Class, the Court must find that at least one Impaired Class has accepted the Plan without regard to the acceptances of insiders, and the Plan does not discriminate unfairly against, and is otherwise fair and equitable, to each non-accepting Impaired Class.  In the event that any Class votes against the plan, the Debtor hereby requests and moves the Court under the provisions of this Plan outlined in Section XII herein, for confirmation pursuant to the "cramdown" provisions of § 1129(b) of the Bankruptcy Code.  In connection therewith, the Debtor shall be allowed to modify the proposed treatment of the Allowed Claims in any Class that votes against the Plan consistent with § 1129(b)(2)(A).

## <u>EXHIBIT 1</u>

### XII.  <u>"CRAMDOWN" FOR IMPAIRED CREDITORS</u><br><u>NOT ACCEPTING THE PLAN</u>

In respect to any Class of creditors Impaired but not accepting the Plan by the requisite majority in number or two-thirds in amount, the proponent of this Plan requests the Court to find that the Plan does not discriminate unfairly and is fair and equitable in respect to each Class of Claims and Equity Interests that are Impaired under the Plan and that the Court confirm the Plan without such acceptances by the said Impaired Classes.  The Debtor will also request that the Court establish a value for any assets, the value of which is in dispute between the Debtor and any secured creditor, at a valuation hearing under Section 506 of the Bankruptcy Code, to be scheduled at the same time as the hearing on confirmation of the Plan.

### XIII.  <u>RETENTION OF JURISDICTION</u>

The Court shall retain jurisdiction of these proceedings pursuant to and for the purposes of Sections 105(a) and 1127 of the Bankruptcy Code and for, without limitation, the following purposes, <u>inter</u> <u>alia</u>:

A.      to determine any and all objections to the allowance of Claims and/or Equity Interests;

B.      to determine any and all applications for allowance of compensation for periods prior to or after the Confirmation Date;

C.      to determine any and all applications pending on the Confirmation Date for the rejection and disaffirmance or assumption or assignment of executory contracts and unexpired leases and the allowance of any Claim resulting therefrom;

D.      to determine all controversies and disputes arising under or in connection with the Plan;

E.      to determine all applications, adversary proceedings and litigated matters pending on the Confirmation Date or permitted to be filed or commenced pursuant to this Plan;

F.      to effectuate payments under, and performance of, the provisions of the Plan, including, but not limited to, future sales of personal and real property retained by the Estate;

G.      to determine such other matters and for such other purposes as may be provided for in the Confirmation Order;

H.      to determine all disputes regarding property of the estate;

I.      to establish and adjust procedures for the orderly administration of the estate;

J.      to determine matters that are subject to proceedings duly removed to the Court;

<u>EXHIBIT 1</u>

K. to interpret and enforce the Plan and to determine compliance with the terms of the confirmed Plan;

L. to correct any defect or omission, or to reconcile any inconsistency in this Plan or the order of confirmation as may be necessary to carry out the purposes and intent of this Plan; and

M. to modify this Plan after confirmation; and

N. to replace the Debtor-in-Possession with a Trustee for good cause shown.

## XIV. <u>MISCELLANEOUS PROVISIONS</u>

A. <u>Survival of Terms</u>.  The covenants, representations and agreements made in this Plan shall survive the Confirmation Date and the transactions contemplated herein.

B. <u>Successors Bound</u>.  This Plan shall on the Confirmation Date be binding upon and inure to the benefit of the respective heirs, successors and assigns of the Debtor, and the holders of Claims and Equity Interests.

C. <u>Controlling Law</u>.  This Plan shall be read and construed and take effect in all respects in accordance with the law as set forth in the United States Bankruptcy Code and the Rules promulgated thereunder. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of North Carolina, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control),  In addition, corporate governance matters relating to the Debtor and/or the Reorganized Debtor, shall be governed by the laws of the State of North Carolina, in which the Debtor was incorporated.

D. <u>Further Assurance</u>.  If at any time, the Debtor shall consider, or be advised, that any further releases, assurances or documents are reasonably necessary or desirable to carry out the provisions hereof, and the transactions contemplated herein, the holders of Claims and the holders of Equity Interests shall, upon reasonable request, execute and deliver any and all documents and assurances, and do all things necessary or appropriate to carry out fully the provisions hereof.

(this space intentionally left blank)

## EXHIBIT 1

Respectfully submitted, this the 6th day of April, 2022.

s/Jason L. Hendren
JASON L. HENDREN
N.C. State Bar #26869
REBECCA F. REDWINE
N.C. State Bar #37012
BENJAMIN E.F.B. WALLER
N.C. State Bar #27680

HENDREN,        REDWINE        &
MALONE, PLLC
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone:  (919) 573-1422
Facsimile:  (919) 420-0475
Email:
jhendren@hendrenmalone.com
rredwine@hendrenmalone.com
bwaller@hendrenmalone.com

CO-COUNSEL FOR THE DEBTOR

s/Algernon L. Butler, III
ALGERNON L. BUTLER, III
N.C. State Bar # 20881

BUTLER & BUTLER, LLP
111 N. 5th Avenue
Wilmington, NC 28401
Telephone: (910) 762-1908
Facsimile:  (910) 762-9441
Email: albutleriii@butlerbutler.com

CO-COUNSEL        FOR        THE
DEBTOR

N. G. PURVIS FARMS, INC.

s/ Steve Weiss
Chief Restructuring Officer

40

# EXHIBIT A

**FIRST AMENDMENT TO WEANED PIG SUPPLY AND PURCHASE AGREEMENT**

This First Amendment to Weaned Pig Supply and Purchase Agreement (the "Amendment"), dated as of February 25, 2022, is made by and between **MURPHY-BROWN LLC** ("Buyer") and **N. G. PURVIS FARMS, INC.** ("Seller" or "Debtor," and together with Buyer, the "Parties").

RECITALS:

WHEREAS, Seller and Buyer are parties to a Weaned Pig Supply and Purchase Agreement dated May 3, 2021 (the "Agreement" or "Weaned Pig Agreement"); and

WHEREAS, the parties desire to amend the Agreement as set forth herein;

NOW THEREFORE, in consideration of the terms, conditions, and covenants set forth herein, Seller and Buyer agree as follows:

1. The first sentence of Section 3 of the Agreement is amended to delete the number "95,940" and substitute in lieu thereof the number "47,970".

2. Section 3 of the Agreement is amended to include the following additional sentence: "Upon inception of this Amendment, Buyer shall designate Green Acres, P&F, Cognac, and Tar Heel as the farms from which Buyer will purchase the Weaned Pigs. Thereafter, Buyer shall have the right, upon advance reasonable notice to Seller of at least 10 business days, to designate (no more than once every 30 days) different farms from which Buyer will purchase the Weaned Pigs."

3. Section 14 of the Agreement is amended to include the following additional sentence: "In the event that a PEDv, PRRS, or foreign animal disease outbreak in Seller's herd, despite Seller's compliance with Section 11, prevents Seller from supplying the entire Required Quantity during a calendar quarter, no Deficiency Fee will be due from Seller to Buyer to the extent that such deficiency was a result of the PEDv, PRRS, or foreign animal disease outbreak; notwithstanding the foregoing, in the event that Seller's Weaned Pigs are allocated among Seller customers as a result of a disease outbreak in Seller's herd, Weaned Pigs will first be allocated entirely to Buyer up to the Required Quantity."

4. This Amendment is subject to the following provisions regarding its effective date:

   a.   Background: The parties also are parties to a Genetic Supply Agreement dated as of May 14, 2018 (the "Genetic Agreement") which they have agreed to amend pursuant to a "First Amendment to Genetic Supply Agreement." On May 6, 2021, Debtor filed with the U.S. Bankruptcy Court for the Eastern District of North Carolina ("Bankruptcy Court") a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, on September 3, 2021 Debtor filed with the Bankruptcy Court a Chapter 11 Plan of Reorganization, and on December 1, 2021 Debtor filed with the Bankruptcy Court Debtor's Second Modification to Plan of Reorganization which among other things proposed certain treatment for Buyer

1

# EXHIBIT A

and the Weaned Pig Agreement and Genetic Supply Agreement under the Debtor's Chapter 11 plan. The Debtor intends to file with the Bankruptcy Courta "Fourth Modification to Plan of Reorganization," the terms of which have been agreed to by the Parties, and this Amendment is entered into in connection with that Fourth Modification to Plan of Reorganization and the First Amendment to Genetic Supply Agreement.

b.  This Amendment and the First Amendment to Genetic Supply Agreement shall be effective on an interim basis as of March 1, 2022 ("Interim Effective Date"), and will become finally effective, if at all, pursuant and subject to the following terms and conditions:

   i.  Beginning on the Interim Effective Date and continuing through the earlier of May 2, 2022 or the Effective Date of the Debtor's Chapter 11 Plan, the Debtor shall segregate and escrow the amount of proceeds received from the sale of weaner pigs (excepting those purchased by SPG or any of its affiliates), to the extent that such proceeds are in excess of the "Purchase Price" for such weaned pigs under the Weaned Pig Agreement in the absence of this Amendment ("Escrowed Funds").

   ii.  The Escrowed Funds shall not be or become property of the Debtor's bankruptcy estate, and shall not be subject to any liens against any property of the Debtor, except as provided in Paragraph 4.b.iv below.  LOL Finance Co. which holds a security interest in the Debtor's weaned pigs and their proceeds, has signed this Amendment in order to acknowledge the provisions of this Paragraph 4.b.ii.

   iii.  Provided that the Bankruptcy Court confirms the Debtor's Chapter 11 plan and approves this Amendment, approves the First Amendment to Genetic Supply Agreement, and approves the mutual releases provided for the Debtor and the Smithfield Affiliates as provided in the Debtor's Fourth Modification to Plan of Reorganization or in form and substance satisfactory to the Smithfield Affiliates in their sole discretion, by May 2, 2022, this Amendment and the First Amendment to Genetic Supply Agreement shall be effective on a final, rather than an interim, basis as of the Effective Dateof the Debtor's Chapter 11 Plan.

   iv.  Furthermore, provided that the Bankruptcy Court confirms the Debtor's Chapter 11 plan and approves this Amendment, approves the First Amendment to Genetic Supply Agreement, and approves the mutual releases provided for the Debtor and the Smithfield Affiliates as provided in the Debtor's Fourth Modification to Plan of Reorganization or in form and substance satisfactory to the Smithfield Affiliates in their sole discretion, by May 2, 2022, the Escrowed Funds shall become property of the Debtor's bankruptcy estate as of the Effective Date of the Debtor's Chapter 11 Plan and shall be released to the Debtor (subject to any valid lien of LOL FinanceCo. and the provisions of the Debtor's Chapter 11 plan) and

2

# EXHIBIT A

neither Murphy-Brown, LLC nor any of the Smithfield Affiliates shall have any interest therein.

v.   If the Bankruptcy Court does not confirm the Debtor's Chapter 11 plan and approve this Amendment, approve the First Amendment to Genetic Supply Agreement, and approve mutual releases provided for the Debtor and the Smithfield Affiliates as provided in the Debtor's Fourth Modification to Plan of Reorganization or in form and substance satisfactory to the Smithfield Affiliates in their sole discretion, by May 2, 2022, the Escrowed Funds shall not be or become property of the Debtor's bankruptcy estate, shall not be subject to any liens against any property of the Debtor, and shall be releasedto Smithfield and the Debtor shall have no interest therein.

vi.   Furthermore, in the event that the Bankruptcy Court does not confirm the Debtor's Chapter 11 plan and approve this Amendment, approve the First Amendment to Weaned Pig Agreement, and approve mutual releases provided for the Debtor and the Smithfield Affiliates as provided in the Debtor's Fourth Modification to Plan of Reorganization or in form and substance satisfactory to the Smithfield Affiliates in their sole discretion, by May 2, 2022, this Amendment and the First Amendment to Weaned Pig Agreement shallterminate.  Provided however, that the provisions of this Paragraph 4 of thisAmendment shall survive such termination.

5.   Except as specifically amended in this Amendment, all terms, provisions, and conditions of the Agreement remain in full force and effect and apply to this Amendment.

EXECUTED as of the date first written above.

**MURPHY-BROWN LLC**

By: _John Sargent_
Name: John Sargent
Its: Executive Vice President, US Hog Operations

**N. G. PURVIS FARMS, INC.**

By: _____
Name: Steve Wais
Its: CRO

IN ACKNOWLEDGEMENT of Paragraph 4.b.ii:

**LOL FINANCE CO.**

By:_____
Name:_____
Its: _____

3

# EXHIBIT A

neither Murphy-Brown, LLC nor any of the Smithfield Affiliates shall have any interest therein.

v.   If the Bankruptcy Court does not confirm the Debtor's Chapter 11 plan and approve this Amendment, approve the First Amendment to Genetic Supply Agreement, and approve mutual releases provided for the Debtor and the Smithfield Affiliates as provided in the Debtor's Fourth Modification to Plan of Reorganization or in form and substance satisfactory to the Smithfield Affiliates in their sole discretion, by May 2, 2022, the Escrowed Funds shall not be or become property of the Debtor's bankruptcy estate, shall not be subject to any liens against any property of the Debtor, and shall be released to Smithfield and the Debtor shall have no interest therein.

vi.   Furthermore, in the event that the Bankruptcy Court does not confirm the Debtor's Chapter 11 plan and approve this Amendment, approve the First Amendment to Weaned Pig Agreement, and approve mutual releases provided for the Debtor and the Smithfield Affiliates as provided in the Debtor's Fourth Modification to Plan of Reorganization or in form and substance satisfactory to the Smithfield Affiliates in their sole discretion, by May 2, 2022, this Amendment and the First Amendment to Weaned Pig Agreement shall terminate.  Provided however, that the provisions of this Paragraph 4 of this Amendment shall survive such termination.

5.   Except as specifically amended in this Amendment, all terms, provisions, and conditions of the Agreement remain in full force and effect and apply to this Amendment.

EXECUTED as of the date first written above.

**MURPHY-BROWN LLC**

By: _John Sargent_
Name: _John Sargent_
Its: _Executive Vice President, US Hog Operations_

**N. G. PURVIS FARMS, INC.**

By: _____
Name: _____
Its: _____

IN ACKNOWLEDGEMENT of Paragraph 4.b.ii:

**LOL FINANCE CO.**

By: _____
Name: _____ LAN GUENKE
Its: _CEO_

3

# EXHIBIT B

**FIRST AMENDMENT TO GENETIC SUPPLY AGREEMENT**

This First Amendment to Genetic Supply Agreement (the "Amendment"), dated as of February 25, 2022, is made by and between **MURPHY-BROWN LLC d/b/a SMITHFIELD PREMIUM GENETICS** ("SPG") and **N. G. PURVIS FARMS, INC.** ("Licensee" or "Debtor," and together with SPG, the "Parties").

RECITALS:

WHEREAS, SPG and Licensee are parties to a Genetic Supply Agreement dated as of May 14, 2018 (the "Agreement" or "Genetic Supply Agreement"); and

WHEREAS, the Parties desire to amend the Agreement as set forth herein, subject to the provisions of Paragraph 12 below;

NOW THEREFORE, in consideration of the terms, conditions, and covenants set forth herein, SPG and Licensee agree as follows:

1. Section 2 of the Agreement is amended to delete the final sentence and add the following sentence at the end of the section: "Licensee may only market or sell live pigs having the Genetics to (i) Smithfield Foods, Inc. or its designated Affiliates or (ii) third parties who will solely raise the pigs for slaughter for human consumption and in no event breed the pigs."

2. Section 13(a)(i) of the Agreement is deleted in its entirety.

3. Section 13(a)(ii) of the Agreement is deleted in its entirety.

4. Section 13(a)(iii) of the Agreement is deleted in its entirety and amended to read as follows: "not breed pigs having the Genetics with pigs not having the Genetics except for sale to Smithfield Foods, Inc. or its designated Affiliates or to third parties solely for slaughter for human consumption."

5. The last sentence of Section 14 of the Agreement is deleted in its entirety and amended to read as follows: "Any other mating of pigs with the Genetics by Licensee is prohibited, except for sale to Smithfield Foods, Inc. or its designated Affiliates or to third parties solely for slaughter for human consumption."

6. Section 15 of the Agreement is deleted in its entirety and amended to read as follows: "**REPORTS.** Quarterly, and additionally from time to time at the reasonable request of SPG, Licensee must supply to SPG all reports and other information reasonably requested by SPG relating to the genetic qualities and the breeding and transfer of pigs which are the subject of this Agreement, specifically including all veterinary reports on any Daughter Nucleus Herd, Multiplication Herds, Commercial Herds containing pigs with the Genetics, and AI boars. Licensee must carry out such tests as are necessary for the purpose of supplying such reports and information."

1

# EXHIBIT B

7.  Section 17(a) of the Agreement is deleted in its entirety and amended to read as follows: "any live pigs from a Daughter Nucleus Herd, Multiplication Herd, Boar Stud, or any Commercial Herd to any Unrelated Party except to third parties who will solelyslaughter them for human consumption and in no event breed the pigs."

8.  Section 17(c) of the Agreement is deleted in its entirety and amended to read as follows: "any pig supplied by SPG, or the progeny thereof, except to (i) Smithfield Foods, Inc. or its designated Affiliates or (ii) third parties who will solely raise the pigs for slaughter for human consumption and in no event breed the pigs."

9.  Section 17 is amended to include the following sentence at the end of the section: "In the event Licensee sells pigs having the Genetics to a third party (which may occur solely in accordance with Section 17(c)), Licensee will be responsible, and liable, for ensuring the third party buyer's compliance with the restrictions set forth in this Agreement on the use and transfer of the System and pigs having the Genetics."

10. Section 29 of the Agreement is deleted in its entirety and amended to read as follows: "TERM. This Agreement is effective as of the Commencement Date and will continue until the earlier of (i) Licensee's written notification to SPG that Licensee no longer requires any pigs having the Genetics or other genetic materials from SPG, and (ii) November 1, 2023."

11. A new Section 49 is added to the Agreement to read as follows: "As of the date of this Amendment, SPG and Licensee acknowledge that Licensee does not have a "Daughter Nucleus Herd," any "Great Grandparent Stock" or "Grandparent Stock," a "Multiplication Herd," or any "Multiplication Premises," such that the provisions in the Agreement specifically relative to those terms are not applicable."

12. This Amendment is subject to the following provisions regarding its effective date:

    a.  Background: The parties also are parties to a Weaned Pig Supply and Purchase Agreement dated May 3, 2021 (the "Weaned Pig Agreement") which they have agreed to amend pursuant to a "First Amendment to Weaned Pig Agreement." On May 6, 2021, Debtor filed with the U.S. Bankruptcy Court for the Eastern District of North Carolina ("Bankruptcy Court") a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, on September 3, 2021 Debtor filed with the Bankruptcy Court a Chapter 11 Plan of Reorganization, and on December 1, 2021 Debtor filed with the Bankruptcy Court Debtor's Second Modification to Plan of Reorganization which among other things proposed certain treatment for SPG and the Weaned Pig Agreement and Genetic Supply Agreement under the Debtor's Chapter 11 plan. The Debtor intends to file with the Bankruptcy Court a "Fourth Modification to Plan of Reorganization," the terms of which have been agreed to by the Parties, and this Amendment is entered into in connection with that Fourth Modification to Plan of Reorganization and the First Amendment to Weaned Pig Agreement.

2

# EXHIBIT B

b. This Amendment and the First Amendment to Weaned Pig Agreement shall be effective on an interim basis as of March 1, 2022 ("Interim Effective Date"), and will become finally effective, if at all, pursuant and subject to the following terms and conditions:

    i. Beginning on the Interim Effective Date and continuing through the earlier of May 2, 2022 or the Effective Date of the Debtor's Chapter 11 Plan, the Debtor shall segregate and escrow the amount of proceeds received from the sale of weaner pigs (excepting those purchased by SPG or any of its affiliates), to the extent that such proceeds are in excess of the "Purchase Price" for such weaned pigs under the Weaned Pig Agreement in the absence of the First Amendment to Weaned Pig Agreement ("Escrowed Funds").

    ii. The Escrowed Funds shall not be or become property of the Debtor's bankruptcy estate, and shall not be subject to any liens against any property of the Debtor, except as provided in Paragraph 12.b.iv below. LOL Finance Co. which holds a security interest in the Debtor's weaned pigs and their proceeds, has signed this Amendment in order to acknowledge the provisions of this Paragraph 12.b.ii.

    iii. Provided that the Bankruptcy Court confirms the Debtor's Chapter 11 plan and approves this Amendment, approves the First Amendment to Weaned Pig Agreement, and approves the mutual releases provided for the Debtor and the Smithfield Affiliates as provided in the Debtor's Fourth Modification to Plan of Reorganization or in form and substance satisfactory to the Smithfield Affiliates in their sole discretion, by May 2, 2022, this Amendment and the First Amendment to Weaned Pig Agreement shall be effective on a final, rather than an interim, basis as of the Effective Date of the Debtor's Chapter 11 Plan.

    iv. Furthermore, provided that the Bankruptcy Court confirms the Debtor's Chapter 11 plan and approves this Amendment, approves the First Amendment to Weaned Pig Agreement, and approves the mutual releases provided for the Debtor and the Smithfield Affiliates as provided in the Debtor's Fourth Modification to Plan of Reorganization or in form and substance satisfactory to the Smithfield Affiliates in their sole discretion, by May 2, 2022, the Escrowed Funds shall become property of the Debtor's bankruptcy estate as of the Effective Date of the Debtor's Chapter 11 Plan and shall be released to the Debtor (subject to any valid lien of LOL Finance Co. and the provisions of the Debtor's Chapter 11 plan) and neither Murphy-Brown, LLC nor any of the Smithfield Affiliates shall have any interest therein.

    v. If the Bankruptcy Court does not confirm the Debtor's Chapter 11 plan and approve this Amendment, approve the First Amendment to Weaned Pig Agreement, and approve mutual releases provided for the Debtor and the

3

# EXHIBIT B

Smithfield Affiliates as provided in the Debtor's Fourth Modification to Plan of Reorganization or in form and substance satisfactory to the Smithfield Affiliates in their sole discretion, by May 2, 2022, the Escrowed Funds shall not be or become property of the Debtor's bankruptcy estate, shall not be subject to any liens against any property of the Debtor, and shall be released to Smithfield and the Debtor shall have no interest therein.

vi. Furthermore, in the event that the Bankruptcy Court does not confirm the Debtor's Chapter 11 plan and approve this Amendment, approve the First Amendment to Weaned Pig Agreement, and approve mutual releases provided for the Debtor and the Smithfield Affiliates as provided in the Debtor's Fourth Modification to Plan of Reorganization or in form and substance satisfactory to the Smithfield Affiliates in their sole discretion, by May 2, 2022, this Amendment and the First Amendment to Weaned Pig Agreement shall terminate. Provided however, that the provisions of this Paragraph 12 of this Amendment shall survive such termination.

13. Except as specifically amended in this Amendment, all terms, provisions, and conditions of the Agreement remain in full force and effect and apply to this Amendment.

[*Signature page follows.*]

4

# EXHIBIT B

EXECUTED as of the date first written above.

**MURPHY-BROWN LLC**

By: _John Sargent_

Name: _John Sargent_

Its: _Executive Vice President, US Hog Operations_

**N. G. PURVIS FARMS, INC.**

By: _____

Name: _Steve Weiss_

Its: _CRO_

IN ACKNOWLEDGEMENT of Paragraph 12.b.ii:

**LOL FINANCE CO.**

By: _____

Name: _____

Its: _____

5

# EXHIBIT B

EXECUTED as of the date first written above.

**MURPHY-BROWN LLC**

By: *John Sargent*

Name: John Sargent

Its: Executive Vice President, US Hog Operations

**N. G. PURVIS FARMS, INC.**

By: _____

Name: _____

Its: _____

IN ACKNOWLEDGEMENT of Paragraph 12.b.ii:

**LOL FINANCE CO.**

By: _____

Name: DAN GLIRUKE

Its: CEO

5